UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

JOSHUA MALAVE-SYKES,

                              Plaintiff,

                                                            3:24-CV-1358
v.                                                          (GTS/ML)

GEODIS SCO USA LLC,

                              Defendant.

_____

APPEARANCES:                                      OF COUNSEL:

JOSHUA MALAVE-SYKES
  Plaintiff, *Pro Se*
15 Delaware Avenue, Apt #245
Endicott, New York 13760

FISHER & PHILLIPS                                 PHILLIP BAUKNIGHT, ESQ.
  Counsel for the Defendant
400 Connell Drive, Suite 4000
Berkeley Heights, New Jersey 07922

MIROSLAV LOVRIC, United States Magistrate Judge

## <u>ORDER and REPORT-RECOMMENDATION</u>

The Clerk has sent a complaint in the above captioned action with an amended motion for

leave to proceed *in forma pauperis* ("IFP") filed by *pro se* plaintiff Joshua Malave-Sykes

("Plaintiff") to the Court for review.  (Dkt. Nos. 1, 7.)  For the reasons discussed below, I (1)

grant Plaintiff's amended IFP application (Dkt. No. 7), and (2) recommend that Plaintiff's

Complaint (Dkt. No. 1) be dismissed in its entirety with leave to amend.

I.    **BACKGROUND**

On November 7, 2024, Plaintiff commenced this action by filing a *pro se* Complaint against Defendant alleging violations of Title VII of the Civil Rights Act of 1964 and the Americans with Disabilities Act of 1990 ("ADA").  (Dkt. No. 1.)

More specifically, the Complaint alleges that Defendant discriminated against Plaintiff—a Black disabled man[1]—by wrongfully terminating Plaintiff's employment "based on [the] hearsay false accusation of two (2) female co-workers" that the females felt uncomfortable around Plaintiff.  (Dkt. No. 1 at 1.)  Plaintiff alleges that the two female coworkers made the false allegations because Plaintiff put them on notice that their performance was substandard.  (Dkt. No. 1 at 2.)  Plaintiff alleges that he was in good standing, had been training for a new position with Defendant before the allegations, and Defendant "demonstrated pure malice and petty vindictiveness in refusing to provide [P]laintiff with his legal[ly] entitled letter of Termination as afforded by New York State Department of Labor laws."  (Dkt. No. 1 at 4.)

Plaintiff alleges that Defendant allowed "prevalent drug usage daily on the premises and many outstanding OSHA violations" which endangered Plaintiff, so he made a report to the Occupational Safety and Health Administration ("OSHA") dated March 27, 2023.  (Dkt. No. 1 at 5.)

Plaintiff alleges that because he

> received excellent job performance evaluations . . . it can only be rational analyzed the company has discriminated against plaintiff on the basis of his race, gender and disability and taking on face value the baseless false accusations of the 2 female co-workers and failing to acknowledge plaintiff emphatically excellent work ethic and good conduct standing spotless disciplinary records to adhere to these 2 disgruntle female co-workers.

---

[1]    Plaintiff alleges that he is disabled "based on symptoms of depression and speech impairment."  (Dkt. No. 1 at 2.)

(Dkt. No. 1 at 6 [errors in original].)  Plaintiff alleges that Defendant threatened to fire any employee who engaged in contact or communication with Plaintiff, which demonstrated "retaliatory tactics and the fostering of a hostile work environment."  (Dkt. No. 1 at 7.)

The Complaint alleges that another employee, Todd Scmherorn who is a white man, was also fired after being falsely accused of making racial slurs against the same two female employees that lodged allegations against Plaintiff.  (Dkt. No. 1 at 7.)  Plaintiff alleges that Mr. Scmherorn "is the biological father of 2 bi-racial children affirmatively contradict[ing] this assertion of being a racist."  (Dkt. No. 1 at 8.)

Plaintiff alleges that Defendant failed to comply with its own policies contained in the Employee Handbook.  (Dkt. No. 1 at 9.)

The Complaint asserts the following three claims: (1) a claim of wrongful termination of employment based on race, disability, and gender in violation of 42 U.S.C. § 2000e; (2) a claim that Defendant engaged in retaliatory conduct against Plaintiff for filing employment inquires in violation of 42 U.S.C. § 12203; (3) a claim that Defendant discriminated against Plaintiff on the basis of disability, race, and gender in violation of 42 U.S.C. § 212101, et seq.  (Dkt. No. 1 at 8-11.)

As relief Plaintiff seeks, among other things, declaratory relief, compensatory damages, and punitive damages.  (Dkt. No. 1 at 11-13.)

Attached to the Complaint is a Determination and Notice of Rights from the United States Equal Employment Opportunity Commission dated August 6, 2024, notifying Plaintiff that his lawsuit must be filed within ninety dates of his receipt of the notice.  (Dkt. No. 1, Attach. 2 at 2.)

## II.    PLAINTIFF'S AMENDED APPLICATION TO PROCEED *IN FORMA PAUPERIS*

When a civil action is commenced in a federal district court, the statutory filing fee, currently set at $405, must ordinarily be paid.  28 U.S.C. § 1914(a).  A court is authorized, however, to permit a litigant to proceed *in forma pauperis* status if a party "is unable to pay" the standard fee for commencing an action.  28 U.S.C. § 1915(a)(1).[2]  After reviewing Plaintiff's amended *in forma pauperis* application (Dkt. No. 7), the Court finds that Plaintiff meets this standard.  Therefore, Plaintiff's amended application to proceed *in forma pauperis* is granted.[3]

## III.    LEGAL STANDARD FOR REVIEW OF THE COMPLAINT

"Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that . . . the action . . . (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief."  28 U.S.C. § 1915(e)(2).

In determining whether an action is frivolous, the court must consider whether the complaint lacks an arguable basis in law or in fact.  *Neitzke v. Williams*, 490 U.S. 319, 325 (1989).  Dismissal of frivolous actions is appropriate to prevent abuses of court process as well as to discourage the waste of judicial resources.  *Neitzke*, 490 U.S. at 327; *Harkins v. Eldridge*,

---

[2]    The language of that section is ambiguous because it suggests an intent to limit availability of *in forma pauperis* status to prison inmates.  *See* 28 U.S.C. § 1915(a)(1) (authorizing the commencement of an action without prepayment of fees "by a person who submits an affidavit that includes a statement of all assets such prisoner possesses").  The courts have construed that section, however, as making *in forma pauperis* status available to any litigant who can meet the governing financial criteria.  *Hayes v. United States*, 71 Fed. Cl. 366, 367 (Fed. Cl. 2006); *Fridman v. City of N.Y.*, 195 F. Supp. 2d 534, 536 n.1 (S.D.N.Y. 2002).

[3]    Plaintiff is reminded that, although his application to proceed *in forma pauperis* has been granted, he is still required to pay fees that he may incur in this action, including copying and/or witness fees.

505 F.2d 802, 804 (8th Cir. 1974); *see Fitzgerald v. First East Seventh Street Tenants Corp.*, 221 F.3d 362, 364 (2d Cir. 2000) (a district court "may dismiss a frivolous complaint *sua sponte* even when the plaintiff has paid the required filing fee[.]"); *see also Pflaum v. Town of Stuyvesant, Columbia Cnty., N.Y.*, 11-CV-0335, 2016 WL 865296, at *1, n.2 (N.D.N.Y. Mar. 2, 2016) (Suddaby, C.J.) (finding that the Court had the power to address and dismiss additional theories of the plaintiff's retaliation claim *sua sponte* because those theories were so lacking in arguable merit as to be frivolous).

In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasis added) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 [2007]). "Determining whether a complaint states a plausible claim for relief . . . requires the . . . court to draw on its judicial experience and common sense. . . . [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not shown–that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (internal citation and punctuation omitted).

"In reviewing a complaint . . . the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal

conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

Courts are "obligated to construe a pro se complaint liberally." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009); *see also Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990) (per curiam) (reading the plaintiff's *pro se* complaint "broadly, as we must" and holding that the complaint sufficiently raised a cognizable claim).  "[E]xtreme caution should be exercised in ordering sua sponte dismissal of a pro se complaint before the adverse party has been served and [the] parties . . . have had an opportunity to respond." *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983).

## IV.    ANALYSIS

In addressing the sufficiency of a plaintiff's complaint, the court must construe his pleadings liberally. *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008). Having reviewed Plaintiff's Complaint with this principle in mind, I recommend that it be dismissed for failure to state a claim upon which relief may be granted.

### A.    Wrongful Termination

To allege a prima facie showing of wrongful termination, a plaintiff must allege that "he (1) is a member of a protected class; (2) was performing his duties satisfactorily; (3) was discharged; and that (4) his discharge occurred under circumstances giving rise to an inference of discrimination on the basis of his membership in the protected class." *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000).  Successful claims of wrongful termination must present a causal connection between some discriminatory reason and the termination. *See Quarless v. Brooklyn Botanic Garden Corp.*, 611 F. App'x 28, 29 (2d Cir. 2015) (citing *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010)).

Here, Plaintiff's claim of wrongful termination based on race, disability, and gender fails to allege facts plausibly suggesting that he was terminated under circumstances giving rise to an inference of discrimination on the basis of his membership in the protected classes. Instead, the Complaint alleges that because Plaintiff received good job performance evaluations, his termination *must* have been discriminatory on the basis of his race, gender, and disability. (Dkt. No. 1 at 6.) The law is clear, though, that a Title VII plaintiff must allege more than that. "Simply being a member of a protected class, without something more to link that status to the action in question, is not enough to raise a reasonable inference of discriminatory animus." *Cole v. Board of Trustees of Northern Ill. Univ.*, 838 F.3d 888, 900 (7th Cir. 2016); *see also Canady v. Union 1199/SEIU*, 527 F. Supp. 3d 515, 516 (W.D.N.Y. 2021) ("simply falling into a protected category is not enough"); *Perry v. County of Westchester*, 06-CV-3000, 2008 WL 11438085, at *17 (S.D.N.Y. Mar. 31, 2008) ("Plaintiff's membership in a protected class in and of itself does not establish discriminatory animus"); *see also Karunakaran v. Borough of Manhattan Cmty. Coll.*, 18-CV-10723, 2022 WL 902370, at *3 (S.D.N.Y. Mar. 28, 2022) (quoting *Littlejohn v. Cit of New York*, 795 F.3d 297, 311 (2d Cir. 2015)) ("Although a plaintiff is not required to plead facts proving each element of a prima facie case of discrimination at the pleading stage, her allegations must provide 'plausible support' for a 'minimal inference' that the employer was motivated by discriminatory intent.").

Beyond Plaintiff's conclusory allegation that he was terminated as a result of discrimination, he does not allege any specific facts plausibly suggesting that the termination was related to discrimination on the basis of his race, disability, or gender. *Karunakaran*, 2022 WL 902370, at *3.

To the extent that Plaintiff sought to allege a discrimination claim based on disparate treatment, I recommend that claim be dismissed because Plaintiff's allegations are conclusory.

"To establish an inference of discrimination, a plaintiff must allege that 'she was similarly situated in all material respects to the individuals with whom she seeks to compare herself.'" *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 230 (2d Cir. 2014) (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)). The judgment rests on "whether the plaintiff and those he maintains were similarly situated were subject to the same workplace standards." *Brown*, 756 F.3d at 230 (quoting *Graham*, 230 F.3d at 40). "The plaintiff's and comparator's circumstances must bear a 'reasonably close resemblance,' but need not be 'identical.'" *Id.* (quoting *Graham*, 230 F.3d at 40). Absent direct evidence of discrimination, "a plaintiff must plausibly allege facts that *would support a finding* that she suffered an adverse employment action and 'has at least minimal support for the proposition that the employer was motivated by discriminatory intent,'" to survive a motion to dismiss a Title VII claim. *Thomson v. Odyssey House*, 14-CV-3857, 2015 WL 5561209, at *14 (E.D.N.Y. Sept. 21, 2015) (emphasis in original) (quoting *Littlejohn*, 795 F.3d at 311).

Here, Plaintiff fails to allege facts plausibly suggesting others were treated differently than him. *See Karunakaran*, 2022 WL 902370, at *4 (dismissing the plaintiff's Title VII discrimination claim where the amended complaint did not identify or describe an alleged comparator or describe specific examples of disparate treatment). More specifically, the Complaint appears to allege that Defendant took the same action—termination—against Mr. Scmherorn, a white employee, when faced with similar allegations as were lodged against Plaintiff. (Dkt. No. 1 at 7.) This allegation suggests that, regardless of an employee's race,

Defendant takes he same action—termination—in response to allegations of inappropriate workplace conduct.

Moreover, it is unclear whether Plaintiff and Mr. Scherorn were "similarly situated in all material respects." Plaintiff alleges that Mr. Scmherorn was a "Junior Production Manager." (Dkt. No. 1 at 7.) Plaintiff alleges that he was hired as an "inventory associate" (Dkt. No. 1 at 3) but was fired while training to become either an assistant production manager (Dkt. No. 1 at 2) or a production manager (Dkt. No. 1 at 4).

For each of these reasons, I recommend that Plaintiff's discriminatory termination claim be dismissed for failure to state a claim upon which relief may be granted.

### B.    Retaliation

42 U.S.C. § 12203(a) provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." For an ADA retaliation claim, a plaintiff must plead the following: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse . . . action; and (4) a causal connection between the protected activity and the adverse . . . action." *Perez v. City of New York*, 843 F. App'x 406, 407 (2d Cir. 2021) (quoting *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010)).

"Protected activity is action taken to protest or oppose statutorily prohibited discrimination." *Shannon v. Credit Agricole Sec. (USA), Inc.*, 17-CV-0667, 2021 WL 1063183, at *9 (S.D.N.Y. Mar. 19, 2021) (quoting *Natofsky v. City of New York*, 921 F.3d 337, 354 (2d Cir. 2019)).

Here, the Complaint fails to allege facts plausibly suggesting that Plaintiff engaged in any protected activity. Instead, the Complaint appears to allege that Plaintiff (1) warned Defendant's employees Sherry Olk and Jenna Rivera that their work productivity was poor (Dkt. No. 1 at 2), and (2) made a complaint to OSHA about various unsafe working conditions Plaintiff endured while employed by Defendant (Dkt. No. 1 at 5-6). However, neither of these alleged actions sufficiently allege that Plaintiff "has opposed any act or practice made unlawful by" the ADA. *See Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 566 (2d Cir. 2000) ("The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination."), *superseded by statute on other grounds identified in Zeng v. New York City Housing Auth.*, 22-CV-0138, 2023 WL 4553416 (2d Cir. July 17, 2023); *Weinstein v. Miller,* 21-CV-4543, 2021 WL 3038370, at *7 (S.D.N.Y. July 15, 2021) (dismissing the plaintiff's complaint where she failed to allege facts "suggesting that she made [a] complaint of disability discrimination or that any Defendant discriminated or retaliated against her because of any such complaint."); *Smith v. City of New York,* 15-CV-4493, 2016 WL 4574924, at *10 (S.D.N.Y. Sept. 1, 2016) (finding that the plaintiff's "objection to being subjected to the disrobement policy does not constitute a protected activity because [the plaintiff] cannot show an objectively reasonable basis for believing that the policy violates the ADA.").

As a result, I recommend that Plaintiff's retaliation claim be dismissed for failure to state a claim upon which relief may be granted.

In the alternative, I recommend that to the extent that Plaintiff seeks monetary damages, his retaliation claim be dismissed because Title V "does not provide for punitive or compensatory damages under the ADA." *Jones v. Volunteers of Am. Greater New York*, 20-CV-5581, 2022 WL 768681, at *6 n.8 (S.D.N.Y. Mar. 14, 2022) (citing *Spiegel v. Schulmann*, 604

10

F.3d 72, 79 (2d Cir. 2010); *Alvarado v. Cajun Operating Co.*, 588 F.3d 1261, 1269-70 (9th Cir.

2009) (holding "punitive and compensatory damages are not available for ADA retaliation

claims."); *Kramer v. Banc of America Securities*, LLC, 355 F.3d 961 (7th Cir. 2004), *cert.*

*denied*, 542 U.S. 932 (2004) (holding that a plaintiff can only recover equitable relief for a

retaliation claim under the ADA); *Shipman v. New York State Office of Persons with*

*Developmental Disabilities*, 11-CV-2780, 2012 WL 897790, at *9 (S.D.N.Y. Mar. 12, 2012)

(even in the retaliation context, "individuals cannot be held liable for money damages under the

ADA in either their personal or official capacities."), *report and recommendation adopted* 2012

WL 3704837, at *3 (S.D.N.Y. Mar. 26, 2012) (money damages unavailable under the ADA)).

### C.    Discrimination Claim

Although Plaintiff cites "42 USC Section 212101, Et Seq." as the basis of this claim, he

also refers to the ADA and thus, the undersigned liberally construed this claim as one pursuant to

42 U.S.C. § 12112(a).[4]

Section 12112 of the ADA provides:

> No covered entity shall discriminate against a qualified individual with a
> disability because of the disability of such individual in regard to job
> application procedures, the hiring, advancement, or discharge of
> employees, employee compensation, job training, and other terms,
> conditions, and privileges of employment.

42 U.S.C. § 12112(a).

A plaintiff challenging disability-based discrimination under the ADA must establish a

prima facie case, which consists of a showing that: "(1) his employer is subject to the ADA; (2)

he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the

essential functions of his job, with or without reasonable accommodation; and (4) he suffered

---

[4]    Title 42 U.S.C. section 212101 does not exist.

adverse employment action because of his disability." *Woolf v. Strada*, 949 F.3d 89, 93 (2d Cir. 2020).

The Complaint fails to assert a claim upon which relief may be granted for two reasons.

First, the Complaint fails to allege facts plausibly suggesting that Plaintiff was disabled within the meaning of the ADA. "The term 'disability' means, with respect to an individual— (A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). Plaintiff alleges that he is disabled "based on symptoms of depression and speech impairment." (Dkt. No. 1 at 2.) Plaintiff fails to allege facts plausibly suggesting that these disabilities impact a major life activity—such as caring for oneself, performing manual tasks, seeing, hearing, eating, or sleeping—or a major bodily function.

Second, the Complaint fails to allege facts plausibly suggesting that Plaintiff suffered an adverse employment action because of his disability. The Complaint identifies Plaintiff as a disabled person but does not allege any facts plausibly suggesting that an adverse action was taken against Plaintiff with any causal connection to his disability. (*See generally* Dkt. No. 1.)

For each of these reasons, I recommend that Plaintiff's disability discrimination claim be dismissed.[5]

## V.    OPPORTUNITY TO AMEND

Generally, a court should not dismiss claims contained in a complaint filed by a *pro se* litigant without granting leave to amend at least once "when a liberal reading of the complaint

---

[5]    To the extent that the Complaint is liberally construed as asserting a discrimination claim based on Plaintiff's race and gender, I recommend that it be dismissed for failure to state a claim upon which relief may be granted. As set forth above in Part IV.A. of this Order and Report-Recommendation, the Complaint fails to assert facts plausibly suggesting that Plaintiff was discriminated against on the basis of his race or gender.

gives any indication that a valid claim might be stated." *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires."). An opportunity to amend is not required, however, where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice."). Stated differently, "[w]here it appears that granting leave to amend is unlikely to be productive, . . . it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993); *accord, Brown v. Peters*, 95-CV-1641, 1997 WL 599355, at *1 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.).[6]

Although I have serious doubts about whether Plaintiff can replead to assert actionable claims, given that this is the Court's first review of Plaintiff's pleading, out of an abundance of caution and in light of Plaintiff's status as a *pro se* litigant, I recommend that he be permitted leave to amend.

If Plaintiff chooses to file an amended complaint, he should note that the law in this circuit clearly provides that "'complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning.'" *Hunt v. Budd*, 895 F. Supp.

---

[6]     *See also Carris v. First Student, Inc.*, 132 F. Supp. 3d 321, 340-41 n.1 (N.D.N.Y. 2015) (Suddaby, C.J.) (explaining that the standard set forth in *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 796 (2d Cir. 1999)—that the Court should grant leave to amend "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would be successful in stating a claim"—is likely not an accurate recitation of the governing law after *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)), *rev'd on other grounds*, 682 F. App'x 30.

35, 38 (N.D.N.Y. 1995) (McAvoy, J.) (quoting *Barr v. Abrams*, 810 F.2d 358, 363 (2d Cir. 1987)); *accord Pourzancvakil v. Humphry*, 94-CV-1594, 1995 WL 316935, at *7 (N.D.N.Y. May 22, 1995) (Pooler, J.).  Therefore, in any amended complaint, Plaintiff must clearly set forth facts that give rise to the claims, including the dates, times, and places of the alleged underlying acts, and each individual who committed each alleged wrongful act.  In addition, the revised pleading should allege facts demonstrating the specific involvement of any of the named defendants in the constitutional deprivations alleged in sufficient detail to establish that they were tangibly connected to those deprivations.  *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).  Finally, Plaintiff is informed that any such amended complaint will replace the existing complaint, and must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the Court.  *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ("It is well established that an amended complaint ordinarily supersedes the original and renders it of no legal effect.").

      **ACCORDINGLY**, it is

      **ORDERED** that Plaintiff's amended application to proceed *in forma pauperis* (Dkt. No. 7) is **GRANTED**; and it is further respectfully

      **RECOMMENDED** that the Court **DISMISS WITH LEAVE TO REPLEAD** Plaintiff's Complaint (Dkt. No. 1) because it fails to state a claim upon which relief may be granted pursuant to 28 U.S.C. § 1915(e)(2)(B); and it is further

      **ORDERED** that the Clerk of the Court shall file a copy of this Order and Report-Recommendation on Plaintiff, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

**NOTICE:** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[7]  Such objections shall be filed with the Clerk of the Court.  **<u>FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW</u>**.  28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)).


Dated: January  7 , 2025
        Binghamton, New York


<u>Miroslav Lovric</u>
Miroslav Lovric
U.S. Magistrate Judge

---

[7]      If you are proceeding *pro se* and served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date that the report, recommendation, and order was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

Case 3:24-cv-01358-GTS-ML    Document 13    Filed 01/07/25    Page 16 of 120

Pflaum v. Town of Stuyvesant, Columbia Cty., N.Y., Not Reported in Fed. Supp. (2016)

2016 WL 865296
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

William PFLAUM, Individually and as a Citizen,
Resident and Taxpayer of Town of Stuyvesant, Plaintiff,
v.
TOWN OF STUYVESANT, COLUMBIA CTY.,
N.Y.; and Valerie Bertram, Individually and as
Supervisor of Town of Stuyvesant, Defendants.

1:11-CV-0335 (GTS/DJS)
|
Signed 03/02/2016

**Attorneys and Law Firms**

WILLIAM PFLAUM, Plaintiff, Pro Se [1], 3 Rybka Road, Box
40, Stuyvesant Falls, NY 12174.

BRYAN D. RICHMOND, ESQ., THOMAS J. MORTATI,
ESQ., BURKE, SCOLAMIERO, MORTATI & HURD, LLP,
Attorneys for Defendants, 9 Washington Square, Suite 201,
P.O. Box 15085, Albany, NY 12212-5085.

**DECISION and ORDER**

GLENN T. SUDDABY, Chief United States District Judge

**\*1** Currently before the Court, in this civil rights action
filed by William Pflaum ("Plaintiff") against the Town of
Stuyvesant ("Town") and Valerie Bertram, Town Supervisor
("Bertram") (collectively, "Defendants"), is Defendants'
motion for summary judgment pursuant to Fed. R. Civ. P. 56.
(Dkt. No. 59.) For the reasons set forth below, Defendants'
motion is granted.

**I. RELEVANT BACKGROUND**

**A. Plaintiff's Complaint**
As a result of the Court's prior decisions (Dkt. Nos. 17,
26), Plaintiff's sole remaining claim in this action is his
First Amendment retaliation claim. More specifically, as
articulated in his Complaint (which was drafted by Plaintiff,
*pro se*, and therefore must be construed with special
solicitude), that claim alleges three separate ways he was
retaliated against for publicly criticizing Town officials. [2]

First, Plaintiff alleges that, in retaliation for filing charges
of ethical violations against Defendant Bertram, she (a)
"collaborated with and supported" the Town's Fire Chief
to deny and/or threaten to deny fire protection to Plaintiff,
(b) "supported and encouraged" various Town employees
to "illegal[ly] revo[ke] ... Plaintiff's permit to operate his
business," and (c) "supported and encouraged" the Town
Assessor's "campaign to intimidate Plaintiff by linking [his]
political speech [with his] real estate assessment." (Dkt. No.
1, ¶¶ 20-23, 116 [Pl.'s Compl.].)

Second, Plaintiff alleges that, in retaliation for writing
columns on his Internet blog regarding corruption among the
Town's public officials, the Town filed false criminal charges
against him. (*Id.*, ¶ 116.)

Third, and finally, Plaintiff alleges that, in retaliation for
criticizing Bertram, the Town Assessor, and the Town, the
Town Assessor used his authority to raise taxes in order to
intimidate Plaintiff into silence. (*Id.*, ¶¶ 23, 39, 47, 116.)

**B. Defendants' Motion for Summary Judgment**
**\*2** In their motion for summary judgment, Defendants
request the dismissal of Plaintiff's Complaint in its entirety.
(Dkt. No. 59.) In support of their motion, Defendants make
the following four arguments. First, Defendants argue that
there was no adverse action against Plaintiff in that there
was no actual chilling of Plaintiff's First Amendment speech
or any other damages. (Dkt. No. 61, at 3-8 [Defs.' Mem. of
Law].)

Second, Defendants argue that, in any event, any such adverse
action was not motivated or substantially caused by Plaintiff's
First Amendment speech. (*Id.* at 5-6.)

Third, in the alternative, Defendants argue that Bertram was
not personally involved in any deprivation of fire protection
services to Plaintiff. (*Id.* at 5, 8-10.)

Fourth, and finally, Defendants argue that Bertram is entitled
to qualified immunity. (*Id.*)

**C. Plaintiff's Opposition Memorandum of Law**
Generally construed, Plaintiff makes five arguments in
opposition to Defendants' motion. First, Plaintiff argues that
he engaged in protected speech by creating an Internet blog
on which he publicly criticized Town officials and exposed

Case 3:24-cv-01358-GTS-ML    Document 13    Filed 01/07/25    Page 17 of 120

Pflaum v. Town of Stuyvesant, Columbia Cty., N.Y., Not Reported in Fed. Supp. (2016)

their illegal activities. (Dkt. No. 65, at 3 [Pl.'s Opp'n Mem. of Law].)

Second, Plaintiff argues that Town officials took adverse action against him by issuing noise violations against him with respect to loud dog barking on his property, retaining special prosecutors to pursue civil suits and criminal charges against him, encouraging harassment and extra-judicial threats against him, and treating him differently from other residents. (*Id.* at 4-5.) As a result, Plaintiff argues that he suffered a chilling effect on his blogging as well as monetary damages due to the expense required to oppose the Town's retaliatory activities. (*Id.* at 6-8.)

Third, Plaintiff argues that the timing of these adverse actions, i.e., that they began after he created his blog, establishes the causal connection between his protected speech and the adverse actions. (*Id.* at 5.)

Fourth, Plaintiff argues that Bertram is not entitled to qualified immunity because it was not objectively reasonable to believe that her actions did not violate Plaintiff's First Amendment rights. (*Id.* at 5-6.) According to Plaintiff, these actions consisted of (1) threatening to fire the Town's Dog Control Officer if he did not serve Plaintiff with a criminal charge related to dog barking, and (2) retaining special prosecutors to pursue this charge against Plaintiff without first obtaining the Town's approval. (*Id.* at 9.)

Fifth, Plaintiff argues that municipal liability extends to the Town because of the actions of Bertram, the Town's supervisor, and her position as a policymaker. (*Id.* at 8-9.)

Finally, the Court notes that Plaintiff spends considerable time in his opposition papers arguing the merits of issues not raised by Defendants in their motion. For example, Plaintiff discusses the Town's denial of his FOIL requests, the Town's failure to respond appropriately to alleged vandalism of his property, and the sufficiency of the evidence that led to the issuance of noise violations related to dog barking. (*See generally id.*, at 3-4, 6-9; Dkt. No. 67, ¶¶ 4, 14, 25, 27, 36, 56-107 [Pl.'s Decl.].)

### D. Defendants' Reply Memorandum of Law
In reply to Plaintiff's opposition memorandum of law, Defendants make two arguments. First, Defendants argue that, because Plaintiff has not complied with Local Rule 7.1(a) (3) in his response to their statement of material facts, their

statement of material facts should be deemed admitted. (Dkt. No. 74, at 2-6 [Defs.' Reply Mem. of Law].)

**\*3** Second, Defendants argue that the record is devoid of any admissible evidence that Bertram was personally involved in an alleged deprivation of fire protection services with regard to Plaintiff's residence. (*Id.* at 6-7.) Furthermore, Defendants argue that Plaintiff cannot demonstrate that any adverse action was taken because he was never actually deprived of fire protection services and his subjective belief that the fire department may not respond to a fire at his residence is insufficient to create a genuine dispute of fact. (*Id.* at 7-8.)

### E. Statement of Material Facts

#### 1. Plaintiff's Failure to Comply with N.D.N.Y. Local Rule 7.1

Before reciting the material facts of this case, the Court must address Plaintiff's response to Defendant's Rule 7.1 Statement of Material Facts. Local Rule 7.1(a)(3) of the Local Rules of Practice for this Court requires a party moving for summary judgment to submit a statement of material facts supported by specific citations to the record where those facts are established. N.D.N.Y. L.R. 7.1(a)(3). The non-moving party's subsequent response must mirror the moving party's statement of material facts by (1) admitting and/or denying each of the moving party's factual assertions in matching numbered paragraphs and (2) supporting any denials with specific citations to the record where the factual issues arise. *Id.* Importantly, "[t]he Court shall deem admitted any properly supported facts set forth in the [moving party's] Statement of Material Facts that the [non-moving] party does not specifically controvert." *Id.*

This Court's "Local Rule requirements are not empty formalities." *Bombard v. Gen. Motors Corp.*, 238 F. Supp. 2d 464, 467 (N.D.N.Y. 2002) (Munson, J.) (stating that "[t]he courts of the Northern District have adhered to a strict application of Local Rule 7.1[a][3]'s requirement on summary judgment motions"); *accord, Cross v. Potter*, 09-CV-1293, 2013 WL 1149525, at *3 (N.D.N.Y. Mar. 19, 2013) (McAvoy, J.). Indeed, the underlying purpose of this rule "is to assist the court in framing the issues and determining whether there exist any triable issues of fact that would preclude the entry of summary judgment." *Youngblood v. Glasser*, 10-CV-1430, 2012 WL 4051846, at *4 (N.D.N.Y. Aug. 22, 2012) (Peebles, M.J.); *see also N.Y. Teamsters Conference Pension*

Case 3:24-cv-01358-GTS-ML    Document 13    Filed 01/07/25    Page 18 of 120

Pflaum v. Town of Stuyvesant, Columbia Cty., N.Y., Not Reported in Fed. Supp. (2016)

*& Ret. Fund v. Express Servs., Inc.*, 426 F.3d 640, 649 (2d Cir. 2005) (noting that "Rules governing summary judgment practice are essential tools for district courts, permitting them to efficiently decide summary judgment motions by relieving them of the onerous task of 'hunt[ing] through voluminous records without guidance from the parties'") (quoting *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 [2d Cir. 2001]).

In the present case, Plaintiff has failed to respond appropriately to Defendants' Rule 7.1 Statement of Material Facts. Specifically, Plaintiff has failed to admit and/or deny each of Defendants' factual assertions in matching numbered paragraphs. Indeed, Defendants' Rule 7.1 Statement contains 71 paragraphs of factual assertions, while Plaintiff's 7.1 Response contains only 11 paragraphs. (*Compare* Dkt. No. 62 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 66 [Pl.'s Rule 7.1 Response].) Moreover, many of Plaintiff's responses are conclusory in nature and/or contain legal arguments. The Court notes that, when he responded to Defendants' motion, Plaintiff was represented by counsel. Accordingly, the Court will accept the factual assertions in Defendants' 7.1 Statement as true to the extent that the evidence in the record supports these facts. *See Davis v. Cumberland Farms, Inc.*, 10-CV-0480, 2013 WL 375477, at *4 (N.D.N.Y. Jan. 29, 2013) (Scullin, J.) (accepting the defendant's statement of material facts as true where plaintiff neither admitted nor denied defendants' factual assertions); *Aktas v. JMC Dev. Co., Inc.*, 877 F. Supp. 2d 1, 5 n.3 (N.D.N.Y. 2012) (D'Agostino, J.) (accepting the third-party defendants' statement of material facts as true because the defendant/third-party plaintiff failed to respond to it in accordance with Local Rule 7.1[a][3] ).

### 2. Undisputed Material Facts

**\*4**  For purposes of this motion, the undisputed material facts are as follows. Gerald Ennis has served as the Zoning Enforcement Officer for the Town of Stuyvesant continuously since 2003. (Dkt. No. 62, ¶ 43 [Defs.' Rule 7.1 Statement].) In this capacity, Mr. Ennis issued Plaintiff a Class 2 Home Occupation Permit in August, 2009. (*Id.*, ¶ 44.) Under this permit, "[n]o unusual appearances, noise, vibration, smoke, dust, odors, heat, glare or electrical disturbances that exceed those normally produced by a resident shall be permitted." (*Id.*, ¶ 45.) Following the issuance of this permit, Mr. Ennis received numerous noise complaints from Plaintiff's neighbors in regard to increasingly loud barking from dogs on Plaintiff's property. (*Id.*, ¶¶ 46-47.) Following an investigation into these complaints, Mr. Ennis concluded that

Plaintiff's "home dog kennel which housed up to 50 dogs at a time was producing noise levels that exceeded those normally produced by a resident and, accordingly, [Plaintiff] was in violation of his Permit." (*Id.*, ¶ 48.)

On December 7, 2009, Mr. Ennis issued Plaintiff a notice of violation, which informed Plaintiff that the Town had received several complaints about the noise coming from his property and directed Plaintiff to remedy the violation by December 23, 2009. (*Id.*, ¶ 49.) Subsequently, Plaintiff contacted Mr. Ennis and requested that his phone number be given to those who had complained with instructions that they contact Plaintiff directly when there are noise issues so he can rectify any problems. (*Id.*, ¶ 50.) However, after a few months had passed, Plaintiff stopped answering his neighbors' phone calls; and, as a result, his neighbors made new complaints to Mr. Ennis. (*Id.*, ¶ 51.) After receiving these complaints and personally observing the loud noise emanating from Plaintiff's property, Mr. Ennis issued a second notice of violation to Plaintiff on April 26, 2010. (*Id.*, ¶¶ 52-53.) In response, Plaintiff advised Mr. Ennis that he would erect a sound barrier to remedy the issue. (*Id.*, ¶ 54.)

According to Mr. Ennis, he waited "some time" for Plaintiff to erect, or apply for a permit to construct, a sound barrier but neither action was taken. (*Id.*, ¶¶ 55-56.) After continuing to receive noise complaints, Mr. Ennis issued a third notice of violation to Plaintiff on August 9, 2010. (*Id.*, ¶ 56.) On the same day, Mr. Ennis met with Bertram and the Town Attorney to discuss the noise issue on Plaintiff's property. (*Id.*, ¶ 57.) The Town Attorney advised Bertram that Mr. Ennis had the authority to revoke Plaintiff's home occupation permit if he determined that Plaintiff was in violation of the permit's conditions. (*Id.*, ¶ 37.) As a result, Bertram advised Mr. Ennis that he may revoke Plaintiff's permit if he determined that the permit's conditions had been violated. (*Id.*, ¶ 38.) Later that same day (August 9, 2010), Mr. Ennis made the decision to revoke Plaintiff's permit and notified Plaintiff of that fact. (*Id.*, ¶¶ 39, 59.) Neither Plaintiff's statements concerning various issues in the Town nor his postings on various Internet sites had any bearing on the decision to revoke Plaintiff's permit. (*Id.*, ¶¶ 40, 61.)

Plaintiff testified at his deposition that the basis for his claim that he was deprived of fire protection services is that, "in 2011, or perhaps late 2010," a local fire department chief, Steve Montie, posted an online statement that Plaintiff should move out of town. (*Id.*, ¶ 14.) Plaintiff testified that the post was made in response to one of his earlier posts on a local

Case 3:24-cv-01358-GTS-ML    Document 13    Filed 01/07/25    Page 19 of 120

Pflaum v. Town of Stuyvesant, Columbia Cty., N.Y., Not Reported in Fed. Supp. (2016)

town Internet forum; in Plaintiff's post, he had complained of alleged ethical violations committed by Bertram. (*Id.*, ¶¶ 15-16.) The alleged post by Mr. Montie states in its entirety as follows:

> William,
>
> How much more of this are you going to do ? ? ? ? You are wasting more tax payer dollars than its worth. Man up correct your problems and move on, or better yet move out.
>
> S

(*Id.*, ¶ 19.) The author of this post is not identified by name but only by the email address stuyvesantchief@fairpoint.net; and, as indicated above, the post is signed only as "S." (*Id.*, ¶ 18.)

**\*5** Plaintiff testified that the statements in the alleged post amounted to a threatened denial of fire department services because "the fire chief told me I should move out of town, which makes me wonder if there was a fire at my house would he come." (*Id.*, ¶ 20.) However, Plaintiff testified that no one has ever told him that the fire department would not respond if there was a fire at his house. (*Id.*, ¶ 22.) In addition, Plaintiff testified that there are two distinct fire departments in the Town, Stuyvesant Company 1 and Stuyvesant Company 2, which divide their responses to emergency calls in the Town geographically. (*Id.*, ¶ 23.) Steve Montie is the Chief of Stuyvesant Company 1 and a different chief controls Company 2. (*Id.*, ¶ 25.) Plaintiff's property is located in the geographic area covered by Company 2. (*Id.*, ¶ 24.) According to Bertram, she did not "in any way direct any fire department to deprive or threaten to deprive [Plaintiff] of fire services." (*Id.*, ¶ 33.)

Finally, Plaintiff testified that there was "never" a time that he did not publicize or speak out against some issues based upon any actions by the Town and the alleged efforts to silence him did not work. (*Id.*, ¶ 26.) In fact, following the alleged actions by the Town, Plaintiff did more blogging and increased his "political activities against the Town." (*Id.*, ¶ 27.) With respect to his business, Plaintiff testified that, despite losing his business permit in August, 2010, he continued to operate his business uninterrupted without a permit as he had before it was issued in 2009. (*Id.*, ¶ 29.) Accordingly, there was no interruption to Plaintiff's business as a result of his home business permit being revoked. (*Id.*, ¶¶ 28, 30.)

## II. STANDARD GOVERNING A MOTION FOR SUMMARY JUDGMENT

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). As a result, "[c]onclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) (citation omitted); *see also* Fed. R. Civ. P. 56(e)(2). As the Supreme Court has famously explained, "[the non-moving party] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movign party. *Anderson*, 477 U.S. at 255. In addition, "[the moving party] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the ... [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986); *see also* Fed. R. Civ. P. 56(c), (e). However, when the moving party has met this initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with specific facts showing a genuine dispute of material fact for trial. Fed. R. Civ. P. 56(c), (e). Where the non-movant fails to deny the factual assertions contained in the movant's Rule 7.1 Statement of Material Facts in matching numbered paragraphs supported by a citation to admissible record evidence (as required by Local Rule 7.1[a][3] of the Court's Local Rules of Practice), the court may not rely solely on the movant's Rule 7.1 Statement; rather, the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.*, 322 F.3d 139, 143, n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

Case 3:24-cv-01358-GTS-ML    Document 13    Filed 01/07/25    Page 20 of 120

Pflaum v. Town of Stuyvesant, Columbia Cty., N.Y., Not Reported in Fed. Supp. (2016)

## III. ANALYSIS

### A. Whether Plaintiff Suffered an Adverse Action

**\*6** After carefully considering the matter, the Court answers this question in the negative for the reasons set forth in Defendants' memorandum of law and reply memorandum of law. (Dkt. No. 61, at 3-8 [Defs.' Mem. of Law]; Dkt. No. 74, at 6-8 [Defs.' Reply Mem. of Law].) To those reasons, the Court adds the following two points.

As this Court noted in its prior decisions, in order to state a claim for retaliation under the First Amendment, "a plaintiff must prove (1) his conduct was protected by the First Amendment, (2) the defendants' actions were motivated or substantially caused by the exercise of that right, and (3) defendants' actions effectively 'chilled' the exercise of plaintiff's First Amendment right." *Pflaum*, 937 F. Supp. 2d at 303 (citing *Dillon v. Morano*, 497 F.3d 247, 251 [2d Cir. 2007]). "In cases 'involving criticism of public officials by private citizens,' the Second Circuit has generally 'impose[d] an actual chill requirement for First Amendment retaliation claims[,]' i.e., a requirement that the plaintiff allege and ultimately prove an 'actual chill' of his First Amendment rights." *Hafez v. City of Schenectady*, 894 F. Supp. 2d 207, 221 (N.D.N.Y. 2012) (D'Agostino, J.) (quoting *Gill v. Pidlypchak*, 389 F.3d 379, 381 [2d Cir. 2004]). "To establish this element, it is not enough for the plaintiff simply to show that he changed his behavior in some way; he must show that the defendant intended to, and did, prevent or deter him from exercising his rights under the First Amendment." *Hafez*, 894 F. Supp. 2d at 221. "However, 'where the retaliation is alleged to have caused an injury separate from any chilling effect, such as a job loss or demotion, an allegation as to a chilling effect is not necessary to state a claim.'" *Id.* (quoting *Puckett v. City of Glen Cove*, 631 F. Supp. 2d 226, 239 [E.D.N.Y. 2009]); *see also Brink v. Muscente*, 11-CV-4306, 2013 WL 5366371, at \*7 (S.D.N.Y. Sept. 25, 2013) (noting that, in private citizen cases, "various forms of concrete harm have been substituted for the 'actual chilling' requirement").

First, it is clear from Plaintiff's deposition testimony that there was no actual chilling of his protected speech as a result of Defendants' actions. As discussed above, Plaintiff admitted that he increased his political activities and continued to publicize his opinions against the Town in the face of its alleged efforts to silence him. "Where a party can show no change in his behavior, he has quite plainly shown no chilling of his First Amendment right to free speech." *Curley v. Vill. of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001); *see also Singer v.*

*Fulton Cty. Sheriff*, 63 F.3d 110, 120 (2d Cir. 1995) (finding no chilling effect where, after an arrest, the plaintiff continued to publish his newspaper through which he criticized the village government); *Spear v. Town of W. Hartford*, 954 F.2d 63, 67 (2d Cir. 1992) (finding no chilling effect where, after the filing of a lawsuit, the plaintiff continued to write criticizing editorials in the same manner as before the lawsuit).

Second, to the extent that Plaintiff argues that he perceived the online post regarding the loss of fire protection as a real threat, he is still required to show that his perception was objectively reasonable, i.e., "that the defendant[s'] actions had some actual, non-speculative chilling effect." *Colombo v. O'Connell*, 310 F.3d 115, 117 (2d Cir. 2002); *see also Laird v. Tatum*, 408 U.S. 1, 13-14 (1972) (holding that "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm"). Plaintiff's subjective belief that the online post constituted a real threat, without more, is insufficient to demonstrate an actual chilling effect on his First Amendment rights. Indeed, as discussed above in Point I.E.2. of this Decision and Order, Plaintiff admitted that no one had told him that the fire department would not respond if there was a fire at his house. Moreover, a different fire chief than the one who allegedly authored the online post is responsible for responding to fire calls in the location of Plaintiff's residence.

### B. Whether There Was a Causal Connection Between Plaintiff's Speech and Any Adverse Action

**\*7** After carefully considering the matter, the Court answers this question in the negative for the reasons set forth below.

To establish the second element of his First Amendment retaliation claim, "plaintiff must provide specific proof of defendants' improper motivation with either circumstantial or direct evidence." *Media All., Inc. v. Mirch*, 09-CV-0659, 2011 WL 3328532, at \*5 (N.D.N.Y. Aug. 2, 2011) (D'Agostino, J.) (citing *Curley*, 285 F.3d at 73). "Circumstantial evidence includes close temporal proximity between plaintiff's speech and the alleged retaliatory act." *Mirch*, 2011 WL 3328532, at \*5.

"Regardless of the presence of retaliatory motive, however, a defendant may be entitled to summary judgment if he can show dual motivation, i.e., that even without the improper motivation the alleged retaliatory action would have occurred." *Scott v. Coughlin*, 344 F.3d 282, 287-88 (2d Cir. 2003) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 [1977]). "Plaintiff has the initial burden

Case 3:24-cv-01358-GTS-ML    Document 13    Filed 01/07/25    Page 21 of 120

Pflaum v. Town of Stuyvesant, Columbia Cty., N.Y., Not Reported in Fed. Supp. (2016)

of showing that an improper motive played a substantial part in defendant's action. The burden then shifts to defendant to show it would have taken exactly the same action absent the improper motive." *Scott*, 344 F.3d at 288.

### 1. Revocation of Plaintiff's Business Permit

In denying Defendants' underlying motion to dismiss Plaintiff's First Amendment claim, this Court held that Plaintiff had sufficiently alleged a concrete harm through the loss of his business permit, and consequently, the loss of business income, as a result of Defendants' alleged retaliatory actions. *Pflaum*, 937 F. Supp. 2d at 308. Having carefully reviewed the record, the Court finds that Plaintiff has failed to create a genuine dispute of material fact regarding Defendants' alleged improper motive. Specifically, with respect to the revocation of his business permit, the undisputed facts establish that the Town received complaints regarding the noise emanating from Plaintiff's property. Plaintiff was given two [3] noise violations over the course of approximately one year and ample opportunity to rectify the problem. (Dkt. No. 67, Attach. 5.) Because the noise problem and complaints continued, Mr. Ennis revoked Plaintiff's permit. [4] Even if Plaintiff were able to establish that an improper motive played a part in this decision, it is clear to the Court that, under these circumstances, the revocation would have still occurred. Indeed, Plaintiff challenged the decision to revoke his permit in appeals made to the Town's Zoning Board of Appeals and in two actions filed in New York State Supreme Court. (Dkt. No. 67, Attachs. 1 & 2.) Although Plaintiff was successful in his state court actions, those decisions were based, in part, upon the Town's failure to follow proper procedure, rather than the merits of the Town's decision. (*Id.*)

### 2. Criminal Charges

 **\*8** Plaintiff has also failed to demonstrate an improper motive with respect to his claim that he received false criminal charges in retaliation for comments on his website about corruption among public officials. Plaintiff relies on the temporal proximity of these charges with a meeting he had with Bertram and his filing of an Article 78 petition in New York State Supreme Court. More specifically, Plaintiff argues that he began an Internet blog on or about January 1, 2011,

and in that blog reported on what he perceived to be the illegal activities of Town officials. (Dkt. No. 67, ¶ 15 [Pl.'s Decl.].)

For example, on January 1, 2011, Plaintiff wrote about the alleged inflation of billable time by the Town Attorney that was spent on work paid for by the Town. (*Id.* at 65:8-11.) Around the same time, Plaintiff met with Bertram to discuss his discovery of specific instances of corruption by public officials, including the alleged inflation of billable work by the Town Attorney. (Dkt. No. 59, Attach. 7, at 62:13-15; 64:9-15 [Pl.'s Dep. Tr.].) On January 15, 2011, a few days after this meeting occurred, Plaintiff was issued a criminal summons for the offense of "habitual loud barking," in violation of N.Y. Local Law § 1. (*Id.* at 61:19-22; Dkt. No. 68, Attach. 7 [Criminal Summons]; Dkt. No. 67, ¶ 15 [Pl.'s Decl.].) Plaintiff testified at his deposition that the Town Attorney went to great lengths to research the Local Law that he was charged under and assisted one of Plaintiff's neighbors in drafting an affidavit upon which the criminal summons was based. (Dkt. No. 59, Attach. 7, at 65:17-21 [Pl.'s Dep. Tr.]; Dkt. No. 67, ¶ 107 [Pl.'s Decl.].) Plaintiff argues that he is the first Town resident to be charged under this section of the Local Law. (Dkt. No. 67, ¶¶ 100, 106 [Pl.'s Decl.].) Finally, Plaintiff argues that Bertram retained outside counsel to pursue this charge against him, which was later dismissed. (Dkt. No. 67, ¶¶ 5, 19, 21 [Pl.'s Decl.]; Dkt. No. 59, Attach. 7, at 57:16-18 [Pl.'s Dep. Tr.].)

Thereafter, in October 2011, Plaintiff filed an Article 78 petition in New York State Supreme Court challenging the Town's denial of Plaintiff's FOIL requests. (Dkt. No. 59, Attach. 7, at 67:7-12 [Pl.'s Dep. Tr.].) Plaintiff sought disclosure of the information in the FOIL requests to substantiate his belief that Town officials were engaging in illegal activities. (Dkt. No. 67, ¶¶ 43-44 [Pl.'s Decl.].) One week after commencing that action, Plaintiff received a second criminal summons for the same offense related to loud dog barking. (Dkt. No. 68, Attach. 7 [Appearance Ticket]; Dkt. No. 59, Attach. 7, at 56:16-19; 67:7-12 [Pl.'s Dep. Tr.].) Plaintiff testified that he had "almost no dogs" on his property in October 2011. (Dkt. No. 59, Attach. 7, at 67:8-10 [Pl.'s Dep. Tr.].) According to Plaintiff, that charge was neither dismissed nor withdrawn, but "vanished." (*Id.*, at 57:19-58:9.)

While Plaintiff's allegations may plausibly suggest that an improper motive played a role in the charges brought against him, Defendants have submitted admissible record evidence that establishes otherwise. (Dkt. No. 59, Attach. 17.) Specifically, the criminal information in question is signed

by one of Plaintiff's neighbors, Frederick Platt, and states, in part, that "my complaint is that the dogs at Glencadia Dog Camp exhibit ongoing habitual barking/howling at any given time of day or night. This has been an issue since the Fall of 2009." (*Id.*) Furthermore, an affidavit filed by Wes Powell, the Town's Dog Control Officer, states that he received repeated complaints from Mr. Platt throughout 2010, culminating in the noise complaint that served as the basis for the criminal charge. (Dkt. No. 59, Attach. 16, ¶¶ 3-5 [Powell Aff.].) Mr. Powell states that the complaint was written by Mr. Platt in his presence and that no Town official directed Mr. Powell to serve Plaintiff with the criminal summons. (*Id.*, ¶¶ 7-10.)

**\*9** Conversely, Plaintiff has not submitted any admissible record evidence supporting his claim that the Town Attorney (who is not a party) played any role in the charge being filed against him or that he is the only resident to have ever been charged under this section of the Local Law. Similarly, Plaintiff's contention that the Town pressured Mr. Platt to file a complaint against him (Dkt. No. 67, ¶ 7[Pl.'s Decl.] ) is unsubstantiated. While the timing of the charge may appear suspicious, the Town cannot control when its residents decide to file a complaint and, in light of the record evidence demonstrating that there was a preexisting noise problem on Plaintiff's property, the complaint is unsurprising. Moreover, the fact that Plaintiff *believes* the Town shored up its criminal charge against him is of little, if any, materiality. Finally, because the second charge seemingly "vanished," no documentation or evidence (other than the appearance ticket itself) has been submitted with respect to that charge. In any event, because the charge was never prosecuted, Plaintiff has failed to support his claim that he suffered any harm. Accordingly, the Court finds that Plaintiff has failed to meet his burden in demonstrating an improper motive with respect to this charge.

### 3. Town Assessor Gleason

Plaintiff claims that Town Assessor Howard Gleason (also not a party) threatened to raise his property taxes for engaging in political activities when Mr. Gleason hand delivered a letter to Plaintiff before a public meeting. (Dkt. No. 69, Attach. 18, at 3 [Letter from Pl. to Gleason]; Dkt. No. 67, ¶ 29 [Pl.'s Decl.].) The only evidence submitted with respect to this claim is not the original letter from Mr. Gleason to Plaintiff but letter correspondence from Plaintiff to Mr. Gleason. (Dkt. No. 69, Attach. 18, at 3 [Letter from Pl. to Gleason].) Plaintiff's letter to Mr. Gleason, dated October 5, 2010, states that Plaintiff

interpreted Mr. Gleason's attempt to speak with him about tax filings before a town hall meeting as threatening in nature due to the "timing and manner of the interaction." (*Id.*) This is because Plaintiff "had announced [his] intention to call for a referendum frequently and in many forums prior to appearing for the meeting." (*Id.*) Furthermore, Plaintiff requested that, in order to "avoid the impression that you coordinate your tax-related activities with other people in government in order to intimidate free speech, please do not present important information to me in such an information [sic] and unverifiable way." (*Id.*)

However, Mr. Gleason's response to Plaintiff's letter suggests that their interaction was not meant as a threat to raise Plaintiff's taxes or "was in any way politically motivated." (Dkt. No. 69, Attach. 18, at 4 [Letter from Pl. to Gleason].) More specifically, Mr. Gleason explains that he needed to re-assess Plaintiff's property in light of the fact that Plaintiff was now running a kennel (business) on his property and decided to hand deliver his letter knowing that Plaintiff would be present for the town hall meeting. (*Id.*) Moreover, Mr. Gleason reassured Plaintiff that politics do not dictate how he performs his job and promised that all future communication will be transmitted through mail rather than in-person. (*Id.*)

Plaintiff has failed to submit any additional evidence with respect to his tax assessment, that his taxes were improperly raised or that Mr. Gleason acted with a retaliatory animus. [5] Similarly, no evidence has been submitted to substantiate Plaintiff's claim that Bertram encouraged Mr. Gleason to use his authority as Town Assessor to intimidate Plaintiff. In sum, Plaintiff has wholly failed to satisfy his burden demonstrating that he suffered harm as a result of any action taken by Mr. Gleason and that Mr. Gleason acted with an improper motive.

**\*10** For all of these reasons, the Court finds that Plaintiff has failed to create a genuine dispute of material fact with respect to his First Amendment claim. Because the Court has reached this conclusion, it need not, and does not, consider the merits of Defendant Bertram's alternative qualified immunity argument.

**ACCORDINGLY**, it is

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 59) is **GRANTED**. The Clerk of the Court is directed to enter judgment in favor of the Defendants and close this case.

Case 3:24-cv-01358-GTS-ML    Document 13    Filed 01/07/25    Page 23 of 120

Pflaum v. Town of Stuyvesant, Columbia Cty., N.Y., Not Reported in Fed. Supp. (2016)

**All Citations**

Not Reported in Fed. Supp., 2016 WL 865296

## Footnotes

1    Although Plaintiff is currently proceeding *pro se*, the Court notes that he had counsel when preparing his response to Defendant's motion for summary judgment. Accordingly, no need exists to construe Plaintiff's response with the special solicitude ordinarily afforded to *pro se* litigants.

2    The Court notes that, while it did not previously (i.e., in its prior decisions) liberally construe Plaintiff's retaliation claim as arising under three separate theories, it does so now. The Court further notes that it has the power to address these two additional theories for each of two alternative reasons: (1) because Defendants moved for dismissal of Plaintiff's retaliation claim in its entirety, Plaintiff has had sufficient notice and an opportunity to be heard with respect to the two theories in question; and (2) in any event, even if Plaintiff cannot be said to have had such notice and an opportunity to be heard, he filed his Complaint *pro se* and the Court finds the two theories to be so lacking in arguable merit as to be frivolous, *see Fitzgerald v. First E. Seventh St. Tenants Corp.,* 221 F.3d 362, 363 (2d Cir. 2000) (recognizing that district court has power to *sua sponte* dismiss *pro se* complaint based on frivolousness notwithstanding fact that plaintiff has paid statutory filing fee).

3    As discussed above, Plaintiff was actually given three noise violations. However, because his permit was revoked on the same day that he received the third violation, the Court will disregard the third violation for purposes of this analysis.

4    The Court notes that Plaintiff spends considerable time in his opposition papers disputing the sufficiency of the evidence and procedures that were followed that led to the issuance of noise violations. (*See generally* Dkt. No. 67, ¶¶ 56-95 [Pl.'s Decl.].) However, this Court is not the proper forum for that dispute. Furthermore, to the extent that the New York Supreme Court observed that there appeared "to have been a disproportionate amount of time and money spent on [the noise violation] notice," and that the records did not "reveal a real issue with dog-barking," those observations are not binding upon this Court. (Dkt. No. 67, Attach. 2, at 6.) Setting aside the fact that the observations constitute dicta, Defendants have submitted admissible record evidence demonstrating that Mr. Ennis acted upon complaints made to him by residents of the Town, which Plaintiff has failed to properly dispute.

5    For example, with regard to this lack of additional evidence regarding retaliatory animus, Plaintiff has failed to adduce admissible record evidence establishing that, even assuming Mr. Gleason knew of Plaintiff's intent to engage in protected speech, the so-called "manner of the interaction" by Mr. Gleason (i.e., the hand delivery of the letter) was in fact unusual for Mr. Gleason given the date of the letter and the date of the public meeting. Moreover, Plaintiff has failed to adduce admissible record evidence that the so-called "timing ... of the interaction" is significant, given his rather constant exercise of his First Amendment rights during the time in question.

2008 WL 11438085
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Ted PERRY, Plaintiff,
v.
COUNTY OF WESTCHESTER, Defendant.

Case No. 06-CV-3000 (KMK)
|
Signed 03/31/2008

**Attorneys and Law Firms**

Pamela D. Hayes, Esq., Law Office of Pamela D. Hayes, Esq., New York, New York, Counsel for Plaintiff.

Stuart E. Kahan, Esq., Oxman Tulis Kirkpatrick Whyatt & Geiger, LLP, White Plains, New York, Counsel for Defendant.

OPINION AND ORDER

KENNETH M. KARAS, UNITED STATES DISTRICT JUDGE

**\*1** On April 19, 2006, Plaintiff Ted Perry ("Plaintiff") filed this employment discrimination suit against Defendant County of Westchester ("Defendant"). Before the Court is Defendant's Motion for Summary Judgment, seeking dismissal of Plaintiff's Complaint. For the reasons stated herein, Defendant's Motion is GRANTED.

I. Background

A. Employment and Disciplinary History

The following facts are undisputed, except where indicated. Plaintiff, an African-American man, began his employment with Defendant in June 1988 as a seasonal laborer in the Department of Parks Recreation and Conservation. (Def.'s Revised Statement of Material Facts Pursuant to Local Civil Rule 56.1(a) ¶¶ 1-2 ("Def.'s 56.1 Stmt"); Pl.'s Revised Counter-Statement of Material Facts Pursuant to Local Rule 56.1(b) ¶¶ 1-2 ("Pl.'s 56.1 Stmt").) Shortly thereafter, in July 1988, Plaintiff was promoted to a full-time Maintenance Laborer, Grade IV. (Def.'s 56.1 Stmt ¶ 3; Pl.'s 56.1 Stmt ¶ 3.) In 1992, Plaintiff was promoted to the position of

Maintenance Mechanic II, Grade VII. (Def.'s 56.1 Stmt ¶ 4; Pl.'s 56.1 Stmt ¶ 4.)

Later, in 1993, Plaintiff's title was reclassified to the position of Housekeeper, Grade VII. (Def.'s 56.1 Stmt ¶ 5; Pl.'s 56.1 Stmt ¶ 5.) The titles of two other employees – Roger Emery ("Emery") and John Ponce ("Ponce"), both of whom are Caucasian – were also reclassified to Housekeeper, but, unlike Plaintiff, these employees filed a union grievance regarding this reclassification. (Def.'s 56.1 Stmt ¶ 6-7; Pl.'s 56.1 Stmt ¶¶ 6-7.) Emery and Ponce were successful in their grievance and had their positions reclassified to Maintenance Mechanic. (Def.'s 56.1 Stmt ¶ 8; Pl.'s 56.1 Stmt ¶ 8; Aff. of Stuart E. Kahan, Ex. H ("Kahan Aff.").)

In the fall of 1995, Plaintiff was suspended for approximately sixty days without pay in connection with an altercation between Plaintiff and a co-worker. (Def.'s 56.1 Stmt ¶¶ 9-12; Pl.'s 56.1 Stmt ¶¶ 9-12; Kahan Aff., Ex. J.) Plaintiff was soon thereafter reassigned to the Division of General Maintenance in November 1995. (Def.'s 56.1 Stmt ¶ 13; Pl.'s 56.1 Stmt ¶ 13.) Years later, in 2000, Plaintiff was reassigned to Croton Point Park, and in 2001, Plaintiff was again reassigned to the Bronx River Parkway Reservation, where he reported to superintendent Robert Bates ("Bates"). (Def.'s 56.1 Stmt ¶¶ 21-22; Pl.'s 56.1 Stmt ¶¶ 21-22.)

Plaintiff was issued a warning notice by Bates on May 14, 2002 for "refus[ing] to do the work assigned to him and [for leaving the] work site without permission." (Def.'s 56.1 Stmt ¶ 23; Pl.'s 56.1 Stmt ¶ 23.) On October 24, 2002, Bates issued to Plaintiff another warning notice, citing Plaintiff for "time abuse." (Def.'s 56.1 Stmt ¶ 25; Pl.'s 56.1 Stmt ¶ 25.) According to Plaintiff, on November 8, 2002, he missed several hours of work to answer a jury summons in the Bronx County Courthouse. (Def.'s 56.1 Stmt ¶ 26; Pl.'s 56.1 Stmt ¶ 26.) Plaintiff alleges that on the following work day, November 12, 2002, Bates reprimanded Plaintiff for attending jury duty and told him that his pay would be docked for the time missed. (Def.'s 56.1 Stmt ¶ 27; Pl.'s 56.1 Stmt ¶ 27.)[1] Defendant claims that Plaintiff's time was never docked for jury duty (Def.'s 56.1 Stmt ¶ 28), but Plaintiff insists that it was (Decl. of Pl. Tedry Perry in Opp'n to Def.'s Mot. for Summ. J. ¶ 14 ("Pl.'s Decl.").) On November 25, 2002, Plaintiff was issued another warning notice, this time for taking time off on November 18, 2002, though he had already used up all of his available time. (Kahan Aff., Ex. Y.) Plaintiff, however, denies missing work on November 18, 2002, and insists that this warning notice was actually for the time he missed

Perry v. County of Westchester, Not Reported in Fed. Supp. (2008)

Case 3:24-cv-01358-GTS-ML    Document 13    Filed 01/07/25    Page 25 of 120

attending jury duty. (Pl.'s Decl. ¶ 14.) Yet more warning notices were issued to Plaintiff on December 30, 2002, for failing to produce a driver's license, and on January 24, 2003 and January 27, 2003, for calling in sick with no sick leave balance. (Kahan Aff, Ex. AA, BB.)

**\*2** On May 2, 2003, Plaintiff injured his back while working, which he did not report until May 5, 2003. (Def.'s 56.1 Stmt ¶¶ 34-35; Pl.'s 56.1 Stmt ¶¶ 34-35.) Also on May 5, Plaintiff was issued a warning notice for inappropriate conduct and insubordination. (Kahan Aff., Ex. DD.) That was the last day Plaintiff went to work. Plaintiff was issued two more warning notices, on May 8, 2003 and May 9, 2003, both for failing to report to work and failing to call in. (Def.'s 56.1 Stmt ¶ 37; Pl.'s 56.1 Stmt ¶ 37.) Thereafter, Plaintiff began collecting worker's compensation and social security disability benefits. (Def.'s 56.1 Stmt ¶ 39; Pl.'s 56.1 Stmt ¶ 39.) Defendant officially terminated Plaintiff's employment on October 28, 2004. (Def.'s 56.1 Stmt ¶¶ 44-45; Pl.'s 56.1 Stmt ¶¶ 44-45.)

### B. Plaintiff's Allegations of Discrimination

Plaintiff alleges that Defendant discriminated against him on the basis of race in violation of Title VII of the Civil Rights Act of 1964 and of the Civil Rights Act of 1866, 42 U.S.C. § 1981. Plaintiff claims that he was subjected to disparate treatment and a hostile work environment when he was forced to work out-of-title – while his Caucasian co-workers were not – from 1995 through May 5, 2003, performing dangerous and undesirable tasks that had no relationship to his job duties and that ultimately resulted in his back injury. (Compl. 3-4, 7-8.) [2] Further, Plaintiff asserts that, from 1999 to 2003, he was subjected to a hostile work environment when he was disciplined for minor infractions, while Caucasian employees were not disciplined for the same or worse behavior. (*Id.* 3.) One incident highlighted by Plaintiff is alleged to have taken place in November 2002, when Plaintiff claims to have had his pay docked for attending jury duty. Plaintiff asserts that Caucasian employees – in particular, Jason Aubry ("Aubry") – were never docked pay for attending court appearances. (*Id.* 4-5, 7.)

In sum, Plaintiff alleges that:

> Plaintiff has continually been disciplined and treated in a disparage [sic] fashion, due to his race. He was forced to work out of title since

1995 when he was required to perform tasks which had no relationship to his duties. He was docked for performing legitimate duties, such as jury duty, all the while white employees were given time off to go to court. He was disciplined, while other white employees were not disciplined for the same or worse behavior. Said discrimination occurred solely because of Plaintiff's race, and amounted to a hostile environment.

(*Id.* 1-2.)

### C. Procedural History

On October 5, 1999, Plaintiff filed a complaint alleging harassment on account of his race with the Westchester County Equal Employment Opportunity/Affirmative Action Office ("EEO/AAO"). (Def.'s 56.1 Stmt ¶ 14; Pl.'s 56.1 Stmt ¶ 14.) In February 2000, the EEO/AAO determined that there existed no evidence of racial discrimination or harassment, and in May 2000, the EEO/AAO closed its file on Plaintiff's complaint. (Def.'s 56.1 Stmt ¶¶ 15-16; Pl.'s 56.1 Stmt ¶¶ 15-16.) Plaintiff filed a complaint dated June 2, 2000 with the Equal Employment Opportunity Commission ("EEOC"), alleging racial discrimination and retaliation premised on a continuing violation spanning from August 2, 1999 to April 14, 2000. (Def.'s 56.1 Stmt ¶ 17; Pl.'s 56.1 Stmt ¶ 17.) In June 2001, the EEOC issued to Plaintiff a Dismissal and Notice of Rights Letter, in which it "adopted the findings of the State or Local Fair Employment Practices Agency that investigated this charge." (Def.'s 56.1 Stmt ¶ 19; Pl.'s 56.1 Stmt ¶ 19.) Plaintiff never filed a lawsuit in connection with these claims. (Def.'s 56.1 Stmt ¶ 20; Pl.'s 56.1 Stmt ¶ 20.)

**\*3** On August 11, 2003, Plaintiff filed another complaint alleging discrimination with the New York State Department of Human Rights ("NYSDHR"). (Def.'s 56.1 Stmt ¶ 40; Pl.'s 56.1 Stmt ¶ 40.) In this complaint, Plaintiff claimed that he had been treated disparately by Defendant due to his race from 1999 until May 5, 2003, and that he had been assigned undesirable tasks at work since 1999. (Kahan Aff., Ex. GG.) The NYSDHR determined on September 28, 2005, that there existed no probable cause to support Plaintiff's allegations of discrimination. (Def.'s 56.1 Stmt ¶ 42; Pl.'s 56.1 Stmt ¶ 42.) On January 17, 2006, the EEOC issued to Plaintiff a Dismissal

and Notice of Rights letter. (Def.'s 56.1 Stmt ¶ 43; Pl.'s 56.1 Stmt ¶ 43.)

Plaintiff initiated the present lawsuit on April 19, 2006, alleging: (i) employment discrimination in violation of Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e-5(f) (Compl. 8); and (ii) racial discrimination in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981 (*id.* 6). Discovery closed on January 3, 2007. On February 26, 2007, Defendant filed a Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56(b), seeking summary judgment in its favor on the following grounds:

> (a) portions of plaintiff's complaint are time barred pursuant to the 300 day limitations period set forth [in] 42 U.S.C. § 2000e-5(e); (b) plaintiff may not seek damages due to his termination from employment since plaintiff failed to exhaust administrative remedies; (c) the plaintiff has failed to make out a prima facie case of racial discrimination via disparate treatment since the plaintiff cannot prove that he was subjected to an adverse employment action or that a reasonable inference of racial discrimination can be reached based upon defendant's actions; (d) assuming that plaintiff has met the minimal requirements for a prima facie case of racial discrimination, the County presented a race neutral reason for its employment decisions regarding [Plaintiff] and the plaintiff cannot prove that the County's actions were mere pretext; (e) the plaintiff's claim based upon the existence of a hostile work environment must be dismissed because there is no evidence that such an environment existed; and (f) plaintiff's Section 1981 claim must be dismissed.

(Def.'s Mem. of Law in Supp. of Def. County of Westchester's Mot. for Summ. J. 1-2 ("Def.'s Mem.").)

Plaintiff did not file opposition papers by the March 12, 2007 deadline set by Judge Colleen McMahon, to whom this case was originally assigned. On June 28, 2007, Judge McMahon issued an order, stating: "Plaintiff's opposition was due March 12, 2007. The court has not received any response. Plaintiff has 30 days to file a response to the motion. If no response has been filed, the motion will be deemed submitted and the court will decide it without benefit of any response." (Docket No. 27.) Plaintiff failed to file opposition papers within the thirty-day deadline set by Judge McMahon on June 28, 2007. On August 6, 2007, the case was reassigned to this Court. Plaintiff finally filed opposition papers on August 22, 2007 – without explanation as to the delay or permission from the Court to do so. The Court held oral argument on March 11, 2008. For reasons stated herein, Defendant's Motion for Summary Judgment is GRANTED.

## II. Discussion

### A. Standard of Review

Summary judgment may be granted when it is shown that there is "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court must view all evidence in the light most favorable to the non-moving party and must draw all reasonable inferences in the non-movant's favor. *See Tufariello v. Long Island R.R. Co.*, 458 F.3d 80, 85 (2d Cir. 2006). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Segal v. City of New York*, 459 F.3d 207, 211 (2d Cir. 2006). "Once the moving party has made a properly supported showing sufficient to suggest the absence of any genuine issue as to a material fact, the nonmoving party, in order to defeat summary judgment, must come forward with evidence that would be sufficient to support a jury verdict in his favor." *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995). "The motion 'will not be defeated merely ... on the basis of conjecture or surmise.' " *Id.* (quoting *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991) ); *see also McPherson v. N.Y. City Dep't of Educ.*, 457 F.3d 211, 215 n.4 (2d Cir. 2006) ("[S]peculation alone is insufficient to defeat a motion for summary judgment."); *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) ("[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts." (internal quotation marks omitted) ).

Case 3:24-cv-01358-GTS-ML   Document 13   Filed 01/07/25   Page 27 of 120

Perry v. County of Westchester, Not Reported in Fed. Supp. (2008)

**\*4** The materiality of the facts considered by the Court will be governed by substantive law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). At summary judgment, the Court is not charged with weighing the evidence and determining its truth, but with determining whether there is a genuine issue for trial. *See Westinghouse Elec. Corp. v. N.Y. City Transit Auth.*, 735 F. Supp. 1205, 1212 (S.D.N.Y. 1990); *see also Castro v. Metro. Transp. Auth.*, No. 04-CV-1445, 2006 WL 1418585, at \*2 (S.D.N.Y. May 23, 2006). A court's goal should be to "isolate and dispose of factually unsupported claims." *Celotex*, 477 U.S. at 323-24.

While courts are to be "particularly cautious" about granting summary judgment to employers in cases where the discriminatory intent of the employer is contested, *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997), "[i]t is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases," *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001). Though district courts must pay careful attention to affidavits and depositions that may reveal circumstantial proof of discrimination, *see Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994), courts are not to "treat discrimination differently from other ultimate questions of fact." *Abdu-Brisson*, 239 F.3d at 466 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000) ); *see also Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 604 (2d Cir. 2006) (noting the caution with which the Second Circuit reviews the grant of summary judgment in discrimination cases "because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions[,]" but stating that "summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact" (internal quotation marks omitted) ).

B. Applicable Time Limitations

In its Motion for Summary Judgment, Defendant argues that Plaintiff is not entitled to base his claim on any discrete acts of alleged discrimination occurring before October 14, 2002 because such acts are more than 300 days before Plaintiff's NYSDHR complaint was filed. [3] (Def.'s Mem. 3.) Further, Defendant argues that acts of alleged discrimination that served as the basis of Plaintiff's 1999 complaint with the NYSDHR may not form the basis of Plaintiff's present claim because Plaintiff failed to file suit on those acts within ninety days of the EEOC's June 11, 2001 Notice of Rights letter. (*Id.* 5-6.)

To these arguments, Plaintiff responds that his present claims are not dependent on any discrete acts occurring before those time periods but insists that consideration of past acts is appropriate in demonstrating the existence of a hostile work environment and validating a theory of a continuing violation based on disparate treatment and out-of-title work. (Pl.'s Mem. of Law in Opp'n to Def. County of Westchester's Mot. for Summ. J. Pursuant to Fed. R. of Civ. P. 56(b) 4 ("Pl.'s Mem.") ("These instances provide the Court with a history of how the underlying cause of action came to pass and does not specifically ask for action on events which started years earlier. It merely demonstrates the theory of a continuing violation.").)

**\*5** The Supreme Court has made clear that discrete acts occurring more than 300 days before Plaintiff filed his complaint with the NYSDHR are not actionable. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002) ("[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act. The charge, therefore, must be filed within the ... 300-day time period after the discrete discriminatory act occurred."). Recently, in *Ledbetter v. Goodyear Tire & Rubber Co.*, the Supreme Court elaborated:

> A new violation does not occur, and a new charging period does not commence upon the occurrence of subsequent nondiscriminatory acts that entail adverse effects resulting from past discrimination. But of course, if an employer engages in a series of acts each of which is intentionally discriminatory, then a fresh violation takes place when each act is committed.... [C]urrent effects alone cannot breathe life into prior, uncharged discrimination....

127 S. Ct. 2162, 2169 (2007)

Perry v. County of Westchester, Not Reported in Fed. Supp. (2008)

Case 3:24-cv-01358-GTS-ML    Document 13    Filed 01/07/25    Page 28 of 120

Acts that were the subject of Plaintiff's 1999 EEO/AAO and EEOC complaints are also not actionable because Plaintiff failed to bring suit on those acts within ninety days from receipt of the EEOC Notice of Rights letter. To the extent that the second right-to-sue letter, dated January 2006, is based on the same facts as the first, Plaintiff cannot complain about those claims in this lawsuit. *See Lo v. Pan Am. World Airways, 787 F.2d 827, 828 (2d Cir. 1986)* (per curiam) (denying claims where second EEOC complaint was based on same facts as earlier lapsed right-to-sue letter). However, the June 2001 right-to-sue letter will not preclude the current suit "to the extent that plaintiff's Complaint is based on allegations in the second [EEOC complaint] which did not appear in the first [EEOC complaint]." *Dahbany-Miraglia v. Queensboro Cmty. Coll.*, No. 03-CV-8052, 2004 WL 1192078, at \*7 (S.D.N.Y. May 27, 2004). Time-barred acts will only be considered to the extent that they constitute "background evidence in support of a timely claim." *Morgan*, 536 U.S. at 113 ("The existence of past acts and the employer's prior knowledge of their occurrence, however, does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed."); *see also Williams v. British Airways, PLC*, 06-CV-5085, 2007 WL 2907426, at \*11 n.20 (E.D.N.Y. Sept. 27, 2007) ("[C]ertain incidents, even if time-barred, 'may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue.' " (quoting *Morgan*, 536 U.S. at 112) ).

The continuing violation theory is a tolling mechanism that rarely permits recovery for otherwise untimely violations. *See Santiago v. Newburgh Enlarged City Sch. Dist.*, 485 F. Supp. 2d 327, 331 (S.D.N.Y. 2007) ("Very few acts qualify as continuing violations, so as to trigger a continuous tolling of the statute of limitations."). A hostile work environment claim is a type of continuing violation based on the "cumulative affect of individual acts," which together constitute "one unlawful employment practice." *See Morgan*, 536 U.S at 115. "It does not matter, for purposes of the [time limitation in the] statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id.* at 117; *accord Santiago*, 485 F. Supp. 2d at 331 ("[I]n a hostile work environment case, acts outside the 300 day limit that contribute to an ongoing hostile work environment are actionable under a continuing violation theory."). The Supreme Court, however, has rejected

the notion "that an employment practice committed with no improper purpose and no discriminatory intent is rendered unlawful nonetheless because it gives some effect to an intentional discriminatory act that occurred outside the charging period." *Ledbetter*, 127 S. Ct. at 2172.

**\*6** To the extent Plaintiff is able to establish that there existed a hostile work environment during his employment with Defendant, recovery may be premised even on untimely acts as long as they – in conjunction with timely acts – created a hostile work environment. The Court notes, however, that even if the past acts contributed to a hostile work environment under a continuing violation theory, those acts would not be actionable to the extent that they formed the basis of Plaintiff's 1999 complaint. Plaintiff's opportunity to file suit on those alleged violations has long since passed and no tolling doctrine will revive them at this point. With respect to Plaintiff's disparate treatment claim based on adverse employment actions, Plaintiff can only rely on discrete acts of alleged discrimination occurring within the 300-day period preceding Plaintiff's August 11, 2003 EEOC complaint. *See Morgan*, 536 U.S. at 113.

### C. Plaintiff's Request to Supplement the Record

On March 13, 2008, after March 11 oral argument, Plaintiff's counsel submitted to the Court an application to supplement the record with a new affidavit from Plaintiff and with what appears to be the minutes of a meeting held on November 9, 1999. [4] According to Plaintiff's counsel, these additional submissions "clearly show Plaintiff was treated differently, that everyone knew about it ... and [that] Plaintiff was held to a different standard which was discriminatory and caused him to suffer damages." (Letter from Pamela D. Hayes, Esq., to the Court, dated March 17, 2008.) Notably absent from Plaintiff's counsel's recent submissions is an explanation as to why it has taken until now to submit these items to the Court – over a year after Plaintiff's full response to Defendant's Motion was due.

"Under Fed. R. Civ. P. 6(b)(2), the Court has discretion to allow plaintiff to submit new evidence if the Court determines that plaintiff's failure to submit such evidence in a timely fashion 'was the result of excusable neglect.' " *Davidson v. Scully*, 148 F. Supp. 2d 249, 251 (S.D.N.Y. 2001) (quoting *Davidson v. Keenan*, 740 F.2d 129, 132 (2d Cir. 1984) ). "The determination whether neglect is 'excusable' in a particular case rests with the sound discretion of the district court." *Keenan*, 740 F.2d at 132. In making the equitable

Perry v. County of Westchester, Not Reported in Fed. Supp. (2008)

Case 3:24-cv-01358-GTS-ML    Document 13    Filed 01/07/25    Page 29 of 120

determination of whether failure to make a more timely submission of new evidence constitutes excusable neglect, the factors that the Court may consider include: " 'the danger of prejudice' to the non-moving party, 'the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith.' " *Scully*, 148 F. Supp. 2d at 251-52 (quoting *Pioneer Inv. Servs. Co. v. Brunswick Assoc. Ltd. P'ship*, 507 U.S. 380, 395 (1993) ).

Here, the Court has little trouble finding that Plaintiff (or, really his counsel) has failed to meet the excusable neglect burden. The information Plaintiff seeks to add was available to him long ago (over a year) and obviously any first-hand testimony he offers has always been available to him. Moreover, Defendant is plainly prejudiced by the late use of this information as it likely would have been the subject of rigorous inquiry during Plaintiff's deposition and other discovery. Nor is there good faith. Plaintiff's counsel only tendered these new offerings when it was clear that her initial representations were exposed as wholly unsupported by the record as it existed at the time the Motion was fully briefed. Thus, the Court finds the extraordinary delay here to be inexcusable. Therefore, Plaintiff's request to supplement the record with the March 13 submissions is denied.

### D. Plaintiff's Claims of Employment Discrimination

**\*7** Plaintiff claims he was the victim of employment discrimination. To establish a claim of racial discrimination, Plaintiff must show that either: "(1) an adverse employment action under circumstances giving rise to an inference of discrimination based on race; or (2) harassment on the basis of race that amounts to a hostile work environment." *Williams*, 2007 WL 2907426, at \*11 (citing *Feingold v. New York*, 366 F.3d 138, 149 (2d Cir. 2004) ). Plaintiff asserts claims of racial discrimination based on each of these theories, so the Court will consider them in turn.

### 1. Disparate Treatment Claim & the *McDonnell Douglas* Framework

Title VII of the Civil Rights Act of 1964 makes it an "unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race...." 42 U.S.C. § 2000e-2(a)(1). The

Supreme Court's opinion in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), "established an allocation of the burden of production and an order for the presentation of proof in Title VII discriminatory-treatment cases." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993). First, the plaintiff must establish, by a preponderance of the evidence, a prima facie case of racial discrimination. *Id.* Plaintiff's burden in establishing a prima facie case is "de minimis." *See Douglas v. Dist. Council 37 Mun. Employees' Educ. Fund Trust*, 207 F. Supp. 2d 282, 289 (S.D.N.Y. 2002). However, a party's bald assertions, without more, are insufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991); *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985) ("To allow a party to defeat a motion for summary judgment by offering purely conclusory allegation of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases."); *Fair v. Weiburg*, No. 02-CV-9218, 2006 WL 2801999, at \*3 (S.D.N.Y. Sept. 28, 2006) ("To avoid summary judgment ... the non-moving party must offer 'some hard evidence' of its version of the facts, not merely rely on conclusory allegations or speculation."); *During v. City Univ. of N.Y.*, No. 01-CV-9584, 2005 WL 2276875, at \*4, \*8-9 (S.D.N.Y. Sept. 19, 2005) (granting summary judgment on discrimination claim where only evidence was conclusory allegations of plaintiff).

The establishment of a prima facie case gives rise to a presumption of discrimination. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). At that point, the burden of production (not persuasion) shifts to the defendant "to provide a legitimate, nondiscriminatory reason for [its] decision." *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 49 (2d Cir. 2002) (hereinafter *RECAP*) (citing *Reeves*, 530 U.S. at 142 and *Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Program, Inc.*, 198 F.3d 68, 72 (2d. Cir. 1999) ). A defendant's burden in this regard is not high; indeed, a defendant need not prove that it was actually motivated by these legitimate reasons. *See Deravin v. Kerik*, No. 00-CV-7487, 2007 WL 1029895, at \*6 (S.D.N.Y. Apr. 2, 2007) (citing *Burdine*, 450 U.S. at 254).

If the defendant makes a satisfactory showing, the presumption of discrimination disappears and the burden shifts back to the plaintiff. *See id.* The plaintiff must then "prove that the defendant[ ] intentionally discriminated against [him] on a prohibited ground." *RECAP*, 294 F.3d at 49. In other words, the plaintiff must show that defendant's "articulated, legitimate, non-discriminatory reasons were

Perry v. County of Westchester, Not Reported in Fed. Supp. (2008)

Case 3:24-cv-01358-GTS-ML    Document 13    Filed 01/07/25    Page 30 of 120

pretextual." *Id.* (internal quotation marks omitted); *accord Feingold,* 366 F.3d at 152 ("If the defendant has stated a neutral reason for the adverse action, 'to defeat summary judgment ... the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination.' " (quoting *Stern v. Trs. of Columbia Univ.,* 131 F.3d 305, 312 (2d Cir. 1997) ) ); *Deravin,* 2007 WL 1029895, at \*6 ("The plaintiff 'may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.' " (quoting *Burdine,* 450 U.S. at 254) ).

**\*8** Under *McDonnell Douglas* and its progeny, the plaintiff has the ultimate burden of proving discrimination, regardless of whether the defendant offers evidence of a legitimate reason for the adverse employment action at issue. *See St. Mary's Honor Ctr.,* 509 U.S. at 507; *Burdine,* 450 U.S. at 253; *Calabro v. Westchester BMW, Inc.,* 398 F. Supp. 2d 281, 292 (S.D.N.Y. 2005) (holding that plaintiff ultimately has the burden of proving employer's discriminatory animus to survive summary judgment).

### a. Prima Facie Case

A plaintiff may establish a prima facie case of disparate treatment by demonstrating: "1) that he belonged to a protected class; 2) that he was qualified for the position he held; 3) that he suffered an adverse employment action; and 4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Feingold,* 366 F.3d at 152.

Because Plaintiff is an African-American man, he belongs to a protected class and thereby satisfies the first prong of his prima facie case. Defendant is willing to assume, as is the Court, that Plaintiff was qualified for the position he held while working for Defendant, satisfying the second prong. (Def.'s Mem. 9.) Defendant argues that it is entitled to summary judgment on Plaintiff's discrimination claim because Plaintiff failed to satisfy the third and fourth prongs of his prima facie case.

### i. Adverse Employment Action

An adverse employment action is a " 'materially adverse change' in the terms and conditions of employment. To be 'materially adverse' a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Galabya v. N.Y. City Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir. 2000) (internal citations and quotation marks omitted). The Second Circuit has "defined adverse employment action broadly to include 'discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand.' " *Lovejoy-Wilson v. Noco Motor Fuel, Inc.,* 263 F.3d 208, 223 (2d Cir. 2001) (quoting *Morris v. Lindau,* 196 F.3d 102, 110 (2d Cir. 1999) ); *accord Feingold,* 366 F.3d at 152 ("Examples of materially adverse employment actions include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation." (internal quotation marks omitted) ).

Plaintiff argues that the following constitute adverse employment actions: (1) the alleged docking of Plaintiff's pay for attending jury duty on November 8, 2002 (Pl.'s Mem. 11); and (2) the out-of-title work Plaintiff was allegedly forced to perform, particularly on May 2, 2003, which led to his back and neck injury and significant loss of earning potential (*id.* 9-11). [5] Defendant argues that neither of these constitutes an adverse employment action. (Def.'s Mem. 10, 12-15.)

**\*9** Plaintiff alleges that he was docked pay for the several hours of work he missed on November 8, 2002, when he answered a jury summons in Bronx County. (Pl.'s Mem. 11; Compl. 4.) On November 25, 2002, Bates issued to Plaintiff a warning notice, in which Bates wrote: "Mr. Perry has used up all his time and continues to take off. On November 18, 2002 [he] used 3 ½ hrs. [leave without pay]. This is warning no. 2." (Kahan Aff., Ex. Y.)

Defendant argues that Plaintiff was never docked pay for attending jury duty on November 8, 2002, but that he was docked 3.30 hours of pay for being absent on November 18, 2002. In support of this position, Defendant submitted Plaintiff's leave history, which shows that Plaintiff was not docked any time on November 8, 2002, and that he was docked 3.30 hours on November 18, 2002. (Kahan Aff., Ex. W.) Defendant also offered affidavits from Joan Vassari, Defendant's director of personnel, and Bates, Plaintiff's then-supervisor, both of whom swear that Plaintiff was never docked pay for attending jury duty. (Aff. of Joan Vassari ¶ 13 ("Vassari Aff."); Aff. of Robert Bates ¶ 8 ("Bates Aff."); Dep.

Perry v. County of Westchester, Not Reported in Fed. Supp. (2008)

Case 3:24-cv-01358-GTS-ML    Document 13    Filed 01/07/25    Page 31 of 120

of Joan Vassari 11 ("Vassari Dep.") ("[An employee] would never be docked for jury duty.").)

The only evidence in the record that supports Plaintiff's claim that he was docked pay for attending jury duty on November 8, 2002, is his own deposition testimony and his own declaration, in which Plaintiff claims that Bates told him that he would be docked for attending jury duty. (Dep. of Ted Perry 81-82 ("Pl.'s Dep."); Pl.'s Decl. ¶ 14.) Plaintiff swears that he was not absent from work on November 18, 2002, arguing instead that the time he took off for jury service was not docked from his paycheck until the following pay period on November 18, 2002. Plaintiff claims that the November 25, 2002, warning notice was actually for the time Plaintiff missed on November 8, 2002. (Pl.'s Decl. ¶ 14.)

Thus, with regard to whether Plaintiff was docked pay for jury duty, the Court has before it conflicting evidence, giving rise to a factual question suited for a jury. Therefore, construing the evidence in the non-movant's favor, the Court assumes for purposes of this Motion that Plaintiff was docked pay for attending jury duty.

Assuming therefore that Plaintiff's pay was docked for his jury duty service, the next question is whether such a docking of pay qualifies as an adverse employment action; in other words, whether it constitutes a "materially adverse change in the terms and conditions of employment." *See Galabya*, 202 F.3d at 640 (internal quotation marks omitted). For purposes of this Motion, the Court is willing to assume that it does. *See Cunningham v. Consol. Edison Inc.*, No. 03-CV-3522, 2006 WL 842914, at *17 (E.D.N.Y. Mar. 28, 2006) ("[D]ocking of an employee's pay is an adverse employment action."); *see also Hicks v. Baines*, 99-CV-315, 2006 WL 1994808, at * (W.D.N.Y. July 14, 2006) ("The only specific allegations that arguably evince an adverse employment action are the docking of two hours of [one plaintiff's] pay ... and the docking of 15 minutes of [the other plaintiff's] pay...."). Therefore, Plaintiff satisfies the third prong of his prima facie case with respect to the jury duty issue.

Plaintiff argues that he also suffered an adverse employment action when he was forced to work outside of his Housekeeper title – often performing the duties meant for employees with higher pay grades – beginning in 1995. [6] (Pl.'s Mem. 12.) New York State Civil Service Law § 61(2) prohibits out-of-title work by declaring that "[n]o person shall be appointed, promoted or employed under any title not appropriate to the duties to be performed and, except upon assignment by proper

authority during the continuance of a temporary emergency situation, no person shall be assigned to perform the duties of any position unless he has been duly appointed, promoted, transferred or reinstated to such position...." New York courts have further defined out-of-title work to encompass situations "when an employee has been assigned ... to perform the duties of a higher grade, without a concomitant increase in pay, frequently, recurrently and for long periods of time." *Sprague v. Governor's Office of Employee Relations*, 786 N.Y.S.2d 634, 635 (App. Div. 2004) (internal quotation marks omitted) (ellipses in original). [7] However, "not all additional duties constitute out-of-title work, and the mere fact that there may be some overlap between two particular positions does not mandate a finding that a petitioner is being compelled to perform out-of-title work." *Woodward v. Governor's Office of Employee Relations*, 718 N.Y.S.2d 465, 467 (App. Div. 2001).

**\*10** Plaintiff claims that his working out-of-title eventually led to a back injury when, on May 2, 2003, he was ordered to move several concrete bumpers. (Compl. 3-4; Pl.'s Decl. ¶ 17.) This injury resulted in a partial permanent disability and loss of Plaintiff's earning potential, which, according to Plaintiff, constituted an adverse employment action. (Pl.'s Mem. 9-11; Compl. 7.)

Defendant disputes Plaintiff's claim that he was working out-of-title or that he was performing the work of a higher salary grade employee. (Def.'s Mem. 13.) Defendant cites *Healy v. County of Nassau*, 796 N.Y.S.2d 377, 379 (App. Div. 2005), for the proposition that "work is not considered 'out-of-title' where it is related to, similar in nature to, or a reasonable outgrowth of, the 'in-title' work." According to Defendant, the job assignments that Plaintiff was asked to complete either fell under his title of Housekeeper or were "reasonably related to" the Housekeeper job description (Def.'s Mem. 14.), and, in either case, were based on the needs of the Department (*id.* 19).

The Court finds a genuine issue of material fact as to whether the assignments given to Plaintiff – particularly the May 2, 2003 assignment – were out-of-title, in-title, or reasonably related to in-title work. In order for Plaintiff to establish that allegedly out-of-title assignments, particularly the assignment to move concrete bumpers, constituted an adverse employment action, Plaintiff must demonstrate that such assignments resulted in a " 'materially adverse change' in the terms and conditions of [his] employment." *Galabya*, 202 F.3d at 640. If what Plaintiff claims is true – that he was assigned duties outside of his Housekeeper title that somehow

Case 3:24-cv-01358-GTS-ML    Document 13    Filed 01/07/25    Page 32 of 120

Perry v. County of Westchester, Not Reported in Fed. Supp. (2008)

were typically performed by employees in a higher pay grade – then Plaintiff will have satisfied his minimal burden of demonstrating that he suffered an adverse employment action, at least with regard to out-of-title work performed within the 300-day-period preceding the filing of Plaintiff's NYSDHR complaint. *See Santiago*, 485 F. Supp. 2d at 335-36 (referring to employer's refusal to compensate employee's performance of out-of-title duties as discrete act). Defendant has failed to adequately demonstrate that there exists no genuine issue of material fact with regard to whether Plaintiff's pay was concomitant with the duties he was assigned. Therefore, for purposes of this Motion, the Court assumes that Plaintiff suffered an adverse employment action by being assigned out-of-title work usually performed by employees with a higher pay grade.

### ii. Inference of Discriminatory Intent

To establish his prima facie case, and thereby shift the burden of production to Defendant, Plaintiff must establish an inference of discrimination. Though not required, this is most commonly done by demonstrating that other similarly situated persons, not of Plaintiff's protected class, were treated more favorably than he was in the workplace. *See Abdu-Brisson*, 239 F.3d at 467-68. Indeed, Plaintiff has chosen this approach to make his case. To be similarly situated, these persons must have been subject to the same standards governing performance evaluation and discipline and must have engaged in conduct similar to Plaintiff's. *See Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 96 (2d Cir. 1999); *see also McGuinness v. Lincoln Hall*, 263 F.3d 49, 54 (2d Cir. 2001) ("[W]here a plaintiff seeks to establish the minimal prima facie case by making reference to the disparate treatment of other employees, those employees must have a situation sufficiently similar to plaintiff's to support at least a minimal inference that the difference of treatment may be attributable to discrimination."). Evidence of disparate treatment, however, cannot be based on conclusory allegations. *See Finney v. Planned Parenthood of N.Y. City, Inc.*, No. 02-CV-7942, 2003 WL 22928730, at *4 (S.D.N.Y. Dec. 10, 2003) (granting summary judgment where only evidence of disparate treatment was plaintiff's own conclusory allegations); *Griffin v. Ambika Corp.*, 103 F. Supp. 2d 297, 308 (S.D.N.Y. 2000) ("Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." (internal quotation marks omitted) ).

**\*11** Defendant argues that even if Plaintiff did suffer adverse employment actions, Plaintiff failed to establish that such actions took place under circumstances giving rise to an inference of discriminatory intent. (Def.'s Mem. 16-18.) Plaintiff relies on the alleged disparate treatment between him and his Caucasian co-workers (in particular, Aubry, Emery and Ponce) to support his claim that he suffered adverse employment actions under circumstances giving rise to an inference of discriminatory intent. (Pl.'s Mem. 12-13.) More specifically, Plaintiff claims that he was constantly disciplined and forced to do undesirable out-of-title work, while his Caucasian co-workers were not. According to Plaintiff, this disparate treatment demonstrates that the adverse employment actions he suffered were motivated by racial discrimination.

In 1993, Emery, Ponce and Plaintiff had their positions reclassified to that of Housekeeper – the position Plaintiff still held when his employment with Defendant ended. After filing a grievance, Emery and Ponce had their positions reclassified to Maintenance Mechanic, which, according to Plaintiff, left them "open to higher salaries and promotion opportunities." (Pl.'s Decl. ¶¶ 7-8.) Plaintiff claims that he was not allowed to grieve his reassignment. (*Id.* ¶ 8.) Plaintiff makes this argument with no proof whatsoever.

As previously noted, after oral argument, Plaintiff submitted to the Court an application to supplement the record with what appears to be the minutes from a meeting that took place in November 1999. According to Plaintiff, this document demonstrates that "Defendant treated Plaintiff differently from the white County employees (Mr. Em[e]ry and Mr. Ponce), thereby showing that Defendant ... was fully aware that Plaintiff's title was supposed to have been changed and was not." (Letter from Pamela D. Hayes, Esq., to the Court, dated Mar. 17, 2008.) Despite Plaintiff's urging, this document cannot be used to create an issue of fact because the meeting minutes are inadmissible hearsay. *See Patterson v. County of* Oneida, 375 F.3d 206, 219 (2d Cir. 2004); *Witkowich v. Gonzales*, 05-CV-7756, 2008 WL 701280, at *10 n.11 (S.D.N.Y. Feb. 25, 2008) ("[I]nadmissible hearsay ... [cannot] be used to defeat summary judgment."). Further, as discussed above, Plaintiff has failed to demonstrate to the Court that excusable neglect was to blame for this document not being added to the record earlier. *Cf. Scully*, 148 F. Supp. 2d at 251-52 (plaintiff was permitted to supplement the summary judgment record because the new evidence was not previously available, plaintiff exercised good faith, and only minimal delays would result). Moreover, even if admissible,

Perry v. County of Westchester, Not Reported in Fed. Supp. (2008)

Case 3:24-cv-01358-GTS-ML    Document 13    Filed 01/07/25    Page 33 of 120

these minutes do Plaintiff no good, for they fail to rebut Defendant's argument that Plaintiff was always free to grieve his assignment, but never did. Plaintiff claims he was unaware of this option, a claim contradicted by the minutes themselves, but Plaintiff still fails to tender any evidence that Defendant engaged in any conduct blocking Plaintiff's efforts to grieve his assigned title.

Without this inadmissible and tardy information, Plaintiff has no admissible evidence showing that Defendant prohibited him from grieving his reassignment, that Defendant had an affirmative obligation to notify Plaintiff of his right to grieve his reassignment or to help him do it, or that Defendant helped Emery and Ponce to grieve their status. Moreover, this alleged act of discrimination was a discrete act occurring several years before Plaintiff initiated legal action. Therefore, the Court will not entertain Plaintiff's argument that discriminatory intent can be inferred from Emery and Ponce being reclassified to the Maintenance Mechanic position after filing grievances.

Plaintiff also focuses on what he sees as the disparate treatment between him and Aubry. Plaintiff claims that he was docked for attending jury duty, but that when Aubry had to appear in court on several occasions, he was given time off and never had his pay docked. (Compl. 4-5; Pl.'s Dep. 117 ("Jason used to go to jail for long periods of time and come back and have his job and nothing said or nothing done.").) [8] Also, Plaintiff alleges that Aubry was permitted to drive County vehicles without a license – even though one was required for his position – but that Plaintiff was disciplined for failing to produce a driver's license – even though his position did not require that he have such a license. (Compl. 5; Pl.'s Mem. 13; Kahan Aff., Ex. AA.) Indeed, according to Plaintiff, he was disciplined for not having a license, while Defendant actually helped Aubry obtain his license. (Pl.'s Mem. 13.) Further, Plaintiff claims that he was constantly disciplined for minor infractions, while Aubry committed much more serious infractions and was not similarly disciplined or docked pay. (Id. 13; Compl. 4-5; Pl.'s Decl. ¶ 19; Kahan Aff., Ex. GG ("In contrast to Mr. Aubry, I have been written up for numerous incidents, none of which are as grave as the incidents involving Mr. Aubry.").)

**\*12** Plaintiff offers no evidence to support his argument that Aubry went undisciplined while committing infractions similar to or worse than those committed by Plaintiff. Plaintiff was disciplined many times during the course of his employment with Defendant, mostly for infractions such as time abuse and insubordination, and he offers no proof

that those were improperly imposed sanctions. (Def.'s 56.1 Stmt ¶¶ 9-12, 23, 25, 29-33, 36-37.) Moreover, Defendant submitted unrefuted evidence demonstrating that Aubry was in fact disciplined for time abuse, at least during 2003 and 2004. (Kahan Aff., Exs. LL-NN.) In fact, the evidence shows that, because of his excessive absenteeism, Aubry was denied salary increments on August 13, 2003, November 10, 2003, and February 19, 2004, and that he was denied an unpaid leave of absence on February 2, 2004. (Id., Ex. MM.) Further, an Amended Notice of Charges dated April 15, 2004, was issued to Aubry, detailing 169 charges and specifications brought against him by Defendant for time abuse spanning from January 16, 2003, through April 5, 2004. (Id., Ex. LL.) Aubry resigned before the charges could be resolved. (Id.) According to Plaintiff, this evidence does nothing to disprove his claim of disparate treatment since "nothing was done to Mr. Aubry while Plaintiff was on the job." (Pl.'s Mem. 13.)

Although the Court agrees with Plaintiff that the record contains evidence of discipline of Aubry (who was employed by Defendant for far less time than Plaintiff) that largely post-dates Plaintiff's employment and, therefore, it does little to disprove Plaintiff's claim of disparate treatment, it is not Defendant's burden to disprove an unsupported claim of disparate treatment. Plaintiff has the ultimate burden under the *McDonnell Douglas* framework, *St. Mary's Honor Ctr., 509 U.S. at 507*, and he cannot satisfy his burden by making bare and conclusory assertions that he and Aubry were similarly situated but that they were treated differently. [9] A conclusory allegation without support in the record will not give rise to an inference of discriminatory intent nor will it defeat a motion for summary judgment.

Aubry, who was a Maintenance Laborer, was required to have a driver's license. Based on the Housekeeper job specifications, it appears that Plaintiff was not. [10] (Kahan Aff., Ex. I.) On December 30, 2002, however, Plaintiff was issued a warning notice by Bates for failure to produce a license. (Id., Ex. AA ("Mr. Perry could be asked to drive at any time and should have his license with him.").) The record shows that on June 17, 2002, Aubry was notified by Commissioner Stanley G. Motley that his probationary appointment would be terminated if he failed to produce a driver's license by July 22, 2002. (Pl.'s Exs. in Opp'n Pursuant to Local Rule 56.1(a) 21 ("Pl.'s Ex.").) In response to this notification, Aubry wrote a letter to Motley on July 8, 2002, indicating that he was in the process of getting his license back, but that he may not have it back from the Department of Motor Vehicles ("DMV") within the time limit specified. (Id.)

Perry v. County of Westchester, Not Reported in Fed. Supp. (2008)

Case 3:24-cv-01358-GTS-ML    Document 13    Filed 01/07/25    Page 34 of 120

Motley replied to Aubry on July 10, 2002, stating that "[the County] will try to expedite the return of your driver's license through the Department of Motor Vehicles. I[n] the event we can not please be assured that you will still be an employee in good standing since you have met the legal requirements and are just awaiting the return of your paperwork from the State of New York." (*Id.*)

**\*13**  Again, Plaintiff has not pointed to any evidence in the record from which the Court could conclude that Plaintiff and Aubry were similarly situated with regard to the driver's license issue. The record demonstrates that Aubry was threatened with termination (by someone other than Bates) if he did not produce a driver's license by a certain date. The record also suggests that Defendant did not offer to "help" Aubry until it was satisfied that Aubry had done all that he could to obtain his driver's license and that he was waiting on paperwork from the DMV. Plaintiff offers no evidence suggesting that, at the time he was issued a warning notice, he, like Aubry, had done all that could to obtain his license but was waiting on documentation from the DMV. Further, Plaintiff and Aubry did not hold the same positions. Though it is not entirely clear from the record why Plaintiff was issued a warning notice for failure to produce a driver's license, there is nothing in the record suggesting that the reason was racial discrimination. And, Plaintiff's bare belief that Defendant was "messing" with him is not evidence of anything. *See Powell v. Consol. Edison Co.*, 97-CV-2439, 2001 WL 262583, at \*12 (S.D.N.Y. Mar. 13, 2001) ("[P]laintiff's subjective belief that a supervisor had an improper motive is not evidence at all...."). From this feeble evidence, no reasonable jury could find that Plaintiff and Aubry were similarly situated but were treated disparately under circumstances giving rise to an inference of discriminatory intent.

Plaintiff argues that he was forced to work out-of-title, while his similarly-situated Caucasian co-workers were not. Some of his complained of out-of-title duties included digging ditches, performing firefighter duties, and moving concrete parking lot bumpers, none of which expressly appear on the illustrative list of possible Housekeeper duties. (Compl. 3-4; Kahan Aff., Ex. I.) [11] Even if the Court accepts Plaintiff's argument that he was given assignments outside of his Housekeeper title, Plaintiff has offered no evidence from which the Court could infer that such assignments were given on account of Plaintiff's race as opposed to any other reason (such as department need or even personal dislike of Plaintiff). It is noteworthy that in regard to this claim, Plaintiff has submitted no evidence of disparate treatment.

Defendant has submitted an affidavit from Bates, in which he stated that "[t]he decisions regarding jobs to be performed depended upon the needs of the department and who is available.... Perry's job assignments were no more difficult, demanding or dangerous than assignments given to other ... employees. That Perry did not like some of [ ]his job assignments is true, but Perry was not singled out for particular jobs." (Bates Aff. ¶¶ 3-4.) Plaintiff testified that during a meeting while Plaintiff was at Bronx River Parkway, Bates said that "any shit detail that was going to be done, [Plaintiff] would be doing it." (Pl.'s Dep. 45.) Plaintiff also testified that, while at Bronx River Parkway, he worked as part of a crew – albeit "not the popular crew." (*Id.* 44.)

Plaintiff cannot defeat Defendant's Summary Judgment Motion with these statements. By themselves, these alleged comments show only that Bates might have disliked Plaintiff (and others in the group), not that he discriminated against him. Thus, it is even more apparent that Plaintiff has failed to demonstrate that any of the work he was assigned – including the assignment that allegedly led to his back injury on May 2, 2003 – was assigned to him because of his race. In a conclusory fashion, Plaintiff claims that he was made to perform dangerous and demanding out-of-title work, while Caucasian co-workers were not. (Pl.'s Mem. 9.) Plaintiff has not made any specific allegations asserting, nor has he provided any admissible evidence suggesting, that Plaintiff was given assignments more dangerous or demanding than similarly-situated Caucasian co-workers. [12] *See Meiri*, 759 F.2d at 998 ("To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases."); *Jones*, 2008 WL 495498, at \*11 (finding plaintiff failed to establish prima facie case of discrimination because plaintiff offered no specific information or evidence to substantiate his conclusory allegation that "white [co-workers] with less seniority and experience were provided summer employment while he was not"); *Marro v. Nicholson*, No. 06-CV-6644, 2008 WL 699506, at \*10 (E.D.N.Y. Mar. 12, 2008) (holding vague and conclusory statements that similarly situated employees were treated differently failed to give rise to issue of material fact regarding disparate treatment); *Randolph v. CIBC World Markets*, No. 01-CV-11589, 2005 WL 704804, at \*13 (S.D.N.Y. Mar. 29, 2005) ("Although [plaintiff] has made the general allegation that he was treated more harshly than white ... employees who committed similar violations ..., there is no other evidence in the record to support this

Case 3:24-cv-01358-GTS-ML     Document 13     Filed 01/07/25     Page 35 of 120

Perry v. County of Westchester, Not Reported in Fed. Supp. (2008)

assertion. Conclusory allegations of this sort are insufficient to survive a motion for summary judgment.").

**\*14** As set forth above, Plaintiff has failed to establish a prima facie case of racial discrimination based on disparate treatment because he has not offered admissible evidence suggesting that he suffered adverse employment actions under circumstances giving rise to an inference of racial discrimination.

### 2. Hostile Work Environment Claim

Plaintiff also brings a hostile work environment claim. "The question of whether a work environment is sufficiently hostile to violate Title VII is one of fact. On a motion for summary judgment, the question for the court is whether a reasonable factfinder could conclude, considering all the circumstances, that the harassment is of such quality or quantity that a reasonable employee would find the conditions of [his] employment *altered for the worse.*" *Schiano,* 445 F.3d at 600 (internal quotation marks and citations omitted).

> In order to prevail on a hostile work environment claim, a plaintiff must first show that the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. Second, the plaintiff must demonstrate a specific basis for imputing the conduct creating the hostile work environment to the employer.

*Feingold,* 366 F.3d at 149-50 (internal citations and quotation marks omitted).

The first prong involves an objective and a subjective component: "the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive." *Id.* (internal quotation marks omitted). In determining whether a work environment is "hostile" or "abusive," courts are to look at the totality of the circumstances, as guided by the following factors: "the frequency of the discriminatory conduct; its

severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23 (1993), *abrogated on other grounds by, Burlington Indust., Inc. v. Ellerth,* 524 U.S. 742 (1998). Thus, to satisfy the first prong, a plaintiff " 'must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were 'sufficiently continuous and concerted' to have altered the conditions of [his] working environment.' " *Alfano v. Costello,* 294 F.3d 365, 374 (2d Cir. 2002) (quoting *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 570 (2d Cir. 2000) ). Though a single incident may be severe enough to materially alter employment conditions, *see Patterson,* 375 F.3d at 227, in general the actions taken by the defendant "must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.' " *Alfano,* 294 F.3d at 375 (quoting *Perry v. Ethan Allen, Inc.,* 115 F.3d 143, 149 (2d Cir. 1997) ); *see also Carrero v. N.Y. City Hous. Auth.,* 890 F.2d 569, 577 (2d Cir. 1989) (holding "incidents must be more than episodic"). "Where reasonable jurors could disagree as to whether alleged incidents of racial insensitivity or harassment would have adversely altered the working conditions of a reasonable employee, the issue of whether a hostile work environment existed may not properly be decided as a matter of law." *Patterson,* 375 F.3d at 227.

**\*15** The existence of a hostile environment alone is insufficient to make out a Title VII claim, however. Plaintiff must also show there is some reason to impute the discriminatory conduct of the employees that created the hostile work environment to the employer. *See Perry,* 115 F.3d at 149. Employers are not generally liable for the harassing behavior of a plaintiff's co-workers; to make an employer liable for a hostile work environment claim, the harassment must generally come from a supervisor with authority over a plaintiff. *See Mack v. Otis Elevator Co.,* 326 F.3d 116, 123 (2d Cir. 2003) ("[I]t is only when a supervisor with immediate (or successively higher) authority over the employee has engaged in the complained of conduct, that the employer may be subject to vicarious liability. Employers are not, by contrast, vicariously liable for hostile work environment created by a mere co-worker of the victim." (internal citations and quotation marks omitted) ).

Finally, Plaintiff must prove that the hostile conduct occurred because of his membership in a protected class. To make such a showing, a plaintiff must introduce evidence of hostile conduct that a reasonable juror could find was a result of the

Perry v. County of Westchester, Not Reported in Fed. Supp. (2008)

Case 3:24-cv-01358-GTS-ML    Document 13    Filed 01/07/25    Page 36 of 120

plaintiff's membership in a protected class. *See Brennan v. Metro. Opera Ass'n,* 192 F.3d 310, 318 (2d Cir. 1999).

Plaintiff argues that the accumulation of the following incidents – which occurred from 1995 through May 2003 – demonstrate that he was treated differently than his Caucasian co-workers and constitute a hostile work environment: [13] (1) After filing a grievance, Emery and Ponce were reclassified from the Housekeeper title to the Maintenance Mechanic title, and Plaintiff was not (Pl.'s Mem. 15); (2) Plaintiff was told he would be fired if he did not do what he was told, regardless of whether the assignment was in- or out-of-title (*id.*; Compl. 5; Pl.'s Dep. 112); (3) Plaintiff was the only person docked pay for going to jury duty (Pl.'s Mem. 15); (4) Plaintiff was written up for excessive absenteeism on May 8 and 9, 2003, even though his supervisor knew that he was out because of the May 2, 2003 injury (*id.*); (5) Plaintiff had to drive Aubry around, even though Aubry was required to have a license (*id.*; Pl.'s Dep. 113); (6) Plaintiff was not allowed to wear safety equipment like his Caucasian co-workers (Pl.'s Mem. 15); (7) Plaintiff was subjected to "Kunta Kinte" jokes (*id.* 15-16); [14] and (8) Plaintiff was disciplined for minor infractions while his Caucasian co-workers were not (Compl. 3). Plaintiff acknowledges that he was not generally subjected to racial epithets or insults, but insists that, because he was the only African-American person in his group, no outright insults were necessary. (Pl.'s Mem. 16.)

**\*16** Plaintiff does not suggest, and the Court does not find, that any one of these alleged incidents was severe enough by itself to alter the conditions of Plaintiff's employment and thereby constitute hostile work environment. [15] Therefore, the Court considers these incidents in the aggregate to determine whether, under the totality of the circumstances, Plaintiff was subjected to a hostile work environment during his employment with Defendant. For present purposes, with regard to timeliness, the Court will assume – without deciding – that these acts are all properly before the Court as part of Plaintiff's hostile work environment claim, unless otherwise noted.

The first issue for the Court is whether Plaintiff was subjected to an objectively hostile environment during his employment with Defendant. *Feingold,* 366 F.3d at 150. In making this determination, the *Harris* factors guide the Court's "totality of the circumstances" analysis. *See Harris,* 510 U.S. at 23. The conduct complained of spans a period of approximately eight years, which is a considerable amount of time considering the fact that most of the incidents complained of are isolated

occurrences. The fact that the incidents are spread out over a long period of time tends to weigh against a finding that Plaintiff's work environment was altered for the worse. *See Williams,* 2007 WL 2907426, at *11 ("The incidents that plaintiff points to were isolated in nature and took place over a number of years.... Taken together, the incidents described are separated in time and space and do not demonstrate a change in work environment.").

Nonetheless, keeping in mind that it is not for the Court to act as a " 'hierophant of social graces,' " *see Schiano,* 445 F.3d at 605 (quoting *Holtz v. Rockefeller Co.,* 258 F.3d 62, 75 (2d Cir. 2001) ), the Court is unwilling to say that no reasonable jury could find that the incidents listed above were severe enough in the aggregate to alter the conditions of Plaintiff's employment, though the Court has serious doubts. Indeed, the Second Circuit has cautioned that "hostile work environment claims present 'mixed question[s] of law and fact' that are 'especially well-suited for jury determination.' " *Id.* (quoting *Richardson v. N.Y. State Dep't of Corr. Serv.,* 180 F.3d 426, 437 (2d Cir. 1999) ) (alteration in original). Only when "application of the law to th[e] undisputed facts will reasonably support only one ultimate conclusion" is summary judgment appropriate. *Richardson,* 180 F.3d at 438. Because reasonable minds may differ on the issue of whether the conduct complained of altered Plaintiff's employment for the worse, the Court will not grant summary judgment to Defendant on the objective element of Plaintiff's hostile work environment case.

With regard to whether Plaintiff subjectively believed that his work environment with Defendant was hostile, Plaintiff has pled that he was caused to "undergo an intimidat[ing], hostile and offensive work environment causing [him] monetary damages and emotional injuries and numerous other injuries." (Compl. 8.) At this stage, Defendant does not challenge Plaintiff's claim that he found the work environment subjectively hostile, so the Court will assume, for purposes of this Motion, that this element is satisfied.

Plaintiff must show a basis upon which to impute the discriminatory conduct of the employees that created the hostile work environment to the employer. *See Perry,* 115 F.3d at 149. Because most of the complained-of conduct was alleged to have been committed by Bates, Plaintiff's direct supervisor, Defendant can be held vicariously liable for any resulting hostile work environment. *See Mack,* 326 F.3d at 123.

Perry v. County of Westchester, Not Reported in Fed. Supp. (2008)

Case 3:24-cv-01358-GTS-ML    Document 13    Filed 01/07/25    Page 37 of 120

**\*17** Finally, Plaintiff must demonstrate that the hostile conduct occurred because of his membership in a protected class. *See Brennan*, 192 F.3d at 318. "Although the incidents comprising a hostile work environment claim need not make reference to any trait or condition on the basis of which the discrimination has occurred ... they must occur under circumstances in which ... the incidents can reasonably be interpreted as having taken place on the basis of that trait or condition." *Williams*, 2007 WL 2907426, at \*10 (internal quotation marks omitted) (ellipses in original). Plaintiff points to no admissible evidence in the record suggesting that his race played a role in the way he was treated during his employment with Defendant. Instead, Plaintiff relies on his own conclusory statements that: (1) race must have been a motivating factor because Plaintiff was the only African American employee in the group (Pl.'s Mem. 16); and (2) he was treated differently from his Caucasian co-workers (Compl. 1-2, 3-5, 7; Pl.'s Mem. 15). The problem, however, is that Plaintiff's membership in a protected class in and of itself does not establish discriminatory intent. *See Ghent v. Moore*, 519 F. Supp. 2d 328, 338 (W.D.N.Y. 2007) ("Without other evidence of discrimination, [the fact that plaintiff was the only African-American employee] alone is not probative of unlawful discrimination."); *Bennett v. Watson Wyatt & Co.*, 136 F. Supp. 2d 236, 252 (S.D.N.Y. 2006) ("It is not enough simply to be a member of a protected class. To invoke the protections of Title VII, an employee must have actually suffered discrimination."). Further, as discussed above, Plaintiff has offered no evidence demonstrating that these Caucasian co-workers were similarly-situated to and actually treated differently than Plaintiff. *See Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d 336, 360 (S.D.N.Y. 2006) ("When a person only makes general allegations that African-Americans are treated differently in the workplace, those allegations are insufficient to support a hostile work environment claim."); *see also Marro*, 2008 WL 699506, at \*10; *Randolph*, 2005 WL 704804, at \*13.

The Second Circuit has said that "[i]n a hostile work environment case, it may well be a proper exercise of the district court's broad discretion to allow the plaintiff to build [his] case partly by adducing incidents for which the link to any discriminatory motive may, in the first instance, appear tenuous or nonexistent." *Schiano*, 445 F.3d at 605. However, the Second Circuit has stood firm on its position that district courts are not to "treat discrimination differently from other ultimate questions of fact." *Abdu-Brisson*, 239 F.3d at 466; *accord Schiano*, 445, F.3d at 603 ("[S]ummary judgment remains available for the dismissal of discrimination claims

in cases lacking genuine issues of material fact." (internal quotation marks omitted) ). On the record before the Court, no reasonable jury could find that Plaintiff was subjected to a hostile work environment on account of his membership in a protected class. Therefore, Defendant's Motion for Summary Judgment dismissing Plaintiff's hostile work environment claim is granted.

### 3. Section 1981 Claim

The *McDonnell Douglas* burden-shifting framework also applies to 42 U.S.C. § 1981 claims. *See Evans-Gadsden v. Bernstein Litowitz Berger & Grossman, LLP*, 491 F. Supp. 2d 386, 402 (S.D.N.Y. 2007). "To establish the requisite prima facie case for a violation of [Section 1981], a plaintiff must establish: (1) that [he] is a member of a racial minority; (2) that the Defendant intended to discriminate against Plaintiff on the basis of [his] race; and (3) that the Defendant discriminated in connection with one of the statute's enumerated activities." *Id.* (citing *Brown v. City of Oneonta*, 221 F.3d 329, 339 (2d Cir. 1999) ).

An individual may be held liable under Section 1981 where the plaintiff demonstrates "some affirmative link to causally connect the [defendant] with the discriminatory action." *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 75 (2d Cir. 2000) (internal quotation marks omitted). Although the elements of a Section 1981 claim and a Title VII claim are distinct, discriminatory intent is a necessary element of a Section 1981 claim. *See Patterson*, 375 F.3d at 226 ("[A] plaintiff pursuing a claimed violation of § 1981 ... must show that the discrimination was intentional."). Thus, a failure to establish sufficient evidence of discriminatory intent to survive summary judgment on a Title VII claim is fatal to a similar claim of racial discrimination under Section 1981. *See Gonzalez v. City of New York*, 354 F. Supp. 2d 327, 330 n.2 (S.D.N.Y. 2005) ("Although claims under 42 U.S.C. § 1981 ... involve different elements than those involved in Title VII claims, they share in common with Title VII claims the essential element of intentional unlawful discrimination. Therefore, the Court's determination that certain of Plaintiffs' Title VII claims do not survive summary judgment due to the inadequacy of evidence regarding discriminatory intent also results in dismissal of Plaintiffs' § 1981 ... claims." (internal quotation marks and citations omitted) ); *Patterson*, 375 F.3d at 225 (holding that reasons supporting summary judgment for defendants on Title VII claims also merited dismissal of plaintiff's Section

Perry v. County of Westchester, Not Reported in Fed. Supp. (2008)

Case 3:24-cv-01358-GTS-ML    Document 13    Filed 01/07/25    Page 38 of 120

1981 claims). As described in the previous section, Plaintiff has failed to show intentionally discriminatory conduct on the part of Defendant, and therefore, summary judgment on Plaintiff's Section 1981 claim is granted.

## III. Conclusion

**\*18** For the reasons stated herein, Plaintiff's application to supplement the record is DENIED, and Defendant's Motion for Summary Judgment is GRANTED. The Clerk of Court is respectfully directed to terminate all pending motions (Dkt. Nos. 23, 45), to enter judgment for Defendant, and to close this case.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2008 WL 11438085

---

## Footnotes

1    Defendant's Employee Handbook provides the following:

  If you are required to serve as a juror or to appear in court pursuant to a subpoena or court order, you will be granted a leave with pay for such required attendance. Any fees received for such attendance, other than travel and meals, must be paid to the County. This leave with pay does not apply when your own personal interests are the subject of the court activity.

  (Kahan Aff., Ex. Z.)

2    The Court will cite to Plaintiff's Complaint by page number rather than paragraph number in an attempt to alleviate the confusion resulting from Plaintiff's reuse of paragraph numbers within the document.

3    "[I]n a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice ..., such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred...." 42 U.S.C. § 2000e-5(e)(1).

4    Plaintiff offered these tardy additions to the record, after he failed to provide the record evidence he claimed would prove that a supervisor had referred to Plaintiff as "Kunta Kinte." Obviously, the Court found Plaintiff's assertion of this claim in response to Defendant's Summary Judgment Motion, which was not backed up by any evidence in the record (despite representations to the contrary), to be potentially material, if not dispositive, in resolving the Motion. Accordingly, the Court asked counsel for Plaintiff to show where in the record there was support for this assertion. Plaintiff never did provide any evidence in the record as it existed when he responded (several months late) to Defendant's Motion. Instead, Plaintiff sought to augment the record with the March 13 submissions.

5    Defendant reads Plaintiff's submissions to assert that the various warning notices Plaintiff was issued for time abuse and failure to produce a driver's license were adverse employment actions in support of this claim. The Court disagrees with this reading. Instead, it is evident to the Court, based on its reading of Plaintiff's various submissions, that Plaintiff relies on these warning notices not as adverse employment actions, but as evidence of discriminatory intent and in support of his hostile work environment claim.

6    Plaintiff offers no specific allegations – let alone evidence – to support this claim. First of all, Plaintiff never identifies which title would be the appropriate recipient of such duties, nor does he identify the salary grade appropriate to these duties. Despite these significant infirmities in Plaintiff's claim and because the outcome

Perry v. County of Westchester, Not Reported in Fed. Supp. (2008)

Case 3:24-cv-01358-GTS-ML    Document 13    Filed 01/07/25    Page 39 of 120

herein is the same either way, the Court will assume – for purposes of this Motion – that the complained-of assignments would normally be given to an employee with a higher salary-grade title.

7   Interestingly, Plaintiff does not here claim a failure to compensate for higher grade work he allegedly was assigned, but claims that the out-of-grade work he was assigned both was highly undesirable (which one would imagine would be lower-grade work) and led to his injuries in May 2003.

8   In his Complaint, Plaintiff also states "the other white employees were given time off without being docked when they had to perform citizenship duties." (Compl. 7.) Without any specific allegations or evidence to support this statement, it cannot be relied upon to establish the fourth prong of Plaintiff's prima facie case. *See Jones v. W. Suffolk Boces*, No. 03-CV-3252, 2008 WL 495498, at *11 (E.D.N.Y. Feb. 20, 2008) (finding as insufficient to satisfy fourth prong of prima facie case plaintiff's conclusory allegation that "white [employees] with less seniority and experience were provided summer employment while [plaintiff] was not").

9   On December 14, 2006, Magistrate Judge George A. Yanthis ordered that Defendant turn over to Plaintiff in discovery Aubry's leave history from 2001 through 2004. (Dkt. No. 15.) Exhibit 34 to Plaintiff's Local Civ. R. 56.1 Statement indicates that these records were in fact provided to Plaintiff. Interestingly, however, Plaintiff decided not to include Aubry's leave history in the present record. Based solely on the record before it, the Court has no way of knowing whether Aubry was excessively absent while Plaintiff was employed by Defendant or, more importantly, whether his pay was ever docked as a result. The Court cannot assume either of these things to be the case based solely on Plaintiff's bare assertions.

10  The Court notes, however, that there is evidence in the record to suggest that, in May 2002, Plaintiff was told that some work assignments would require him to drive. (Kahan Aff., Ex. V.) During his deposition, Plaintiff testified to his belief that his supervisors would make him drive because "they w[ere] just messing with [him]." (Pl.'s Dep. 60.)

11  Plaintiff elaborated more fully on this issue in his complaint before the NYSDHR:

Since Mr. Bates became my supervisor, I have been assigned tasks that no one else wants to do. These tasks are the most physically demanding and dangerous assignments. For example, I have been assigned to dig holes without a back hoe or assistance, and I have been required to move concrete parking lot bumpers despite the fact that I have a documented back injury. I have been sent to do weed-whacking jobs without chaps, safety glasses and ear protection. The aforementioned examples are not an exhaustive list of undesirable duties I have been assigned since 1999. It should be noted that when co-workers are assigned to work with me, they view the assignments as a form of punishment. I am being punished everyday especially since almost all the work I perform is out of my job title.

(Kahan Aff., Ex. GG.) Again, it is entirely unclear from Plaintiff's allegations and submissions the title for which Plaintiff believes these duties are appropriate.

12  One of the alleged out-of-title assignments that Plaintiff complains of was when he was allegedly asked to perform "firefighter duties." (Compl. ¶ 1.) However, in an undated letter written by Donald Kranker, a Maintenance Laborer and Shop Steward, he complains of an August 23, 2002 firefighting assignment that was given to him, Plaintiff, Jason Aubry and one other employee. (*See* Pl.'s Ex. 29.) Thus, at least with respect to the firefighting assignment, the record not only fails to show that Plaintiff was singled out for the assignment, but actually demonstrates that Caucasian co-workers were given the same assignment; in fact, Jason Aubry – who happens to be the employee Plaintiff focuses on to demonstrate disparate treatment – was one of the employees sent to perform firefighting duties with Plaintiff. Therefore, there is no basis whatsoever for Plaintiff to claim that he was assigned firefighter duties based on his race.

Perry v. County of Westchester, Not Reported in Fed. Supp. (2008)

Case 3:24-cv-01358-GTS-ML    Document 13    Filed 01/07/25    Page 40 of 120

13      In his Complaint, Plaintiff alleged that the hostile work environment spanned from 1999 to 2003. (Compl. 3.)

14      In his opposition brief, Plaintiff asserted – as evidence that he was subjected to a hostile work environment – that he endured comments about "Kunta Kinte." (Pl.'s Mem. 15-16.) In support of this allegation, Plaintiff offered the Court an unhelpful and erroneous citation – without page number – to Plaintiff's Exhibit 3, which is an approximately 50-page excerpt from Plaintiff's deposition testimony. Yet, there was no reference to this comment in Plaintiff's deposition. In fact, nothing Plaintiff provided in opposition to the Summary Judgment Motion contained any evidence that Plaintiff was subjected to such comments.

During oral argument, the Court asked Plaintiff's counsel what in the record supported the allegation that Plaintiff was subjected to "Kunta Kinte" comments. Plaintiff's counsel represented to the Court that Plaintiff testified during his deposition that he was referred to as "Kunta Kinte" by his supervisor. Defendant's counsel indicated that he had a recollection of such testimony. Plaintiff's counsel further represented that she would send the relevant pages from Plaintiff's deposition transcript to the Court the following day, which she failed to do.

Instead, on March 12, 2008, Defendant's counsel sent to the Court Plaintiff's entire deposition transcript and a letter, in which he represented: "I have found no reference to the 'Kunta Kinte' comment referenced by plaintiff's counsel. I was in error when I stated that such a comment was made by Mr. Perry at his deposition." (Letter from Stuart E. Kahan, Esq., to the Court, dated Mar. 11, 2008.)

On March 14, 2008, the Court received from Plaintiff's counsel via overnight mail: (1) a letter dated March 13, 2008, in which she admitted, "[t]here is no reference to the "Kunta Kinte" comment] in the *deposition* transcript," and (2) an application to supplement the record with a new affidavit from Plaintiff and what appears to be the minutes of a meeting held on November 9, 1999. (Letter from Pamela D. Hayes, Esq., to the Court, dated Mar. 13, 2008.) In his putative supplemental affidavit, Plaintiff states that he was referred to as "Kunta Kinte" by a supervisor identified only as "Mike," without any details regarding when or where this allegedly occurred.

This affidavit is suspicious. First, Plaintiff never made this allegation in either claim he made to the EEOC, nor included it in his Complaint. Second, it is plainly lacking in details – including the full identity of the *speaker* and the date. In any event, the Court will not accept this affidavit, as it is way out of time from a party that has already demonstrated, through his counsel, a profound disregard for deadlines and process in this case. *Cf. Scully*, 148 F. Supp. 2d at 251-52 (allowing plaintiff to oppose defendant's summary judgment with new evidence for limited purposes because plaintiff could not have submitted new evidence earlier and plaintiff demonstrated good faith).

15      Again, this excludes the alleged "Kunta Kinte" reference.

---

**End of Document**                                      © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:24-cv-01358-GTS-ML     Document 13     Filed 01/07/25     Page 41 of 120

Karunakaran v. Borough of Manhattan Community College, Not Reported in Fed. Supp....

2022 WL 902370
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Chitra KARUNAKARAN, Plaintiff,

v.

BOROUGH OF MANHATTAN COMMUNITY
COLLEGE, City University of New York, Antonio
Perez, Karin Wilks, Sangeeta Bishop, Rifat Salam,
Antionette McKain, Robert Diaz, Ian Wentworth,
Michael Hutmaker, and Marva Craig, Defendants.

18 Civ. 10723 (ER)
|
Signed 03/28/2022

**Attorneys and Law Firms**

Chitra Karunakaran, New York, NY, Pro Se.

Jack Kevin Shaffer, IRS Office of Chief Counsel, New York,
NY, for Defendants Antonio Perez, Sangeeta Bishop, Rifat
Salam, Antionette McKain, Robert Diaz, Ian Wentworth,
Borough of Manhattan Community College, City University
of New York, Karin Wilks, Michael Hutmaker, Marva Craig.

**OPINION AND ORDER**

Ramos, D.J.:

 **\*1** Chitra Karunakaran, who was a Professor at the Borough
of Manhattan Community College ("BMCC"), which is part
of the City University of New York ("CUNY"), brings this
action against CUNY, BMCC, and several current and former
employees of BMCC [1] (collectively, the "Defendants"),
for violation of Title VII of the Civil Rights Act of
1964 ("Title VII"), the Age Discrimination in Employment
Act ("ADEA"), the New York State Human Rights Law
("NYSHRL"), and the New York City Human Rights Law
("NYCHRL"). *See* Doc. 62. In particular, Karunakaran
alleges that Defendants discriminated against her on the basis
of her race, national origin, and age, and retaliated against her.
*See id.*

Karunakaran, proceeding *pro se*, first filed her complaint
on November 15, 2018. *See* Doc. 2. On September 6,
2019, after retaining counsel, Karunakaran filed an amended
complaint ("First Amended Complaint" or "FAC"). *See* Doc.

7. Defendants moved to dismiss the FAC on May 7, 2020.
*See* Doc. 45. On February 12, 2021, the Court granted
Defendants' motion, dismissing Karunakaran's federal claims
without prejudice to replead, and declining to exercise
supplemental jurisdiction over Karunakaran's NYSHRL and
NYCHRL claims. *See* Doc. 55. On March 26 and 27,
2021, Karunakaran's counsel filed letter motions seeking to
withdraw. See Docs. 57-58. The Court granted counsel's
requests to withdraw. *See* Doc. 59.

On April 30, 2021, Karunakaran, again proceeding *pro se*,
filed a second amended complaint ("SAC"). *See* Doc. 62.
Defendants now move to dismiss the SAC pursuant to Federal
Rule of Civil Procedure 12(b)(6). For the reasons discussed
below, the motion is GRANTED.

**I. BACKGROUND**
Karunakaran, a 75-year-old Indian woman, was employed by
CUNY at BMCC for approximately 20 years as a professor
of psychology and sociology. Doc. 62 ¶¶ 13, 37. Karunakaran
alleges that on February 27, 2018, a student (the "Student") in
her class became verbally and physically aggressive towards
her and disrupted class. *Id.* ¶ 41. Specifically, Karunakaran
alleges that the Student told her, "You suck. You don't
know anything." *Id.* ¶ 42. According to Karunakaran, the
Student repeated these comments on two other occasions.
*Id.* Karunakaran argues that the Student's behavior was
racially motivated because, when she had previously taught
the Student in online classes, the Student had not been
disruptive. *Id.* Karunakaran also argues that the Student relied
on "prevailing racialized stereotypes ... about Asians" and
assumed Karunakaran would remain silent "in the face of her
mocking verbal abuse" and would not confront her or call
security. *Id.* at 23.

Karunakaran alleges she complained to Defendants about
the Student's behavior, and, in particular, that in emails to
Defendants, she offered to speak with the Student, suggested
that the Student take her class online, and requested that
BMCC's Office of Student Affairs remove the Student
from her class. *Id.* ¶¶ 42, 43. According to Karunakaran,
Defendants did not respond to her emails and did not
otherwise intervene to address the Student's behavior. *Id.*
Specifically, Karunakaran alleges Defendant Ian Wentworth,
who at the time worked in the Office of Student Affairs, took
no action in response to the Student's behavior and in so doing
allowed the behavior to re-occur. *Id.* ¶ 43.

Karunakaran v. Borough of Manhattan Community College, Not Reported in Fed. Supp....

Case 3:24-cv-01358-GTS-ML    Document 13    Filed 01/07/25    Page 42 of 120

**\*2** On March 18, 2018, Karunakaran filed a complaint, titled "A Hostile Work Environment," with Defendant Antonio Perez, who was at the time President of BMCC. *Id.* ¶¶ 18, 49; Doc. 2 at 19. In her complaint, Karunakaran alleged that BMCC maintained a "covert, ad hoc/post hoc mode of organizational dysfunction resulting in a generally unchallenged racialized, ageist hostile work environment for contingent academic labor." Doc. 2 at 19.

Karunakaran alleges that on March 27, 2018, the Student, after learning she had failed the midterm, tried to grab papers and other materials from her and ran from her office. Doc. 62 ¶ 45. Karunakaran alleges she continued to complain to Defendants about the Student's conduct but, as before, they took no action. *Id.* ¶ 46. Karunakaran argues that Defendants, in "completely disregarding their job responsibilities ... and at no point attempting to remedy the ongoing and dangerous situation caused by [the] Student," discriminated against her on the basis of her race, national origin, and age. *Id.* ¶ 47.

Karunakaran also alleges that she participated in various whistleblowing and union activities throughout her tenure, *id.* ¶¶ 40, 52, and lists a number of examples of these activities. *Id.* at 50. Specifically, Karunakaran alleges that she emailed Perez to encourage him to program every department printer to print double-sided; she asked Perez why online classes could not be taught through "Peer faculty mentoring;" she asked Defendant Sangeeta Bishop whether she could serve on an equity and inclusion task force but was told that adjunct professors were not included; she asked whether faculty needed to include attendance information in their syllabi; she complained about Defendants' failure to manage the Student's conduct; and she asked why hard copies of mail had not been delivered to BMCC's uptown campus. *Id.* at 50-51.

On May 11, 2018, Karunakaran was denied reappointment for the Fall 2018 semester. *Id.* ¶¶ 39, 51. Karunakaran argues this denial resulted from discrimination and retaliation on the basis of her race, national origin, and age. *Id.* ¶ 40. Karunakaran alleges that she was replaced by a younger professor with "less age-defined seniority ... [and] possibly without a doctorate...." *Id.* at 39-40.

On August 13, 2018, Karunakaran filed a charge of discrimination with the New York State Division of Human Rights. *Id.* ¶ 3. The charge was subsequently sent to the Equal Employment Opportunity Commission ("EEOC"), and on August 21, 2018, the EEOC issued a Right to Sue letter. *Id.* ¶ 4.

As stated above, Karunakaran filed a *pro se* complaint in this Court on November 15, 2018. Doc. 2. With the assistance of counsel, she filed an FAC on September 6, 2019. Doc. 7. Defendants moved to dismiss the FAC on May 7, 2020, and the Court granted Defendants' motion on February 12, 2021, dismissing Karunakaran's federal claims without prejudice to replead, and declining to exercise supplemental jurisdiction over Karunakaran's NYSHRL and NYCHRL claims. *See* Docs. 45, 55. On April 30, 2021, Karunakaran —again proceeding *pro se*—filed the instant complaint., alleging substantially the same facts she alleged in her FAC.

## II. LEGAL STANDARD

When ruling on a motion to dismiss pursuant to Rule 12(b)(6), district courts are required to accept as true all factual allegations in the complaint and to draw all reasonable inferences in the plaintiff's favor. *Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013). However, this requirement does not apply to legal conclusions, bare assertions, or conclusory allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 681 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). In order to satisfy the pleading standard set forth in Rule 8, a complaint must contain sufficient factual matter to state a claim for relief that is plausible on its face. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 570). Accordingly, a plaintiff is required to support her claims with sufficient factual allegations to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (quoting *Twombly*, 550 U.S. at 557) (internal quotation marks omitted).

**\*3** "Because [Karunakaran] is a *pro se* litigant, we read h[er] supporting papers liberally, and will interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). When a plaintiff's claims involve civil rights violations, the Court applies this standard "with particular force." *Jackson v. NYS Dep't of Lab.*, 709 F. Supp. 2d 218, 224 (S.D.N.Y. 2010) (citing *McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004)). "However, even *pro se* plaintiffs asserting civil right claims cannot withstand a motion to dismiss unless their pleadings contain factual allegations sufficient to raise a 'right to relief above the speculative level.' " *Id.* (quoting *Twombly*, 550 U.S. at 555). Lastly, "[a] district court deciding a motion to dismiss may consider factual allegations made by a *pro se* party in his papers opposing the motion." *Walker*, 717 F.3d at 122 n.1.

Case 3:24-cv-01358-GTS-ML    Document 13    Filed 01/07/25    Page 43 of 120

Karunakaran v. Borough of Manhattan Community College, Not Reported in Fed. Supp....

## III. DISCUSSION

### a. Title VII and ADEA Claims

#### i. Discrimination

Karunakaran alleges that Defendants discriminated against her when they failed to address the Student's behavior and when they denied her reappointment. Doc. 62 ¶¶ 47, 55. Karunakaran also alleges Defendants treated her less favorably than similarly situated co-workers. *Id.* ¶ 55.

Discrimination claims under Title VII or the ADEA are analyzed under the three-step burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 136 (2d Cir. 2016). Under the *McDonnell* framework, a plaintiff first must establish a *prima facie* case of discrimination. *McDonnell*, 411 U.S. at 802. Once the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to offer a legitimate, nondiscriminatory reason for its actions. *Id.* at 802-03. If the defendant satisfies its burden, the burden shifts back to the plaintiff to demonstrate that the proffered reason is pretextual. *Id.* at 804. Ultimately, the plaintiff will be required to prove that the defendant acted with discriminatory motivation. *See Littlejohn v. City of New York*, 795 F.3d 297, 307 (2d Cir. 2015). At the pleading stage, however, the facts alleged must merely "give plausible support to the reduced requirements that arise under *McDonnell Douglas* in the initial phase of ... litigation." *Id.* at 311. Thus, the question on a motion to dismiss is whether the plaintiff has adequately pleaded a *prima facie* case.

To establish a *prima facie* case of discrimination under either Title VII or the ADEA, a plaintiff must show that (1) she belonged to a protected class, (2) she was qualified for the position, (3) she suffered an adverse employment action, and (4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent. *See Terry v. Ashcroft*, 336 F.3d 128, 137-38 (2d Cir. 2003). Although a plaintiff is not required to plead facts proving each element of a *prima facie* case of discrimination at the pleading stage, her allegations must provide "plausible support" for a "minimal inference" that the employer was motivated by discriminatory intent." *Littlejohn*, 795 F.3d at 311. Further, those allegations must be fact-specific. *See*

*Grimes v. Fremont General Corp.*, 785 F. Supp. 2d 269, 296 (S.D.N.Y. 2011). Conclusory or naked allegations will not do. *See id.*

Here, as was the case in her first amended complaint, Karunakaran fails to plead allegations that support a minimal inference of discriminatory motivation. As Defendants point out, Karunakaran's SAC "suffers from the same flaws" as her FAC. *See* Doc. 69 at 10. Again, beyond conclusory statements that she was denied reappointment as a result of discrimination, Karunakaran does not allege any specific facts showing that the denial was related to discrimination on the basis of her race, national origin, or age. *See, e.g.*, *Marcus v. Leviton Mfg. Co.*, 661 F. App'x 29, 32-33 (2d Cir. 2016) ("plaintiff must supply sufficient factual material, and not just legal conclusions, to push the misconduct alleged in the pleading beyond he realm of the 'conceivable' to the 'plausible' ").

**\*4** Beyond this, Karunakaran again does not provide any information about similarly situated employees. When a plaintiff seeks to meet her *prima facie* case by reference to the disparate treatment of an allegedly similarly situated employee, "the plaintiff must show that she shared sufficient employment characteristics with that comparator so that they could be considered similarly situated." *McGuinness v. Lincoln Hall*, 263 F.3d 49, 53 (2d Cir. 2001). A plaintiff need not show that a comparator was an "*identically* situated employee," just that she was "similarly situated in all *material* respects." *Id.* at 53-4 (quoting *Shumway v. United Parcel Service*, 118 F.3d 60, 64 (2d Cir. 1997)) (emphasis in original). Further, such employee "must have a situation sufficiently similar to plaintiff's to support at least a minimal inference that the difference of treatment may be attributable to discrimination." *Kearney v. ABN AMRO, Inc.*, 738 F. Supp. 2d. 419, 426 (S.D.N.Y. Sept. 15, 2010) (quoting *McGuinness*, 263 F. 3d at 54) (internal quotation marks omitted). Employment characteristics which can support a finding that two employees are "similarly situated" include "similarities in education, seniority, performance, and specific work duties," *DeJesus v. Starr Technical Risks Agency, Inc.*, 03 Civ. 1298 (RJH), 2004 WL 2181403, at \*9 (S.D.N.Y. Sept. 27, 2004), and similar requirements for skill, effort, and responsibility for jobs performed "under similar working conditions." *DeJohn v. Wal-Mart Stores E., LP*, 09 Civ. 01315 (GTS), 2013 WL 1180863, at \*6 (N.D.N.Y. Mar. 20, 2013).

Case 3:24-cv-01358-GTS-ML    Document 13    Filed 01/07/25    Page 44 of 120

Karunakaran v. Borough of Manhattan Community College, Not Reported in Fed. Supp....

In the Court's order granting Defendants' first motion to dismiss, the Court noted that Karunakaran's general allegations that she was treated less favorably than certain similarly situated employees were insufficient "without ... additional details about specific events and without ... additional facts that [she] was similarly situated in all material respects to those comparator employees." Doc. 55 at 9-10. While given another opportunity to do so, Karunakaran again does not provide these specifics. Karunakaran merely re-alleges, upon information and belief, that she was replaced by a younger professor. She does not identify or otherwise describe this professor, nor does she provide any facts alleging that she and this professor were similarly situated in any material respect or that she was treated less well than this professor.

In addition, in a purported attempt to remedy the deficiencies in her FAC, Karunakaran explains that *all* her former co-workers are her comparators: "All faculty regardless of appointment, are comparators." Doc. 62 at 17. But, again, she does not explain how she was similarly situated to all faculty members. That they teach the same students, as Karunakaran alleges, is not enough. *See id.* Nor does she offer specific examples of disparate treatment with respect to these co-workers. While Karunakaran generally alleges that her similarly-situated co-workers were not terminated, *id.* ¶ 55, she does not provide any further details.

Karunakaran also alleges that another professor in the psychology department at times let her students leave after only one hour of class, even though the class was meant to run for two and a half hours. Doc. 62 at 59-60. Karunakaran does not identify or describe this alleged comparator, nor does she explain how this professor's choice to let her students leave class early in any way supports an inference of discrimination against her; notably, Karunakaran does not allege that she would not have been allowed to make the same choice. At bottom, none of these allegations can support even a minimal inference that Karunakaran experienced a difference in treatment attributable to discrimination. *See Henry v. NYC Health & Hosp. Corp.*, 18 F. Supp. 3d 396, 409 (S.D.N.Y. 2014) (dismissing discrimination claims where complaint fails to identify, let alone describe, any purported comparator).

As to her claim that Defendants discriminated against her by failing to address the Student's behavior, Karunakaran does not show how this failure is in any way connected to her race, national origin, or age.

**\*5** Because, as Defendants argue, Karunakaran does not submit any allegations to support an inference that Defendants' failure to address the Student's behavior and denial of her reappointment were at all motivated by her race, national origin, or age, her federal discrimination claims are dismissed.

### ii. Retaliation Claims

Karunakaran alleges Defendants retaliated against her for her participation in a protected activity. Doc. 62 at 14. Specifically, she alleges Defendants denied her reappointment because of her "persistent participation in lawful union activity" and because of her "whistleblower queries." *Id.* ¶ 40.

Like her discrimination claims, Karunakaran's retaliation claims also are analyzed under the *McDonnell* framework. [2] Under that framework, a plaintiff first must establish a *prima facie* case of retaliation. *McDonnell*, 411 U.S. at 802. Once the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to offer a legitimate, nonretaliatory reason for its actions. *Id.* at 802–03; *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014). If the defendant satisfies its burden, the burden shifts back to the plaintiff to demonstrate that the proffered reason is pretextual. *McDonnell*, 411 U.S. at 804; *Kirkland*, 760 F.3d at 225.

To state a *prima facie* case of retaliation under § 1981, a plaintiff must establish (1) participation in a protected activity; (2) defendant's knowledge of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action. *Dickens v. Hudson Sheraton Corp., LLC*, 167 F. Supp. 3d 499, 522 (S.D.N.Y. 2016), *aff'd*, 689 F. App'x 670 (2d Cir. 2017).

Here, Karunakaran cannot plausibly allege a protected activity. "A protected activity is one that 'protest[s] or oppose[s] statutorily prohibited discrimination.' " *Kouakou v. Fideliscare New York*, 920 F. Supp. 2d 391, 400 (quoting *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566); *Brands-Kousaros v. Banco Di Napoli S.P.A.*, No. 97 Civ. 1673 (DLC), 1997 WL 790748, at \*5 (S.D.N.Y. Dec. 23, 1997) ("the protected activity alleged must involve some sort of complaint about a type of discrimination that [a statute] forbids."). While a protected activity generally involves the filing of a formal

complaint of discrimination with an administrative agency, *see Kotcher v. Rosa & Sullivan Appliance Ctr.,* 957 F.2d 59, 65 (2d Cir. 1992), "both formal and informal complaints [are] protected activity...." *Schaper v. Bronx Lebanon Hosp. Ctr.,* 408 F. Supp. 3d 379, 391 (S.D.N.Y. 2019) (citing *Hubbard v. Total Commc'ns, Inc.,* 347 F. App'x 679, 680–81 (2d Cir. 2009)).

Protected complaints generally include "making complaints to management ..., protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges." *Soliman v. Deutsche Bank AG,* No. 03 Civ. 104 (CBM), 2004 WL 1124689, at *12 (S.D.N.Y. May 20, 2004) (citing *Cruz,* 202 F.3d at 566); *see also Sumner v. U.S. Postal Serv.,* 899 F.2d 203, 209 (2d Cir. 1990). An informal complaint may be "nothing more than a simple 'objection voiced to the employer,' ... but at the very least, 'there must be some form of professional indicia of a complaint made against an unlawful activity.' " *Soliman,* 2004 WL 1124689, at *12 (internal citations omitted).

**\*6** Though Karunakaran repeatedly refers to "union activities" and "whistleblowing" she does not, as Defendants point out, provide any allegations that her union activities or whistleblowing concerned or were related to some statutorily-prohibited discrimination. In particular, Karunakaran alleges that she emailed Perez to encourage him to program every department printer to print double-sided; she asked Perez why online classes could not be taught through "Peer faculty mentoring;" she asked Defendant Sangeeta Bishop whether she could serve on an equity and inclusion task force but was told that adjunct professors were not included; she asked whether faculty needed to include attendance information in their syllabi; and she asked why hard copies of mail had not been delivered to BMCC's uptown campus. [3] Doc. 62 at 50-51. None of these suggestions or questions is a complaint, protest, or objection and, in any event, Karunakaran does not show how any of these activities relates to an unlawful activity, let alone statutorily-prohibited discrimination. As Karunakaran cannot allege a protected activity, her federal retaliation claim is dismissed.

### b. NYSHRL and NYCHRL Claims

A district court may decline to exercise supplemental jurisdiction over state and city law claims when "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3); *see also In re Merrill Lynch Ltd. P'ships Litig.,* 154 F.3d 56, 61 (2d Cir. 1998) ("[W]hen the federal claims are dismissed the 'state claims should be dismissed as well.' " (quoting *United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 726 (1966))). Once a district court's discretion is triggered under § 1367(c)(3), it balances the traditional "values of judicial economy, convenience, fairness, and comity" in deciding whether to exercise jurisdiction. *Kolari v. New York-Presbyterian Hospital,* 455 F.3d 118, 122 (2d Cir. 2006) (quoting *Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350 (1988)). The Supreme Court has noted that in a case where all federal claims are eliminated before trial, "the balance of factors ... will point toward declining to exercise jurisdiction over the remaining state-law claims." *Id.* (quoting *Cohill,* 484 18 U.S. at 350 n.7). Having dismissed all of Karunakaran's federal claims under Rule 12(b)(6), the Court declines to exercise supplemental jurisdiction over, and dismisses, her state and city law claims.

### IV. CONCLUSION

For the reasons set forth above, the Defendants' motion to dismiss the SAC is GRANTED with prejudice.

It is SO ORDERED.

### All Citations

Not Reported in Fed. Supp., 2022 WL 902370

---

## Footnotes

1    Antonio Perez, Karin Wilks, Sangeeta Bishop, Rifat Salam, Antoinette McKain, Robert Diaz, Ian Wentworth, Michael Hutmaker, and Marva Craig.

2    Title VII and the ADEA contain nearly identical provisions forbidding retaliation. *Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 205 (2d Cir. 2006). Retaliation claims under Title VII and the ADEA therefore are analyzed under the same framework. Dickens v. Hudson Sheraton Corp., LLC, 167 F. Supp. 3d 499, 522 (S.D.N.Y. 2016), aff'd, 689 F. App'x 670 (2d Cir. 2017); see also Terry, 336 F.3d at 141 (applying the same standards and burdens to claims of retaliation brought under both Title VII and the ADEA).

3    Karunakaran also repeats her allegation—in her FAC—that she engaged in protected activity when she complained to Defendants about the Student's behavior, but the Court in its order granting Defendants' first motion to dismiss found none of those complaints—her informal complaints to Defendants as well as her formal March 18 complaint—amounted to protected activities because they did not concern unlawful activity. *See* Doc. 55 at 11.

---

**End of Document**                                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

652 Fed.Appx. 44
This case was not selected for
publication in West's Federal Reporter.
RULINGS BY SUMMARY ORDER DO NOT HAVE
PRECEDENTIAL EFFECT. CITATION TO A
SUMMARY ORDER FILED ON OR AFTER JANUARY
1, 2007, IS PERMITTED AND IS GOVERNED BY
FEDERAL RULE OF APPELLATE PROCEDURE 32.1
AND THIS COURT'S LOCAL RULE 32.1.1. WHEN
CITING A SUMMARY ORDER IN A DOCUMENT
FILED WITH THIS COURT, A PARTY MUST
CITE EITHER THE FEDERAL APPENDIX OR AN
ELECTRONIC DATABASE (WITH THE NOTATION
"SUMMARY ORDER"). A PARTY CITING A
SUMMARY ORDER MUST SERVE A COPY OF IT ON
ANY PARTY NOT REPRESENTED BY COUNSEL.
United States Court of Appeals, Second Circuit.

Georgina THOMSON, Plaintiff–Appellant,
Sheila Clark, Plaintiff,
v.
ODYSSEY HOUSE, Defendant–Appellee,
Vance Herbert, Darrin Brown, Gail
Harrison, Does 1–10, Defendants. *

15–3363
|
June 16, 2016

*** Start Section

...

**Synopsis**

**Background:** Former employee brought action against
employer for unlawful retaliation and violation of the
Americans with Disabilities Act (ADA). The United States
District Court for the Eastern District of New York, Brodie,
J., 2015 WL **5561209**, dismissed the complaint for failure to
state a claim. Employee appealed.

**Holdings:** The Court of Appeals held that:

[1]  excessive scrutiny was not an actionable adverse
employment action;

[2]  employee failed to plead causal link between alleged
disability and termination, as required to state claim for
discrimination in violation of ADA; and

[3]  employee's failure to notify employer of alleged disability
precluded recovery on reasonable accommodation claim.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion to Dismiss.

West Headnotes (3)

[1]  **Civil Rights**  ⚬⟲  Particular cases

Excessive scrutiny was not an actionable adverse
employment action, for purposes of bringing
retaliation claim under § 1981. 42 U.S.C.A. §
1981.

22 Cases that cite this headnote

[2]  **Civil Rights**  ⚬⟲  Particular cases

...

2021 WL 1063183
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Parker SHANNON, Plaintiff,

v.

CREDIT AGRICOLE SECURITIES
(USA), INC., Defendant.

17-cv-00667 (AJN)
|
Signed 03/19/2021

**Attorneys and Law Firms**

Erica Sanders, Phillips & Associates, PLLC, White Plains, NY, Benjamin Davis Weisenberg, The Ottinger Firm, P.C., New York, NY, for Plaintiff.

David Justin Baron, Hogan Lovells US LLP, Tyler Thomas Hendry, Barbara M. Roth, Herbert Smith Freehills New York LLP, New York, NY, for Defendant.

MEMORANDUM OPINION & ORDER

ALISON J. NATHAN, District Judge:

**\*1** Plaintiff brings claims under the Americans with Disabilities Act against his former employer for allegedly terminating him because of his cancer diagnosis. Defendant moves for summary judgment on the grounds that Plaintiff's ADA claims fail as a matter of law and because they are time-barred. For the reasons that follow, Defendant's motion is GRANTED.

**I. BACKGROUND**

**A. Facts**

The facts in this section are drawn from Defendant's Rule 56.1 statement and are undisputed unless otherwise stated. As explained in section II.A. of this Opinion, the Court will not consider a fact to be "in dispute" if Plaintiff has provided only (a) a conclusory citation to evidentiary or procedural rules without any explanation or justification for the objection or (b) a citation purportedly to the record that provides the Court

no reasonable means to locate the document and without any explanation of what the document is.

Defendant Credit Agricole Securities, Inc. ("CAS") is a New York corporation and a U.S. Broker dealer. Dkt. No. 107 at 4. CLSA Limited ("CLSA") is a Hong Kong-based entity, with offices in multiple Asian countries, New York, and London. *Id.* at 5. Plaintiff was hired by one or both companies in 2007 (the parties dispute which one) as a salesman and a specialist with regards to Korea and Taiwan. *Id.* at 20. *Id.* Plaintiff's duties generally included researching and reviewing financial data and news and working with clients. *Id.* at 23. Plaintiff was a "key relationship manager" on five accounts and a "Korea / Taiwan specialist" on six or seven. *Id.* at 32.

In 2008, Plaintiff was diagnosed with a form of cancer called non-Hodgkin's lymphoma and began treatment. *Id.* at 24. Plaintiff was told by Jay Plourde, his supervisor, to take as much time off as he needed regarding his health. *Id.* Plaintiff lost all of his hair but it grew back within a year. *Id.* at 25. According to Defendant, by 2010, Plaintiff's supervisors were under the impression that Plaintiff no longer had cancer. *Id.* Plaintiff disputes this fact and claims Plaintiff that his supervisors were well aware of the fact that he still had cancer past this point, as he regularly discussed his cancer diagnosis and treatment with them, and that it was not until September 2012 that he no longer had active Lymphoma. *Id.*

From 2010 to 2011, Defendant's management team in Asia made job cuts for New York workers as a result of restructuring. *Id.* at 28. In 2011, management proposed that Plaintiff be terminated and Plourde advocated on behalf of Plaintiff that he be able to keep his job. *Id.* at 28-29. Plaintiff stayed on the job until 2012, when CLSA management engaged in more job cuts. *Id.* at 29. In or around October 2012, Defendant agreed to a merger with a Chinese company, and in preparation for that sale consolidated its Korea and Taiwan related functions to the North Asian office. *Id.* at 29-30. Plourde was told in June 2012 that Plaintiff's job would be eliminated. *Id.* at 30.

Plourde waited until November 29, 2012 to inform Plaintiff of his termination. *Id.* According to Defendant, Plaintiff then informed Plourde that he still had cancer, which Plourde was not aware of until that conversation. *Id.* at 31. Plaintiff disputes this fact and claims that Plourde was already aware that he had cancer well before that time. Plourde then told Plaintiff that he could forget about termination and return to work while Plourde looked for another position for him.

Shannon v. Credit Agricole Securities (USA), Inc., Not Reported in Fed. Supp. (2021)

(According to Plaintiff, Plaintiff has had no active lymphoma since at least September 2012. *Id.* at 33-34.).

**\*2** On November 30, 2012, Plourde told management in Hong Kong about Plaintiff's cancer, and Plourde was permitted to try and find Plaintiff another job. *Id.* at 34. Plourde found a job for Plaintiff as "Head of Syndications." *Id.* at 35. Plourde and Plaintiff exchanged emails regarding this position on December 13, 2012. *Id.* at 37. On December 17, 2012, Plaintiff contacted Human Resources to request a disability leave and on December 20, 2012 Plaintiff told human resources that he intended to begin disability leave in January 2013. *Id.*

In his Amended Complaint and responses to Defendant's interrogatories, Plaintiff maintained that on November 20, 2012 he provided his supervisors with "a formal written complaint about the apparent discrimination that he was being subjected to in the workplace." *Id.* at 60. Plaintiff has admitted in sworn testimony that he did not mention his disability in this complaint. Dkt. No. 109 ¶ 24. In his deposition testimony, Plaintiff stated that his first written complaint regarding his disability was instead a written letter from his lawyer dated January 2, 2013, which was after Plaintiff had elected to take disability leave. *Id.* ¶ 33. Defendants responded to this letter in a letter on January 4, 2013, stating that Plaintiff was not terminated due to his disability and that, though he had been terminated in November 2012, Defendants were willing to keep him on as an employee through February 2013. Dkt. No. 115-6, Pl. Ex. N.

Plaintiff then applied for and received "short-term disability benefits" from Defendants, which permitted a 100% salary continuation for up to 26 weeks. Dkt. No. 107 at 37-38. The insurance company Prudential administered the plan, and as would decide whether Plaintiff was eligible. *Id.* Plaintiff had to provide medical records and information to show his eligibility for the disability benefits to Prudential. *Id.* Plaintiff certified in his application to Prudential that he had fatigue, anxiety, and loss of cognitive ability, including difficulty concentrating, multitasking, word retrieval and recalling simple facts. *Id.* at 41.

Plaintiff's short term disability leave began on January 14, 2013. *Id.* at 39-40. Plaintiff chose this date to begin voluntary leave. *Id.* Plaintiff remained employed by Defendants during this time. *Id.* at 44-45. Defendant did not hire anyone to fulfill Plaintiff's job at any point after he was gone. *Id.* at 43.

Plaintiff also applied for supplemental disability benefits through a second insurance company on February 2013, in which he certified that he was totally unable to work because of his disability as of January 14, 2013 and that he had "fatigue and cognitive d[y]sfunction" which were "making travel difficult, including staying awake in client meetings" and "difficult to read research to properly influence client decisions." *Id.* at 41. Plaintiff's treating physician submitted a statement in support of this application, stating that he advised Plaintiff to stop working at that time because of these issues. *Id.*

As part of the salary continuation in his short-term disability benefits, Plaintiff continued to be paid his regular salary by Defendants. *Id.* at 48. Around March 2013, Plaintiff received a $140,000 bonus from CAS or CLSA, and other New-York based workers received similar payments. *Id.* at 45.

After the short-term disability leave ended, Plaintiff began to receive long term disability benefits from Prudential. *Id.* at 51. In order to receive these benefits, Plaintiff had to show that he was "unable to perform the material and substantial duties of [his] own occupation due to [his] sickness or injury." *Id.* at 51. After 24 months, to continue receiving benefits he had to show that he was "unable to perform the duties of any occupation for which [he is] reasonably fitted by education, training, or experience." *Id.* Plaintiff never reached out to Defendants to inform them that he could return to work in any position. *Id.* at 52-53.

**\*3** Plaintiff's long term disability payments were terminated by Prudential on August 26, 2015, when Prudential learned that Plaintiff had begun work as a CEO of a new business. *Id.* Plaintiff appealed this decision, and in that appeal he and his physician argued that he was unable to perform work in any occupation at all because he was "totally disabled." *Id.* at 53. Plaintiff explained that he was "totally disabled" because of "chemo brain," which is a cognitive disorder caused by chemotherapy. *Id.* at 54. Plaintiff certified under penalty of perjury that:

> "the chemotherapy treatments have severely diminished my cognitive functioning to where I could no longer work in my occupation or frankly in any occupation. In particular, my chemo brain impairs my ability to maintain focus, multi-task, and recall simple facts and names in a disconnect I describe as 'on-tip-of-my-tongue'. So impaired, it was becoming impossible for me to sell research in the fast paced environment of Wall Street and as a result, I stopped

Case 3:24-cv-01358-GTS-ML    Document 13    Filed 01/07/25    Page 50 of 120

Shannon v. Credit Agricole Securities (USA), Inc., Not Reported in Fed. Supp. (2021)

working as a salesman on January 12, 2013 ...
[chemotherapy] treatments have had a devastating
effect on both my physical and cognitive abilities
which continue to render me totally disabled" and
"[a]s a result of my restrictions and limitations which
I set forth above, I can no longer perform the material
and substantial duties of any occupation for which
I am reasonably suited by virtue of my education,
training and experience. Thus, without the ability to
focus on details, without the ability to multi-task,
without the ability to remember details, without the
ability to go through a day without fatigue and without
the ability to sit, stand or walk for a considerable
period of time, to say nothing about my extensive
travel requirements, I simply cannot work in any
capacity commensurate with my attempts at work."

*Id.* at 54-55. Plaintiff's physician informed Prudential and
Mass Mutual that Plaintiff reported having the above
symptoms as early as May 2011. *Id.* at 57.

### B. Procedural History

Plaintiff filed an Amended Complaint on May 9, 2017,
bringing claims for discrimination and retaliation under the
ADA, NYSHL, and NYCHRL. Dkt. No. 20. Defendant filed
a motion to dismiss on May 22, 2017. Dkt. No. 21. In an
Opinion on March 22, 2018, the Court granted Defendant's
motion in part and dismissed all claims except for Plaintiff's
ADA claims. Dkt. No. 29. The parties proceeded to discovery,
and Defendant now moves for summary judgment as to all
remaining claims. Dkt. No. 89. Plaintiff filed an opposition to
Defendant's motion, as well as a motion to strike Defendant's
Rule 56.1 Statement. Dkt. Nos. 106-107, 114.

### II. DISCUSSION

Defendant moves for summary judgment on the remaining
claims in Plaintiff's Amended Complaint: Plaintiff's
discrimination and retaliation claims under the American with
Disabilities Act. Dkt. No. 90 at 7. For the reasons that follow,
the Court determines that there are no genuine disputes of
material fact and that Defendant is entitled to judgment as a
matter of law on Plaintiff's ADA claims. Because the Court
grants Defendant's summary judgment on these grounds, it
need not consider Defendant's argument that Plaintiff's claims
are time-barred. The Court also denies Plaintiff's Motion to
Strike for the reasons stated below.

### A. Plaintiff's Objections to
### Defendant's Rule 56.1 Statement

Plaintiff has filed both a motion to strike portions of
Defendant's Rule 56.1 Statement and responses to each
purported undisputed fact. Dkt. No. 107, 114. Plaintiff has
formally disputed virtually all facts asserted by Defendant.

 **\*4** "[E]vidence considered on summary judgment must
generally be admissible." *LaSalle Bank Nat. Ass'n v. Nomura
Asset Capital Corp.*, 424 F.3d 195, 205 (2d Cir. 2005). The
Federal Rules of Civil Procedure Rule 56, as amended in
2010, allows that "[a] party may object that the material cited
to support or dispute a fact cannot be presented in a form that
would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).
As the Advisory Committee Notes attendant to that provision
make clear, "[t]here is no need to make a separate motion to
strike" in addition to that objection. *See* Advisory Committee
Note to Fed. R. Civ. P. 56.

To the extent that Plaintiff argues that Defendant's Rule
56.1 statement relies on inadmissible evidence, because
inadmissible evidence "is insufficient to create a genuine
dispute of material fact," the Court "need not engage
in separate analysis of the motion to strike." *Codename
Enterprises, Inc. v. Fremantlemedia N. Am., Inc.*, No.
16CIV1267ATSN, 2018 WL 3407709, at *4 (S.D.N.Y. Jan.
12, 2018). To the extent the Plaintiff otherwise argues that
Defendant's Rule 56.1 statement should be stricken because it
contains "improper arguments," the burden for demonstrating
the necessity of such a remedy is high. *See Christians of
California, Inc. v. Clive Christian New York, LLP*, No. 13-
CV-275 KBF, 2014 WL 3407108, at *2 (S.D.N.Y. July 7,
2014) ("A party seeking to strike a Rule 56.1 statement
'bears a heavy burden, as courts generally disfavor motions
to strike.' ").

In Plaintiff's motion to strike, Dkt. No. 114, Plaintiff listed
nearly 50 statements from Defendant's Rule 56.1 submission
and "objects" on the grounds of "hearsay" or "improper
argument" by providing a corresponding citation to either
the Federal Rules of Evidence 801-803, the Undersigned's
Individual Rules 3.G.v, Federal Rule of Civil Procedure 56(c)
(2), *Pacenza v. IBM Corp.*, No. 04 CIV. 5831 (SCR), 2007
WL 9817926, at *2 (S.D.N.Y. July 26, 2007) (a case that
was decided prior to the 2010 amendments to Rule 56), or
a combination of the above. Aside from these bare citations,
Plaintiff declined to provide *any* explanation or justification

Shannon v. Credit Agricole Securities (USA), Inc., Not Reported in Fed. Supp. (2021)

for why each statement is based on inadmissible or otherwise improper. Plaintiff makes the same or similar objections to the corresponding facts in his response to Defendant's Rule 56.1 Statement. Dkt. No. 107.

Because "[a]sserting an issue without advancing an argument does not suffice to adequately raise" it, *Casciani v. Nesbitt*, 392 F. App'x 887, 889 (2d Cir. 2010), the Court declines to deem any statements inadmissible solely on the basis of Plaintiff's indolent objections. *See Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, No. 20 CV 1186-LTS, 2020 WL 5370576, at *4 (S.D.N.Y. Sept. 8, 2020) (declining to consider an issue where a party did "not provide any explanation or proffer any support for these conclusory arguments."); *Tolbert v. Queens Coll.*, 242 F.3d 58, 75 (2d Cir. 2001) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") (internal quotation marks omitted). Instead, when determining whether a material fact is in dispute, the Court will consider all arguments properly advanced in the parties' submissions as to the admissibility of evidence cited in support of those factual allegations. *F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (to create "doubt as to the material facts," a party "may not rely on conclusory allegations or unsubstantiated speculation.").

**\*5** Moreover, in Plaintiff's response to Defendant's Rule 56.1 Statement, Dkt. No. 107, Plaintiff provides some record citations that provide no discernable method for the Court to locate the documents because there is no reference to the docket number, filing, submission, or any other indicator of the documents' location.[1] Specifically, at times Plaintiff references what appear to be bates stamps ranges but does not explain what the documents are or where they can be found. *See, e.g.*, Dkt. No. 107 at 37, 41. By citing unidentifiable documents without explanation, Plaintiff "leaves it to the Court to hunt down the evidence to evaluate Plaintiff's conclusory argument." *Florkevicz v. Comm'r of Soc. Sec.*, No. CV 19-19919 (SRC), 2020 WL 3867409, at *2 n.1 (D.N.J. July 9, 2020). *See also Rios v. Bigler*, 67 F.3d 1543, 1553 (10th Cir. 1995) ("It is not this court's burden to hunt down the pertinent materials."). Because "nothing in the federal rules mandates that district courts conduct an exhaustive search of the entire record before ruling on a motion for summary judgment," and as such "district courts are entitled to order" – and this Court *has* ordered – "litigants to provide specific record citations," *Amnesty Am. v. Town of W. Hartford*, 288 F.3d 467, 470–71 (2d Cir. 2002), Plaintiff's failure to provide

functioning citations may result in some instances in a fact being undisputed.

## B. Defendant's Motion for Summary Judgment

Defendant moves for summary judgment as to Plaintiff's ADA discrimination and retaliation claims. "Summary judgment is appropriate when the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Smith v. Cty. of Suffolk*, 776 F.3d 114, 121 (2d Cir. 2015). Summary judgment may not be granted unless all of the submissions taken together "show[ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination, the Court must view all facts in the light most favorable to the non-moving party. *See Eastman Kodak Co. v. Image Techn. Servs., Inc.*, 504 U.S. 451, 456 (1992); *Gemmink v. Jay Peak Inc.*, 807 F.3d 46, 48 (2d Cir. 2015). In evaluating cross-motions for summary judgment, each motion must be examined "on its own merits," and "all reasonable inferences must be drawn against the party whose motion is under consideration." *Vugo, Inc. v. City of New York*, 931 F.3d 42, 48 (2d Cir. 2019) (internal quotations and citations omitted).

Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, "the party opposing summary judgment may not merely rest on the allegations or denials of his pleading; rather his response, by affidavits or otherwise as provided in the Rule, must set forth specific facts demonstrating that there is a genuine issue for trial." *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) (quotations omitted). "[C]onclusory statements, conjecture, and inadmissible evidence are insufficient to defeat summary judgment." *ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 151 (2d Cir. 2007). The same is true for "mere speculation or conjecture as to the true nature of the facts." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010).

Only disputes over material facts will "preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "An issue of fact is genuine and material if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Cross Commerce Media, Inc. v. Collective, Inc.*, 841 F.3d 155, 162 (2d Cir. 2016). "On a motion for summary judgment, a fact is material

if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene,* 746 F.3d 538, 544 (2d Cir. 2014) (internal quotation marks omitted).

### 1. Plaintiff's Discrimination Claim

The ADA provides "that no covered employer 'shall discriminate against a qualified individual on the basis of disability ... in regard to ... [the] discharge of employees.' " *Clark v. Jewish Childcare Ass'n, Inc.,* 96 F. Supp. 3d 237, 248 (S.D.N.Y. 2015) (citing 42 U.S.C. § 12112(a)). "In analyzing a discriminatory discharge claim under the ADA, [courts] apply the burden-shifting analysis established by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-04 (1973)," under which the "plaintiff bears the initial burden of proving by a preponderance of the evidence a prima facie case of discrimination," and then "[t]he burden of production then shifts to defendants, who must offer through the introduction of admissible evidence a non-discriminatory reason for their actions that, if believed by the trier of fact, would support a finding that unlawful discrimination was not a cause of the disputed employment action." *Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Program, Inc.,* 198 F.3d 68, 72 (2d Cir. 1999) (internal citations omitted). "If the defendant proffers such a reason, the presumption of discrimination drops out of the analysis, and the defendant will be entitled to summary judgment unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." *Spiegel v. Schulmann,* 604 F.3d 72, 80 (2d Cir. 2010) (alterations and internal quotation marks omitted).

**\*6** "To establish a prima facie case of discrimination under the ADA, plaintiff must show by a preponderance of the evidence that (1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability." *Heyman,* 198 F.3d at 72 (citing *Ryan v. Grae & Rybicki, P.C.,* 135 F.3d 867, 869-70 (2d Cir. 1998)).

Defendant does not contest the first two elements of Plaintiff's prima facie case for the purposes of this motion. Dkt. No. 90 at 7. The Court determines that there are no genuine disputes of any material facts and that Plaintiff has failed to meet his initial "burden of production" for establishing the other two elements. *Heyman,* 198 F.3d at 72.

### a. Third Element: Qualified to Perform Essential Job Functions

Plaintiff maintains that his job position was "Key Relationship Manager" and that he was qualified to perform that job, with reasonable accommodations, when it was taken away from him on November 29, 2012. Dkt. No. 106 at 12-13. However, Plaintiff's contention that he was able to perform his job as "key relationship manager" is in direct conflict with his sworn statements made to the Social Security Administration, Prudential, and Mass Mutual in obtaining his disability benefits that, as a result of chemotherapy, Plaintiff had suffered serious disability in his cognitive functioning that rendered him incapable of performing in his occupation or *any* other occupation. Dkt. No. 107 at 50-54 ("the chemotherapy treatments have severely diminished my cognitive functioning to where I could no longer work in my occupation or frankly in any occupation").

Moreover, as explained *supra* II.A., Plaintiff's objections to the introduction of these statements are entirely conclusory and unsupported by any explanation for why the underlying evidence is inadmissible. As Plaintiff provides no evidence to rebut Defendant's claim that Plaintiff made these statements or otherwise provide an explanation as to their veracity, the Court concludes that there is no genuine dispute of material fact as to whether Plaintiff made these statements. *See Hicks v. Baines,* 593 F.3d 159, 166 (2d Cir. 2010) ("[M]ere conclusory allegations or denials ... cannot by themselves create a genuine issue of material fact where none would otherwise exist.").

To be sure, Plaintiff's statements to the Social Security Administration, Prudential, and Mass Mutual that he is totally disabled and cannot work "do not necessarily bar [him] from claiming in an ADA action that he can perform the essential functions of the job at issue." *Parker v. Columbia Pictures Indus.,* 204 F.3d 326, 333 (2d Cir. 2000) (citing *Cleveland v. Policy Mgmt. Sys. Corp.,* 526 U.S. 795, 802 (1999)). However, because Plaintiff's earlier statements to these entities "directly contradict the allegations made in" this ADA lawsuit, Plaintiff "must offer some explanation for the inconsistency" that is "sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good faith belief in, the earlier statement, the plaintiff could

nonetheless 'perform the essential functions' of the job, with or without 'reasonable accommodation' " in order to "defeat summary judgment." *Id.* (citing *Cleveland*, 526 U.S. at 802).

Plaintiff has failed to make this showing. Plaintiff has sworn under oath that he had suffered serious cognitive impairment that affected his ability to read research and recall basic facts, and Plaintiff provides no discernable explanation of how he can perform the essential functions of the key manager role without those abilities or why this job is an exception to his statement that he cannot perform in any occupation. Moreover, though Plaintiff points out that he was terminated from his preferred position on November 29, 2012, two months before he began disability leave, he points to nothing in the record to explain why he was "totally disabled" in January of 2013 but not in November of 2012. He at no point claims or points to evidence in the record that his condition deteriorated in that two-month period, and in fact the undisputed evidence in the record shows that Plaintiff began chemotherapy in 2008 and complained of cognitive dysfunction as early as May 2011. Therefore, the Court concludes that there is no genuine dispute that Plaintiff was totally disabled during this time period.

**\*7** To be sure, even though he was totally disabled, Plaintiff may still have been "qualified to perform the essential functions of his job" with "a reasonable accommodation." *Heyman*, 198 F.3d at 72. Plaintiff argues that he requested that his employer "find someone else to perform certain Korea and Taiwan specialist functions," so that he could perform only the "key manager role." Dkt. No. 106. at 7. However, eliminating one of Plaintiff's key job roles that he was hired to do is not a "reasonable accommodation." To the contrary, this is the *removal* of a job function, not an accommodation for performing one. *See Turowski v. Triarc Companies, Inc.*, 761 F. Supp. 2d 107, 112 (S.D.N.Y. 2011) ("While a reasonable accommodation may include adjustments such as the modification of physical facilities, work schedules or equipment or job restructuring, reasonable accommodation does not mean the elimination of any of the position's essential functions.") (citing *Gilbert v. Frank*, 949 F.2d 637, 642 (2d Cir. 1991)); *Jasany v. U.S. Postal Serv.*, 755 F.2d 1244, 1250 (6th Cir. 1985) ("The post office was not required to accommodate [the plaintiff] by eliminating one of the essential functions of his job."). And while "[t]he ADA lists reassignment to an existing, vacant position as a possible reasonable accommodation, 42 U.S.C. § 12111(9)(B)," the ADA "does not require creating a new position for a disabled

employee." *Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 187 (2d Cir. 2006).

Second, even if this were to be considered a "reasonable accommodation" in theory, Plaintiff has still not shown that with it he would be "qualified to perform the essential functions of his job," *Heyman*, 198 F.3d at 72, because he provides no explanation of how his disability to his cognitive functioning made him unable to complete the specialist Taiwan and Korea functions but not the key manager functions. In sum, because there is no genuine dispute of fact that Plaintiff was totally disabled during this time period and that there was no accommodation that could enable him to perform his duties, the Court concludes as a matter of law that Plaintiff was not "qualified to perform the essential functions of his job." *Id.*

**b. Fourth Element: Adverse Action because of Disability**

Although the conclusion above is sufficient to dismiss Plaintiff's discrimination claim, the Court also concludes that there is no genuine issue of material fact that the Defendant took adverse action against the Plaintiff because of his disability. For the fourth element of his claim, Plaintiff must show that he "suffered adverse employment action because of his disability," *Heyman*, 198 F.3d at 72. "[T]he ADA requires a plaintiff alleging a claim of employment discrimination to prove that discrimination was the but-for cause of any adverse employment action." *Natofsky v. City of New York*, 921 F.3d 337, 348 (2d Cir. 2019). Once "Defendant proffers a legitimate reason for Plaintiff's termination, the burden shifts to Plaintiff to demonstrate that the reason Defendant offers is merely a pretext for discrimination." *Clark*, 96 F. Supp. 3d at 254-55 (citing *Heyman*, 198 F.3d at 71) (quotations omitted). In analyzing whether there is discriminatory intent, the Court may look to factors such as whether the Defendant hired a new person of similar qualifications after Plaintiff's discharge, criticized the Plaintiff's performance in disability-related degrading terms, or engaged in "more favorable treatment of employees not in the protected group." *Exarhakis v. Visiting Nurse Serv. of New York*, No. 02-CV-5562 (ILG), 2006 WL 335420, at *11 (E.D.N.Y. Feb. 13, 2006) (quoting *Chambers v. TRM Copy Centers Corporation*, 43 F.3d 29, 37 (2d Cir. 1994)).

Plaintiff claims that his supervisors were aware of his cancer diagnosis, as evidenced by Plaintiff's testimony that he told them about it, and that he was terminated from his preferred

Case 3:24-cv-01358-GTS-ML    Document 13    Filed 01/07/25    Page 54 of 120

Shannon v. Credit Agricole Securities (USA), Inc., Not Reported in Fed. Supp. (2021)

position in November 29, 2012 as a result. Defendants have offered a "legitimate reason for Plaintiff' termination" in response, *Clark*, 96 F. Supp. 3d at 254-55, which is that he was not terminated for any reason related to his disability but because his position, along with those of other employees, was to be eliminated as a result of restructuring of the company.

**\*8** Plaintiff has not provided evidence from which a reasonable jury could conclude that Defendant's purported reason for termination was pretextual. As purported evidence of discriminatory intent, Plaintiff claims that his salary had been decreasing each year starting in 2009 after his diagnosis in 2008. Dkt. No. 106 at 13-14, 28. However, Defendant explains that the company's struggles following the financial crisis in 2008 led to salary and bonus decreases for almost all employees. Dkt. No. 107 at 28. Plaintiff has not "allege[d] that defendants treated [him] differently from non-disabled employees, [n]or that defendants' practices have a disparate impact upon disabled employees relative to non-disabled employees." *Brennen v. Comptroller of State of N.Y.*, 100 F.3d 942 (2d Cir. 1996).

In fact, to the contrary, the only conclusion a reasonable jury conclude reach from the undisputed facts in the record is that there was an absence of discriminatory intent for termination of Plaintiff from his preferred position on November 29, 2012. Defendant never hired someone else to fill his position and Plaintiff's supervisor was also terminated a year later. Dkt. No. 107 at 43, 50. Additionally, when Plaintiff was initially terminated as a result of the layoffs, his supervisors strived to find him another position in the company, which he was offered and accepted. Plaintiff was permitted to and took full advantage of the disability leave provided by Defendants in 2013. Therefore, the material facts established in the record on this issue – none of which are meaningfully disputed – do not give rise to an inference of discrimination. *See Exarhakis*, 2006 WL 335420, at *11 (determining that the plaintiff's allegations "do not give rise to a rational inference of discrimination, especially in the context of the other events that transpired, including [defendant] offering her gratuitous leaves of absence, creating a new position for her, allowing her a tremendous amount of flexibility in the work created for her, and reviewing her work positively."). The Court concludes as a matter of law that Plaintiff did not suffer an adverse employment action as a result of his disability.

\* \* \*

Based on the undisputed facts in the record, no reasonable jury could conclude that the Plaintiff was qualified to perform the essential functions of his job or that any adverse employment action was taken against him because of his disability, both of which are required for a claim of discrimination under the ADA. Defendant is therefore entitled to summary judgment on Plaintiff's discrimination claim.

## 2. Plaintiff's Retaliation Claim

Plaintiff also brings a claim for retaliation under the ADA. The statute "provides that '[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). "A prima facie case of retaliation under the ADA is made up of the following elements: (1) the employee was engaged in an activity protected by the ADA, (2) the employer was aware of that activity, (3) an employment action adverse to the plaintiff occurred, and (4) there existed a causal connection between the protected activity and the adverse employment action." *Muller v. Costello*, 187 F.3d 298, 311 (2d Cir. 1999) (internal quotations omitted). "Once a plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the challenged employment decision." *Treglia v. Town of Manlius*, 313 F.3d 713, 721 (2d Cir. 2002). Then, "[i]f a defendant meets this burden, 'the plaintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation.' " *Id.* (citing *Cifra v. G.E. Co.*, 252 F.3d 205, 216 (2d Cir. 2001)).

**\*9** Plaintiff claims that there were two retaliatory events arising out of his complaints to supervisors regarding their alleged discriminatory treatment. Dkt. No. 106 at 17-18. First, he states that he made a "plain English written complaint" regarding the alleged discrimination in his November 20, 2012 employee performance review, and that he was subsequently terminated from his preferred position on November 29, 2012. *Id.* However, this complaint, which was contained in an "employee performance review," Dkt. No. 106 at 18, was not "protected activity" under the ADA. "Protected activity is action taken to protest or oppose statutorily prohibited discrimination." *Natofsky v. City of New York*, 921 F.3d 337, 354 (2d Cir. 2019) (quotations omitted).

Case 3:24-cv-01358-GTS-ML    Document 13    Filed 01/07/25    Page 55 of 120

Shannon v. Credit Agricole Securities (USA), Inc., Not Reported in Fed. Supp. (2021)

Plaintiff himself admits in sworn testimony that he did not reference his disability in this document, Dkt. No. 109 ¶ 24, and there is therefore no genuine dispute that Plaintiff did not "protest or oppose statutorily prohibited" discrimination in the November 20, 2012 complaint. Moreover, even if Plaintiff had established a prima facie case of retaliation on this claim, as discussed *supra* II.B.1.b, Defendant has proffered a legitimate reason for Plaintiff's termination and Plaintiff has not "point[ed] to evidence that would be sufficient to permit a rational factfinder to conclude that" Defendant's explanation for the firing is pretextual. *Treglia*, 313 F.3d at 721.

As to the second alleged retaliatory event, Plaintiff made a formal complaint regarding the alleged discrimination on January 2, 2012 through his attorney. Defendant responded in a January 4, 2013, letter stating that Plaintiff had not been terminated on the basis of his disability, and that the company was willing to keep him employed until the end of February 2013. Dkt. No. 115, Exhibit N.

However, Defendant's January 4, 2013 letter was not an "adverse employment action." The Second Circuit defines an adverse employment action as a "materially adverse change in the terms and conditions of employment," such as "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation." *Sanders v. New York City Hum. Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004). By the time the above correspondence occurred, Plaintiff had already been terminated and therefore the action did not constitute a "materially adverse change" in the terms and conditions of his employment. *Boyle v. McCann-Erickson, Inc.*, 949 F. Supp. 1095, 1104-05 (S.D.N.Y. 1997). (holding that where a plaintiff "had already been terminated," an "alleged

decision" not to hire him for freelance work was not an adverse employment action because it "did not [a]ffect his employment nor hinder him in any way from enforcing his rights."). *See also Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006) ("The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm.").

Indeed, the action was not "adverse" at all considering that Defendant extended to Plaintiff the opportunity to continue working through February 2013. And the fact that this opportunity was only temporary also does not constitute an adverse employment action, because Plaintiff was not entitled to any further employment after he had been lawfully terminated from his preferred position on November 12, 2012. *See Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 187 (2d Cir. 2006) ("[T]he ADA did not require [the defendant] give [the plaintiff] this new position for any longer than it did," because "[g]iven that the ADA does not require creating a new position for [the plaintiff] at all," it does not "dictate the duration of a new position that his employer created for him as a matter of grace."). The Court therefore concludes, based on the undisputed facts in the record, that Defendant is entitled to judgment as a matter of law on Plaintiff's retaliation claim.

### III. CONCLUSION

For the reasons described above, Defendant's motion for summary judgment is GRANTED. Plaintiff's Motion to Strike is DENIED. This resolves Dkt. Nos. 89, 114.

**\*10**  SO ORDERED.

### All Citations

Not Reported in Fed. Supp., 2021 WL 1063183

---

### Footnotes

1  Plaintiff also on at least one occasion disputed a fact with "[Need citation here.]". Dkt. No. 107 at 53.

---

End of Document    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 4553416
Only the Westlaw citation is currently available.
United States Court of Appeals, Second Circuit.

Xiamin ZENG, aka Aimee Zane, Plaintiff-Appellant,

v.

NEW YORK CITY HOUSING
AUTHORITY, Defendant-Appellee.

22-138-cv
|
July 17, 2023

Appeal from the United States District Court for the Southern District of New York (Hellerstein, *J.*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court is hereby **VACATED**, and the action is **REMANDED** for further proceedings consistent with this order.

**Attorneys and Law Firms**

FOR PLAINTIFF-APPELLANT: Kenneth F. McCallion, McCallion & Associates, LLP, New York, NY.

FOR DEFENDANT-APPELLEE: Hanh H. Le (Nancy M. Harnett, on the brief), for Lisa Bova-Hiatt, Executive Vice President for Legal Affairs and General Counsel, New York City Housing Authority, New York, NY.

PRESENT: ROBERT D. SACK, JOSEPH F. BIANCO, EUNICE C. LEE, Circuit Judges.

## SUMMARY ORDER

 **\*1** Plaintiff-appellant Xiamin Zeng ("Zeng") appeals from the January 4, 2022, judgment of the United States District Court for the Southern District of New York, granting summary judgment to the New York City Housing Authority ("NYCHA") on her federal claims and declining to exercise supplemental jurisdiction over her state law claims. Zeng was employed by NYCHA as a probationary Caretaker, performing janitorial services at three different NYCHA housing developments from July 28, 2016, until her termination on May 12, 2017. Zeng, who is a Chinese-American woman, alleged, *inter alia*, that NYCHA discriminated against her on account of her race, national

origin, gender, familial status as a single parent, and status as a victim of domestic violence by subjecting her to a hostile work environment, and terminated her employment in retaliation for her reporting the discriminatory conduct to her supervisors, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101 *et seq.* ("NYCHRL"), and 42 U.S.C. § 1981 ("Section 1981"). We assume the parties' familiarity with the underlying facts and procedural history, to which we refer only as necessary to explain our decision.

We review *de novo* the grant of summary judgment. *Brooklyn Ctr. for Indep. of the Disabled v. Metro. Transp. Auth.*, 11 F.4th 55, 61 (2d Cir. 2021). Summary judgment is appropriate "only upon a showing 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.' " *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(a)). When deciding a motion for summary judgment, we must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Id.* (internal quotation marks and citation omitted).

Zeng advances three principal arguments on appeal. First, she argues that the district court erred in concluding that despite evidence of repeated and extensive discriminatory remarks directed at her by her supervisors and co-workers, among other misconduct, summary judgment on the hostile work environment claims was warranted. Second, Zeng asserts that the district court similarly erred in granting summary judgment on the discriminatory termination claims because triable issues of fact existed as to whether NYCHA's stated non-discriminatory grounds were a pretext for Zeng's termination. Finally, with respect to the retaliation claims, Zeng contends that the district court erred in determining that the evidence in the record established that NYCHA's decision to terminate Zeng pre-dated her complaints of discriminatory conduct, and that, even assuming that a *prima facie* case of retaliation was established, NYCHA articulated legitimate non-discriminatory reasons for her termination that she failed to rebut with evidence of retaliation.

 **\*2** As an initial matter, we affirm the district court's dismissal of Zeng's claims under Title VII and Section 1981 to the extent that they are predicated upon her status as a single parent or a victim of domestic violence. *See* 42 U.S.C. § 2000e-2(a) (recognizing claims based on race, color, religion, sex, or national origin, but not familial status or status as

Case 3:24-cv-01358-GTS-ML   Document 13   Filed 01/07/25   Page 57 of 120

Zeng v. New York City Housing Authority, Not Reported in Fed. Rptr. (2023)

victim of domestic violence); 42 U.S.C. § 1981; *see also Albert v. Carovano*, 851 F.2d 561, 572 (2d Cir. 1988) (en banc) ("Section 1981 was intended to combat racial or ethnic discrimination, nothing more."). [1]

However, as set forth below, we conclude that the district court erred in granting summary judgment on Zeng's claims based on race and gender, as well as retaliation, under Title VII and Section 1981. [2] We conclude, construing the evidence in the record most favorably to Zeng, that there is sufficient evidence from which a reasonable jury could find that the alleged racial and sexist remarks directed at Zeng, combined with other conduct by co-workers and supervisors, cumulatively created a hostile work environment based on her race and/or gender. We also conclude that the district court erred in granting summary judgment on Zeng's discriminatory termination claims because disputed issues of material fact exist regarding whether NYCHA's stated reasons for terminating her were pretext for unlawful race and/or gender discrimination. Lastly, we similarly conclude that the evidence, including a supervisor's written request for Zeng's termination within weeks of her complaints of discriminatory conduct, as well as other evidence in the record supporting an inference of retaliation, precludes summary judgment on Zeng's retaliation claims. [3]

## I. Hostile Work Environment Claims

"[T]o survive summary judgment on a claim of hostile work environment harassment, a plaintiff must produce evidence that 'the workplace is permeated with "discriminatory intimidation, ridicule, and insult," that is "sufficiently severe or pervasive to alter the conditions of the victim's employment." ' " *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)), *superseded on other grounds by*, N.Y.C. Local L. No. 85. We may consider five non-exclusive factors in determining the existence of a hostile work environment: "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether the conduct was physically threatening or humiliating, or a 'mere offensive utterance'; (4) whether the conduct unreasonably interfered with plaintiff's work; and (5) what psychological harm, if any, resulted." *Aulicino v. N.Y.C. Dep't of Homeless Servs.*, 580 F.3d 73, 82 (2d Cir. 2009) (quoting *Richardson v. N.Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 437 (2d Cir. 1999), *abrogated on other grounds*, *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)). "Our case law treats the first two of these factors—the frequency and the severity of the misconduct—

as the principal focus of the analysis; the last three factors are specific considerations within the severity inquiry. Core hostile work environment cases involve misconduct that is both frequent and severe, for example, when a supervisor utters blatant racial epithets on a regular if not constant basis and behaves in a physically threatening manner." *Id.* (internal quotation marks and citation omitted). We have explained that an employer's motion for summary judgment must be denied "if the conduct there is *either* so severe *or* so pervasive as to alter the working conditions of a reasonable employee." *Richardson*, 180 F.3d at 440. In addition, although "[i]solated incidents usually will not suffice to establish a hostile work environment, ... we have often noted that even a single episode of harassment can establish a hostile work environment if the incident is sufficiently severe." *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 175–76 (2d Cir. 2012) (internal quotation marks and citations omitted). However, for "racist comments, slurs, and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (internal quotation marks and citation omitted). "Thus, whether racial slurs constitute a hostile work environment typically depends upon the quantity, frequency, and severity of those slurs, considered cumulatively in order to obtain a realistic view of the work environment." *Id.* at 110–11 (internal quotation marks and citations omitted).

**\*3** Zeng asserts that the repeated incidents of abusive, discriminatory remarks and conduct by co-workers and supervisors, which occurred during her approximately ten months at NYCHA, were sufficiently severe and pervasive to support a hostile work environment claim. The district court determined otherwise, holding that "[b]ased on all the evidence presented ... [the district court is] not persuaded that a reasonable person would view [Zeng's] work environment as sufficiently racially or sexually hostile so as to alter the conditions of employment." Special App'x at 18–19 (internal quotation marks omitted). We disagree with the district court and conclude that the evidence in the record, construed most favorably to Zeng, was sufficient to preclude summary judgment on the hostile work environment claims under Title VII and Section 1981.

Zeng submitted a sworn declaration and stated in her complaint that, in July 2016, when she began working at LaGuardia Houses as the only Asian employee for NYCHA at that location, her male supervisor (Alex Rodriguez) assigned her to work alone in a dangerous building, despite the fact that workers were usually assigned to work there in pairs for

Case 3:24-cv-01358-GTS-ML    Document 13    Filed 01/07/25    Page 58 of 120

Zeng v. New York City Housing Authority, Not Reported in Fed. Rptr. (2023)

safety. In September 2016, Zeng was cornered by a resident of the building who threatened and sexually assaulted her. According to Zeng, although she reported the assault to NYCHA and requested a transfer to a safer location, there was no investigation or transfer, and instead she continued to be required to work alone on projects at LaGuardia Houses, unlike her male and non-Asian co-workers. Zeng also stated in her sworn declaration that she was forced to work outside without a coat for long hours during the cold month of November while NYCHA provided all other employees with winter coats. Zeng further asserts that, in October 2016, she was denied time off to attend court appearances to renew an order of protection against her abusive ex-boyfriend, and her supervisor threatened to terminate her employment if she attended the hearing. Several weeks later, in November 2016, she was transferred to Isaacs Houses after she saw the man who had sexually assaulted her in September 2016 taking drugs near where she was working in LaGuardia Houses.

Zeng stated in her declaration and complaint that the alleged hostile work environment continued at Isaacs Houses based upon, *inter alia*, the following events: (1) on multiple occasions, her new male supervisor (Elliot Ramos) "kicked the unlockable women's bathroom door open and walked in while [she] was using the bathroom," asking whether she was sleeping or taking a break, App'x at 773; (2) for the majority of her placement at Isaacs Houses, Zeng did not receive a physical schedule setting forth her responsibilities on a weekly basis, even though her non-Asian co-workers received such a schedule, *id.*; *id.* at 62; and (3) in December 2016, while sitting with her co-workers and her then-supervisor Ramos, she told them that she would not work on Christmas Day because she had to facilitate a visitation with her son's father, and they responded by laughing and shouting racist and sexist comments, such as "f**king Asian," "f**king yellow Asian," "f**king stupid b***h," and "f**k her son," *id.* at 773.

After complaining about her mistreatment at Isaacs Houses, Zeng was transferred to Smith Houses in January 2017 and allegedly overheard her new supervisor (Elliott Medina) call her prior supervisor (Ramos) on her first day to ask for her personnel file, as to which Ramos angrily responded, "F**k the B***h! Do not transfer her! I'm her boss. She must be [at Isaacs Houses]! Give her a Memo. Kick her out. Stupid Yellow B***h!" *Id.* at 774. According to Zeng, one of her co-workers (Ms. Slim) from Isaacs Houses, who had cursed and laughed at her and said "F**k Asians" whenever she saw Zeng, also had been re-assigned to Smith Houses. *Id.* at 775.

When Slim learned of Zeng's transfer, Slim called several of Zeng's co-workers at Smith Houses who subsequently, on many occasions, shouted insulting words to Zeng in the women's restroom.

**\*4** Here, "[t]aking the evidence in the light most favorable to [Zeng] and accepting her version of the events as true, as we are required to do and a jury would be permitted to do," *Redd*, 678 F.3d at 178, this evidence was sufficient to create a genuine issue of fact as to whether the alleged racist and sexist insults leveled against her by her supervisors and co-workers, combined with the aforementioned conduct —including her male supervisor's physical invasion of her privacy in the women's restroom on multiple occasions— could lead a reasonable jury to conclude that Zeng was subjected to a hostile work environment based on her race and gender.

In reaching the opposite conclusion, the district court made unwarranted credibility determinations regarding the evidence. For instance, because Zeng claimed both that she was forced to work alone and that she was harassed by her co-workers and supervisors, the district court found that it was "implausible that both allegations could be true simultaneously." Special App'x at 19. However, there is nothing in the record to suggest that, although Zeng alleges that she was assigned to work alone in the dangerous building, she did not interact with her co-workers and supervisor at other times during the workday, such as during breaks and meetings. In fact, Zeng alleges that the racist and sexist insults in December 2016 occurred with other co-workers in the dining room. Similarly, the district court found that Zeng's allegation in the complaint about being forced to work outside for "long hours during the winter" at LaGuardia Houses without workcoats, App'x at 60, was contradicted by the record because she was transferred out of LaGuardia Houses in November 2016 and, thus, did not work there during the *winter*, Special App'x at 19. That improper credibility assessment, however, did not allow for the possibility that Zeng was colloquially referring to "winter" as also including cold days in late autumn when a jacket was necessary. Indeed, in her declaration, Zeng specifically refers to her supervisors forcing her "to work long hours during a cold *November*." App'x at 772 (emphasis added). Furthermore, in rejecting Zeng's claim that she was denied leave forms by her supervisor, the district court appears to have credited the testimony given by Zeng's supervisor that the leave forms in question were "readily available in his office, and more importantly, that he could not deny a request to attend a

Case 3:24-cv-01358-GTS-ML    Document 13    Filed 01/07/25    Page 59 of 120

Zeng v. New York City Housing Authority, Not Reported in Fed. Rptr. (2023)

court hearing." Special App'x at 20. Moreover, the district court did not address evidence Zeng submitted of a recording which, construed most favorably to Zeng, created a disputed issue of fact as to whether the supervisor repeatedly denied her request for a particular leave form. In short, these credibility determinations regarding Zeng's sworn statements, as compared to other evidence in the record, should have been reserved for the jury. *See, e.g., Eichelberg v. Nat'l R.R. Passenger Corp.*, 57 F.3d 1179, 1186 (2d Cir. 1995) ("[C]redibility determinations are within the province of the jury and may not be resolved on a motion for summary judgment."); *see also Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 725 (2d Cir. 2010) ("[A]s a general rule, a district court may not discredit a witness's deposition testimony on a motion for summary judgment, because the assessment of a witness's credibility is a function reserved for the jury.").

Finally, in limiting Zeng's hostile work environment claim to "four instances in which her supervisors or co-workers uttered racist and sexist slurs," Special App'x at 18, the district court did not consider that Zeng's sworn statements which suggest that those instances were illustrations of insults that occurred on a more frequent basis. *See, e.g.*, App'x at 775 (alleging that Ms. Slim stated "F**k Asians" whenever she saw Zeng at Isaacs Houses, and that Zeng's female colleagues at Smith Houses "called Ms. Slim in front of [Zeng] many times and they shouted insulting words to [Zeng] in the women's restroom"). The district court also failed to consider the other alleged harassing conduct beyond the racist and sexist insults, such as her male supervisor (Ramos) entering the women's restroom on multiple occasions, while she was using it, to question her about her work performance.

**\*5** Accordingly, because the evidence was sufficient to create a triable issue of fact as to whether Zeng was subjected to a hostile work environment based on race and gender, the district court erred in granting summary judgment for NYCHA on those claims under Title VII and Section 1981.

### II. Discriminatory Termination and Retaliation Claims

We further conclude that the district court erred in granting summary judgment on Zeng's discriminatory termination and retaliation claims, which we analyze pursuant to the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014) (analyzing Title VII

and retaliation claims together under the *McDonnell Douglas* burden-shifting standard).

Under Title VII, "[t]o state a prima facie case of race discrimination, a plaintiff must proffer evidence that (1) [s]he belongs to a protected group; (2) [s]he was qualified for [her] position; (3) [her] employer took an adverse action against [her]; and (4) the adverse action occurred in circumstances giving rise to an inference of race discrimination." *Id.* (citing *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003)). "To state a prima facie case of retaliation under Title VII, a plaintiff must proffer evidence that [she] engaged in a protected activity, such as complaining about race discrimination, and that [her] employer took an adverse action in retaliation." *Id.* (citing *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010)).

"Once an employee makes a prima facie case of either discrimination or retaliation, the burden shifts to the employer to give a legitimate, non-discriminatory reason for its actions." *Id.* (citing *McDonnell Douglas*, 411 U.S. at 802). "If the employer does so, the burden then shifts back to the plaintiff to show that the employer's explanation is a pretext for race discrimination or retaliation." *Id.* "With respect to a discrimination claim, 'once the employer has made a showing of a neutral reason for the complained of action, to defeat summary judgment the employee's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the employer's employment decision was more likely than not based in whole or in part on discrimination.' " *Id.* (alterations adopted) (quoting *Terry*, 336 F.3d at 138). "With respect to a retaliation claim, the employee's admissible evidence must show 'that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.' " *Id.* (quoting *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 835 (2d Cir. 2013)).

On appeal, NYCHA does not argue that Zeng failed to establish a prima facie case of race- or gender-based discrimination. Instead, NYCHA urges us to uphold the district court's determination that NYCHA had adequately rebutted Zeng's prima facie case by articulating legitimate, non-discriminatory reasons for terminating her employment—premised, primarily, on poor performance and insubordination—and that Zeng failed to proffer sufficient evidence of pretext to rebut these non-discriminatory grounds for termination. We are unpersuaded.

Case 3:24-cv-01358-GTS-ML    Document 13    Filed 01/07/25    Page 60 of 120

Zeng v. New York City Housing Authority, Not Reported in Fed. Rptr. (2023)

On the record before us, there is sufficient evidence that, if credited, could rationally support a jury's finding that NYCHA's termination of Zeng was a pretext for unlawful race discrimination and/or retaliation. The evidence in the record, construed most favorably to Zeng, includes the following:

**\*6** • On December 21, 2016, Ramos, Zeng's supervisor at Isaac Houses, issued her a disciplinary memorandum for misplacing her keys but did not penalize other employees who also lost their keys. When Zeng reported Ramos for this discriminatory conduct, he threatened to fire her.

• Several days later, on December 23, 2016, Ramos and other employees made a number of racist and sexist comments at Zeng after she informed them that she did not want to work overtime on Christmas Day because she had to facilitate a child custody visit on that day. Zeng again complained about Ramos's discriminatory treatment to Russell Hartfield, another supervisor, but that supervisor did nothing. Then, on December 28 and 30, 2016, Zeng was issued negative memoranda about her work, and she later learned that Ramos and Hartfield had issued a negative evaluation.

• After filing a telephonic complaint with Human Resources about her treatment at Isaac Houses, Zeng was transferred to Smith Houses on January 10, 2017. There, Elliott Medina, Zeng's new supervisor, asked her to come to the management office, where she overheard him speaking on the telephone with Ramos regarding the transfer of her personnel files to Smith Houses. In her sworn declaration, as noted *supra*, Zeng proffered that she overheard Ramos get angry and yell racist and sexist comments regarding Zeng and also tell Medina that Zeng should be disciplined and terminated.

• On January 31, 2017, Zeng emailed Medina to inform him that she was unable to attend work because of menstrual pains and that she would be using two sick days. Medina then sent that email to Superintendent Liliana Billini and Ivonne Cunningham, writing, "Look at this Billini! It [sic] Chinese new year. Ivy pay dock her." App'x at 734.

• On February 3, 2017, Zeng emailed Deborah Altman in the Human Resources Department to apply for a transfer to another location. Although the documentary evidence shows that Zeng made this request out of a concern for her physical safety due to her belief that her ex-partner, whom she claims was abusive to her, discovered that she had been working at Smith Houses, Zeng later proffered,

in a sworn declaration, that she had made that request after being subjected to the foregoing discriminatory conduct. She also stated that, on her last day at Smith Houses, three supervisors gave her three disciplinary memoranda, the contents of which she claims were largely false.

• In a letter dated February 6, 2017, Billini recommended to the Borough Director that Zeng be "[i]mmediately [t]erminated due to repeated memo issuance, being insubordinate to her supervisors, poor janitorial work performance and creating a hostile work environment." App'x at 222.

• On February 7, 2017, Zeng was placed on an unpaid leave of absence until such time that an alternative suitable worksite location could be found, and, after discussions regarding a potential transfer to a different NYCHA location failed, Zeng was terminated on May 12, 2017.

NYCHA argues that Zeng cannot rely upon the alleged discrimination that occurred at LaGuardia Houses and Isaacs Houses to demonstrate pretext because her supervisors at those locations did not recommend her termination; rather, the request for termination was made at Smith Houses by Billini, who was not alleged to have displayed any animus. However, that contention overlooks the fact that Billini's memorandum requesting termination was based not only on events at Smith Houses, but also noted "repeated memo issuance," App'x 222, which one could reasonably infer was a reference to prior counseling memos at other NYCHA sites—including three such memos at Isaacs Houses written by Ramos, whom Zeng alleges used racial and sexist epithets against her.[4] Moreover, Ramos allegedly conveyed his racial and retaliatory animus in Zeng's presence to Medina, her supervisor at Smith Houses, who allegedly also harbored racial animus and wrote counseling memos for insubordination and poor performance. As we have explained, the "cat's paw" theory of liability imputes a discriminatory motive to a decisionmaker where such action is proximately caused by the animus of a subordinate—that is, "the supervisor, acting as agent of the employer, has permitted himself to be used as the conduit of the subordinate's prejudice." *Vasquez v. Express Ambulance Serv., Inc.*, 835 F.3d 267, 272 (2d Cir. 2016) (alteration adopted) (internal quotation marks and citation omitted). Thus, on this record, the alleged discriminatory animus of Ramos and Medina supports the existence of a disputed issue of material fact as to whether the reasons underlying Billini's termination request, including prior counseling memos by

Case 3:24-cv-01358-GTS-ML    Document 13    Filed 01/07/25    Page 61 of 120

Zeng v. New York City Housing Authority, Not Reported in Fed. Rptr. (2023)

Ramos and Medina, were pretext for discrimination and/or retaliation.

**\*7** In addition, with respect to retaliation, we disagree with the district court's determination that those claims "fail at the threshold because she has not established a causal relationship between her protected activity and termination." Special App'x at 21–22. The district court principally focused on the timing between when Zeng allegedly first complained about the discrimination (December 2016 or January 2017) and the formal date of her termination (May 12, 2017), which it held was "too remote in time" to allow an inference of causation. *Id.* at 22. As a threshold matter, although the "causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action," *Cifra v. G.E. Co.*, 252 F.3d 205, 217 (2d Cir. 2001) (internal quotation marks and citation omitted), this Court "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action," *Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001); *see also Hubbard v. Total Commc'n, Inc.*, 347 F. App'x 679, 681 (2d Cir. 2009) (summary order) (holding that four months was not too remote in time to establish a causal relationship). In any event, the district court's exclusive focus on the formal date of termination failed to consider the undisputed evidence, as discussed *supra*, that Billini first recommended Zeng's immediate termination on February 6, 2017, only weeks after she purportedly complained about the discriminatory conduct. Under these circumstances, the fact that the formal termination did not occur until several months later does not undermine a reasonable inference of causation that could be drawn from the close proximity between the alleged complaint of discrimination and the initial request for termination.[5] *See Sassaman v. Gamache*, 566 F.3d 307, 312 (2d Cir. 2009) (explaining that "an inference of discriminatory intent may be established by, *inter alia* ... the sequence of events leading to the plaintiff's discharge." (internal quotation marks and citations omitted)). Moreover, the district court failed to consider that Zeng also sought to establish a retaliatory motive by relying more directly on the alleged instruction by Ramos to Medina, after Zeng had been transferred to Smith Houses, to "[g]ive her a Memo" and "[k]ick her out." App'x at 774.

In sum, Zeng's sworn declaration, combined with the other evidence in the record, is sufficient to raise a genuine issue of material fact as to whether NYCHA's non-discriminatory grounds for termination were pretext for discrimination and/or retaliation. Of course, a "jury might credit all of this proffered evidence, some of it, or none at all. But that is left for the jury to decide at trial." *Kirkland*, 760 F.3d at 227 (internal quotation marks and citation omitted).

Accordingly, the district court erred in granting NYCHA's motion for summary judgment on Zeng's discriminatory termination and retaliation claims under Title VII and Section 1981.

\* \* \*

We have reviewed NYCHA's remaining arguments and conclude that they are without merit. For the foregoing reasons, we **VACATE** the judgment of the district court and **REMAND** the action for further proceedings consistent with this order.

### All Citations

Not Reported in Fed. Rptr., 2023 WL 4553416

---

## Footnotes

1    We note that, even though not separately actionable under these statutes, Zeng is permitted to rely upon evidence of her interactions with NYCHA regarding her marital issues and being the victim of domestic abuse to the extent such interactions are relevant to her Title VII and Section 1981 claims based on race and gender discrimination.

2    We analyze Zeng's hostile work environment, discriminatory termination, and retaliation claims under Section 1981 utilizing the Title VII framework. *See Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11,

20 n.4 (2d Cir. 2014) (hostile work environment claims under Title VII and Section 1981); *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010) (race discrimination claims under Title VII and Section 1981); *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (retaliation claims under Title VII and Section 1981).

3  Because the district court declined to exercise supplemental jurisdiction over the NYCHRL claims and dismissed them without prejudice due solely to the absence of any remaining federal claims, we likewise vacate the dismissal of the NYCHRL claims. *See, e.g.*, *Ramsy v. Marriott Int'l, Inc.*, 952 F.3d 379, 393 (2d Cir. 2020); *Karibian v. Columbia Univ.*, 14 F.3d 773, 781 (2d Cir. 1994).

4  NYCHA contends that Billini was referencing only counseling memos at Smith Houses. However, the ambiguous record permits more than one reasonable inference, including the one Zeng seeks to draw.

5  NYCHA argues that, between the request for termination and the actual termination, there were good faith efforts by NYCHA to attempt to transfer Zeng to Rutgers Houses or developments in the Bronx and Staten Island, but Zeng rejected any such alternatives. However, Zeng contends that those efforts were intended to cover up their pretextual reasons for termination. For example, in a March 2017 email chain about a vacancy in Rutgers Houses, the Deputy Assistant Director of Human Resources wrote, "I thought I had deleted the bulk of questionable comments from the email chain. However, [I] will oblige your request." App'x at 743. In short, the events following the request for termination also contain factual disputes that cannot be resolved on summary judgment.

---

**End of Document**  <span style="float:right;">© 2025 Thomson Reuters. No claim to original U.S. Government Works.</span>

2021 WL 3038370
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Elizabeth Harding WEINSTEIN, Plaintiff,

v.

Judge Robert J. MILLER, et al., Defendants.

21-CV-4543 (CS)
|
Signed 07/15/2021

**Attorneys and Law Firms**

Elizabeth Harding Weinstein, Briarcliff Manor, NY, Pro Se.

ORDER OF DISMISSAL

CATHY SEIBEL, United States District Judge:

**\*1** Plaintiff brings this *pro se* action, for which the filing fees have been paid, alleging that Defendants are violating her civil rights in state-court proceedings. She seeks money damages and emergency injunctive relief. For the reasons set forth below, the Court dismisses Plaintiff's complaint without prejudice.

**STANDARD OF REVIEW**

The Court has the authority to dismiss a complaint, even when the plaintiff has paid the filing fee, if it determines that the action is frivolous, *Fitzgerald v. First E. Seventh Tenants Corp.*, 221 F.3d 362, 363-64 (2d Cir. 2000) (*per curiam*) (citing *Pillay v. INS*, 45 F.3d 14, 16-17 (2d Cir. 1995) (*per curiam*) (holding that Court of Appeals has inherent authority to dismiss frivolous appeal)), or that the Court lacks subject matter jurisdiction, *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999). An action is frivolous if it "lacks an arguable basis either in law or in fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). Moreover, the Court "has the power to dismiss a complaint sua sponte for failure to state a claim," *Leonhard v. United States*, 633 F.2d 599, 609 n. 11 (2d Cir. 1980), so long as the plaintiff is given notice and "an opportunity to be heard." *Thomas v. Scully*, 943 F.2d 259, 260 (2d Cir. 1991) (*per curiam*); *see also Perez v. Ortiz*, 849 F.2d 793, 797 (2d Cir. 1988); Wright & Miller, *Federal Practice and Procedure* § 1357, at 301 & n. 3. The Court is obliged,

however, to construe *pro se* pleadings liberally, *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009), and interpret them to raise the "strongest [claims] that they *suggest*," *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474-75 (2d Cir. 2006) (internal quotation marks and citations omitted) (emphasis in original).

**BACKGROUND**

**A. Plaintiff's Complaint**

Plaintiff brings this action under 42 U.S.C. §§ 1983 and 1988, and the Americans with Disabilities Act of 1990's (ADA) anti-retaliation provision, 42 U.S.C. § 12203. She alleges that she is a "victim of severe domestic violence [and] narcissistic abuse," and that Defendants violated her rights by depriving her of due process, obstructing her access to the court, and committing fraud on the court. (ECF 1, at ¶ 1.) Plaintiff asserts that the alleged violations occurred largely because of the undue influence wielded in state-court proceedings by her husband Brian Stryker Weinstein, a well-known attorney. She sues the New York State Supreme Court, Appellate Division, Second Department (Appellate Division); New York Supreme Court, Westchester County; Judge Miller of the Appellate Division; four staff members of the Appellate Division – Clerk of Court Aprilanne Agostino, Associate Deputy Clerk Wendy Stynes, Program Coordinator Joseph Castellano, and Program Administrator Jeanne Muratore; her husband; Dina Kaplan, her husband's attorney; and Gloria Marchetti-Bruck, her children's court-appointed attorney.

The following allegations are taken from the complaint. On June 1, 2020, Plaintiff's husband filed a Family Offense Petition (FOP) against Plaintiff in the Westchester County Family Court and sought a temporary order of protection (TOP). Plaintiff and her husband were "estranged" at the time, and he was undergoing a "pedophilia investigation." (*Id.* at ¶ 44.) On June 5, 2020, Judge Arlene Katz of the Family Court issued a TOP against Plaintiff, requiring her to stay away from her husband, her three children, and their home. Immediately after the order was issued, police officers from the Briarcliff Manor Police Department removed Plaintiff from the house she had shared with her husband and children.

**\*2** Plaintiff responded to the TOP by filing divorce proceedings and a state-court petition for a writ of mandamus in the Westchester County Supreme Court. In December 2020, all of the state-court proceedings were consolidated as one action in the Westchester County Supreme Court. On

Weinstein v. Miller, Not Reported in Fed. Supp. (2021)

Case 3:24-cv-01358-GTS-ML    Document 13    Filed 01/07/25    Page 64 of 120

December 4, 2020, Judge Nancy Quinn-Koba, the presiding state-court judge, issued a new TOP *ex parte*, which again directed Plaintiff to stay away from her husband, her three children, and their home.

Plaintiff asserts that Judge Quinn-Koba and Referee Janet Gandolfo denied her due process, access to her children, access to her property, and access to financial support. Plaintiff filed an emergency request for an order to show cause relating to the December 4, 2020 TOP; Judge Quinn-Koba denied the request.

On or about December 30, 2020, Plaintiff filed an application pursuant to New York Civil Practice and Rules § 5704 in the New York State Supreme Court, Appellate Division, seeking review of the *ex parte* TOP. But the Appellate Division improperly processed the application, failing to place it on the New York State Courts Electronic Filing system (NYSCEF), misplacing it, and not finding it until January 25, 2021. Once the file was found, the Appellate Division scheduled a conference. On February 17, 2021, the conference relating to Plaintiff's § 5704 application was conducted by Associate Deputy Clerk Wendy Stynes and attended by Marchetti-Bruck, the children's court-appointed attorney, and Kaplan, Plaintiff's husband's attorney. Plaintiff objected to the conference because it was not conducted by a judge, and Deputy Clerk Stynes refused to tell her the name of the judge assigned to the case. The next day, on February 17, 2020, Judge Robert J. Miller issued a one-line order denying Plaintiff's § 5704 application.

On April 16, 2021, Judge Quinn-Koba issued a "new unlawful Ex Parte TOP," dating it back to December 4, 2020, although no TOP was in effect from March 5, 2021, to April 16, 2021. (*Id.* at ¶ 89.) Within minutes after the new TOP was issued, Plaintiff was unlawfully pulled over while driving by officers from the Briarcliff Manor Police. The officers arrested Plaintiff for alleged violations of the April 16, 2021 TOP but refused to tell her how she had violated the order. Only after she was handcuffed did the officers inform her that she had violated the TOP on April 5-7, 2021, when in fact no TOP was in effect. Plaintiff was charged with misdemeanor offenses.

That same day, in new proceedings in the Briarcliff Manor Village Court, Village Justice Halper issued a new *ex parte* TOP, directing that Plaintiff stay 1500 feet away from her home and children. She also has been denied discovery by ADAs Lauscher and Miller.

Plaintiff seeks to vacate the April 16, 2021 TOP issued in the Westchester County Supreme Court proceedings, and the second TOP, issued on April 16, 2021, in the new matter in the Briarcliff Manor Village Court. She also seeks money damages. [1]

## B. Requests for Emergency Injunctive Relief

**\*3** Plaintiff alleges that the matter at issue in this case is the Appellate Division's denial to her of due process and access to the courts in proceedings concerning her December 30, 2020 § 5704 application to the Appellate Division for review of the December 4, 2020 TOP issued by the Westchester County Supreme Court. (*See id.* ¶ 39.) But despite Plaintiff's assertion, she raises claims arising out of and seeks relief in proceedings before the Westchester County Supreme Court and Briarcliff Manor Village Court. In fact, since the filing of this action, Plaintiff has submitted at least six letters seeking emergency injunctive relief as to the Westchester County Supreme Court case. (*See* ECF 5, 6, 7, 10, 11, 12.) She generally asserts in these letters that her husband is a pedophile, her children have been kidnapped, she has been a victim of human trafficking, and she has been denied due process and access to the courts in the state-court matters. In some of the letters she claims that her husband and Kaplan, his attorney, are colluding with state actors to violate her rights and retaliate against her for the filing of this action. Plaintiff attaches to all the letters screenshots of purported text messages between her and her husband concerning his alleged pedophilia, and the February 1, 2021 letter from Elizabeth Bussian, indicating that Plaintiff does not need psychiatric evaluation.

## C. Plaintiff's Competency

Plaintiff has another pending case before the Court, *Weinstein v. Village of Briarcliff Manor*, No. 21-CV-1996 (CS) (*Weinstein I*), in which she brought claims arising out of her January 4, 2021 arrest for disorderly conduct in the Briarcliff Manor Municipal Building. In that action, she named as defendants: her husband, the Village of Briarcliff Manor, judges, judicial officials, prosecutors, police officials, town officials, and others. Plaintiff asserted that her husband "has been using his inner workings of the Westchester Judiciary" to have the judges, police officers, and district attorneys "discredit" Plaintiff in order to "provide a cover for [her husband's] nefarious actions, abuse of process, and domestic violence thus far." (ECF 7:21-CV-1996, 1 at 20.) In that complaint, Plaintiff sought damages and injunctive relief, including the recusal of the judge presiding over her criminal

Case 3:24-cv-01358-GTS-ML    Document 13    Filed 01/07/25    Page 65 of 120

Weinstein v. Miller, Not Reported in Fed. Supp. (2021)

case in the Briarcliff Manor Village Court and dismissal of the disorderly conduct charges.

Plaintiff also made allegations in the complaint that suggested that she was undergoing or had undergone a mental competency examination under Article 730 of the New York State Criminal Procedure Law. [2] (*See* ECF 7:21-CV-1996, 1 at 20.) But it was unclear whether Plaintiff has been formally adjudicated incompetent. Plaintiff later filed several submissions in which she sought an immediate stay of Village Justice Howard Code's attempts to hold competency hearings (ECF 7:21-CV-1996, 3 at 2-4), and then "an emergency stay on an unlawful imprisonment and involuntary commitment order issued" on March 9, 2021, by Village Justice Code in her proceedings in the Briarcliff Manor Village Court (ECF 7:21-CV-1996, 5 at 1-2).

On March 17, 2021, the Court issued an order that: (1) dismissed without prejudice Plaintiff's claims against judges and prosecutors on absolute immunity grounds; and (2) declined under the *Younger* abstention doctrine to intervene in Plaintiff's ongoing state-court proceeding. (ECF 7:21-CV-1996, 8.) The order also declined to issue summonses as to the remaining defendants pending information regarding Plaintiff's mental health status.

The Court later issued two subsequent orders stating that, because Plaintiff had raised the issue of her competency by challenging a commitment order allegedly issued by Village Justice Code, the Court would be conducting an inquiry as to Plaintiff's mental health to determine if it would be appropriate to appoint a guardian *ad litem* under Federal Rule of Civil Procedure 17(c). (*See* ECF 7:21-CV-1996, 9, 12.)

## DISCUSSION

### D. Plaintiff's Competency to Litigate

Under Federal Rule of Civil Procedure 17(c)(2), a person who is adjudicated incompetent and who does not have a duly appointed representative may only sue by a next friend or *guardian ad litem*. The Second Circuit has instructed district courts not to make a merits determination in an incompetent person's federal civil action unless the incompetent person is represented by a guardian *ad litem*. *See Berrios v. N.Y.C. Hous. Auth.*, 564 F.3d 130, 134-35 (2d Cir. 2009).

**\*4**  As noted, Plaintiff's competency is at issue in *Weinstein I*, and the Court is presently conducting an inquiry to determine

if Plaintiff is competent, and if not, whether it would be appropriate to appoint a guardian *ad litem* for Plaintiff in that action or take other appropriate measures. But the Court need not wait to complete the inquiry in *Weinstein I* or address the issue of Plaintiff's competency in this action because, as detailed below, Plaintiff's claims are frivolous. *See generally Denton v. Hernandez*, 504 U.S. 25, 34 (1992) (dismissal of complaint on ground of frivolousness is not a dismissal on the merits, but rather an exercise of the court's discretion). But in an abundance of caution, the Court dismisses this action without prejudice. *See Berrios*, 564 F.3d at 135 (courts should dismiss without prejudice claims of incompetent persons who appear without a guardian *ad litem* or counsel).

### E. *Younger* abstention

Similar to *Weinstein I*, Plaintiff again seeks this Court's intervention in her pending state-court proceedings by repeatedly requesting emergency injunctive relief from orders and actions in those proceedings. But as the Court has previously explained to Plaintiff, such claims must be dismissed. In *Younger v. Harris*, 401 U.S. 37 (1971), the United States Supreme Court held that a federal court may not enjoin a pending state-court criminal proceeding in the absence of special circumstances suggesting bad faith, harassment, or irreparable injury that is both serious and immediate. *See Gibson v. Berryhill*, 411 U.S. 564, 573-74 (1973) (citing *Younger*, 401 U.S. 37). This doctrine has been extended to civil actions. *See Kaufman v. Kaye*, 466 F.3d 83, 86 (2d Cir. 2006); *Diamond "D" Constr. Corp. v. McGowan*, 282 F.3d 191, 198 (2d Cir. 2002) ("*Younger* generally requires federal courts to abstain from taking jurisdiction over federal constitutional claims that involve or call into question ongoing state proceedings."). Thus, *Younger* abstention is appropriate in only three categories of state court proceedings: (1) state criminal prosecutions; (2) civil enforcement proceedings that are "akin to criminal prosecutions"; and (3) civil proceedings "that implicate a State's interest in enforcing the orders and judgments of its courts." *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 72-73 (2013). The proceedings with which Plaintiff wishes this Court to interfere fit within those categories.

Specifically, Plaintiff asks the Court to intervene in her ongoing proceedings in the Westchester County Supreme Court and related proceedings in other courts. Although she asserts that she has been denied due process and access to the courts, and that there is a conspiracy to violate her rights stemming from her husband's undue influence in the state-court actions, Plaintiff has alleged no facts showing bad

Case 3:24-cv-01358-GTS-ML    Document 13    Filed 01/07/25    Page 66 of 120

Weinstein v. Miller, Not Reported in Fed. Supp. (2021)

faith, harassment, or irreparable injury with respect to her pending state-court proceedings. The Court will therefore not intervene in Plaintiff's ongoing state-court proceedings and denies her requests for emergency injunctive relief (ECF 5, 6, 7, 10, 11, 12). Her remedy for erroneous decisions in those proceedings, should there be any, would be via the state-court appellate process, not via this Court's intervention.

**F. Judicial Immunity**

**1. Claims against Judge Miller**

The Court must also dismiss Plaintiff's claims against Judge Robert J. Miller of the Appellate Division. Judges are absolutely immune from suit for damages for any actions taken within the scope of their judicial responsibilities. *Mireles v. Waco,* 502 U.S. 9, 11 (1991). Generally, "acts arising out of, or related to, individual cases before the judge are considered judicial in nature." *Bliven v. Hunt,* 579 F.3d 204, 210 (2d Cir. 2009). "Even allegations of bad faith or malice cannot overcome judicial immunity." *Id.* (citations omitted). This is because "[w]ithout insulation from liability, judges would be subject to harassment and intimidation...." *Young v. Selsky,* 41 F.3d 47, 51 (2d Cir. 1994). In addition, as amended in 1996, § 1983 provides that "in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable." 42 U.S.C. § 1983.

**\*5** Judicial immunity does not apply when the judge takes action "outside" his judicial capacity, or when the judge takes action that, although judicial in nature, is taken "in absence of jurisdiction." *Mireles,* 502 U.S. at 9-10; *see also Bliven,* 579 F.3d at 209-10 (describing actions that are judicial in nature). But "the scope of [a] judge's jurisdiction must be construed broadly where the issue is the immunity of the judge." *Stump v. Sparkman,* 435 U.S. 349, 356 (1978).

Plaintiff's claims against Judge Miller arise out of his ruling denying her § 5704 application filed in the Appellate Division. That ruling was within the scope of Judge Miller's judicial capacity and jurisdiction. The Court therefore dismisses Plaintiff's claims against Judge Miller under the doctrine of judicial immunity and as frivolous. *See Neitzke,* 490 U.S. at 325 (stating that a claim is frivolous if it "lacks and arguable basis either in law or in fact"); *Montero v. Travis,* 171 F.3d 757, 760 (2d Cir. 1999) ("A complaint will be dismissed

as 'frivolous' when 'it is clear that the defendants are immune from suit.' " (quoting *Neitzke,* 490 U.S. at 327)); *see also Mills v. Fischer,* 645 F.3d 176, 177 (2d Cir. 2011) ("Any claim dismissed on the ground of absolute judicial immunity is 'frivolous' for purposes of [the *in forma pauperis* statute].").

**2. Claims against Appellate Division Clerks**

Plaintiff's claims against the four Appellate Division employees – Clerk of Court Aprilanne Agostino, Associate Deputy Clerk Stynes, Program Coordinator Joseph Castellano, and Program Administrator Jeanne Muratore – must also be dismissed. Judicial immunity has been extended to court clerks and "others who perform functions closely associated with the judicial process" when they are performing discretionary acts of a judicial nature which are essential to the judicial process, such as filing court documents or managing a court's calendar. *Cleavinger v. Saxner,* 474 U.S. 193, 200 (1985); *see Rodriguez v. Weprin,* 116 F.3d 62, 66 (2d Cir. 1997) (extending judicial immunity to state court clerks who were ordered by Appellate Division judges not to provide a litigant with documents and not to expand the record on appeal); *McKnight v. Middleton,* 699 F. Supp. 2d 507, 526 (E.D.N.Y. 2010) ("Clerk's Office activities of filing and docketing legal documents" are an "integral part of the judicial process" and are generally entitled to absolute immunity); *Pikulin v. Gonzales,* No. 07-CV-0412 (CBA), 2007 WL 1063353, at \*2 (E.D.N.Y Apr. 5, 2007) (extending judicial immunity to the federal court clerk with respect to claims arising out of the filing and docketing of legal documents).

Here, Plaintiff asserts claims against the Appellate Division clerks for actions they took in relation to her December 30, 2020 § 5704 application for review of the December 4, 2020 temporary order of protection issued by Westchester County Supreme Court. In particular, Plaintiff takes issue with how the application was processed, claiming that the clerks improperly failed to place her petition on the New York State Courts Electronic Filing system, misplaced it, and did not find it until January 25, 2021. Further, once the file was found, the Appellate Division held a conference conducted by Stynes, rather than a judge or a full panel of the Appellate Division. But the clerks are not subject to liability when performing the administrative tasks described by Plaintiff. Court clerks are entitled to immunity for harm caused by action undertaken pursuant to the direction of a judicial officer or court policy. *Rodriguez,* 116 F.3d at 67. As it appears that

Weinstein v. Miller, Not Reported in Fed. Supp. (2021)

the complained-of actions of the Appellate Division clerks involved filing and docketing documents and implementing court procedures related to Plaintiff's § 5704 application, they are entitled to absolute judicial immunity. The Court therefore dismisses Plaintiff's claims against Defendants Agostino, Stynes, Castellano, and Muratore under the doctrine of judicial immunity and as frivolous.

### G. Eleventh Amendment Immunity

**\*6**  Plaintiff's claims against the Appellate Division and the Westchester County Supreme Court are barred under the Eleventh Amendment. "[A]s a general rule, state governments may not be sued in federal court unless they have waived their Eleventh Amendment immunity, or unless Congress has abrogated the states' Eleventh Amendment immunity...." *Gollomp v. Spitzer*, 568 F.3d 355, 366 (2d Cir. 2009). "The immunity recognized by the Eleventh Amendment extends beyond the states themselves to state agents and state instrumentalities that are, effectively, arms of a state." *Id.* New York has not waived its Eleventh Amendment immunity to suit in federal court, and Congress did not abrogate the states' immunity in enacting 42 U.S.C. § 1983. *See Trotman v. Palisades Interstate Park Comm'n*, 557 F.2d 35, 40 (2d Cir. 1977).

As the Appellate Division and the Westchester County Supreme Court are part of the New York State Unified Court System, which is an agency of the State of New York, the two state-court defendants are immune from suit under the Eleventh Amendment. *See Gollomp*, 568 F.3d at 368 (holding that the New York State Unified Court System "is unquestionably an 'arm of the State,' and is entitled to Eleventh Amendment sovereign immunity"); *Goldberg v. Roth*, No. 99-CV-11591, 2001 WL 1622201, at \*4 (S.D.N.Y. Dec. 17, 2001) (citations omitted) (holding that New York courts are immune from suit under the Eleventh Amendment). Plaintiff's § 1983 claims against the Appellate Division and the Westchester County Supreme Court are dismissed as barred under the Eleventh Amendment and as frivolous. [3]

### H. Claims against Private Parties

Finally, to the extent Plaintiff brings claim under § 1983 against her husband Brian Stryker Weinstein; Dina Kaplan, her husband's attorney; and Gloria Marchetti-Bruck, her children's court-appointed attorney, those claims must also be dismissed. A claim for relief under § 1983 must allege facts showing that each defendant acted under the color of a state "statute, ordinance, regulation, custom or usage." 42

U.S.C. § 1983. Private parties are therefore not generally liable under the statute. *Sykes v. Bank of America*, 723 F.3d 399, 406 (2d Cir. 2013) (citing *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001)); *see also Ciambriello v. County of Nassau*, 292 F.3d 307, 323 (2d Cir. 2002) ("[T]he United States Constitution regulates only the Government, not private parties."). As Brian Weinstein, Kaplan, and Marchetti-Bruck are private parties who are not alleged to have been working for any state or other government body, and Plaintiff does not allege any facts suggesting that these defendants' actions could be "fairly attributable" to the state, the defendants are not subject to liability under § 1983. [4] *See Rendell-Baker v. Kohn*, 457 U.S. 830, 838-42 (1982); *Flagg Bros. v. Brooks*, 436 U.S. 149, 155-57 (1978); *Fabrikant v. French*, 691 F.3d 193, 207 (2d Cir. 2012). The Court dismisses Plaintiff's claims against Defendant Brian Weinstein, Kaplan, and Marchetti-Bruck.

### I. Claims under the ADA

**\*7**  Plaintiff also brings her claims citing to the ADA's anti-retaliation provision, 42 U.S.C. § 12203, which generally prohibits adverse action taken against a person who has engaged in protected activity. [5] Plaintiff does not allege any facts suggesting that she made complaint of disability discrimination or that any Defendant discriminated or retaliated against her because of any such complaint, and accordingly the claim is frivolous.

### J. Leave to Amend Denied

Generally, a court should not dismiss a *pro se* complaint "without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) (quoting *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010) (internal quotation marks omitted)). But a court has inherent power to dismiss without leave to amend or replead in "where ... the substance of the claim pleaded is frivolous on its face," *Salahuddin v. Cuomo*, 861 F.3d 40, 42 (2d Cir. 1988) (citation omitted), or where amendment would otherwise be futile, *Hill v. Curcione*, 657 F. 3d 116, 123-24 (2d Cir. 2011); *see also Shapiro v. McManus*, 136 S. Ct. 450, 455-56 (2015) (holding that federal-question jurisdiction is lacking where the claims are "wholly insubstantial and frivolous," "essentially fictitious," or "obviously without merit" (internal quotation marks and citations omitted)). Because Plaintiff's assertions are frivolous

Case 3:24-cv-01358-GTS-ML    Document 13    Filed 01/07/25    Page 68 of 120

Weinstein v. Miller, Not Reported in Fed. Supp. (2021)

and cannot be cured with an amendment, the Court declines to grant Plaintiff leave to amend her complaint.

### K. Consolidation

Because this case and No. 21-CV-1996 involve a common question – specifically, Plaintiff's competence – they are hereby consolidated, pursuant to Federal Rule of Civil Procedure 42, only for purposes of competency proceedings.

### CONCLUSION

The Court denies Plaintiff's requests for emergency injunctive relief (ECF 5, 6, 7, 10, 11, 12) under the *Younger* abstention doctrine.

The Court dismisses Plaintiff's claims without prejudice on immunity grounds and as frivolous.

The Court consolidates this case with No. 21-CV-1996 only for purposes of competency proceedings.

Although Plaintiff paid the filing fees for this action, the Court certifies under 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore *in forma pauperis* status is denied for the purpose of an appeal. *See Coppedge v. United States*, 369 U.S. 438, 444-45 (1962).

Plaintiff has consented to receive electronic service of Court filings. (ECF 3.)

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2021 WL 3038370

---

### Footnotes

1    Plaintiff attaches to the complaint multiple documents, including a copy of a letter dated February 1, 2021 addressed "[t]o whom it may concern" from Elizabeth Bussian, a Licensed Clinical Social Worker (LCSW) who has been working with Plaintiff since 2013. Bussian writes that she has "no psychiatric concerns" about Plaintiff and that Plaintiff "do[es] not require a psychiatric evaluation." (*Id.* at 36.) Plaintiff also attaches copies of the FOP and TOPs; copies of the dockets of her state-court cases on NYSCEF; transcripts of proceedings that she recorded; and links to videos that she has posted on social media.

2    Article 730 of the New York Criminal Procedure Law provides that any time the court is of the opinion that the defendant may be an incapacitated person, the court must order a psychiatric examination. *See* N.Y. Crim. Pro. L. § 730.30.

3    *See also Zuckerman v. App. Div., Second Dep't, Sup. Ct.*, 421 F.2d 625, 626 (2d Cir. 1970) (holding that the Appellate Division, Second Department is not a "person" for the purpose of § 1983 liability). *See generally Will v. Mich. Dep't of State Police*, 491 U.S. 58 (1989) (holding that a state agency is not a "person" for the purpose of § 1983 liability).

4    Marchetti-Bruck's status as Plaintiff's children's court-appointed attorney does not make her a state actor for purposes of § 1983. Absent special circumstances suggesting concerted action between an attorney and a state representative, *see Nicholas v. Goord*, 430 F.3d 652, 656 n.7 (2d Cir. 2005) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970)), the representation of a person by private counsel in state-court criminal or other proceedings does not constitute the degree of state involvement or interference necessary to establish a claim under § 1983, regardless of whether that attorney is privately retained, court-appointed, or employed as a public defender. *See Bourdon v. Loughren*, 386 F.3d 88, 90 (2d Cir. 2004) (citing *Polk County v. Dodson*, 454 U.S. 312, 324-25 (1981)); *see also Schnabel v. Abramson*, 232 F.3d 83, 87 (2d Cir. 2000) (holding that legal aid organization ordinarily is not a state actor for purposes of section 1983).

5    The provision provides: "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a).

---

**End of Document**                                  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:24-cv-01358-GTS-ML    Document 13    Filed 01/07/25    Page 70 of 120

Smith v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 4574924
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Louisa SMITH, Plaintiff,
v.
CITY OF NEW YORK, et al., Defendants.

No. 15-cv-4493 (RJS)
|
Signed 09/01/2016

**Attorneys and Law Firms**

Louisa Smith, New York, NY, pro se.

Cherie Nicole Brown, Linda Margareta Mindrutiu, NYC
Law Department, Office of the Corporation Counsel, New
York, NY, Adam Moshe Dlugacz, Heidell, Pittoni, Murphy
& Bach, LLP, White Plains, NY, Daniel Scott Ratner, Scott
Michael Zimmerman, Heidell, Pittoni, Murphy & Bach, LLP,
Stamford, CT, for Defendants.

OPINION AND ORDER

RICHARD J. SULLIVAN, District Judge

**\*1**    Plaintiff Louisa Smith, who is proceeding *pro se*,
asserts claims for discrimination and retaliation against the
City of New York (the "City"), New York Presbyterian
Hospital ("NYPH"), and Weill-Cornell College of Cornell
University, New York ("Weill-Cornell," and with NYPH,
the "Hospital Defendants") in connection with Plaintiff's
involuntary hospitalization following an anonymous call to
the police indicating that she posed a danger to herself. (Doc.
No. 1.) Now before the Court are the motions of the City and
the Hospital Defendants to dismiss Plaintiff's complaint with
prejudice. For the reasons set forth below, both motions are
granted.

I. BACKGROUND [1]

Plaintiff alleges that on June 7, 2012, she was on a
conference call "in connection with legal claims" when
police officers suddenly appeared at her door, placed her in
handcuffs, and took her against her will to NYPH, where
she was checked into the Psychiatric Emergency Department

("PED"). (Compl. ¶¶ 15, 39-40.) Plaintiff alleges that this was
the result of an unsubstantiated anonymous phone call to the
police department, wherein the caller told police officers that
Plaintiff was in danger of harming herself. (*Id.* ¶ 44.)

Plaintiff admits that she has had "depressive conditions ...
twice in her life" that did disable her, but contends that she was
not suffering from any mental illness or medical condition at
the time she was taken into custody. (*Id.* at 28.) Specifically,
Plaintiff says that she was "cogent" (*id.* ¶ 46) and that she
attempted to explain to the officers that she was fine and did
not require any medical attention or aid, but they refused to
listen to her (*id.* at 30-31.)

On the way to the hospital, Plaintiff complained of
cardiological symptoms and tightness of the handcuffs, but
was given no assistance. (*Id.* ¶ 53.) Once at the hospital,
"[b]ased on the manner in which she arrived at the hospital
and the allegations made by an anonymous caller," Plaintiff
was subjected to the PED's mandatory disrobement policy,
pursuant to which she was forced to remove her clothes,
including her underwear, under the examination of a security
officer. (*Id.* ¶ 57.) Plaintiff claims that she was told to
comply with this procedure in front of a male security officer,
and that, when she refused, she was unnecessarily sedated
with a drug that was contraindicated for individuals with
cardiological conditions. (*Id.* ¶¶ 58-63.) She was then forcibly
disrobed in a cubicle with windows by a female officer "with
other staff crowding in." (*Id.* ¶ 61.) Plaintiff complains that
this disrobement policy is discriminatory against those with
disabilities. (*Id.* ¶ 98.)

**\*2**    Once admitted, Plaintiff continued to complain of
cardiological symptoms, but was only given a single aspirin
as treatment. (*Id.* ¶¶ 64-65.) No testing was performed to
further investigate her condition. (*Id.* ¶ 65.) Plaintiff alleges
that she was denied release from care and moved to a different
location for retaliatory reasons, since the hospital staff were
proponents of the disrobement policy and knew that Plaintiff
was a lawyer (previously employed by the Department of
Justice) who would challenge it in court. (*Id.* ¶¶ 72-77, 104.)
She further claims that staff "laugh[ed] about her complaints"
and "teas[ed] her." (*Id.* ¶ 75.) Plaintiff also states that she was
"allowed to make a few phone calls but only overheard by
security staff." (*Id.* ¶ 71.) She was detained in the emergency
room for approximately 36 to 38 hours (*id.* ¶ 66) and
subsequently moved "elsewhere" (*id.* ¶ 75) to a "location
near Defendant Hospital (just a block or so away from the
emergency room of Defendant Hospital)" (*id.* ¶ 79). Plaintiff

claims that these acts were motivated by the facts that she objected to the disrobement policy and that she was viewed as a "litigation threat," due to her training as a lawyer. (*Id.* ¶ 104.) Plaintiff was discharged on June 10, 2012. (*Id.* ¶ 83.)

On June 8, 2015, Plaintiff filed her complaint in the Southern District of New York, alleging violations of her constitutional rights pursuant to 42 U.S.C. § 1983, discrimination under Titles II and III of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act, retaliation under Title V of the ADA, violations of the New York State and City human rights laws, and violations of the New York state constitution against the City, the Hospital Defendants, various individuals including Jane and John Doe Defendants, and Dr. Sharon Hird, none of whom have been served. Although the case was originally assigned to Judge Paul G. Gardephe and then to Judge Katherine C. Forrest, on October 22, 2015, the case was reassigned to my docket pursuant to Local Civil Rule 13 as related to a previous action filed by Plaintiff, which is discussed in more detail below. On January 20, 2016, the City and the Hospital Defendants each filed a motion to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) on the ground that Plaintiff had failed to state a claim. (Doc. Nos. 37 and 31.) The Hospital Defendants also moved to dismiss the complaint for failure to prosecute pursuant to Federal Rule of Civil Procedure 41(b) and argued that some of Plaintiff's claims are barred on *res judicata* grounds. The motions were fully briefed as of April 20, 2016.

As relevant here, Plaintiff previously filed a similar complaint against NYPH, Weill-Cornell, and various individual doctors and nurses at the hospital. (*See Smith v. N.Y. Presbyterian Hosp.*, No. 05-cv-7729 (RJS) (SDNY) ("*Smith I*").) In that suit, Plaintiff likewise brought claims for discrimination under Section 504 of the Rehabilitation Act, discrimination under Title III of the ADA, retaliation under Title V of the ADA, violations of the New York State Human Rights Law, violations of the New York state constitution, and state law claims for medical malpractice, invasion of privacy, assault and battery, intentional and negligent infliction of emotional distress, and negligent hiring, training, supervision, and retention of employees, in connection with a series of forced hospitalizations between January 2002 and August 2009. Notably, in *Smith I*, Plaintiff also alleged that the mandatory disrobement policy of the PED was discriminatory.

The case, which extended nearly a decade, was first assigned to then-Chief Judge Michael B. Mukasey, who dismissed the

original complaint for failure to state a claim, a decision which was later vacated in part by the Second Circuit. (*Smith I*, Doc. Nos. 1, 7.) On remand, the case was reassigned to Judge P. Kevin Castel, at which time Plaintiff amended her complaint. (*Id.* Doc. No. 10.) On April 3, 2009, the case was once again reassigned, from Judge Castel to Judge Gerard E. Lynch, who referred the matter to Magistrate Judge Debra C. Freeman for discovery and general pre-trial supervision. (Doc. No. 11.) The case was reassigned to my docket on February 26, 2009, following Judge Lynch's elevation to the United States Court of Appeals for the Second Circuit. Nevertheless, from June 2008 to February 2013, Judge Freeman continued to oversee discovery, albeit with frequent interruptions and delays due to Plaintiff's numerous requests for adjournments. (*See, e.g.*, *id.* Doc. Nos. 26, 41, 55, 99.) Finally, on April 16, 2013, Defendants moved for summary judgment. (*Id.* Doc. No. 202.) On March 19, 2014, the Court granted Defendants' motion, which Plaintiff did not oppose, as to most of Plaintiff's claims, including her claim that the PED's disrobement policy was discriminatory. (*Id.* Doc. No. 231.) The Court concluded that Plaintiff had not shown that the PED disrobement policy was discriminatory on the basis of a disability; rather, the Court found, the PED's disrobement policy constituted a medical treatment decision not actionable under the ADA. (*Id.*) On January 26, 2015, the Court dismissed the remaining causes of action with prejudice pursuant to Federal Rule of Civil Procedure 16(f) in light of Plaintiff's failure to prosecute her case and comply with judicial orders requiring pre-trial submissions. (*Smith I*, Doc. No. 288.) The Second Circuit affirmed the Court's dismissal on September 30, 2015, when it dismissed Plaintiff's appeal. (*Smith I*, Doc. No. 290.)

## II. LEGAL STANDARD

**\*3** To survive a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must "provide the grounds upon which [the] claim rests." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); *see also* Fed. R. Civ. P. 8(a)(2) ("A pleading that states a claim for relief must contain ... a short and plain statement of the claim showing that the pleader is entitled to relief ...."). To meet this standard, plaintiffs must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In reviewing a Rule

Case 3:24-cv-01358-GTS-ML    Document 13    Filed 01/07/25    Page 72 of 120

Smith v. City of New York, Not Reported in Fed. Supp. (2016)

12(b)(6) motion to dismiss, a court must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff. *ATSI Commc'ns, 493 F.3d at 98.* However, that tenet "is inapplicable to legal conclusions." *Iqbal, 556 U.S. at 678.* Thus, a pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly, 550 U.S. at 555.* If the plaintiff "ha[s] not nudged [its] claims across the line from conceivable to plausible, [its] complaint must be dismissed." *Id.* at 570.

Although a court must generally construe the pleadings of a *pro se* litigant liberally, *see Tracy v. Freshwater, 623 F.3d 90, 101 (2d Cir. 2010)* ("It is well established that a court is ordinarily obligated to afford a special solicitude to *pro se* litigants."), a court is not obligated to do so where the *pro se* plaintiff is a licensed attorney, *see id.* at 101-02; *Truong v. Cuthbertson, No. 15-cv-4268 (DLI) (LB), 2015 WL 4771852, at *1 (E.D.N.Y. Aug. 12, 2015)* ("As Plaintiff is a former attorney, the Court is not obligated to read his pleadings liberally."); *Goel v. U.S. Dep't of Justice, No. 03-cv-0579 (HB), 2003 WL 22047877, at *1 (S.D.N.Y. Aug. 29, 2003)* (declining to construe pleadings liberally where *pro se* plaintiff was licensed attorney). Here, Plaintiff is an attorney with extensive legal training and experience and is thus not entitled to the special solicitude granted to *pro se* litigants. Nevertheless, in light of Plaintiff's medical and mental health conditions, the Court construes her pleadings with the degree of liberality typically given to *pro se* plaintiffs, although "[even] a *pro se* complaint must state a plausible claim for relief." *Nielsen v. Rabin, 746 F.3d 58, 63 (2d Cir. 2014).*

## III. DISCUSSION

As an initial matter, the Court notes Plaintiff's continued refusal to comply with Court deadlines and her repeated late filings in this case. Even after the Court granted Plaintiff an extension of time in which to submit her responses to Defendants' motions to dismiss (Doc. Nos. 40 and 43), Plaintiff sought a further extension (Doc. No. 48), which the Court denied (Doc. No. 49). Plaintiff nonetheless decided to grant herself the extension denied by the Court and filed her responses three days after the already-extended deadline. (Doc. No. 51 and 52.) She then filed additional lengthy submissions with "errata pages" four days after that. (Doc. Nos. 56 and 57.) Despite Plaintiff's repeated late filings in clear violation of Court orders, the Court has considered all of

Plaintiff's submissions, including those filed after deadlines, in resolving these motions. For the reasons set forth below, the Court concludes that Plaintiff's complaint must be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6). [2]

### A. *Monell* Liability of the City

**\*4** Plaintiff's complaint may be construed to bring several claims against the City, including a claim arising under 28 U.S.C. § 1983, as well as a claim for discrimination, which the Court addresses later in this opinion. As to the Section 1983 claim, although Plaintiff does not specifically cite that statute, Plaintiff's complaint refers to "federal Constitutional claims under the First and Fourteenth Amendments" (Compl. ¶ 90), and identifies "errors in training or otherwise" (*id.* ¶ 91). Plaintiff also cites "improper policies and practices of the City of New York and its urgent response departments (specifically, calls or statements made by anonymous persons concerning other persons with alleged emergency conditions)," and she alleges that "[p]olice officers may it appears also need more training on *when they do and do not have a reasonable concern about personal liability*" (*Id.* at 34 (emphasis in original)). The Court construes these allegations as raising a Section 1983 *Monell* claim against the City. [3]

Section 1983 provides a civil cause of action for damages against any person who, acting under color of state law, deprives another of a right, privilege, or immunity secured by the Constitution or laws of the United States. *See 42 U.S.C. § 1983.* "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Duamutef v. Morris, 956 F. Supp. 1112, 1115 (S.D.N.Y. 1997)* (citing *Sykes v. James, 13 F.3d 515, 519 (2d Cir. 1993)*). To prevail on a claim under Section 1983, a plaintiff must demonstrate (1) the deprivation of any right, privilege, or immunity secured by the Constitution or laws of the United States (2) by a person acting under the color of state law. *See id.* "In order to establish a § 1983 claim ..., a plaintiff must also show that the defendants are *personally* involved in the unconstitutional conduct." *Green v. Bauvi, 46 F.3d 189, 194 (2d Cir. 1995)* (emphasis added); *see also Alfaro Motors, Inc. v. Ward, 814 F.2d 883, 886 (2d Cir. 1987)* (finding a complaint to be facially defective when the plaintiff failed to allege that "defendants were directly and personally responsible for the purported unlawful conduct").

Case 3:24-cv-01358-GTS-ML    Document 13    Filed 01/07/25    Page 73 of 120

Smith v. City of New York, Not Reported in Fed. Supp. (2016)

To recover on a Section 1983 claim against a municipality or municipal agency, a plaintiff must allege that the deprivation of his rights was caused by the execution of an official policy, custom, or practice. *See Monell v. City of N.Y. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978); *Reynolds v. Giuliani*, 506 F.3d 183, 190-91 (2d Cir. 2007); *Ezagui v. City of New York*, 726 F. Supp. 2d 275, 284 (S.D.N.Y. 2010) (explaining that for municipality to be held liable for constitutional violation under Section 1983, plaintiff must prove that: "(1) an official policy or custom ... (2) cause[d] the plaintiff to be subjected to (3) a denial of a constitutional right" (alteration in original) (quoting *Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995))). An official policy or custom can be demonstrated in a number of ways. First, a policy can be shown where the agency "promulgates an official policy," or "a municipal employee with final policymaking authority" undertakes an unconstitutional act. *Warheit v. City of New York*, No. 02-cv-7345 (PAC), 2006 WL 2381871, at *12 (S.D. RY. Aug. 15, 2006); *accord Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986). Second, a custom or practice may be demonstrated based on a pattern of misconduct that is "sufficiently persistent or widespread" as to constitute a custom of which a supervising policy-maker must have been aware. *Reynolds*, 506 F.3d at 192. Third, an official policy can be established by a municipality's failure to adequately train or supervise its agents or employees. *See Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 127-28 & n.8 (2d Cir. 2004). Finally, a plaintiff can state a *Monell* claim where he or she demonstrates that the municipality repeatedly failed to discipline employees or agents who violate civil rights because "the persistent failure to discipline [can] give rise to an inference of an unlawful municipal policy of ratification of unconstitutional conduct within the meaning of *Monell*." *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983).

**\*5** However, it is well established that "the mere assertion ... that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference." *Zherka v. City of New York*, 459 Fed.Appx. 10, 12 (2d Cir. 2012) (quoting *Zahra*, 48 F.3d at 685). Moreover, "[a] single incident alleged in a complaint, especially if it involved only actors below the policymaking level, generally will not suffice to raise an inference of the existence of a custom or policy." *Id.* Here, Plaintiff pleads no facts that could support a finding of an official city policy or custom. Although Plaintiff does not focus on one particular policy, she appears to allege that the City has unconstitutional policies in responding to anonymous phone calls (Compl. at 3) and

failing to properly train officers to respond to 911 calls (*id.* at 34). Specifically, Plaintiff refers broadly to "improper policies and practices of the City of New York and its urgent response departments (specifically, calls or statements made by anonymous persons concerning other persons with alleged emergency conditions)," and she alleges that "[p]olice officers may it appears also need more training on *when they do and do not have a reasonable concern about personal liability*" (*id.* at 34 (emphasis in original)). These conclusory and vague assertions are insufficient to state a *Monell* claim against the City as they include no "allegations of fact tending to support, at least circumstantially" an inference of an official policy or custom. *Ulysses I & Co. v. Peer Morton*, 11 Fed.Appx. 14, 16 (2d Cir. 2001). Indeed, the only facts on which Plaintiff rests her claims of unconstitutional policies appear to be the incident at the center of this complaint. In addition, Plaintiff makes no assertion that a policymaker was involved in that incident. *See id.* The Court thus finds that Plaintiff's conclusory statements are insufficient to allege an official city policy or custom. Accordingly, the Court grants the City's motion to dismiss Plaintiff's *Monell* claim.

### B. Plaintiff's Discrimination Claims

#### 1. The Hospital Defendants

With respect to the Hospital Defendants, Plaintiff brings claims of discrimination under both Title III of the ADA and Section 504 of the Rehabilitation Act based on the PED's mandatory disrobement policy, which requires that patients in the PED remove their clothes on arrival. Specifically, Plaintiff alleges that the PED's disrobement policy is a "practice that amounts to a 'strip search' procedure (as that procedure is defined by law) applied for unwarranted stereotypes and assumptions about persons alleged to have a psychiatric disabling condition." (Compl. ¶ 98.) Plaintiff's claims of discrimination fail for two reasons, which the Court addresses in turn.

#### a. *Res Judicata*

As stated above, this is not the first time that Plaintiff has filed a suit based on the PED's mandatory disrobement policy, and since the Court previously ruled against Plaintiff on the very same claims in *Smith I*, Plaintiff's claim of discrimination

Case 3:24-cv-01358-GTS-ML    Document 13    Filed 01/07/25    Page 74 of 120

Smith v. City of New York, Not Reported in Fed. Supp. (2016)

against the Hospital Defendants is barred by the doctrine of *res judicata.*

"Under the doctrine of res judicata, or claim preclusion, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *St. Pierre v. Dyer,* 208 F.3d 394, 399 (2d Cir. 2000) (brackets omitted). To prove that a claim is precluded under this doctrine, "a party must show that (1) the previous action involved an adjudication on the merits; (2) the previous action involved the [parties] or those in privity with them; [and] (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action." *Monahan v. N.Y.C. Dep't of Corrs.,* 214 F.3d 275, 285 (2d Cir. 2000). Whether a claim that was not raised in the previous action could have been raised "depends in part on whether the same transaction or connected series of transactions is at issue, and whether the same evidence is needed to support both claims." *Interoceanica Corp. v. Sound Pilots, Inc.,* 107 F.3d 86, 90 (2d Cir. 1997) (brackets omitted). The doctrine of *res judicata* is designed to "relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication." *Envtl. Def. v. U.S. E.P.A.,* 369 F.3d 193, 202 (2d Cir. 2004) (quoting *Allen,* 449 U.S. at 94).

Here, there is no question that *Smith I* – which involved Plaintiff and the same Hospital Defendants as this action – constituted an adjudication on the merits. The Court dismissed the complaint in *Smith I* pursuant to Federal Rules of Civil Procedure 56 and 16(f) after giving Plaintiff a full and fair opportunity to litigate her case. Almost all of Plaintiff's claims were dismissed on summary judgment pursuant to Rule 56. (*Smith I,* Doc. No. 231.) Indeed, with respect to the disrobement policy, the Court found that Plaintiff had not shown it was discriminatory on the basis of a disability and that it was a non-actionable medical treatment decision. (*Id.*) Although Plaintiff did not oppose Defendants' motion for summary judgment, she was given numerous opportunities to do so. Plaintiff's remaining claims were dismissed pursuant to Federal Rule of Civil Procedure 16(f) after Plaintiff failed to file a number of pre-trial submissions despite multiple extensions. (*Smith I,* Doc. No. 290.) Each of these decisions constituted a decision on the merits, which, together, resolved Plaintiff's entire case in favor of Defendants. *See Nemaizer v. Baker,* 793 F.2d 58, 60-61 (2d Cir. 1986) ("A dismissal with prejudice has the effect of a final adjudication on the merits favorable to defendant and bars future suits brought by plaintiff upon the same cause of action.... Such a dismissal

constitutes a final judgment with the preclusive effect of *res judicata* not only as to all matters litigated and decided by it, but as to all relevant issues which could have been but were not raised and litigated in the suit." (internal quotation marks omitted)). Accordingly, the Court has little difficulty concluding that *Smith I* was an adjudication on the merits involving the same parties in which Plaintiff and Defendants each had a full opportunity to litigate.

**\*6** The only remaining question then is whether the issue raised in this complaint with respect to the mandatory disrobement policy is the same issue already litigated in *Smith I.* The Court finds that it is. In fact, Plaintiff's claim of discrimination in this case is almost identical to her previous one with the only difference being the time at which the alleged disrobement took place. In *Smith I,* Plaintiff alleged that the mandatory disrobement policy was "discriminatory ... based on stereotypes and overgeneralizations about mental illness." (*Smith I,* Doc. No. 10 ¶ 67.) In the current action, Plaintiff states that the disrobement policy is "applied for unwarranted stereotypes and assumptions about persons alleged to have a psychiatric disabling condition" (Compl. ¶ 98) and that it "rests on assumptions that are unwarranted stereotypes about persons with psychiatric disabilities" (*id.* ¶ 99). Although the conduct in *Smith I* dates from a different time period – the hospital visits at issue in that case occurred between 2002 and 2009, whereas the incident here took place in 2012 – Plaintiff's complaint does not allege that the disrobement policy was any different at the time of *Smith I* than it was in 2012. Plaintiff now attempts in her briefing to argue that the policy is in fact different by stating conclusorily that Defendants "produced policies and admissions concerning policies VERY different than the one they CLAIM is extant in their brief at this time or as of June 7, 2012" (Doc. No. 51 at 23), but she does not identify any actual differences in the policies. In fact, some of the evidence presented in *Smith I* actually postdates the incident at issue in this case and confirms that the same policy was in place in 2012.[4] Specifically, the affidavits of Dr. Jack Barchas, dated April 12, 2013, and Lisa Sombrotto, dated April 15, 2013, describe the mandatory disrobement policy in the present tense indicating that the policy in effect when the Court first considered it in *Smith I* is the same policy that was in effect during the June 7, 2012 incident at the center of this most recent complaint. (*Smith I,* Doc. No. 206, Declaration of Elizabeth Cornacchio, dated April 15, 2013, Exs. F and G.) Because Plaintiff has alleged no facts demonstrating any difference in the mandatory disrobement policy, and the evidence in *Smith I* supports a finding that

Case 3:24-cv-01358-GTS-ML    Document 13    Filed 01/07/25    Page 75 of 120

Smith v. City of New York, Not Reported in Fed. Supp. (2016)

the same policy was in effect in 2012, the Court concludes that the disrobement policy in this complaint is the same policy already addressed in *Smith I*, and thus that this case involves the same issue resolved in *Smith I* for purposes of *res judicata*. [5] *See Monahan*, 214 F.3d at 289 ("Plaintiffs' assertion of new incidents arising from the application of the challenged policy is ... insufficient to bar the application of *res judicata*."); *see also Interoceanica Corp.*, 107 F.3d at 91 ("[Transaction] must be given a flexible, common-sense construction that recognizes the reality of the situation."); *N.L.R.B. v. United Techs. Corp.*, 706 F.2d 1254, 1260 (2d Cir. 1983) ("Whether or not the first judgment will have preclusive effect depends in part on whether the same transaction or connected series of transactions is at issue, whether the same evidence is needed to support both claims, and whether the facts essential to the second were present in the first."). Accordingly, the Court finds that Plaintiff's discrimination claim about the mandatory disrobement policy must be dismissed on *res judicata* grounds.

### b. Failure to State a Claim

Even if Plaintiff's discrimination claims were not barred by the doctrine of *res judicata*, she has failed to state a claim that the mandatory disrobement policy is discriminatory under either Title III of the ADA, which applies to public accommodations like hospitals, or Section 504 of the Rehabilitation Act. The ADA generally prohibits "discrimination against an individual 'on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases ... or operates a place of public accommodation.' " *Krist v. Kolombos Rest., Inc.*, 688 F.3d 89, 94 (2d Cir. 2012) (quoting 42 U.S.C. § 12182(a)). Similarly, Section 504 of the Rehabilitation Act, which applies to programs and entities that receive federal government funding, provides: "No otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance ...." 29 U.S.C. § 794(a). The elements of a discrimination claim are substantially identical under both statutes. *Harris v. Mills*, 572 F.3d 66, 73 (2d Cir. 2009); *see also Powell v. Nat'l Bd. of Med. Examiners*, 364 F.3d 79, 85 (2d Cir. 2004). Thus, in order to prevail under either statute, a plaintiff must establish: "(1) that she is a 'qualified individual' with

a disability; (2) that the defendants are subject to one of the Acts; and (3) that she was 'denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or [was] otherwise discriminated against by defendants, by reason of [her] disabilit[y].' " *Id.* (citation and quotation marks omitted) (alterations in original). A plaintiff may establish the last prong under three possible theories: "disparate treatment, disparate impact, and failure to make reasonable accommodation." *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 48 (2d Cir. 2002).

**\*7** The Court already considered Plaintiff's allegations relating to any discrimination resulting from the PED's mandatory disrobement policy in its summary judgement decision in *Smith I*, and the analysis from that decision applies here as well, since Plaintiff includes no facts that might distinguish that case from this one. (*See Smith I*, Doc. No. 231.) Based on the allegations in her complaint, even if one accepts that Plaintiff is a "qualified individual" and that the Hospital Defendants are subject to the ADA and the Rehabilitation Act, Plaintiff simply has not pled sufficient facts to show that she was discriminated against because of her disability, since the mandatory disrobement policy is applied to *all* patients entering the hospital for a psychiatric emergency.

The Second Circuit's decision in *McGugan v. Aldana-Bernier*, which affirmed a district court's dismissal of a complaint on a Rule 12(b)(6) motion, is instructive on this point. 752 F.3d 224 (2d Cir. 2014), *cert. denied*, 135 S. Ct. 1703 (2015). In *McGugan*, the Second Circuit found that a plaintiff's allegations that she was discriminated against based on her mental health were insufficient to state a claim. *Id.* at 234. Specifically, the plaintiff in that case objected to her involuntary confinement to a hospital after she was disruptive on an airplane. *Id.* at 227. The plaintiff accused the defendant hospital of "stereotyping persons who suffer from mental illness, rather than making a medically appropriate, individualized assessment." *Id.* at 231. The Second Circuit concluded that "a plaintiff pleads an actionable claim of discrimination in the medical treatment context under the ADA or the Rehabilitation Act if she alleges that the defendants made treatment decisions based on factors that are 'unrelated to, and thus improper to consideration of the inquiry in question,' " which in that case, as in this one, was "the likelihood that [the plaintiff] posed a danger to herself or others." *Id.* at 234. Because the plaintiff had not alleged any discriminatory conduct that was not related to her psychiatric

condition at the time, the Circuit affirmed the district court's dismissal of the complaint. *Id.*; *see also United States v. Univ. Hosp., State Univ. of N.Y. at Stony Brook*, 729 F.2d 144, 157 (2d Cir. 1984) ("Where the handicapping condition is related to the condition(s) to be treated, it will rarely, if ever, be possible to say with certainty that a particular decision was 'discriminatory.' "); *cf. Doe v. Pfrommer*, 148 F.3d 73, 84 (2d Cir. 1998) (affirming dismissal on summary judgment where no allegation of "illegal discrimination against the disabled").

The same reasoning applies here. Plaintiff's own characterization of the disrobement policy appears to concede that the policy is related to a person's psychiatric condition at the time he or she enters the hospital. Indeed, she describes the policy as:

> requiring of patients brought in over their objection for any evaluation in any emergency room if identified as a "psychiatric" case as plaintiff was in this incident, but not if the identification of the patient leaves out any allegation of past or current psychiatric disability, and which discrimination (based on alleged, perceived, actual, or known or alleged historical psychiatric disability) includes a practice that amounts to a "strip search" procedure. ...

(Compl. ¶ 98.) As her own words thus reflect, Plaintiff does not allege that she was treated any differently than non-disabled patients who are brought in for psychiatric emergencies. *See Pfrommer*, 148 F.3d at 82 (noting that the plaintiff's "discrimination claims do not draw their substance from any allegedly discriminatory animus against the disabled"). Indeed, she acknowledges that the disrobement policy applies to every individual "identified as a 'psychiatric case' " (*id.* ¶ 98) and that she was subjected to the policy "[b]ased on the manner in which she arrived at the hospital and the allegations made by the anonymous caller" (*id.* ¶ 57), who had told officers that Plaintiff was at "risk of harming herself" (*id.* ¶ 44). While Plaintiff seems to suggest that she was entitled to a personal evaluation by medical staff before the disrobement policy could be applied (*see id.* ¶ 98), *McGugan* clearly recognizes, and common sense confirms,

that such an individualized assessment is not required if the treatment is related to a person's perceived danger to themselves or others when admitted for psychiatric care. 752 F.3d at 234.

**\*8** Put simply, Plaintiff's allegations include no mention of any discriminatory intent or improper consideration of Plaintiff's disability. Rather, the allegations implicitly acknowledge that the disrobement policy is based on a judgment about the appropriate medical response to an apparent psychiatric emergency and is appropriately tailored to the difficult and potentially dangerous conditions associated with the care of patients in the PED. As Plaintiff has pled no facts that might demonstrate that she was treated any differently than other PED patients on account of improper considerations relating to her disability, her claim for discrimination must fail. *See, e.g., Maccharulo v. N.Y. State Dep't of Corr. Servs.*, No. 08-cv-301 (LTS), 2010 WL 2899751, at \*4 (S.D.N.Y. July 21, 2010) (dismissing complaint because "[p]laintiffs do not plead facts demonstrating that Decedent was treated differently from non-disabled individuals exhibiting the same behavior"); *Atkins v. County of Orange*, 251 F. Supp. 3d 1225, 1232 (S.D.N.Y. 2003) (dismissing complaint where plaintiffs did not "allege that violent and self-destructive inmates who are disabled due to mental illness are treated any differently than violent, self-destructive inmates who are not disabled due to mental illness"); *Aiken v. Nixon*, 236 F. Supp. 2d 211, 226 (N.D.N.Y. 2002) ("By plaintiffs' allegations, subjugation to the reaches of the policy arises as a condition of entry as a patient into the facility, not from considerations of a person's status as being disabled or not."), *aff'd*, 80 Fed.Appx. 146 (2d Cir. 2003).

In sum, Plaintiff's complaint fails to state a claim for discrimination because she does not allege that the PED's mandatory disrobement policy – which applies to any and all patients entering the hospital for a psychiatric emergency – results in any disparate treatment or impact on account of a person's disability. As *McGugan* recognizes, treatment based on a perception that a person poses a danger to themselves or others simply does not violate the ADA. 752 F.3d at 234. Accordingly, Plaintiff's claims under the ADA and the Rehabilitation Act against the Hospital Defendants must be dismissed for failure to state a claim. [6]

2. Defendant City of New York

Plaintiff also appears to assert a claim of discrimination against the City, although the complaint is unclear as to her theory of liability in this regard. In her complaint, Plaintiff states that "[t]his is an action under the Federal and State (New York) Constitutions, federal civil rights statutes (Americans with Disabilities Act and Rehabilitation Act[) ] – both those that require accommodations in law enforcement and other activities by the city and in health care." (Compl. ¶ 89). A few pages later, she also references "the deprivation of liberty and equal protection of law on account of alleged disability and emergency without sufficient cause ... resulting in removal of persons with and without disabilities alike." (*Id.* ¶ 97.) Construing Plaintiff's complaint liberally, the Court interprets these statements to raise a discrimination claim against the City.

**\*9** Title II of the ADA, which applies to state and local governments, provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. In evaluating a claim brought under Title II of the ADA, the Court considers the same factors cited above in the Title III analysis. *See Disabled in Action v. Bd. of Elections*, 752 F.3d 189, 196 (2d Cir. 2014).

Plaintiff has simply not alleged any facts that would support a claim of discrimination against the City under either the ADA or the Rehabilitation Act. Plaintiff's conclusory statements about the "deprivation of liberty and equal protection of law on account of alleged disability and emergency without sufficient cause ... resulting in removal of persons with and without disabilities alike" (Compl. ¶ 97) and the fact that the ADA and Rehabilitation Act "require accommodations in law enforcement and other activities by the city" (*id.* ¶ 89) are obviously insufficient to state a claim for discrimination against the City. *See Hedges v. Town of Madison*, 456 Fed.Appx. 22, 24 (2d Cir. Jan. 13, 2012) (affirming dismissal of complaint because even under "the most minimal of notice pleading standards" the plaintiff had not alleged "a single fact in support of his claims of discriminatory treatment which might conceivably give notice of the basis of his claims to the defendants"); *Samuel v. Bellevue Hosp. Ctr.*, 366 Fed.Appx. 206, 207 (2d Cir. Feb 17, 2010) (affirming dismissal where the plaintiff "failed to allege sufficient facts to render plausible his conclusory assertion that the defendants discriminated against him on the basis of his membership in a protected class"). Put simply, throughout her complaint, Plaintiff's

factual allegations of discrimination focus almost entirely on the mandatory disrobement policy, which is a hospital policy, not a City policy, and any claim of discrimination she alleges against the City is stated in vague and conclusory terms, which are insufficient to survive a motion to dismiss. In light of the fact that Plaintiff does not allege any facts to suggest that the City discriminated against her or denied her any opportunity or benefit, Plaintiff's claim of discrimination against the City must be dismissed.

## C. Retaliation

The ADA also "prohibits, *inter alia*, retaliation against any individual who has asserted rights under the ADA." *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 159 (2d Cir. 1999). Under the ADA's retaliation provision in Title V, "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). A plaintiff states an ADA retaliation claim if she establishes that: "(i) [she] was engaged in protected activity; (ii) the alleged retaliator knew that plaintiff was involved in protected activity; (iii) an adverse decision or course of action was taken against plaintiff; and (iv) a causal connection exists between the protected activity and the adverse action." *Weixel v. Bd. of Educ.*, 287 F.3d 138, 148 (2d Cir. 2002) (internal quotation marks omitted). The same standards apply to a claim of retaliation under Section 504 of the Rehabilitation Act. *See Aiken*, 236 F. Supp. 2d at 225.

**\*10** Generally, informal complaints and threats to take legal action qualify as protected activities. *Treglia v. Town of Manlius*, 313 F.3d 713, 720 (2d Cir. 2002) (citing cases). Simply put, an adverse action is one that "well might have dissuaded a reasonable [person] from making or supporting a charge of discrimination." *Warren v. Goord*, No. 06-3349-PR, 2008 WL 5077004, at \*2 (2d Cir. Nov. 26, 2008) (citations and quotation marks omitted) (alteration in original). Nevertheless, to adequately plead a causal connection, the "allegations must be sufficient to support the inference that [the protected activity] played a substantial part in the adverse action." *Davis v. Goord*, 320 F.3d 346, 354 (2d Cir. 2003) (internal quotation marks omitted). However, "the plaintiff's pleading need not clearly establish that the defendant harbored retaliatory intent. It is sufficient to allege facts which could reasonably support an inference to that

Case 3:24-cv-01358-GTS-ML    Document 13    Filed 01/07/25    Page 78 of 120

Smith v. City of New York, Not Reported in Fed. Supp. (2016)

effect." *Posr v. Court Officer Shield # 207*, 180 F.3d 409, 418 (2d Cir. 1999). Causation can be proven either: "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000).

With respect to the Hospital Defendants, Plaintiff asserts that she was "retaliated against for her objection and litigation threat (and perceived strength of her assessment as a known former civil rights lawyer in the U.S. Justice Department lawyer with knowledge of applicable laws) to their policy of requiring her to remove all her garments." (Compl. ¶ 104.) She also alleges that "Dr. [Sharon] Hird is one of the architects [and] chief proponents of the mandatory stripsearch policy and practice Ms. Smith claims is illegal under federal law and had told Dr. Hird and others at Defendant hospital, including risk management and legal personnel who were well aware of her background as a Justice Department lawyer." (*Id.* ¶ 73.) The Court construes these statements as alleging two protected activities that might provide a basis for a claim of retaliation: (1) Plaintiff's "objection" at the hospital to the mandatory disrobement policy, and (2) her prior litigation challenging the disrobement policy. The Court finds that, under either theory, Plaintiff has failed to state a claim for retaliation.

To the extent that Plaintiff bases her claim of retaliation on her objection to the disrobement policy, such an allegation is insufficient to allege a protected activity because Plaintiff simply cannot establish that she possessed a "good faith, reasonable belief that the underlying challenged actions of the [defendant] violated the law." *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir. 1998); *see also Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000) ("The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination."). The Second Circuit has stated that the objective reasonableness of a person's belief "must 'be measured against existing substantive law,' because a failure to do so would 'eviscerate the objective component of our reasonableness inquiry.' " *Sosa v. Local Staff, LLC*, 618 Fed.Appx. 19, 19-20 (2d Cir. 2015) (quoting *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1351 (11th Cir. 1999)). Here, Plaintiff cannot allege that she had a reasonable belief that the mandatory disrobement policy – which, again, was applied to everyone

in the PED regardless of any disability based on a medical concern that psychiatric patients might pose a danger to themselves or others – violated the ADA. *See Wimmer v. Suffolk Cty. Police Dep't*, 176 F.3d 125, 135-36 (2d Cir. 1999) (a plaintiff "could not have reasonably believed that he was opposing" a discriminatory employment practice where there was no evidence of discrimination in the employment practice); *see also Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590, 594 (2d Cir. 1988) (holding that plaintiff could not have held a reasonable belief where "objections neither pointed out discrimination against particular individuals nor discriminatory practices by [the employer]"). As discussed above, Plaintiff's own complaint fails to allege that the policy is applied in a discriminatory fashion based on a disability. Rather, her allegations implicitly acknowledge that the policy reflects a medical concern for a patient's psychiatric condition. Although Plaintiff asserts that the policy was overboard and that she was entitled to a personal evaluation by doctors *before* she was compelled to disrobe, that position is simply untenable for the reasons discussed above. As such, the Court finds that Plaintiff's objection to being subjected to the disrobement policy does not constitute a protected activity because Plaintiff cannot show an objectively reasonable basis for believing that the policy violates the ADA.

**\*11** Moreover, to the extent Plaintiff's retaliation claim is based on her prior litigation against the Hospital Defendants, Plaintiff's claim fails for the additional reason that Plaintiff does not explain how her treating doctors would have even been aware of her prior litigation involving the mandatory disrobement policy. As pled, the complaint merely alleges that Dr. Hird and others were aware that Plaintiff was a lawyer, and therefore posed a litigation risk, not that she had previously sued the hospital with regard to its disrobement policy. As such, Plaintiff's allegations do not support an inference that the medical staff on duty even knew about the prior litigation, much less that the litigation was the *cause* of the alleged adverse actions. In short, Plaintiff has failed to plead facts from which the Court could infer a retaliatory animus or that might support a finding of a causal relationship between the alleged adverse action and her prior litigation.

Finally, Plaintiff has not alleged any adverse actions that would be sufficient to state a claim of retaliation. "Actions are materially adverse if they are harmful to the point that they could well dissuade a reasonable [person] from making or supporting a charge of discrimination [or retaliation]." *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010). Here,

Case 3:24-cv-01358-GTS-ML    Document 13    Filed 01/07/25    Page 79 of 120

Smith v. City of New York, Not Reported in Fed. Supp. (2016)

Plaintiff states that hospital officials took adverse actions against her because they sent her to a different facility rather than to a "bed in the hospital or its associated Westchester campus" (Compl. 74-75), kept her under care for a longer period than otherwise necessary (*id.* ¶¶ 66, 74), and "laugh[ed] about her complaints ... and teas[ed] her" (*id.* ¶ 75). As an initial matter, Plaintiff's complaints of teasing and laughing are insufficient to state a claim of retaliation because these actions are "unpleasant matters that do not rise to the level of adverse ... actions." *Ramsey v. N.Y.C. Health & Hosps. Corp.*, No. 98-cv-1594 (RPP), 2000 WL 713045, at *12 (S.D.N.Y. June 2, 2000) (brackets and internal quotation marks omitted); *see also Laudadio v. Johanns*, 677 F. Supp. 2d 590, 613 (E.D.N.Y. 2010) (" '[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious)' may be insufficient to establish a materially adverse action." (quoting *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 271 (2001)).

As to Plaintiff's complaints that she was kept under care longer than necessary and transferred to a different facility, the Court finds that these are precisely the type of decisions involving medical judgment that are not actionable under the ADA. It is well established that complaints about medical treatment are generally insufficient to state a claim under the ADA. *See United States v. Univ. Hosp.*, 729 F.2d 144, 156-60 (2d Cir. 1984); *see also Burger v. Bloomberg*, 418 F.3d 882, 883 (8th Cir. 2005) ("[A] lawsuit under the Rehab[ilitation] Act or the Americans with Disabilities Act (ADA) cannot be based on medical treatment decisions.") (citing cases). Here, the Court simply will not second-guess a hospital's decision to keep a patient under care because of Plaintiff's vague allegation that decision was retaliatory. Indeed, while courts have allowed claims of retaliation to proceed based on allegations of the *denial* of medical care, *see, e.g., Liner v. Fischer*, No. 11-cv-6711 (PAC) (JLC), 2013 WL 3168660, at *15 (S.D.N.Y. June 24, 2013) (citing *Burton v. Lynch*, 664 F.Supp.2d 349, 367 (S.D.N.Y. 2009)), *adopted*, 2013 WL 4405539 (S.D.N.Y. Aug. 7, 2013), the Court is not aware of any case in which a plaintiff has brought a claim for retaliation against a hospital based on a plaintiff's disagreement with the decisions made by the hospital about the patient's care. In addition, Plaintiff's own complaint states that the facility to which Plaintiff was transferred was "not bad to her" (*id.* ¶ 84), and she implicitly acknowledges that the medical care she received was related to her condition because her blood tests were "abnormal" and "consistent with muscle damage" (*id.* ¶¶ 80, 82). Because actions based on medical judgments are

not actionable under the ADA, Plaintiff has failed to allege an adverse action that could support her claim of retaliation.

**\*12** Accordingly, the Court concludes that Plaintiff has failed to state a claim against the Hospital Defendants for retaliation under the ADA. [7]

### D. State Law Claims

Having dismissed Plaintiff's federal claims in this case, the Court declines to exercise supplemental jurisdiction over any potential state law claims alleged in the complaint, including any claims brought under New York State and City human rights laws or any alleged violations of the New York State constitution, and thus dismisses those claims as well. *See* 28 U.S.C. § 1367(c)(3) ("[A] district court may decline to exercise supplemental jurisdiction over a claim ... if ... the district court has dismissed all claims over which it has original jurisdiction."); *see also United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966) ("[I]f the federal law claims are dismissed before trial ... the state claims should be dismissed as well."); *Prado v. City of New York*, No. 12-cv-4239 (RJS), 2015 WL 5190427, at *6 (S.D.N.Y. Sept. 3, 2015) (" '[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of [relevant] factors ... will point toward declining to exercise jurisdiction over the remaining state-law claims.' " (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988))).

### E. Dr. Sharon Hird

Plaintiff's complaint also names Dr. Sharon Hird, one of the doctors who treated her at the hospital, as a Defendant. (Doc. No. 1.) More than a year has passed since Plaintiff initiated this action and Plaintiff has failed to file an affidavit of service with the Court attesting to service of the summons and complaint on Dr. Hird. Accordingly, Plaintiff's claims against Dr. Hird would ordinarily be subject to dismissal without prejudice pursuant to Federal Rule of Civil Procedure 4(m).

However, the Court concludes that Plaintiff's claims against Dr. Hird must be dismissed with prejudice because, for the reasons discussed above, Plaintiff has failed to state a claim for discrimination or retaliation. In addition, Plaintiff's claim of discrimination is barred by collateral estoppel. Although Dr. Hird was not a defendant in the prior action, and thus, claims against her are not barred by *res judicata*, the related

Case 3:24-cv-01358-GTS-ML    Document 13    Filed 01/07/25    Page 80 of 120

Smith v. City of New York, Not Reported in Fed. Supp. (2016)

doctrine of collateral estoppel provides that "once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." *Allen v. McCurry*, 449 U.S. 90, 94 (1980). Normally, collateral estoppel "will bar the relitigation of an issue of law or fact that was raised, litigated, and actually decided by a judgment in a prior proceeding between the parties," as long as "the determination of that issue was essential to the judgment, regardless of whether or not the two proceedings are based on the same claim." *NLRB v. United Techs. Corp.*, 706 F.2d 1254, 1260 (2d Cir. 1983). However, the doctrine of non-mutual defensive collateral estoppel also "precludes a plaintiff from relitigating identical issues by merely switching adversaries." *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 329 (1979) (internal quotation marks omitted).

**\*13** As discussed above, this litigation involves the same mandatory disrobement policy that was already extensively litigated in *Smith I*. As a result, the issue in that litigation – whether the mandatory disrobement policy is discriminatory – is identical to the discrimination claim that Plaintiff raises here. Although Dr. Hird was not a defendant in *Smith I*, Plaintiff has not stated any facts relating to Dr. Hird that might warrant a separate analysis or lead to a different result than in *Smith I*. The doctrine of non-mutual defensive collateral estoppel is designed to prevent precisely this type of attempt to relitigate an issue by "merely switching adversaries." *Parklane*, 439 U.S. at 329; *see also Jasper v. Sony Music Entm't, Inc.*, 378 F. Supp. 2d 334, 343 (S.D.N.Y. 2005) ("By binding the plaintiff to earlier judicial decisions in which he was a party, defensive collateral estoppel precludes a plaintiff from getting a second bite at the apple merely by choosing a new adversary."). As such, in addition to the fact that Plaintiff's claims against Dr. Hird must be dismissed under Rule 12(b)(6) for failure to state a claim, Plaintiff's suit against Dr. Hird is also barred by the doctrine of collateral estoppel.

### F. Leave to Amend

Plaintiff has previously sought leave to amend her complaint in order to add individual officers based on a *Valentin* order issued by Judge Forrest in October 2015 (Doc. No. 3). (*See* Doc. No. 14.) In her response to the City's motion to dismiss, Plaintiff also now seeks leave to amend her complaint to add a separate incident from January 2016 when Plaintiff alleges that she was put into an ambulance based on an anonymous call. (Doc. No. 52.)

Federal Rule of Civil Procedure 15(a)(2) permits a party to amend its pleading "only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). Generally "[t]he court should freely give leave when justice so requires," *id.*, but there are times when granting such leave may be inappropriate, *see Dluhos v. Floating & Abandoned Vessel, Known as "New York"*, 162 F.3d 63, 69 (2d Cir. 1998) ("[A] motion to amend should be denied if there is an apparent or declared reason – such as undue delay, bad faith or dilatory motive[ ], repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of the amendment, [or] futility of amendment." (citation and internal quotation marks omitted)). And "[w]hile pleading is not a game of skill in which one misstep may be decisive to the outcome, neither is it an interactive game in which plaintiffs file a complaint, and then bat it back and forth with the Court over a rhetorical net until a viable complaint emerges." *In re Refco Capital Mkts., Ltd. Brokerage Customer Sec. Litig.*, No. 06-cv-643 (GEL), 2008 WL 4962985, at *2 (S.D.N.Y. Nov. 20, 2008) (internal quotation marks omitted).

With respect to the *Valentin* order, the Court finds that any amendment to add the names of individual officers would be futile because claims against them would be time barred. On October 5, 2015, Judge Forrest issued a *Valentin* order for the City to provide the names of individual officers so that Plaintiff might add them to her complaint. (Doc. No. 3.) On March 25, 2016, after the case was reassigned to my docket, the Court stayed compliance with the *Valentin* order until the resolution of the motions to dismiss. (Doc. No. 46.) However, it should be noted that Plaintiff filed this action on the very day the statute of limitations on her Section 1983 claims ran – three years after the June 7, 2012 incident. *See Espada v. Schneider*, 522 F. Supp. 2d 544, 550 (S.D.N.Y. 2007) ("New York law supplies the applicable statute of limitations periods – three years for § 1983 claims ...." (citing *Eagleston v. Guido*, 41 F.3d 865, 871 (2d Cir. 1994))); *see also Mitchell v. Home*, 377 F. Supp. 2d 361, 371 (S.D.N.Y. 2005) ("Under New York law, the statute of limitations for § 1983 claims premised on torts such as false arrest or false imprisonment is three years."). Any amendment to include individual officers at this point – or at any time after Plaintiff first filed her complaint – would thus be futile because claims against the individual officers were time-barred well before Judge Forrest issued the *Valentin* order on October 5, 2015 and do not relate back to Plaintiff's filing of the original complaint. *See Hogan v. Fischer*, 738 F.3d 509, 517 (2d Cir. 2013) ("Generally,

Case 3:24-cv-01358-GTS-ML    Document 13    Filed 01/07/25    Page 81 of 120

Smith v. City of New York, Not Reported in Fed. Supp. (2016)

'John Doe' pleadings cannot be used to circumvent statutes of limitations because replacing a 'John Doe' with a named party in effect constitutes a change in the party sued."); *see also Vasconcellos v. City of New York*, No. 12-cv-8445 (CM), 2014 WL 4961441, at *6 (S.D.N.Y. Oct. 2, 2014) (holding that a plaintiff's "failure [to name individual defendants] cannot be characterized as a mistake, so her amended complaint does not relate back to her original complaint and is time-barred" (internal quotation marks omitted)). Accordingly, the Court vacates the earlier *Valentin* order and denies Plaintiff leave to amend her complaint to name individual officers.

 **\*14**  Plaintiff also asks for leave to amend the complaint to add an incident that she alleges took place in January 2016. Although she does not offer much detail about the incident, she essentially alleges that she was "removed from a public plaza" and put into an ambulance because of the cold weather and an anonymous phone call which stated that she was "allegedly suicidal." (Doc. No. 52 at 19.) Plaintiff does not state, nor does she even suggest, that this incident involved any of the same officers as the incident underlying this complaint.

The Court finds that amending the complaint to add this incident would be futile. Plaintiff includes no explanation as to how this incident involved any discrimination or retaliation, nor how it is related to the incident underlying the complaint. Indeed, she once again appears to concede that the hospitalization in that incident was due to concerns for her mental and physical health – and not improper discriminatory motives – and she does not indicate that she was retaliated against in any way. In addition, Plaintiff provides no facts as to how this second incident might demonstrate any unconstitutional official policy to bolster her *Monell* claim. As such, the Court finds that allowing Plaintiff to amend her complaint to add this incident would be futile as it would have no impact on the viability of her claims. *See Health-Chem Corp. v. Baker*, 915 F.2d 805, 810 (2d Cir. 1990) ("[W]here ... there is no merit in the proposed amendments, leave to amend should be denied.").

The Court also finds that granting leave to amend at this point would cause undue prejudice to the Hospital Defendants, who

have been embroiled in litigation initiated by Plaintiff for over ten years. Indeed, this latest complaint appears designed to relitigate the legality of the mandatory disrobement policy, an issue on which the Court already ruled in *Smith I*. Moreover, to this day, Plaintiff continues to attempt to prolong the litigation in *Smith I*. In her answer to the Hospital Defendants' motion to dismiss, Plaintiff claims that her appeal in *Smith I* "remains subject to reinstatement" (Doc. No. 51 at 24), despite the fact that the Supreme Court has already denied her petition for writ of *certiorari* after the Second Circuit dismissed her appeal. *See Smith v. N.Y. Presbyterian Hosp.*, 136 S.Ct. 1528 (Mem.) (Apr. 4, 2016). In light of Plaintiff's determination to continue to litigate claims that several courts, including the Supreme Court, have already rejected, the Court concludes that granting leave to amend in this case would only cause further prejudice to Defendants. *See In re Martin-Trigona*, 737 F.2d 1254, 1262 (2d Cir. 1984)(noting that a district court has "the power and the obligation to protect the public and the efficient administration of justice from [a vexatious litigant's] litigious propensities"). Accordingly, the Court denies Plaintiff leave to amend her complaint.

IV. CONCLUSION

For the reasons stated above, IT IS HEREBY ORDERED THAT the City and the Hospital Defendants' motions to dismiss Plaintiff's complaint with prejudice are granted. IT IS FURTHER ORDERED THAT Plaintiff's claims against Dr. Sharon Hird are dismissed with prejudice. IT IS FURTHER ORDERED THAT leave to amend the complaint is denied. The Clerk of the Court is respectfully directed to terminate the motions pending at docket numbers 27 and 31 and to close this case. The Clerk of the Court is also respectfully directed to mail a copy of this Order to Plaintiff.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 4574924

---

**Footnotes**

Case 3:24-cv-01358-GTS-ML    Document 13    Filed 01/07/25    Page 82 of 120

Smith v. City of New York, Not Reported in Fed. Supp. (2016)

1    The following facts are taken from the complaint, filed on June 8, 2015 (Doc. No. 1 ("Compl.")), and from the public docket of a prior case brought by Plaintiff, *Smith v. N.Y. Presbyterian Hosp.*, No. 05-cv-7729 (RJS) (SDNY), which is a matter of public record, *see Pani v. Empire Blue Cross Blue Shield,* 152 F.3d 67, 75 (2d Cir. 1998). In ruling on the motion, the Court has also considered the City's memorandum of law (Doc. No. 32), the Hospital Defendants' memorandum of law (Doc. No. 29), Plaintiff's multiple filings in opposition to Defendants' motions (Doc. Nos. 51, 52, 56, and 57), the City's reply (Doc. No. 65), the Hospital Defendants' reply (Doc. No. 58), and the exhibits attached to those filings.

2    As noted above, the Hospital Defendants also ask the Court to dismiss Plaintiff's complaint for failure to prosecute pursuant to Federal Rule of Civil Procedure 41(b). Dismissal with prejudice for lack of prosecution is " 'a harsh remedy to be utilized only in extreme situations.' " *LeSane v. Hall's Sec. Analyst, Inc.,* 239 F.3d 206, 209 (2d Cir. 2001) (quoting *Theilman v. Rutland Hosp., Inc.,* 455 F.2d 853, 855 (2d Cir. 1972)). Here, Plaintiff has failed to comply with a number of Court orders, including several scheduling orders in late October and November 2015 (*see* Doc. Nos. 20 and 23), and filed her untimely responses to the motions to dismiss. In light of the facts that these delays have occurred over a relatively short span of time, that Plaintiff has prosecuted her case by appearing for the December 23, 2015 initial and pre-motion conference (*see* Minute Entry, dated December 23, 2015), and that she has filed responses to Defendants' motions to dismiss, the Court declines to grant the "drastic remedy" of dismissal pursuant to Rule 41(b). *Carter v. Jablonsky,* 121 Fed.Appx. 888, 889 (2d Cir. 2005).

3    Plaintiff's complaint also seems to raise several Section 1983 claims against the individual officers involved in her forced hospitalization, including excessive force and false arrest claims. Specifically, she states that "[t]o the extent police officers involved acted outside their received training Ms. Smith reserves claims of improper use of force and restraint and false imprisonment and constitutional and human rights violations." (Compl. ¶ 14.) However, as discussed in more detail below with respect to Plaintiff's request for leave to amend (*see* Section III.F.), no individual officers have been named or served, and any claims against the individual officers are time-barred.

4    As noted above, the Court takes judicial notice of the record in *Smith I,* including the undisputed evidence submitted by the defendants in connection with their motion for summary judgment. *See Day v. Moscow,* 955 F.2d 807, 811 (2d Cir. 1992) ("Generally *res judicata* is an affirmative defense to be pleaded in the defendant's answer. However, when all relevant facts are shown by the court's own records, of which the court takes notice, the defense may be upheld on a Rule 12(b)(6) motion without requiring an answer.").

5    Indeed, even if the disrobement policy had been slightly modified between *Smith I* and the present action, Plaintiff's claims might still be subject to *res judicata. See Monahan,* 214 F.3d at 289 ("There is ample precedent to show that mere modification of a challenged policy will not alone undo the preclusive effect of a former judgment.").

6    To the extent Plaintiff's complaint may be construed to raise a claim of discrimination under a theory of reasonable accommodation, this claim also fails. The ADA requires covered entities to provide reasonable accommodations to a disabled individual "whenever doing so would provide that individual with an opportunity to participate in, make use of, or derive a benefit from a program, facility, or service that would otherwise not be equally accessible to disabled and non-disabled individuals." *Andersen v. N. Shore Long Island Jewish Healthcare Sys.'s Zucker Hillside Hosp.,* No. 12-cv-1049 (JFB) (ETB), 2013 WL 784391, at *10 (E.D.N.Y. Jan. 23, 2013); *see* 42 U.S.C. § 12182(b)(2)(A)(ii)–(iii). Smith alleges only that she was subjected to the PED policies "without accommodation or waiver ever permitted." (Compl. ¶ 96.) Such a conclusory statement is obviously insufficient to state a claim for a failure to provide reasonable accommodation. *See Twombly,* 550 U.S. at 555 ("[A] formulaic recitation of the elements of a cause of action will not do."). Because Plaintiff includes no facts to demonstrate how she participated in services or received benefits differently

because of her mental illness, she has failed to state a claim for discrimination under a theory of reasonable accommodation.

7    Plaintiff does not appear to state a claim for retaliation against the City. Specifically, Plaintiff has not alleged any facts, nor does she even include any conclusory assertion, that might support a claim that the City took any adverse action against her in retaliation for protected activity. As such, the Court concludes that Plaintiff has not stated a claim for retaliation against the City.

---

**End of Document**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:24-cv-01358-GTS-ML    Document 13    Filed 01/07/25    Page 84 of 120

Jones v. Volunteers of America Greater New York, Not Reported in Fed. Supp. (2022)

2022 WL 768681
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Brandon C. JONES, Plaintiff,

v.

VOLUNTEERS OF AMERICA GREATER
NEW YORK, et al., Defendants.

1:20-cv-5581 (MKV)
|
Signed 03/14/2022

**Attorneys and Law Firms**

Brandon C. Jones, Brooklyn, NY, Pro Se.

Kristine Denning, Harwood Lloyd, Hackensack, NJ, for Defendants Jsin H. Thomas, Volunteers of America (Swartz Shelter) Corporation, Mr. Jonathan Tavarez, Volunteers of America Greater New York.

**OPINION AND ORDER GRANTING
DEFENDANTS' MOTION TO DISMISS**

MARY KAY VYSKOCIL, United States District Judge:

**\*1** *Pro se* Plaintiff Brandon Jones alleges that he was denied rights guaranteed to him under the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.* (the "ADA"), the Rehabilitation Act, 29 U.S.C. §§ 701 *et seq.*, and the Fair Housing Act, 42 U.S.C. §§ 3601 *et seq.* (the "FHA"), while living at a homeless shelter run by Defendant Volunteers of America Greater New York (the "VOA"). Plaintiff alleges that Defendants Lijin Thomas, Jonathan Tavarez, and Deborah Johnson, all employees of the VOA (collectively, "Defendants") discriminated against him on the basis of his disability. [1] Pending before the Court is the Defendants' Motion to Dismiss Plaintiff's Third Amended Complaint. [ECF No. 29]. For the reasons stated herein, the motion is granted.

**BACKGROUND**

**I. FACTUAL BACKGROUND**

On this motion, the Court is constrained to "accept all factual allegations in the complaint as true and draw all reasonable inferences in" Plaintiff's favor. *Cargo Partner AG v. Albatrans, Inc.*, 352 F.3d 41, 44 (2d Cir. 2003) (internal quotation marks, citation, and alterations omitted). The following facts are adapted from Plaintiff's Third Amended Complaint. [2]

From February through July 2020, Plaintiff lived at the "Swartz Building," located on Randall's Island in New York City, at a Volunteers of America Greater New York shelter (the "VOA Shelter"). Third Am. Compl. at 5, 10, 13. During his intake at the facility, Plaintiff "filled out numerous packets of paperwork" which "formally disclosed" his disabilities and his required medicine. Third Am. Compl. at 10. According to Plaintiff, he has suffered from third-degree burns on both of his legs and feet, lymphedema, and chronic pain "since December 9th, 1992," and Vons Willebrand disease "since birth." Third Am. Compl. at 10. The burns increase his risk of infection. Third Amended Compl. at 10.

**\*2** The day following intake, Plaintiff "woke up to uncapped needles in [his] blankets and sheets" and found the showers to be "filled with hazardous trash." Third Am. Compl. at 10. Plaintiff was told to see Defendant Lijin Thomas "regarding the shower situation" and for any requests for "medical equipment." Third Am. Compl. at 10. A few days later, Plaintiff met with Thomas who told him that "no medical equipment was permitted" inside the shelter, and that cleaning supplies, like bleach, were also prohibited for resident use because they "could be used as a weapon." Third Am. Compl. at 11. Plaintiff left Thomas' office and looked for another person to assist him in his request for "medical equipment and cleaning supplies." Third Am. Compl. at 11. After speaking with another individual, he was directed back to Thomas who told him "I don't have time to talk to you." Third Am. Compl. at 11.

A few weeks later, Plaintiff was treated for an infection in his left foot at a hospital in Manhattan. Third Am. Compl. at 11. Plaintiff was given antibiotics, pain medicine, and a note "to receive cleaning supplies" for the shower area. Third Am. Compl. at 11. When Plaintiff took the note to Thomas she "declined to even look at" it. Third Am. Compl. at 11. The next day, Plaintiff "filed a formal grievance into the matter of cleaning supplies" with an individual who worked at the front desk of the shelter. Third Am. Compl. at 11. That individual "took [the] grievance" and said that someone "will look into the issue." Third Am. Compl. at 11. Plaintiff then asked if he could store his medicine in the refrigerator but he was told that he "was not permitted to use the refrigerator." Third

Case 3:24-cv-01358-GTS-ML    Document 13    Filed 01/07/25    Page 85 of 120

Jones v. Volunteers of America Greater New York, Not Reported in Fed. Supp. (2022)

Am. Compl. at 11. Plaintiff returned to Thomas who said that he "could not refrigerate anything—including medication." Third Am. Compl. at 11.

Plaintiff next renewed his requests for cleaning supplies and medical equipment with Defendant Jonathan Tavarez. Third Am. Compl. at 11. Tavarez informed Plaintiff that "Ms. Thomas told him [he] was not permitted cleaning supplies or medical equipment." Third Am. Compl. at 11. Plaintiff then called his probation officer who said that he had "nothing to do with the [VOA Shelter] and [Plaintiff has] to work it out with them." Third Am. Compl. at 11. [3]

A month later, near the end of March 2020, Plaintiff returned to the hospital to be treated for a skin infection and sore on his left foot. Third Am. Compl. at 11. He was provided "bed-rest passes" and "other letters for cleaning supplies and medical equipment," which were passed on to Tavarez. Third Am. Compl. at 11. Plaintiff did not receive cleaning supplies and medical equipment and was "not permitted to stay [in] bed." Instead he was told by "employees of the [VOA Shelter]" that he had to "leave the dorm area and stay out in front" in the "TV area." Third Am. Compl. at 11-12. The doors returning to the dorms were "purposely locked" which prevented Plaintiff from accessing his antibiotic and pain medicine. Third Am. Compl. at 12.

In April 2020, Plaintiff was treated for an infection in both feet, and asked for an "updated medical note concerning 'medical solution – not bleach.' " Third Am. Compl. at 12. He provided the note to Thomas who "once again refused to accept the note." Third Am. Compl. at 12. At some point during this period, Plaintiff was "referred to a lymphedema doctor" who "ordered a specialized pump to remove built up fluid from [Plaintiff's] disabled legs and feet." Third Am. Compl. at 12. The pump was sent to the VOA Shelter via Federal Express, but the shipment was rejected because shelter personnel told the driver they did not know who the recipient was. Third Am. Compl. at 12. Plaintiff attributes this rejection to the VOA Shelter's "two official representatives," Thomas and Tavarez. Third Am. Compl. at 12. Following the rejection, Plaintiff called the CEO of Volunteers of America, located in Virginia, after which he received a call from the "out-going President" of the New York office. Third Am. Compl. at 12. Plaintiff was told that the out-going president would "do [her] best to assist [him]" but that she was retiring and he could be assisted by her replacement. Third Am. Compl. at 12.

**\*3** In May 2020, Plaintiff returned to the hospital for infections, and received a note for cleaning supplies that stated: "Patient shall be provided with bleach solution to clean showers before and after every use – due to burns and frequent cellulitis & [MRSA] infections." Third Am. Compl. at 12. That note, and Plaintiff's request for medical equipment, was again rejected, apparently by Thomas and Tavarez. Third Am. Compl. at 12. Plaintiff then decided to contact "DHS, NYS Agencies and 311" and received a complaint number. Third Am. Compl. at 12. Plaintiff's situation did not change, but he states he "started having more issues with the Directors" of the VOA Shelter. Third Am. Compl. at 12. A month later, Plaintiff received a phone call and text from Deborah Johnson who said she would let the out-going president know about Plaintiff's requests. Third Am. Compl. at 12.

On July 9th, 2020, Plaintiff "filed a formal complaint with the New York State Division of Human Rights – Housing Complaint Unit," which he provided to a shelter employee who passed it along to Thomas and Tavarez. Third Am. Compl. at 13. That same day, Plaintiff was given an "infraction" by Tavarez "for having electronics, [including his] Bi-Pap Machine." Third Am. Compl. at 13. After receiving the infraction, Plaintiff received a call from his probation officer, who told him to report to the probation office the following day. Third Am. Compl. at 13. Plaintiff alleges that Thomas and Tavarez had contacted his probation officer, who, as a result of the infraction, threatened to take Plaintiff "before the judge in [his] white collar case for [a] probation violation." Third Am. Compl. at 13.

On July 17th, 2020, Plaintiff "decided enough was enough" and initiated this action by filing his *pro se* Complaint [ECF No. 2]. Third Am. Compl. at 13. A little over a week later, Plaintiff received a letter that within 48 hours he was being administratively transferred to a shelter in Brooklyn, New York. Third Am. Compl. at 13. Plaintiff has access to "cleaning supplies and specialized medical equipment," provided by the "nursing staff" at his new facility. Third Am. Compl. at 13.

## II. PROCEDURAL HISTORY

Plaintiff amended his complaint for the first time on July 30, 2020. [ECF No. 6]. On August 27, 2020, Judge Stein, then presiding over this case, ordered Plaintiff to further amend his complaint, identifying various pleading deficiencies that Plaintiff would have to remedy if he intended to pursue this action. [ECF No. 9] (the "August 27 Opinion"). Plaintiff then filed a second amended complaint on October 21, 2020 [ECF

Case 3:24-cv-01358-GTS-ML    Document 13    Filed 01/07/25    Page 86 of 120

Jones v. Volunteers of America Greater New York, Not Reported in Fed. Supp. (2022)

No. 11], and the Court thereafter ordered the United States Marshal Service to effect service on the Defendants. [ECF No. 13]. Defendants then timely moved to dismiss Plaintiff's second amended complaint. [ECF No. 21]. Pursuant to the Individual Practices of Judge Nathan (the second judge to preside over this case), Plaintiff had the opportunity to amend his complaint a third time. [ECF No. 22].

Plaintiff elected to amend his complaint, filing the operative Third Amended Complaint on February 19, 2021. [ECF No. 25]. Defendants thereafter renewed their motion to dismiss [ECF No. 29] ("Mem"). [4] After a delay, Plaintiff filed a "Severe Objection of the Defense Counsel Motion for Dismissal," [ECF No. 46], which the Court construes as Plaintiff's opposition. ("Opp."). Defendants responded with a reply letter in support of their motion. [ECF No. 29] ("Reply"). While the motion was pending, this case was reassigned to me.

**\*4** Plaintiff's Third Amended Complaint seeks $800,000 for "pain & injuries & emotional stress and suffering," the termination of Thomas and Tavarez, a "certified letter of apology for defendants failure to comply w/ rule of law," and a "complete 'overhaul' of" the VOA Shelter's management and leadership. Third. Am. Compl. at 6.

## LEGAL STANDARD

Defendants move this Court pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss Plaintiff's Third Amended Complaint for failure to state a claim upon which relief can be granted. To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955). While a sufficiently pleaded complaint "does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955 (internal quotation marks, alterations, and citations omitted); *see also Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937

(noting that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" (citing *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955)). In determining whether a complaint states a plausible claim for relief, a district court must consider the context and "draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 662, 129 S.Ct. 1937.

Plaintiff represents himself in this action *pro se*. "It is well established that a court is ordinarily obligated to afford a special solicitude to *pro se* litigants." *Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010). The Court therefore liberally construes Plaintiff's pleadings and motion papers to raise the strongest arguments they suggest. *Fowlkes v. Ironworkers Local 40*, 790 F.3d 378, 387 (2d Cir. 2015). "At the same time, a *pro se* complaint must allege 'enough facts to state a claim to relief that is plausible on its face.' " *Id.* (quoting *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955).

## DISCUSSION

Defendants argue that Plaintiff's claims are barred under the doctrine of *res judicata*, are moot, and otherwise should be dismissed for failure to state a claim. *See generally* Mem. at 5. The Court addresses each argument in turn.

## I. PLAINTIFF'S ACTION IS NOT BARRED UNDER THE DOCTRINE OF RES JUDICATA

Plaintiff commenced a seemingly parallel action in New York Supreme Court on July 21, 2020, almost simultaneously with this federal action. *See* Compl., Index No. 100551/2020, *Brandon Jones v. Jisin Thomas, Jonathan Tavarez, and Volunteers of America Corp.* That case was ultimately dismissed. Defendants argue that Plaintiff's action is therefore barred under the doctrine of *res judicata.* Mem. at 13-17.

A court may grant dismissal under Federal Rule of Civil 12(b)(6) when a defendant raises claim preclusion as an affirmative defense and it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law. *Conopco, Inc. v. Roll Intern.*, 231 F.3d 82, 86 (2d Cir. 2000). "It is well-settled that, in considering a motion to dismiss, the Court is entitled to take judicial notice of documents integral to or referred to in the complaint, as well as documents filed in other courts and other public records." *Reyes v. Fairfield Props.*, 661 F. Supp. 2d 249, 255 n.1 (E.D.N.Y. 2009) (citing

*Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006)). As such, the Court takes notice of the action docketed at Index Number 100551/2020 in the Supreme Court of the State of New York, New York County, and in particular the Decision and Order filed on January 21, 2021, dismissing that case in its entirety (the "NY Op.").

### A. Plaintiff's action is not barred by the doctrine of claim preclusion

**\*5** Under the doctrine of res judicata, or claim preclusion, a " 'final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action.' " *St. Pierre v. Dyer*, 208 F.3d 394, 399 (2d Cir. 2000) (quoting *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 398, 101 S.Ct. 2424, 69 L.Ed.2d 103 (1981)).[5] Thus, the claim preclusion doctrine bars "later litigation if [an] earlier decision was (1) a final judgment on the merits, (2) by a court of competent jurisdiction, (3) in a case involving the same parties or their privies, and (4) involving the same cause of action." *In re Teltronics Servs., Inc.*, 762 F.2d 185, 190 (2d Cir. 1985). Res judicata, and claim preclusion, "is a rule of fundamental repose important for both the litigants and for society." *In re Teltronics Servs.*, 762 F.2d at 190. These doctrines serve the goals of avoiding costs and vexation of duplicative litigation, conserving judicial resources, and preventing inconsistent decisions. *Allen v. McCurry*, 449 U.S. 90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980).

To determine whether the doctrine of claim preclusion applies to a New York state court judgment, this Court must apply New York *res judicata* law. *See New York v. Mountain Tobacco Co.*, 942 F.3d 536, 543 (2d Cir. 2019) ("A federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered.") (internal quotation marks omitted). New York law bars "a later claim arising out of the same factual grouping as an earlier litigated claim even if the later claim is based on different legal theories or seeks dissimilar or additional relief." *Mountain Tobacco Co.*, 942 F.3d at 543 (internal quotation marks omitted); *see also Washington v. Blackmore*, 468 F. App'x 86, 87 (2d Cir. 2012) ("[A] claim is barred by res judicata so long as it could have been litigated in a prior action."); *Giannone v. York Tape & Label, Inc.*, 548 F.3d 191, 193 (2d Cir. 2008).

The court dismissed Plaintiff's New York state complaint "in its entirety" and directed the clerk "to enter judgment

accordingly." NY Op. at 4.[6] That dismissal, however, was "pursuant to CPLR 3211(a)(7)." NY Op. at 1. "Under New York law, a dismissal pursuant to N.Y. C.P.L.R. 3211(a)(7), for failure to state a cause of action, is presumptively not on a case's merits and lacks *res judicata* effect; indeed a Rule 3211(a)(7) dismissal is only on the case's merits if the rendering court explicitly says so." *DDR Constr. Servs. v. Siemens Indus.*, 770 F. Supp. 2d 627, 647 (S.D.N.Y. 2011) (collecting cases); *Pereira v St. Joseph's Cemetery*, 78 A.D.3d 1141, 1142, 912 N.Y.S.2d 121 (2010) ("As a general rule, a dismissal for failure to state a cause of action is not on the merits and, thus, will not be given res judicata effect."). Justice Jaffe did not indicate in her decision that the dismissal of "the entire complaint" was on the merits, and therefore this Court cannot agree with Defendants that the dismissal was merits-based. As a result, Plaintiff's claims are not barred by the doctrine of claim preclusion.

### B. Plaintiff's claims are not barred by the doctrine of issue preclusion

Defendants argue, in the alternative, that Plaintiff's claims under the ADA and the Rehabilitation Act are barred by the doctrine of issue preclusion. The doctrine of issue preclusion "is a narrower species of res judicata, [which] precludes a party from relitigating in a subsequent action or proceeding an issue clearly raised in a prior action or proceeding and decided against that party or those in privity, whether or not the tribunals or causes of action are the same." *Tsirelman v. Daines*, 19 F. Supp. 3d 438, 449 (E.D.N.Y. 2014) (quoting *Ryan v. N.Y. Tel. Co.*, 62 N.Y.2d 494, 500, 467 N.E.2d 487, 478 N.Y.S.2d 823 (1984)). For issue preclusion to apply, the following four requirements must be met: "(1) the identical issue was actually raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the part[ies] had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits." *Wyly v. Weiss*, 697 F.3d 131, 141 (2d Cir. 2012) (alteration in original). The party seeking to apply issue preclusion bears the burden of showing that the issues are identical and were necessarily decided in the prior action, and the party opposing its application bears the burden of showing that the prior action did not afford a full and fair opportunity to litigate the issues. *Id.*

**\*6** The Court concludes that issue preclusion does not bar Plaintiff's ADA or Rehabilitation Act claim here for substantively the same reasons that this action is not barred

Case 3:24-cv-01358-GTS-ML    Document 13    Filed 01/07/25    Page 88 of 120

Jones v. Volunteers of America Greater New York, Not Reported in Fed. Supp. (2022)

by claim preclusion. Where "the prior claims were dismissed for pleading deficiencies and were not litigated on the merits, neither ... collateral estoppel, nor the doctrine of issue preclusion are applicable." *Capellan v. Jackson Ave. Realty, LLC*, 2011 N.Y. Misc. LEXIS 6929, at *5 (N.Y. Sup. Ct. Sept. 26, 2011). A motion to dismiss pursuant to CPLR 3211(a) (7) accepts the facts alleged in the complaint as true, draws all inferences in the plaintiff's favor, and determines whether the facts alleged comport with a cognizable legal theory. *See Mendelovitz v Cohen*, 37 A.D.3d 670, 671, 830 N.Y.S.2d 577 (2007). But it does not resolve the issues on the merits.

\* \* \*

Because Plaintiff's action is not barred under a theory of *res judicata*, the Court will review the sufficiency of Plaintiff's Third Amended Complaint. The Court agrees with its sister court, the Supreme Court of the State of New York, that Plaintiff fails to state a claim upon which relief may be granted.

## II. PLAINTIFF'S COMPLAINT FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

The Court construes Plaintiff's Third Amended Complaint as asserting causes of action pursuant to the ADA, the Rehabilitation Act, and the FHA. [7] The Court addresses the ADA and Rehabilitation Act claims together, and the FHA claim separately.

### A. Plaintiff's ADA and Rehabilitation Act claims fail as a matter of law

Title III of the ADA forbids discrimination "on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." 42 U.S.C. § 12182(a). The Court construes Plaintiff's Third Amended Complaint as alleging that the VOA Shelter is a place of public accommodation under the ADA, and that he was denied the enjoyment or accommodation of that space on the basis of his disability. In order to state a claim under Title III of the ADA, a plaintiff must allege: (1) that he is disabled under the meaning of the ADA; (2) that defendant(s) own, lease or operate a place of public accommodation; and (3) that defendant(s) discriminated against him by denying them a full and equal opportunity to enjoy the services defendants provide because of that known disability. *Krist v. Kolombos Rest Inc.*, 688 F.3d 89, 94-95 (2d Cir. 2012); *Camarillo v. Carrols Corp.*, 518 F.3d 153, 156 (2d Cir. 2008).

Rehabilitation Act claims are "treated identically" to ADA claims. *See Getso v. City University*, 2009 WL 4042848, at *4 (S.D.N.Y. Nov. 18, 2009); *Rodriguez v. City of New York*, 197 F.3d 611, 618 (2d Cir. 1998) (Rehabilitation Act and the ADA "impose identical requirements").

### 1. A claim for money damages does not lie under the ADA or Rehabilitation Act here

Assuming *arguendo* that Plaintiff makes out the required elements for a claim under Title III of the ADA or the Rehabilitation Act, Plaintiff is nonetheless not entitled to the relief he seeks. It is well established that a private plaintiff suing under the ADA "may only obtain injunctive relief for violations of a right granted under Title III; he cannot recover damages." *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 86 (2d Cir. 2004); *see also Brief v. Albert Einstein Coll. of Med.*, 423 F. App'x. 88, 90 (2d Cir. 2011) (Title III of the ADA "allows only for injunctive relief"). Similarly, a private individual may only obtain injunctive relief for violations of the Rehabilitation Act. *Forzian v. Indep. Group Home Living Program*, 613 F. App'x 15, 18-19 (2d Cir. 2015); *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 275 (2d Cir. 2009); *Castro v. City of New York*, 24 F. Supp. 3d 250, 259 (E.D.N.Y. 2014) (dismissing ADA and Rehabilitation Act claims against individual defendants because neither statute provides for individual liability for claims for monetary damages); *Cohn v. KeySpan Corp.*, 713 F. Supp. 2d 143, 154-55 (E.D.N.Y. 2010). Plaintiff here seeks $800,000 for "pain and injuries and emotional stress and suffering." Third Am. Compl. at 6. Plaintiff's request for monetary relief is not cognizable under the ADA or the Rehabilitation Act. *See* 42 U.S.C. § 12188(b) (1)(B) (money damages for civil suit plaintiffs under Title III of the ADA is appropriate "when requested by the Attorney General."); *Forziano*, 613 F. App'x at 18-19. [8]

### 2. Plaintiff lacks standing to seek injunctive relief

**\*7** Construing Plaintiff's Third Amended Complaint as seeking declaratory or injunctive relief does not save Plaintiff's ADA and Rehabilitation Act claims. Plaintiff asks for the "termination" of Defendants Thomas and Tavarez, a "Certified Letter of Apology For Defendants Failure to Comply w/ Rule of Law," and a "Complete 'Overhaul' of VOA" management and leadership. Third Am. Compl. at 6. Plaintiff acknowledges that he no longer resides at the VOA, and is instead living at a facility which he finds much more amenable to his requests. *See* Third Am. Compl. at 13. Plaintiff's non-monetary claims for relief are therefore moot.

Case 3:24-cv-01358-GTS-ML    Document 13    Filed 01/07/25    Page 89 of 120

Jones v. Volunteers of America Greater New York, Not Reported in Fed. Supp. (2022)

"[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969). A case may be considered mooted when it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *See also Adarand Constructors, Inc. v. Slater*, 528 U.S. 216, 221-22, 120 S.Ct. 722, 145 L.Ed.2d 650 (2000) (citation and italics omitted). Plaintiff can suffer no ongoing harm at the hands of the Defendants because he no longer lives at the facility at-issue in this cause of action. *See Am. Freedom Def. Initiative v. Metro. Transp. Auth.*, 815 F.3d 105, 110 (2d Cir. 2015) (case moot where ongoing harm not present and where challenged conduct has been completely eliminated); *Wiltz v. New York Univ.,* 2019 WL 8437456, at *16, 2019 U.S. Dist. LEXIS 220563, at *46-47 (S.D.N.Y. Dec. 23, 2019) (no standing under FHA, ADA, or Rehabilitation Act where plaintiff no longer resided with defendants, so no showing of "a real or immediate threat that he will be wronged again.") *report and recommendation adopted* 2020 U.S. Dist. LEXIS 22866 (S.D.N.Y. Feb 10, 2020) *appeal dismissed* 2020 U.S. App. LEXIS 41705 (2d Cir. Sept. 23, 2020).

Here, even if this Court could order the termination of employees, or the reorganization of a private, non-profit organization (a specious proposition), doing so would not give Plaintiff any relief because he no longer interacts with those employees or resides at the VOA Shelter, thereby mooting Plaintiff's non-monetary requests for relief. *See Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307, 132 S.Ct. 2277, 183 L.Ed.2d 281 (2012) ("A case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party.") (internal quotation marks omitted).

The Court therefore grants Defendants' Motion to Dismiss Plaintiff's Third Amended Complaint with respect to the asserted ADA and Rehabilitation Act claims.

### B. Plaintiff's FHA claims fails to state a claim upon which relief can be granted

The FHA "broadly prohibits discrimination in housing." *Mitchell v. City of New York*, 2019 WL 2725615, at *3 (S.D.N.Y. July 1, 2019). The FHA, as applicable here, makes it unlawful "[t]o ... make unavailable or deny, a dwelling to any buyer or renter" or "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith," on the basis of, *inter alia*, disability.

42 U.S.C. §§ 3604 (a), (b), (f)(1)-(2). For purposes of the FHA, discrimination includes a refusal to make "reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). The FHA also makes it "unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of ... any right granted or protected by" Section 3604. 42 U.S.C. § 3617. The Court liberally construes *pro se* Plaintiff's Third Amended Complaint as alleging a disparate treatment or impact claim, a denial of reasonable accommodations claim, and a retaliation claim under the FHA. To the extent Plaintiff asserts such claims, the FHA claims fail as a matter of law and must be dismissed.

### *1. Plaintiff is not within the category of persons protected by the FHA and does not have standing to assert a claim under the FHA*

**\*8**  As stated, the Fair Housing Act makes it illegal to "to discriminate in the sale or rental, or otherwise make unavailable or deny, a dwelling to any buyer or renter because of a" disability. 42 U.S.C. § 3604(f). Based on the plain language of the FHA, a plaintiff must—at minimum—allege that he was discriminated against 1) in the sale or rental, or otherwise was made unavailable or denied, 2) a dwelling, 3) as a buyer or renter, 4) because of a disability. *Id.*; *see also Jenkins v. NY City Dep't of Homeless Servs.*, 643 F. Supp. 2d 507, 516-20 (S.D.N.Y. 2009) *aff'd* 391 F. App'x 81 (2d Cir. 2010); *Ricks v. Beta Development Co.*, 92 F.3d 1193, 1996 U.S. Dist. LEXIS 19743, 1996 WL 436548, at *1 (9th Cir. Jul. 10, 1996). (upholding dismissal of a Section 3604(f) claim and holding that the FHA "employs the terms 'renter or buyer', suggesting that, at the very least, [the plaintiff] must allege that he is a prospective buyer to achieve standing."). As a fundamental matter, Plaintiff must be a "buyer or renter" to maintain an FHA claim. [9]

The FHA defines "to rent" as "to lease, to sublease, to let and otherwise to grant *for a consideration* the right to occupy premises not owned by the occupant. 42 U.S.C. § 3602(e) (emphasis added). Plaintiff does not allege that he paid anything to live at the VOA Shelter. Indeed, the most generous read of Plaintiff's Third Amended Complaint indicates that he was *directed* to live there from February 2020 to July 2020. *See* Third Am. Compl. at 10, 13 (Plaintiff was "transferred" to the VOA Shelter from another in Manhattan, and later "transferred" to his current facility in Brooklyn). On these facts, no inference arises that Plaintiff was a "buyer or

renter" under the FHA. *Jenkins*, 643 F. Supp. 2d at 519-20. Plaintiff's FHA claims are not cognizable for the simple fact that the plain language of the statute does not apply to Plaintiff as a non-renter. [10]

Even if this Court were to assume that Plaintiff was a renter or buyer at the VOA Shelter, Plaintiff's claims under the FHA would still fail to state a claim upon which relief may be granted.

### 2. Plaintiff's FHA reasonable accommodation claim fails to state a claim

The only provision of the FHA that Plaintiff explicitly invokes is 42 U.S.C. § 3604(f)(3)(B). Third Am. Compl. at 2. A plaintiff may make out an FHA violation under Section 3604(f)(3) by claiming a failure to make a reasonable accommodation. *Regional Economic Community Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 48 (2d Cir. 2002). To bring a reasonable accommodation claim, a complaint must make out that: (1) the plaintiff suffers from a handicap as defined by the FHA; (2) the defendant knew or reasonably should have known of plaintiff's handicap; (3) accommodation of the handicap may be necessary to afford plaintiff an equal opportunity to use and enjoy the dwelling; (4) the requested accommodation was reasonable; and (5) the defendant refused to make such accommodation. *See Olsen v. Stark Homes, Inc.*, 759 F.3d 140, 156 (2d Cir. 2014).

**\*9** The Second Circuit appears to differentiate between "intentional" and "non-intentional" discrimination claims under the FHA, treating a reasonable accommodation as "non-intentional." *See Forziano*, 613 F. App'x at 18-19 (Section 3604(f)(3) is a "non-intentional discrimination claim" under the FHA). Non-intentional discrimination claims provide only for "injunctive relief," not money damages. *See id.* ("Plaintiffs' reasonable accommodation damages claims must be dismissed because it is well-settled that injunctive relief is the only relief available for non-intentional violations of the [FHA, ADA, and Rehabilitation Act]."). As discussed above in the context of Plaintiff's ADA and Rehabilitation Act claims, Plaintiff's request for injunctive relief is moot. The Court therefore is constrained to dismiss Plaintiff's reasonable accommodations claim under the FHA. *Id.*; *Wiltz*, 2019 WL 8437456, at \*16, 2019 U.S. Dist. LEXIS 220563, at \*46-47 (no standing under FHA, ADA, or Rehabilitation Act where plaintiff no longer resided with defendants).

### 3. Plaintiff's FHA disparate treatment or impact claim fails to state a claim

A plaintiff alleging violations of Section 3604(f)(1) or (f)(2) of the FHA may proceed under two theories: disparate treatment or disparate impact. *See LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 425 (2d Cir. 1995).

**Disparate treatment.** To state a claim under either Section 3604(f)(1) or (f)(2) on the basis of disparate treatment at the motion to dismiss stage, a "plaintiff must allege enough facts to state a plausible claim that animus against the protected group was a significant factor in the position taken by the [ ] decision-makers." *Perricone-Bernovich v. Tohill*, 843 F. App'x 419, 421 (2d Cir. 2021) (internal quotation marks omitted); *Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 73 (2d Cir. 2021) (FHA discrimination claim must "plausibly allege ... at least minimal support for the proposition that the [defendant] was motivated by discriminatory intent."); *see also Palmer v. Fannie Mae*, 755 F. App'x 43, 45 (2d Cir. 2018) (disparate treatment plaintiff must state he was a "member of a protected class," suffered relevant "adverse" treatment, and plead facts that suggest "an inference of discriminatory motivation."). The Second Circuit has instructed that an "inference of discrimination can be shown through circumstances demonstrating that a person or group is treated differently from others who are 'similarly situated.' " *Littlejohn v. City of N.Y.*, 795 F.3d 297, 312 (2d Cir. 2015). [11]

Plaintiff fails to provide facts that could plausibly support even a minimal inference of discriminatory motivation. Nowhere in Plaintiff's Third Amended Complaint does he allege, conclusory or otherwise, that an action taken by any Defendant was because of his disability. Nor does Plaintiff identify other individuals, disabled or not, at the shelter who were treated differently than he was. Nothing suggests, for example, a non-disabled resident was allowed to keep his medication in the refrigerator while others—including Plaintiff—were not. *See Perricone-Bernovich*, 843 F. App'x at 421 (FHA disparate treatment claim properly dismissed where "nothing in the complaint" suggested that Plaintiff's treatment was "different from those faced by similarly-situated [people] without disabilities."). To the extent that *no one* was allowed cleaning supplies or medical equipment, the only inference is that *all* residents were treated equally (*i.e.* there was no disparate treatment), and in all events it would be difficult to impute a discriminatory motive to any Defendant.

Case 3:24-cv-01358-GTS-ML    Document 13    Filed 01/07/25    Page 91 of 120

Jones v. Volunteers of America Greater New York, Not Reported in Fed. Supp. (2022)

Plaintiff therefore cannot succeed on a disparate treatment theory.

**Disparate impact.** Plaintiff also fails to state a claim on a disparate impact theory. A "*prima facie* case under a disparate impact theory requires a showing of 'a significantly adverse or disproportionate impact on persons of a particular type' produced by a facially neutral practice." *Perricone-Bernovich*, 843 F. App'x at 421 (quoting *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 574-75 (2d Cir. 2003)). Plaintiff's Third Amended Complaint relays grievances with the way he was treated by the Defendants, not how the practices of the Defendants had a disproportionate impact on people with disabilities generally. Because the gravamen of Plaintiff's Third Amended Complaint relates to his individual experiences with the Defendants—and does not plead *any* facts about how his treatment was indicative of systemic adverse impact on those with disabilities generally—Plaintiff cannot succeed on a disparate impact theory of FHA liability.

### 4. Plaintiff's FHA retaliation claim fails to state a claim

**\*10** A *prima facie* retaliation claim under the FHA Section 3617 must allege "(1) the plaintiff engaged in [a] protected activity, (2) the defendant was aware of this activity, (3) the defendant took adverse action against the plaintiff, and (4) a causal connection exists between the protected activity and the adverse action." *Wilson v. Wilder Balter Partners, Inc.*, 2015 WL 685194, at *8 (S.D.N.Y. Feb. 17, 2015). Section 3617 requires "a showing of a particular state of mind, *i.e.*, a retaliatory motive." *Austin v. Town of Farmington*, 826 F.3d 622, 630 (2d Cir. 2016). "[R]egardless of how the prima facie standard is articulated, the plaintiff is required to show that defendant's action against him arose from a discriminatory motive." *Haber v. ASN 50th St. LLC*, 847 F. Supp. 2d 578, 586 (S.D.N.Y. 2012).

The Court notes that Defendants oppose Plaintiff's FHA reasonable accommodation claim because he "does not allege that he exercised his rights under the FHA and [that] Defendants coerced, intimidated, or threatened him, or interfered with his exercise of those rights." Mem. at 10. That statement, and the pithy argument that follows, is cookie cutter, almost word-for-word lifted from the Court's August 27 Opinion ordering Plaintiff to amend his complaint. *Compare* Mem. at 10 *with* August 27 Opinion at 7. Defendants' stolen argument that the "only specific fact that Plaintiff alleges" relates to an interaction with his probation officer is nonsensical where Plaintiff has amended his complaint *two times* since the Court's August 27 Opinion,

and now includes an additional "factual statement of record" in his Third Amended Complaint that includes information beyond that originally pled.

However, Plaintiff fails to plead any *new* factual allegations that draw a causal connection between a protected activity and an adverse action. Plaintiff characterizes certain of his complaints throughout his tenure at the VOA shelter as "formal grievances." Third Am. Compl. at 15. Without more, the Court cannot understand if these were protected activities that allow the Court to draw a nexus between them and any adverse action. Plaintiff does state that he contacted "DHS, NYS Agencies and 311" and received a complaint number in early-late July 2020. Third Am. Compl. at 12. Following that, Plaintiff pleads he "started having more issues with the Directors" of the VOA Shelter. Third Am. Compl. at 12. But the Court cannot credit the vague and conclusory allegation that a complaint was met with "more issues" for purposes of this motion. *See Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."); *cf. Kastrati v. Progress of Peoples Mgmt. Corp.*, 2020 U.S. Dist. LEXIS 221464, 2020 WL 6940991, at *5 (E.D.N.Y. Nov. 24, 2020) ("Plaintiff's allegations purportedly supporting an inference of retaliatory intent rest exclusively on timing. However, Plaintiff was subject to gradual adverse actions well before" the allegedly protected activity took place).

In any event, as the Court discussed with respect to Plaintiff's disparate treatment and impact theories above, the Third Amended Complaint is devoid of any reference to a desire to discriminate against Plaintiff because of his disability or because of an alleged protected activity with respect to that disability. *Cf. Francis*, 992 F.3d at 73 (FHA claim must "plausibly allege ... at least minimal support for the proposition that the [defendant] was motivated by discriminatory intent"); *Austin*, 826 F.3d 622 (an FHA retaliation claim "require[s] a showing of a particular state of mind, *i.e.*, a retaliatory motive."). Accordingly, Plaintiff's FHA retaliation claim must therefore be dismissed.

## III. LEAVE TO FURTHER AMEND THE COMPLAINT FOR A FOURTH TIME IS NOT WARRANTED

**\*11** Leave to amend a complaint should be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2). While Plaintiff does not ask for leave to amend, the Court nonetheless has considered whether, as a *pro se* litigant,

Case 3:24-cv-01358-GTS-ML    Document 13    Filed 01/07/25    Page 92 of 120

Jones v. Volunteers of America Greater New York, Not Reported in Fed. Supp. (2022)

Plaintiff again should be given leave to amend his deficient complaint. *See Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795-96 (2d Cir. 1999) (per curiam) (*pro se* plaintiffs should generally be given leave to amend). A district court may deny leave to amend when amendment would be futile because the problem with the claim "is substantive [and] better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).

"[E]ven the special solicitude afforded to *pro se* litigants does not entitle Plaintiff to file an infinite number of amended pleadings." *Boykin v. Moreno*, 2020 WL 882195, at *8 (S.D.N.Y. Feb. 24, 2020). This is especially true where "Plaintiff has fixed virtually none of the deficiencies highlighted by the Court in its" prior opinions and orders. *Id.* Under such circumstances, Courts in this district routinely dismiss a Plaintiff's amended pleadings with prejudice. *See Al-Qadaffi v. Servs. for the Underserved (SUS)*, 2015 WL 585801, at *8 (S.D.N.Y. Jan. 30, 2015), *aff'd* 632 F. App'x 31 (2d Cir. 2016) (dismissing a pro se plaintiff's claim with prejudice where he "already had one chance to amend his Complaint, and there is still no indication that a valid claim might be stated if given a second chance"); *Boykin*, 2020 WL 882195, at *8 (dismissing a plaintiff's fourth amended pleadings).

Plaintiff has been given—in federal court—four chances to state a legally cognizable claim. [ECF Nos. 2, 6, 11, 25]. The substantive issues in Plaintiff's Third Amended Complaint —also identified in the Court's prior August 27 Opinion [ECF No. 9]—cannot be cured through further amendment. Amendment would therefore be futile, and Plaintiff is not

granted leave to further amend his complaint. *See Cuoco*, 222 F.3d at 112 ("[A] futile request to replead should be denied.").

\* \* \*

The Court has carefully reviewed Plaintiff's Third Amended Complaint and the Parties' briefs. Any remaining allegations not specifically discussed in this opinion are without merit and fail to state a claim upon which relief can be granted. To the extent that Plaintiff's Third Amended Complaint raises questions of state law, the Court declines to exercise supplemental jurisdiction over them. Third Am. Compl. at 2 (denoting basis for jurisdiction is federal question jurisdiction); Third Am. Compl. at 3 (plaintiff, and at least one defendant, is a New York citizen); *see United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) (a district court should decline supplemental jurisdiction if, as here, all federal claims have been dismissed at the pleading stage).

## <u>CONCLUSION</u>

For the reasons stated herein, Defendants' Motion to Dismiss is GRANTED with prejudice. The Clerk of the Court respectfully is requested to close this case.

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2022 WL 768681

---

## Footnotes

1    Plaintiff's Third Amended Complaint inconsistently, and improperly, names the Defendants in this action. The Third Amended Complaint lists "Deborah Johnson" as "Defendant 3." Third Am. Compl. at 4. The caption on Plaintiff's form complaint does not list Deborah Johnson as a defendant. Third Am. Compl. at 1. Plaintiff's appended "Factual Statement of Record" also does not mention Deborah Johnson as a defendant. *See* Third Am. Compl. at 10, 17. For the avoidance of doubt, however, the Court construes the Defendants in this case as the VOA, Lijin Thomas, Jonathan Tavarez, and Deborah Johnson. Defendants write that Plaintiff misspells certain individuals' names (Tavarez as Tavarez, and Lijin Thomas as Jisin Thomas). [ECF No. 29]. The Court uses the provided proper spelling of the Defendants' names where applicable.

2    Plaintiff, *pro se*, has attached a "Factual Statement of Record" to his Third Amended Complaint. [ECF No. 25]. The Court construes the attachment as part of his Third Amended Complaint. Because the document does

Case 3:24-cv-01358-GTS-ML    Document 13    Filed 01/07/25    Page 93 of 120

Jones v. Volunteers of America Greater New York, Not Reported in Fed. Supp. (2022)

not have internal pagination or numbered paragraphs, the Court will cite to the allegations as they appear at the ECF pagination of the entire document.

3    The record is devoid of any information about why Mr. Jones might have a probation officer; although elsewhere in his operative complaint Mr. Jones later references a "white collar case." Third Am. Compl. at 13.

4    Defendants' Motion to Dismiss attaches all related documents in a single PDF, including affidavits, exhibits, and a memorandum of law in support of dismissal. Because Defendants' Memorandum of Law includes internal pagination, the Court refers to it at the pagination provided rather than the ECF pagination. On this motion, the Court disregards any extraneous material submitted, and relies on the information provided in Plaintiff's pleadings, and items that the Court may take judicial notice of. *See Can v. Goodrich Pump & Engine Control Sys., Inc.*, 711 F. Supp. 2d 241, 246 (D. Conn. 2010) ("On a motion to dismiss under Rule 12(b)(6), judicial notice may be taken of other judicial documents that might provide the basis for issue preclusion.").

5    The Court notes that *res judicata* refers to both claim and issue preclusion, but that the Second Circuit has acknowledged they are "significantly different doctrines." *Marcel Fashions Group, Inc. v. Lucky Brand Dungarees, Inc.*, 779 F.3d 102, 107 (2d Cir. 2015).

6    The Court notes that Defendants provided only a copy of the New York opinion, but not the judgment entered by the Clerk of the Court dismissing the case.

7    To the extent the Plaintiff's Third Amended Complaint could raise a claim under Section 1983, *see* Defs. Mem. at 11-12, any such claim necessarily fails because the Defendants are private parties. Private parties are not generally liable for constitutional violations under Section 1983. *See Sykes v. Bank of America*, 723 F.3d 399, 406 (2d Cir. 2013). This Court has previously ruled that Plaintiff's then-operative complaint failed to plead that the Defendants were "state actors," or acting under color of law, for purposes of Section 1983 liability, [ECF No. 9 at 4-5], and Plaintiff has not cured that deficiency.

8    To the extent that Plaintiff seeks to bring an ADA retaliation claim against any Defendant pursuant to 42 U.S.C. § 12203(a), it appears that Plaintiff's claim would fail because that section also does not provide for punitive or compensatory damages under the ADA in this case. *Spiegel v. Schulmann*, 604 F.3d 72, 79 (2d Cir. 2010); *Shipman v. New York State Office of Persons with Developmental Disabilities*, 2012 WL 897790, at *9 (S.D.N.Y. Mar. 12, 2012) (even in the retaliation context, "individuals cannot be held liable for money damages under the ADA in either their personal or official capacities."), *report and recommendation adopted* 2012 WL 3704837, at *3 (S.D.N.Y. Mar. 26, 2012) (money damages unavailable under the ADA); *Kramer v. Banc of America Securities, LLC*, 355 F.3d 961 (7th Cir. 2004), *cert. denied*, 542 U.S. 932, 124 S. Ct. 2876, 159 L. Ed. 2d 798 (2004) (holding that a plaintiff can only recover equitable relief for a retaliation claim under the ADA);. *Alvarado v. Cajun Operating Co.*, 588 F.3d 1261, 1269-70 (9th Cir. 2009) (holding "punitive and compensatory damages are not available for ADA retaliation claims.").

9    The Court assumes without agreeing that the VOA Shelter constitutes a "dwelling" for purposes of the FHA. *See Madison v. Graham*, 2021 WL 2784763, at *5, 2021 U.S. Dist. LEXIS 124437, at *12 (S.D.N.Y. July 1, 2021) ("District courts in the Second Circuit have held that the FHA does not apply to certain shelters" and the question remains open).

10    The FHA's prohibition on "otherwise mak[ing] unavailable or deny[ing]" a dwelling on the basis of disability is of no help to Plaintiff because he is not a buyer or renter for purposes of the statute. *Jenkins*, 643 F. Supp. 2d at 519-20 (the " 'otherwise make unavailable' clause may expand the prohibited activities under § 3604(f) beyond simply renting and selling but it does not expand the class of individuals who are protected from discrimination on the basis of handicap beyond renters or buyers."); *Ricks*, 1996 WL 436548, at *1, 92 F.3d 1193 (no standing if not renting or buying).

11    *Littlejohn*, and its progeny, concerned employment discrimination claims. The Second Circuit, and courts within it, have applied its teachings to the framework of FHA claims. *See Palmer*, 755 F. App'x at 45 n.1.

---

**End of Document**                                             © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 897790
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Dennis SHIPMAN, Plaintiff,
v.
NEW YORK STATE OFFICE OF PERSONS
WITH DEVELOPMENTAL DISABILITIES,
Metro Developmental Disabilities Services
Office, Max E. Chmura, Jill Gentile, Delores
Lark, and Patricia Schuckle, Individually and
in Their Official Capacities, and Professional
Employees Federation, AFL/CIO, Defendants.

No. 11 Civ. 2780(GBD)(FM).
|
March 13, 2012.

***REPORT AND RECOMMENDATION TO
THE HONORABLE GEORGE B. DANIELS***

FRANK MAAS, United States Magistrate Judge.

I. *Introduction*

**\*1** In this employment discrimination case, *pro se* plaintiff Dennis Shipman ("Shipman"), proceeding *in forma pauperis,* seeks monetary and injunctive relief from the New York State Office of Persons With Developmental Disabilities ("OPWDD"), the Metro Developmental Disabilities Services Office ("DDSO" and, together with OPWDD, the "Agency"), and four current or former Agency officials: former Acting Commissioner Max E. Chmura ("Chmura"); Associate Commissioner Jill Gentile ("Gentile"); Director of the Office of Affirmative Action, Delores Lark ("Lark"); and former Acting Director of the DDSO, Particia Schuckle ("Schuckle") ("Individual Defendants" and, together with the Agency, the "State Defendants"). Shipman also has sued his union, the New York State Public Employees Federation, AFL–CIO ("PEF"), mistakenly identified in his pleadings as the Professional Employees Federation, for failing to provide him with legal representation.

Shipman, who allegedly suffers from Post–Traumatic Stress Disorder ("PTSD") as a result of his service as a volunteer emergency medical technician at Ground Zero on September 11, 2001, contends that the State Defendants failed to provide him with a reasonable accommodation for his disability, in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12181, *et seq.,* and that this failure ultimately caused him to quit his job.

The State Defendants and PEF each have moved to dismiss Shipman's claims pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons set forth below, their motions should be granted.

II. *Background*

A. *Facts*

The following facts are either undisputed or set forth in the light most favorable to Shipman for purposes of this motion:

In September 2002, Shipman began working at the DDSO (an OPWDD facility) as a "social worker assistant." (ECF No. 72 ("Pl.'s Opp'n") at 1). [1] In July 2005, Shipman's PTSD caused him to take an unpaid leave of absence pursuant to New York Civil Service Law Section 73. (*Id.*). Although the unpaid leave lasted much longer than one year, the Agency "grudgingly reinstated" Shipman in August 2009. [2] (*Id.*).

After his reinstatement, Shipman was subjected to "life threatening stress levels" caused by "vindictive managers" who "harass[ed] him daily." (*Id.* at 2). In particular, former DDSO Treatment Team Leader Paul Blackwell ("Blackwell"), with the "tacit consent" of Program Specialist Josie Astacio–Cancel ("Astacio–Cancel"), "badgered" Shipman about his weekly work schedule. (ECF No. 24 ("Amended Complaint" or "Am. Compl.") ¶ 6(3)). Although other Agency employees were afforded wide latitude in selecting their schedules as long as they worked eight and one-half hours per day, Blackwell told Shipman that he could not begin work before 8:30 a.m. (*Id.*). Blackwell and Astacio–Cancel also directed Shipman to perform tasks that were redundant or unnecessary, which necessitated his taking a sick day as "a coping mechanism." (*Id.* ¶ 6(5)). Blackman subsequently caused an unwarranted "counseling memo" to be placed in Shipman's file. (*Id.*).

**\*2** In either March or May 2010, Shipman reported his disability to Donald Odom ("Odom"), a DDSO Affirmative Action Counselor. Shipman requested that he be reassigned to a less stressful position within the Agency or another state agency, noting that his PTSD caused "an inability to effectively cope with stress or stressful situations." (*Id.* at ¶

Case 3:24-cv-01358-GTS-ML    Document 13    Filed 01/07/25    Page 96 of 120

Shipman v. New York State Office of Persons with..., Not Reported in...

6(7); Pl.'s Opp'n at 3). [3]  His request for an accommodation was denied, however, "because his medical records were not updated and, more importantly, he was stable." (Am.Compl.¶ 6(7)). Shipman concedes that he did not comply with the Agency's request for medical records, but contends that any such submissions would have been unnecessarily duplicative because "[Agency] Personnel had already been provided with an application for accommodation despite their protestations to the contrary, which are frankly untrue." (Pl.'s Opp'n at 3).

Shipman "immediately reported this exchange" to Lark, the DDSO Director of Affirmative Action, who failed to respond. (Am.Compl.¶ 6(8)). Shipman also wrote to Schuckle, who was serving as DDSO's Acting Director. Schuckle also did not respond. (*Id.* ¶ 6(9)).

On May 25, 2010, Shipman suffered what he describes as "a nervous breakdown" triggered by the "discriminatory conduct" of Blackwell and Astacio–Cancel. (*Id.* ¶¶ 6(1), 6(3)). Around that time, Shipman informed Astacio–Cancel and other Agency personnel that he was unable to perform his job and, therefore, "was taking a leave of absence because he could no longer tolerate the stress [,] and was experiencing strong or violent anger while having flashbacks to a prior traumatic event[.]" (*Id.* ¶ 6(9)).

Shipman wrote to Schuckle again on June 1, 2010, "asking to not be removed from the payroll or to be accommodated." (*Id.* ¶ 6(10)). Schuckle failed to respond, and Shipman was removed from the state payroll on June 3, 2010. (*Id.* ¶¶ 6(10–11)).

On July 17, 2010, Shipman sent a letter to Schuckle's supervisor, Associate Commissioner Gentile, who responded on July 27, 2010, and apologized for her delayed response. Gentile promised to contact Shipman "once [she] ha[d] information for [him]." (*Id.* ¶ 6(14)). On July 27, Shipman also wrote a letter to then-Acting Commissioner Chmura. Chmura did not respond to that letter or a letter that Shipman sent to him on August 1. (*Id.*).

Shipman promptly communicated the foregoing facts to his union, PEF. (*Id.* ¶ 6(19)). Shipman's numerous attempts to discuss his situation with PEF personnel proved unsuccessful, however, until Field Representative Barry Markman ("Markman") "responded after an urgent call was placed to him on September 16, 2010, when [Shipman] was directed to leave the premises of ... DDSO with no written notice as to why he was ordered to vacate the premises." (*Id.*).

According to Shipman, "PEF has done little or nothing ... to redress what is a blatant violation of th[e] collective bargaining agreement, New York State Civil Service [Law, and New York] Worker Compensation Law." (*Id.*). Shipman further surmises that, by failing to advocate on his behalf, PEF is "acting in concert with ... DDSO in furtherance of an illegal scheme to deny [Shipman] reasonable accommodation ... [and] employment, and aggravate the hardship with which he has been confronted since being removed from the state payroll." (*Id.*).

**\*3**  On January 31, 2011, Shipman was "compelled to resign." (Pl.'s Opp'n at 4). As a result of being removed from the DDSO payroll, Shipman has suffered serious financial difficulties and emotional distress, and subsequently has been forced to file for bankruptcy in the District of Delaware, where he now lives. (*See* Am. Compl. ¶¶ 6(17–18); Pl.'s Opp'n at 5). Shipman therefore seeks relief in the form of "reinstatement of pay with lost time; reasonable accommodation; re-assignment, and, an inter-agency transfer." (Am.Compl.¶ 7). Shipman also renews a prior request for a temporary restraining order or preliminary injunction requiring the State Defendants to reinstate him pending the final resolution of this case. (Pl.'s Opp'n at 1). [4] Shipman further seeks relief from PEF in the form of legal representation and sanctions. (*Id.* at 2).

### B. *Procedural History*

Shipman commenced this action on July 30, 2010, by filing a complaint in the Northern District of New York. (*See* ECF No. 1 ("Original Complaint")). Shipman subsequently filed his Amended Complaint on October 20, 2010. (Am. Compl. at 1). On April 19, 2011, the parties stipulated to a transfer of venue to this District pursuant to 28 U.S.C. 1404(a). (ECF No. 52). Thereafter, on April 29, 2011, Your Honor referred this case to me for a Report and Recommendation with respect to any dispositive motions. (ECF No. 57). The State Defendants and PEF then filed their motions to dismiss on July 17, 2011. (ECF Nos. 65, 67). Those motions are fully submitted. (*See* ECF Nos. 65–76).

### C. *In Forma Pauperis Application*

When he filed the Original Complaint, Shipman also filed a motion for leave to proceed *in forma pauperis* ("IFP"). (ECF No. 3). Magistrate Judge Randolph F. Treece of the Northern District of New York granted that motion on August 30, 2010. (ECF No. 9). In his affidavit in support of the IFP motion, Shipman stated under oath that he earned no income

from any "[b]usiness, profession or form of self-employment" in the twelve months preceding the filing of this lawsuit. (ECF No. 3). That statement is contradicted, however, by Shipman's admission that the Agency paid him through June 2010, one month before he filed his Original Complaint. (Pl.'s Opp'n at 4 ("The last check plaintiff had received from defendants is dated June 2010."); *see also* ECF No. 68 (Aff. of Herminia Torres, sworn to on July 12, 2011 ("Torres Aff.")), ¶ 3 ("[Shipman] was paid the sum of $41,323.80 ... within the twelve months preceding the date of his affidavit)).

Shipman contends that "[a]ny error made on [the] affidavit relative to his income for the 12 months preceding his emergency *ex parte* application is a red herring; strictly innocuous and, by extension, unintentional." (Pl.'s Opp'n Ex. A at 16). In response to that assertion, the State Defendants have submitted evidence that Shipman also provided false information in his IFP applications in other cases. For example, in *Shipman v. Verizon Communications Corp.,* 10 Civ. 271 (D.Del.), Shipman's IFP affidavit, sworn to on March 30, 2010, stated that he was unemployed and had earned no income in the previous twelve months. If his allegations in this case are true, however, Shipman was employed by the Agency from August 2009 through March 2010. (*See* ECF No. 6 (Aff. of Barbara K. Hathaway, Esq., Ass't Att'y Gen., sworn to on July 15, 2011 ("Hathaway Aff."), Ex. B)). Similarly, in *Shipman, a/k/a Shipman Holdings LLC v. Sprint Nextel Corp.,* 10 Civ. 130 (D.Del.), Shipman stated under penalties of perjury in his IFP application that he was unemployed and had earned no income in the twelve months prior to February 5, 2010. (*See* Hathaway Aff. Ex. C).

**\*4** In yet another *pro se* case, *Shipman v. TD Bank,* 10 Civ. 2217 (D.N.J.), the district judge dismissed Shipman's complaint due to: (1) "significant inconsistencies between [Shipman's IFP] application and his civil suit," which alleged that Shipman had suffered substantial losses to his business, and (2) Shipman's failure to submit a timely response to the court's request that he amend his IFP application to clarify his financial situation. (*See* Hathaway Aff. Ex. D).

III. *Discussion*

A. *Standard of Review*

1. *Rule 12(b)(6)*
A Rule 12(b)(6) motion to dismiss for failure to state a claim tests the legal sufficiency of a plaintiff's claims for relief. *Krasner v. HSH Nordbank AG,* 680 F.Supp.2d 502,

511 (S.D.N.Y.2010) (Lynch, D.J.). In deciding the motion, the Court must accept as true all factual allegations made in the complaint and draw all reasonable inferences in favor of the plaintiff. *Allaire Corp. v. Okumus,* 433 F.3d 248, 249–50 (2d Cir.2006). The complaint need not contain "detailed factual allegations." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). Nonetheless, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly,* 550 U.S. at 555).

To survive a Rule 12(b)(6) motion, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Id.* (quoting *Twombly,* 550 U.S. at 570). [5] Determining whether the allegations of a complaint nudge a plaintiff's claims across the line from merely "conceivable to plausible" requires the Court to "draw on its judicial experience and common sense." *Id.* at 1950–51.

In making its assessment, the Court may consider, in addition to the plaintiff's factual averments, any written instrument upon which the plaintiff necessarily relies, regardless of whether it is attached to the complaint or incorporated therein by reference. *See Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152–53 (2d Cir.2002). When a plaintiff is proceeding pro se, the Court also may rely on any opposition papers in assessing the legal sufficiency of the plaintiff's claims. *See Crum v. Dodrill,* 562 F.Supp.2d 366, 373 n. 13 (N.D.N.Y.2008) (citing *Gadson v. Goord,* No. 96 Civ. 7544(SS), 1997 WL 714878, at \*1 n. 2 (S.D.N.Y. Nov.17, 1997)). Furthermore, the Court may take judicial notice of indisputable facts. *See* Fed.R.Evid. 201. Legal conclusions masquerading as factual averments, however, may not be taken into account. *Smith v. Local 819 I.B.T. Pension Plan,* 291 F.3d 236, 240 (2d Cir.2002) (citing *Gebhardt v. Allspect, Inc.,* 96 F.Supp.2d 331, 333 (S.D.N.Y.2000)).

Because Shipman is proceeding *pro se,* the Court must read his pleadings "liberally" and interpret them "to raise the strongest arguments" that they may suggest. *Chavis v. Chappius,* 618 F.3d 162, 170 (2d Cir.2010) (citing *Harris v. City of N.Y.,* 607 F.3d 18, 24 (2d Cir.2010)). "Dismissal of a *pro se* complaint is nevertheless appropriate where a plaintiff has clearly failed to meet minimum pleading requirements." *Carvel v. Ross,* No. 09 Civ. 722(LAK)(JCF), 2011 WL 856283, at \*8 (S.D.N.Y. Feb. 16, 2011).

Case 3:24-cv-01358-GTS-ML   Document 13   Filed 01/07/25   Page 98 of 120

Shipman v. New York State Office of Persons with..., Not Reported in...

### 2. *Rule 12(b)(1)*

**\*5** Under Rule 12(b)(1), a complaint must be dismissed if a court lacks subject matter jurisdiction over the action. In deciding a Rule 12(b)(1) motion, a court is not limited to the face of the complaint and may consider evidence outside the pleadings to resolve disputed factual issues. *State Emp. Bargaining Agent Coal. v. Rowland,* 494 F.3d 71, 77 n. 4 (2d Cir.2007); *Phifer v. City of N .Y.,* 289 F.3d 49, 55 (2d Cir.2002). The plaintiff has the burden of proving by a preponderance of the evidence that subject matter jurisdiction exists. *Phifer,* 289 F.3d at 55 (citing *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir.2000)).

When a court is faced with a motion to dismiss pursuant to both Rules 12(b)(1) and 12(b)(6), it should "decide the 'jurisdictional question [under Rule 12(b)(1) ] first because a disposition of a Rule 12(b)(6) motion is a decision on the merits, and therefore, an exercise of jurisdiction.' " *Tirone v. N.Y. Stock Exch., Inc.,* No. 05 Civ. 8703(WHP), 2007 WL 2164064, at \*3 (S.D.N.Y. July 27, 2007) (quoting *Magee v. Nassau Cnty. Med. Ctr.,* 27 F.Supp.2d 154, 158 (E.D.N.Y.1998)). Accordingly, I will turn first to the State Defendants' Rule 12(b)(1) motion seeking dismissal of Shipman's ADA claim on jurisdictional grounds.

### B. *ADA Claim Against the State Defendants*

#### 1. *Eleventh Amendment*

Under the Eleventh Amendment to the United States Constitution, a State and its agencies generally are immune from suit in federal court. *See Seminole Tribe of Fla. v. Florida,* 517 U.S. 44, 54–56, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). "For Eleventh Amendment purposes, [OPWDD] is to be considered an arm of New York State." *Komlosi v. N.Y. Office of Mental Retardation & Developmental Disabilities,* 64 F.3d 810, 815 (2d Cir.1995); *see Komlosi v. Fudenberg,* No. 88 Civ. 1792(HBP), 2009 WL 4722758, at \*3 (S.D.N.Y. Dec.9, 2009).

There are only two exceptions to Eleventh Amendment sovereign immunity. These exceptions apply when there has been an explicit and unequivocal waiver of immunity by a State or a similarly clear abrogation of the immunity by Congress. *See Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 99, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). "A claim that is barred by a state's sovereign immunity must be dismissed pursuant to the Eleventh Amendment for lack of subject matter jurisdiction." *Henny v. New York,* No. 08 Civ.

10981(KMK), 2012 WL 335732, at \*10 (S.D.N.Y. Jan.30, 2012) (citing *Va. Office for Prot. & Advocacy v. Stewart,* ––– U.S. ––––, ––––, 131 S.Ct. 1632, 1637, 179 L.Ed.2d 675 (2011); *Seminole Tribe,* 517 U.S. at 54).

Here, there is no suggestion that the State Defendants have waived their sovereign immunity. *See Perciballi v. New York,* No. 09 Civ. 6933(WHP), 2010 WL 3958731, at \*3 (S.D.N.Y. Sept.28, 2010). The Court must, however, consider several separate provisions of the ADA to determine whether Congress has abrogated the State Agency's sovereign immunity.

#### 2. *ADA Claim Against the Agency*

##### a. *Title I*

**\*6** Title I of the ADA provides that, "no covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a) ("Title I").

In *Board of Trustees of the University of Alabama v. Garrett,* 531 U.S. 356, 121 S.Ct. 955, 148 L.Ed.2d 866 (2011), the Supreme Court held that Title I did not validly abrogate state Eleventh Amendment immunity, despite the fact that Congress "unequivocally intend[ed] to do so." *Id.* at 363–64, 368–74 (citing 42 U.S.C. § 12202 ("A State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in [a] Federal or State court of competent jurisdiction for a violation of [the ADA].")). The Court explained that "Congress may not ... base its abrogation of the States' Eleventh Amendment immunity upon the powers enumerated in Article I" of the Constitution. *Id.* at 364. Instead, "Congress may subject nonconsenting States to suit in federal court" only pursuant to a valid exercise of Section 5 of the Fourteenth Amendment. *Id.* Because Section 5 of the Fourteenth Amendment only permits Congress to enact legislation enforcing the substantive guarantees contained in Section 1 of that amendment, Congress may not abrogate state Eleventh Amendment immunity "unless Congress' actions were congruent and proportional in enforcing the constitutional guarantees set forth in Section 1 [.]" [6] *Castells v. Fisher,* No. 05 CV 4866(SJ), 2007 WL 1100850, at \*3 (E.D.N.Y. Mar.24, 2007) (citing *Garrett,* 531 U.S. at 368; *City of Boerne v. Flores,* 521 U.S. 507, 512, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997)).

Case 3:24-cv-01358-GTS-ML    Document 13    Filed 01/07/25    Page 99 of 120

Shipman v. New York State Office of Persons with..., Not Reported in...

In *Garrett,* the Court found that "States are not required by the Fourteenth Amendment to make special accommodations for the disabled, so long as their actions toward such individuals are rational." *Garrett,* 531 U.S. at 367. In doing so, the Court recognized that States "could quite hardheadedly—and perhaps hardheartedly—hold to job-qualification requirements which do not make allowance for the disabled" without violating the Equal Protection Clause of the Fourteenth Amendment. *Id.* at 367–68. The Court further found that the legislative record of the ADA failed to demonstrate "a pattern of unconstitutional discrimination on which [Section] 5 legislation must be based," *id.* at 370, and that "the accommodation duty" created by Title I "far exceeds what is constitutionally required." *Id.* at 372. The Court therefore held that Title I did not validly abrogate the States' Eleventh Amendment immunity. *Id.* at 374.

Applying *Garrett* here, Shipman's ADA claim must be dismissed to the extent that he seeks money damages or injunctive relief from the Agency under Title I. *See also Fed. Mar. Comm'n v. S.C. State Ports Auth.,* 535 U.S. 743, 765, 122 S.Ct. 1864, 152 L.Ed.2d 962 (2002) ("[S]overeign immunity applies regardless of whether a private plaintiff's suit is for monetary damages or some other type of relief."); *Seminole Tribe,* 517 U.S. at 58 (The Supreme Court has "often made it clear that the relief sought by a plaintiff suing a State is irrelevant to the question whether the suit is barred by the Eleventh Amendment.").

   b. *Title II*

**\*7** Apparently cognizant of his inability to bring a successful Title I claim against the Agency, Shipman seeks to characterize his claim as having been brought pursuant to Title II of the ADA. *See* 42 U.S.C. § 12132 ("Title II"). Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from the participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *Id.*

Neither the Supreme Court nor the Second Circuit has decided whether employment discrimination claims against public employers can be brought under Title II. *See Garrett,* 531 U.S. at 360 n. 1 (declining to decide "whether Title II of the ADA ... is available for claims of employment discrimination when Title I of the ADA expressly deals with that subject"); *Brown v. Connecticut,* 08–CV–1478, 2010 WL 2220580, at \*18 (D.Conn. May 27, 2010) ("[T]he Second Circuit has not yet decided whether claims of discrimination in employment

are cognizable under Title II of the ADA."). The circuit courts that have addressed the issue are split, as are district courts in this District. *Compare Zimmerman v. Or. Dep't of Justice,* 170 F.3d 1169, 1173 (9th Cir.1999) (Title II not applicable to discrimination claims), and *Henny,* 2012 WL 335732, at \*14 (same), *with Bledsoe v. Palm Beach Cnty. Soil & Water Conservation Dist.,* 133 F.3d 816, 820 (11th Cir.1998) (employment discrimination claims may be brought pursuant to Title II), and *Transp. Workers Union of Am., Local 100 v. N.Y.C. Transit Auth.,* 342 F.Supp.2d 160, 175 (S.D.N.Y.2004) (same).

The Court need not resolve whether the availability of Title I precludes an employment discrimination claim under Title II because, even if it does not, the same Eleventh Amendment bar that precludes Shipman's Title I claim also precludes any employment discrimination claim that might be brought under Title II.

In *Garrett,* the Supreme Court chose not to "decide the constitutional issue whether Title II, which has somewhat different remedial provisions from Title I, is appropriate legislation under [Section] 5 of the Fourteenth Amendment." 531 U.S. at 360 n. 1. Nevertheless, five years later, in *United States v. Georgia,* 546 U.S. 151, 126 S.Ct. 877, 163 L.Ed.2d 650 (2006), the Court held that Title II *is* a valid abrogation of the States' Eleventh Amendment immunity, "insofar as Title II creates a private cause of action for damages against the States for conduct that *actually* violates the Fourteenth Amendment." *Id.* at 159 (emphasis in original). The Court declined to decide whether a State is immune to Title II claims "premised on conduct that does not independently violate the Fourteenth Amendment," because

> lower courts will be best situated to determine in the first instance, on a claim-by-claim basis, (1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid.

Case 3:24-cv-01358-GTS-ML    Document 13    Filed 01/07/25    Page 100 of 120

Shipman v. New York State Office of Persons with..., Not Reported in...

**\*8** *Id.*

Applying those factors here, Shipman's Title II claim is clearly barred by the Eleventh Amendment. At the outset, the State conduct that allegedly violated Title II in this case is the Agency's failure to make a reasonable accommodation for an employee's disability. As the Court made clear in *Garrett, such conduct does not violate the Fourteenth Amendment, as long as the State acts rationally. 531 U.S. at 367* ("States are not required by the Fourteenth Amendment to make special accommodations for the disabled, so long as their actions toward such individuals are rational."). Shipman contends that the reason the Agency did not grant him an accommodation was "because his medical records were not updated and, more importantly, he was stable." (Am.Compl.¶ 6(7)). Assuming that is true, the Agency, at a minimum, acted rationally by requiring Shipman to prove that he was disabled before it granted him an accommodation. The Agency therefore did not violate the Fourteenth Amendment, even if its conduct amounts to a violation of Title II. *See Castells,* 2007 WL 1100850, at \*5 (finding no Fourteenth Amendment violation on similar facts, and noting that "the ADA's legislative record fails to show that Congress identified a history and pattern of irrational employment discrimination by the States against the disabled").

Turning to the third *Georgia* factor, even if Congress validly abrogated the States' immunity with respect to certain Title II claims "premised on conduct that does not independently violate the Fourteenth Amendment," any such abrogation is clearly inapplicable to employment discrimination claims. *See Garrett,* 531 U.S. at 374; *see also Castells,* 2007 WL 1100850, at \*5 ("it is well-settled that government employment is not a fundamental right") (citing *United Bldg. & Const. Trades Council v. Camden,* 465 U.S. 208, 219, 104 S.Ct. 1020, 79 L.Ed.2d 249 (1984); *Mass. Bd. of Retir. v. Margia,* 427 U.S. 307, 313, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1967)).

In sum, the alleged Agency conduct in this case did not violate the Fourteenth Amendment, and Congress did not validly abrogate the States' Eleventh Amendment immunity with respect to such conduct. Shipman's Title II claim against the Agency therefore must be denied. *See Castells,* 2007 WL 1100850, at \*5 ("Accordingly, specifically where there is no fundamental right at issue, Title II of the ADA does not abrogate the States' Eleventh Amendment immunity .").

#### c. *Title V*

Construed liberally, the Amended Complain also alleges that Blackman and Astacio–Cancel assigned Shipman unnecessary and redundant work and improperly disciplined him in retaliation for complaining about discrimination. (*See* Am. Compl. ¶¶ 6(3–5); *see also* Pl.'s Opp'n at 2 (the Agency *"never, ever* reprimanded, counseled, or disciplined [Shipman] for his conduct, work performance, or any other alleged abuse ... until *after* he filed a formal ADA disability discrimination complaint with the United States Equal Opportunity Commission") (emphasis in original)).

**\*9** Title V of the ADA provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." *42 U .S.C. § 12203* ("Title V"). Although the Supreme Court and Second Circuit have not explicitly held that the Eleventh Amendment bars Title V claims against state agencies, "every district court in this Circuit to consider the issue has concluded that sovereign immunity bars Title V claims." *Padilla v. N.Y.S. Dep't of Labor,* No. 09 Civ. 5291(CM)(RLE), 2010 WL 3835182, at \*4 (S.D.N.Y. Sept. 13, 2010) (collecting cases); *see also Chiesa v. N.Y.S. Dep't of Labor,* 638 F.Supp.2d 316, 323 (N.D.N.Y.2009) ("If a state is immune from underlying discrimination, then it follows that the state must be immune from claims alleging retaliation for protesting against discrimination."); *Demshki v. Monteith,* 255 F.3d 986, 988–89 (9th Cir.2001) ("nothing in the ADA's legislative findings demonstrat [es] a pattern of discrimination by states against employees who oppose unlawful employment discrimination against the disabled," and "[a]bsent a history of such evil by the states, Congress may not abrogate the states' Eleventh Amendment immunity from Title V claims").

Consequently, to the extent Shipman alleges that the Agency retaliated against him in violation of Title V, his claim must be dismissed.

#### 2. *ADA Claims Against the Individual Defendants*

To the extent Shipman seeks to sue any of the Individual Defendants for money damages under the ADA, his claims are barred because individuals cannot be held liable for money damages under the ADA in either their personal or official capacities. *See Percibali,* 2010 WL 3958731, at \*4; *Candelaria v. Cunningham,* No. 98 Civ. 6273(LAP),

Case 3:24-cv-01358-GTS-ML    Document 13    Filed 01/07/25    Page 101 of 120

Shipman v. New York State Office of Persons with..., Not Reported in...

2000 WL 798636, at *2 (S.D.N.Y. June 20, 2000). This includes retaliation claims brought under Title V. *See Spiegel v. Schulmann,* 604 F.3d 72, 79–80 (2d Cir.2010). Shipman's claims against the Individual Defendants for money damages therefore must be dismissed.

Certain individual defendants, however, may be held liable in their official capacity pursuant to *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). Under the *Ex parte Young* exception, the Eleventh Amendment does not bar "suit against a state official when that suit seeks ... prospective injunctive relief." *Seminole Tribe,* 517 U.S. 44 at 73, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996); *see also In re Dairy Mart Convenience Stores, Inc.,* 411 F.3d 367, 372 (2d Cir.2005) ("Whether a litigant's claim falls under the *Ex parte Young* exception to the Eleventh Amendment's bar against suing a state is a 'straightforward inquiry' that asks 'whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.' ") (quoting *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.,* 535 U.S. 635, 645, 122 S.Ct. 1753, 152 L.Ed.2d 871 (2002)).

**\*10** In the employment context, "claims for reinstatement to previous employment satisfy the *Ex parte Young* exception to the Eleventh Amendment's sovereign immunity bar." *State Emps. Bargaining Agent,* 494 F.3d at 96. Shipman, however, has failed to allege that either Chmura, Gentile, Lark, or Schuckle has the authority to reinstate him. Indeed, Shipman has indicated that he became *ineligible* for reinstatement on January 31, 2012. (*See* Pl.'s Opp'n at 1, 5). When a plaintiff "fails to allege that any [i]ndividual [d]efendant has the authority to reinstate him," his "claim for injunctive relief against the [i]ndividual [d]efendants cannot proceed." *Perciballi,* 2010 WL 3958731, at *4. Accordingly, Shipman's claim for injunctive relief against the Individual Defendants must be dismissed pursuant to Rule 12(b)(6) for failure to state a claim. Shipman, however, should be permitted to replead if he complies with Section III.D, *infra.*

C. *Breach of the Duty of Fair Representation*

Construing the Amended Complaint liberally, Shipman appears to allege that PEF breached its duty of fair representation. (*See* Am. Compl. ¶ 6(19)). This claim also must be dismissed on jurisdictional grounds.

"It is well settled that [federal courts] lack subject matter jurisdiction over duty of fair representation claims brought by employees of political subdivisions." *Gear v. Dep't of Ed.,* No. 07 Civ. 11102(NRB), 2010 WL 5297850, at *3 (S.D.N.Y.

Dec.21, 2010) (citing *Ford v. D.C. 37 Union Local 1549,* 579 F.3d 187, 188 (2d Cir.2009) (*per curiam* ) (holding as such and noting that "[w]e deem it appropriate to issue a published opinion and thereby make clear beyond peradventure that this is the law of our Circuit")). Consequently, because the Agency clearly is a political subdivision of the state, the Court lacks subject matter jurisdiction over Shipman's fair representation claim against PEF. [7]

D. *IFP Application*

The statute governing IFP applications provides that "the court shall dismiss the case at any time if the court determines that ... the allegation of poverty is untrue[.]" 28 U.S.C. § 1915(e)(2)(A). Courts disagree as to whether a case must be dismissed any time the allegations in the affidavit are discovered to be untrue, or only if the plaintiff was not actually impoverished. *Compare McRoyal v. Commonwealth Edison Co.,* 263 Fed. App'x 500, 502 (7th Cir.2008) ( "Whether the false statements actually result in a grant of in forma pauperis status or other relief is irrelevant under § 1915(e)(2)(a)."), *with Lee v. McDonald's Corp.,* 231 F.3d 456, 459 (8th Cir.2000) (plaintiff's claim need not be dismissed unless the court finds that he "is not sufficiently poor to qualify for in forma pauperis status given the facts that are true").

Although Shipman clearly earned income during the twelve months preceding the filing of this suit, it is unclear whether he would have qualified for IFP status had his affidavit been truthful. In any event, assuming that a truthful application would have been granted, the only claim that Shipman potentially might have been able to pursue without the payment of fees would have been a claim for injunctive relief against the Individual Defendants. Here, because Shipman has knowingly made false statements on several IFP applications, including his affidavit in this case, if he wishes to proceed with that narrow claim, he should be required to pay (1) the $350 filing fee to the Clerk of the Court and (2) a $112 sanction to reimburse the United States Marshals Service for the costs incurred in serving the defendants. (*See* ECF No. 45); *see also Moorish Nat'l Republic v. City of Chicago,* No. 10 C 1047, 2011 WL 1485574, at *6 (N.D.Ill. Apr.18, 2011) (requiring, on similar facts, that the plaintiff "disgorge the benefits of *in forma pauperis* status" by paying the $350 filing fee and a $100 sanction for the costs of service).

IV. *Conclusion*

Case 3:24-cv-01358-GTS-ML    Document 13    Filed 01/07/25    Page 102 of 120

Shipman v. New York State Office of Persons with..., Not Reported in...

**\*11** For the foregoing reasons, PEF's motion to dismiss Shipman's breach of the duty of fair representation claim should be granted with prejudice, as well as the State Defendants' motion to dismiss his ADA claims against the Agency and his ADA claim for money damages against the Individual Defendants. Additionally, the State Defendants' motion to dismiss Shipman's ADA claim against the Individual Defendants should be denied without prejudice to the extent he seeks injunctive relief. If Shipman wishes to proceed with that claim, he should first be required to pay the Clerk of the Court the sum of $462.

Because all of Shipman's claims are subject to dismissal, his renewed application for a temporary restraining order or injunction should also be denied. Further, if the Court adopts this Report and Recommendation, it may wish to certify, pursuant to 28 U.S.C. § 1915(a)(3), that *in forma pauperis* status is denied for purposes of an appeal because an appeal would not be taken in good faith.

V. *Notice of Procedure for Filing of Objections to this Report and Recommendation*

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. *See also* Fed.R.Civ.P. 6(a) and (d). Any such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable George B. Daniels and to the chambers of the undersigned at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be directed to Judge Daniels. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72(b); *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 897790

---

## Footnotes

1    Shipman's opposition papers consist of three documents, each captioned "Opposition to Motion To Dismiss" and independently numbered. Although much of the text of each document is identical, there are non-duplicative portions. Accordingly, I will refer to the first document as "Pl.'s Opp'n," the second as "Pl.'s Opp'n Ex. A," and the third as "Pl.'s Opp'n Ex. B."

2    Section 73 of the Civil Service Law provides in relevant part:

When an employee has been continuously absent from and unable to perform the duties of his position for one year or more by reason of a disability ... his employment status may be terminated and his position may be filled by a permanent appointment. Such employee may, within one year after the termination of such disability, make application ... for a medical examination to be conducted .... If, upon such medical examination, such medical officer shall certify that such person is physically and mentally fit to perform the duties of his former position, he shall be reinstated to his former position, if vacant, or to a vacancy in a similar position ... in his former department or agency.

N.Y. Civ. Serv. Law § 73.

3    In his Amended Complaint, Shipman contends that he asked Odom for the accommodation in "March"—presumably March 2010. (*See* Am. Compl. ¶ 6(7)). In his opposition papers, however, Shipman states that he requested the accommodation on May 24, 2010. (Pl.'s Opp'n at 3).

4    Consistent with Section 73 of the New York Civil Service Law, Shipman contends that he only had until January 31, 2012, (one year after the date he resigned) to request reinstatement to his former position. (Pl.'s Opp'n at 1, 5).

5    Citing *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), Shipman contends that his claim cannot be dismissed "unless it appears beyond a doubt that [he] can prove no set of facts ... which would entitle him to relief." (Pl.'s Opp'n at 14). In *Twombly,* however, the Supreme Court cautioned that the "no set of facts" formulation is "best forgotten as an incomplete, negative gloss on an accepted pleading standard." 550 U.S. at 563.

6    Section 1 of the Fourteenth Amendment provides, in relevant part:

> "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

7    In his opposition papers, Shipman objects to the characterization of his claim against PEF as being based on a breach of the duty of fair representation. (*See* Pl.'s Opp'n at 13). Instead, Shipman maintains that his claim against PEF is brought pursuant to the ADA (*Id.*). Shipman's pleadings, however, merely speculate that PEF is "acting in concert with [the Agency] in furtherance of an illegal scheme to deny [Shipman] reasonable accommodation, employment, and aggravate the hardship with which he has been confronted since being removed from the state payroll." (Am.Compl.¶ 6(19)). These conclusory allegations are insufficient to state an ADA claim against PEF. *See* Fed.R.Civ.P. 12(b)(6).

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 3704837
Only the Westlaw citation is currently available.
United States District Court,
N.D. Georgia,
Atlanta Division.

Calvin Cecil JONES, Movant,

v.

UNITED STATES of America, Respondent.

Criminal Action No. 1:02–CR–443–CC–LTW–1.

|

Civil Action No. 1:12–CV–2392–CC–LTW.

|

Aug. 27, 2012.

**Attorneys and Law Firms**

Angela Marie Jordan, U.S. Attorneys, Atlanta, GA, for Respondent.

*ORDER*

CLARENCE COOPER, District Judge.

**\*1** Movant, pro se, filed a motion under 28 U.S.C. § 2255 to vacate his sentence in this case, which the Court imposed on March 11, 2003. (Doc. 139 in 1:02–cr–443–CAP–LTW.) Magistrate Judge Walker issued a Report and Recommendation that the motion be denied under Rule 4 of the Rules Governing § 2255 Proceedings for the U.S. District Courts because it is untimely. (Doc. 141 ("R & R").)

The R & R correctly noted that Movant's conviction became final on March 25, 2003. (R & R at 5.) Absent the applicability of one of the alternate starting dates for § 2255's one-year statute of limitations, Movant had until March 25, 2004 to file his § 2255 motion. (*Id.* at 5–6); *see* 28 U.S.C. § 2255(f). Movant filed his § 2255 motion on July 3, 2012. (Doc. 139–1 at 3.)

In his § 2255 motion and his objections to the R & R, Movant argues that the one-year limitations period did not begin until the U.S. Court of Appeals for the Fourth Circuit issued its opinion in *United States v. Simmons,* 649 F.3d 237 (4th Cir.2011) (en banc) on August 17, 2011. Movant contends that the Fourth Circuit ruling is a "fact" for purposes of § 2255(f)(4), which provides that the limitations period may begin on

"the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence." (Doc. 143); *see* 28 U.S .C. § 2255(f)(4).

As Judge Walker correctly concluded, a court decision cannot serve as a "fact" that triggers the limitations period under § 2255(f)(4). *See E.J.R.E. v. United States,* 453 F.3d 1094, 1097–98 (8th Cir.2006) ("A decision such as the one promulgated [by this court] in *J.W.T.,* unlike a predicate conviction, is a ruling exclusively within the domain of the courts and is incapable of being proved or disproved."); *United States v. Hardison,* No. 4:11–CV–196–FL, 2011 WL 6780783, at \*2 (E.D.N.C. Dec.27, 2011) (holding that "the Fourth Circuit's decision in *Simmons* does not constitute a 'fact supporting [petitioner's] claim' " because "[t]o hold now that appellate court decisions constitute 'facts' under § 2255(f)(4), and therefore could serve as the tolling dates for § 2255 motions, would render moot § 2255(f)(3)"); Order, *Valdovinos–Busto v. United States,* No. 1:03–CR–493–ODE–7, at \*6 (N.D.Ga. Feb. 15, 2011). While there may be similarities between the facts in the *Simmons* case and Movant's case, § 2255(f)(4) applies only to facts in the present case, i.e., Movant's case. Movant was not a party to *Simmons* and has no personal connection to that case. *See generally Simmons.* Similar legal issues in Simmons and this case do not trigger application of § 2255(f)(4), as that provision focuses solely on factual evidence, not law, supporting a movant's claims.

The Court disagrees with Movant that this is a "complex issue" warranting a certificate of appealability. (Doc. 143 at 3.) The U.S. Court of Appeals for the Eleventh Circuit has rejected an argument, like Movant's, that discovery of new law or a court opinion separate from the § 2255 movant's case triggers § 2255(f) (4). *See Madaio v. United States,* 397 F. App'x 568 (11th Cir.2010) (claim in § 2255 motion relying on recent Ninth Circuit decision was untimely). "Since Section 2255(f)(4) is predicated on the date that ' *facts* supporting the claim' could have been discovered, the discovery of a new court legal opinion, as opposed to new factual information affecting the claim, does not trigger the limitations period." *Id.* at 570. That conclusion is not reasonably debatable given the text of § 2255(f)(4).

**\*2** Accordingly, Movant's objections to the R & R [143] are **OVERRULED .** The Court **ADOPTS** the R & R [141] as the opinion of the Court. Movant's § 2255 motion [139] is **DENIED** and Movant is **DENIED** a certificate of appealability.

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 3704837

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:24-cv-01358-GTS-ML    Document 13    Filed 01/07/25    Page 106 of 120

Brown v. Peters, Not Reported in F.Supp. (1997)

1997 WL 599355
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Kenneth BROWN, Plaintiff,

v.

Andrew PETERS, Warden, Watertown Correctional
Facility; Joseph Williams, Warden, Lincoln Work–
Release Center; Francis J. Herman, Senior Parole
Officer Interstate Bureau; T. Stanford, Senior Parole
Officer; Deborah Stewart, Parole Officer; John Doe #
1, Parole Agent, Watertown Correctional Facility; John
Doe # 2, Parole Agent, Lincoln Work Release Center;
Susan Bishop, Director of Interstate Compact, South
Carolina; Cecil Magee, Parole Officer, South Carolina;
Frank Barton, Parole Officer, South Carolina; John
McMahan, Parole Officer, South Carolina, Defendants.

No. Civ.A. 95CV1641RSPDS.
|
Sept. 22, 1997.

**Attorneys and Law Firms**

Kenneth Brown, State Court Institute–Greene, Waynesburg,
PA, plaintiff, pro se.

Dennis C. Vacco, New York State Attorney General, The
Capitol Albany, NY, for defendants Peters, Herman Stewart,
Doe # 1, Doe # 2, and Williams, Jeffrey M. Dvorin, Assistant
Attorney General, Carl N. Lundberg, Chief Legal Counsel,
South Carolina Department of Probation, Columbia, SC, for
defendants Bishop, Magee, Barton, McMahan, and Stanford,
Carl N. Lundberg, of Counsel.

DECISION AND ORDER

POOLER, J.

**\*1** The above matter comes to me following a Report–
Recommendation by Magistrate Judge Daniel Scanlon, Jr.,
duly filed on April 17, 1997. Following ten days from the
service thereof, the Clerk has sent me the entire file, including
any and all objections filed by the parties herein.

Plaintiff Kenneth Brown commenced this Section 1983 civil
rights action on November 17, 1995. On February 12,
1996, Magistrate Judge Scanlon ordered Brown to submit an
amended complaint alleging the specific acts committed by
the individuals named as defendants which Brown claimed
violated his constitutional rights. Brown filed an amended
complaint on March 21, 1996. In his amended complaint,
Brown alleged that defendants violated his rights under the
Eighth and Fourteenth Amendments by failing to process
properly his interstate compact paperwork, resulting in Brown
being imprisoned pursuant to a parole hold when in fact
he had never violated the conditions of his parole. For a
more complete statement of Brown's claims, see his amended
complaint. Dkt. No. 5.

On August 5, 1996, defendants Peters and Williams made
a motion to dismiss for failure to state a claim pursuant to
Fed.R.Civ.P. 12(b)(6). Dkt. No. 13; Dkt. No. 14, at 2. On
August 19, 1996, defendants Bishop, Magee, Barton, and
McMahan made a motion to dismiss the complaint against
them or, in the alternative, for summary judgment. Dkt. No.
20. On October 17, 1996, defendants Herman, Stewart, and
Stanford made a motion to dismiss for failure to state a
claim. Dkt. No 34. On April 17, 1996, Magistrate Judge
Scanlon recommended that all defendants' motions to dismiss
be granted and that the complaint be dismissed. Dkt. No. 50.

On June 9, 1997, Brown filed objections to the
magistrate judge's report-recommendation, having been
granted additional time in which to do so. Dkt. No. 52. In
addition, Brown filed on June 9, 1997, a motion for leave to
file a second amended complaint and a copy of his proposed
amended complaint. Dkt. No. 53. I turn first to the last motion
filed, Brown's motion for leave to amend his complaint a
second time.

Brown seeks to file a second amended complaint "setting
forth in detail the personal involvement of each defendant
and how their acts of commission and omission served to
deprive plaintiff of Constitutionally secured rights." Dkt. No.
53. The district court has discretion whether to grant leave
to amend. Ruffalo v. Oppenheimer & Co., 987 F.2d 129,
131 (2d Cir.1993). In exercising that discretion, the court
should freely grant leave to amend when justice so requires.
Fed.R.Civ.P. 15(a). However, the court need not grant leave
to amend where it appears that amendment would prove to be
unproductive or futile. Ruffalo, 987 F.2d at 131.

Here, Brown moved to amend his complaint to add additional
allegations against the named defendants. However, the
additional allegations fail to cure the deficiency which

Case 3:24-cv-01358-GTS-ML    Document 13    Filed 01/07/25    Page 107 of 120

Brown v. Peters, Not Reported in F.Supp. (1997)

forms the basis of defendants' motion to dismiss—the absence of defendants' personal involvement in a constitutional deprivation. Section 1983 imposes liability upon an individual only when personal involvement of that individual subjects a person to deprivation of a federal right. *See Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A complaint is fatally defective if it fails to allege personal involvement sufficient to establish that a supervisor was "directly and personally responsible for the purported unlawful conduct." *Alfaro Motors, Inc. v. Ward,* 814 F.2d 883, 886 (2d Cir.1987).

**\*2** Brown's proposed amended complaint alleges in conclusory fashion that defendants acted "in a grossly negligent and concerted manner which breached their duties owed to Plaintiff and is the proximate cause of [the violation of plaintiff's constitutional rights]." Proposed Am. Compl., at 3. Brown continues in the same vein, stating that defendants owed duties to plaintiff to carry out their jobs in a professional manner and they failed to carry out those duties appropriately. The complaint states that defendants held specific responsibilities, such as checking for outstanding warrants, which if performed properly should have alerted them to a problem. However, nowhere does the complaint set forth allegations that these defendants either participated directly in any constitutional infraction or that they were even aware of such an infraction. The proposed amended complaint merely alleges that these defendants failed in performing their supervisory and ministerial functions. "These bare assertions do not state a claim under 42 U.S.C. § 1983." *Smiley v. Davis,* 1988 WL 78306, \*2 (S.D.N.Y.).

This plaintiff previously has had the opportunity to amend his complaint for the same reason asserted here, to allege personal involvement on the part of defendants. Brown's first amended complaint failed to accomplish that task, and it appears that even if allowed to amend again Brown would be unable to make the requisite allegations with sufficient specificity to sustain his complaint. Consequently, I find that amendment would be futile, and I deny Brown's motion for leave to amend his complaint.

I turn now to the magistrate judge's report-recommendation and defendants' motions. The magistrate judge recommends that I grant defendants' motions and dismiss the complaint as to all defendants. The report-recommendation clearly describes the grounds on which the magistrate judge recommends dismissal as to each defendant. Fed.R.Civ.P. 72(b) requires the district judge to make a *de novo*

determination on "any portion of the magistrate's disposition to which specific, written objection has been made." Brown's objections fail to address directly any of the analysis. Brown's objections state (1) that he has been deprived of his constitutional rights; (2) that he has stated a cause of action; (3) that the court wrongly refused to appoint an attorney for him and wrongly stayed discovery pending the outcome of these motions; (4) that he seeks to file an amended complaint; (5) the standard of review for a Fed.R.Civ.P 12(b)(6) motion; (6) that he disagrees with the magistrate judge's recommendation to grant defendants' motions because the allegations in his complaint, which he repeats, show that his rights were violated; and (7) the text of the Fourteenth and Eighth Amendments.

Even affording the objections the liberal reading required for *pro se* pleadings, I find that these objections fail to state any basis whatsoever, much less a specific one, for the court not to adopt the magistrate judge's rulings. They simply re-state the relief sought and the facts on which Brown grounds his complaint and conclude that the magistrate judge's conclusions are wrong. When the parties make only frivolous, conclusive, or general objections, the court reviews the report-recommendation for clear error. *See Camardo v. General Motors Hourly–Rate Employees Pension Plan,* 806 F.Supp. 380, 382 (W.D.N.Y.1992) (court need not consider objections which are frivolous, conclusive, or general and constitute a rehashing of the same arguments and positions taken in original pleadings); *Chambers v. Leonardo,* 1991 WL 44838, \*1 (S.D.N.Y.) (restatement of allegations already before the court and assertion that valid constitutional claim exists insufficient to form specific objections); *Schoolfield v. Dep't of Correction,* 1994 WL 119740, \*2 (S.D.N.Y.) (objections stating that magistrate judge's decisions are wrong and unjust, and restating relief sought and facts upon which complaint grounded, are conclusory and do not form specific basis for not adopting report-recommendation); *Vargas v. Keane,* 1994 WL 693885, \*1 (S.D.N.Y.) (general objection that report does not address violation of petitioner's constitutional rights is a general plea that report not be adopted and cannot be treated as objection within the meaning of 28 U.S.C. § 636), *aff'd,* 86 F.3d 1273 (2d Cir.), *cert. denied,* 519 U.S. 895, 117 S.Ct. 240, 136 L.Ed.2d 169 (U.S.1996). *See also Scipio v. Keane,* 1997 WL 375601, \*1 (1997) (when objections fail to address analysis directly, court reviews report-recommendation for clear error); Fed.R.Civ.P. 72(b), Advisory Comm. Note (when no specific, written objections filed, "court need only satisfy itself that there is

Case 3:24-cv-01358-GTS-ML    Document 13    Filed 01/07/25    Page 108 of 120

Brown v. Peters, Not Reported in F.Supp. (1997)

no clear error on the face of the record in order to accept the recommendation").

**\*3** Because Brown fails to make specific objections or provide any basis for his general objections, I review the report-recommendation for clear error. After careful review, I conclude that the magistrate judge's report-recommendation is well-reasoned and is not clearly erroneous. [1] The magistrate judge employed the proper standard, accurately recited the facts, and reasonably applied the law to those facts. Consequently, I adopt the report-recommendation.

CONCLUSION

Because plaintiff's proposed amendment demonstrates that amendment would be futile, I deny plaintiff's motion for leave to amend his complaint. I approve the magistrate judge's recommendation and grant defendants' motions to dismiss. Plaintiff's complaint is dismissed in its entirety.

IT IS SO ORDERED.

## ORDER and REPORT–RECOMMENDATION

This matter was referred to the undersigned for report and recommendation by the Hon. Rosemary S. Pooler, United States District Judge, by Standing Order dated November 12, 1986. Currently before this Court are a number of motions. Defendants Peters and Williams have filed a motion to dismiss (dkt.13); defendants Bishop, Magee, Barton and McMahan have filed a motion for summary judgment, or in the alternative to dismiss (dkt.20); and defendants Herman, Stewart and Stanford also have filed a motion to dismiss (dkt.34). Plaintiff opposes these three motions (dkts.27, 29, 33, 38). Defendants Bishop, Magee and McMahan have filed a motion to stay discovery (dkt.41) and plaintiff has filed a motion to extend time (dkt.44) in which to file opposition to the latter motion for a stay of discovery.

The Court addresses these issues *seriatim.*

## BACKGROUND

Plaintiff's amended complaint, which he has brought pursuant to 42 U.S.C. § 1983, alleges the following facts. In October, 1991, plaintiff was incarcerated in the Watertown Correctional Facility in Watertown, New York. He applied for an interstate compact because he wanted to return to South Carolina to live with his common law wife, Pamela Reid. During the application process, he was interviewed by the facility's parole officer, identified only as defendant John Doe # 1. After signing the necessary papers, his application was forwarded to defendant Andrew Peters, the facility's superintendent, who reviewed, signed and forwarded the papers to the Interstate Bureau. Amend. Compl. at ¶¶ 1–2; Exs. A, B.

On or about January 15, 1992, while his compact was waiting for review at the Interstate Bureau, plaintiff was approved for work release and sent to the Lincoln Work Release Center in New York City. While at the center, plaintiff spoke to a parole officer, defendant John Doe # 2, and told him that he was seeking a compact that would return him to South Carolina upon his conditional release. Plaintiff claims the parole officer told him that he would handle the necessary paperwork, although the officer had had no experience with an interstate compact. Amend. Compl. at ¶¶ 3, 4.

**\*4** Plaintiff, meanwhile, asked Reid whether any officials had contacted her in South Carolina regarding his prospective residence in that state. Upon discovering no one had contacted her, plaintiff asked a lawyer he knew, Navron Ponds, to inquire as to his compact status. In March, 1992, the lawyer spoke with defendant Susan Bishop, who is the director of the interstate compact program in South Carolina. Bishop allegedly told Ponds that plaintiff "was disapproved because there was a discrepancy about approving plaintiff['s] compact." The "discrepancy" was the fact that plaintiff owed the state of South Carolina eighty-six days of confinement from a previous sentence. Plaintiff claims Bishop told Ponds to contact defendants Cecil Magee and Frank Barton, who worked for the South Carolina Parole Department. Sometime in March, 1992, Ponds made some calls to Barton and Magee. A verbal agreement was reached, and plaintiff, upon speaking with Barton and Magee was told that his compact had been approved. He also was told that he should report to the South Carolina Department of Parole upon being released. Amend. Compl. at ¶¶ 5–7.

Prior to leaving the Lincoln Work Release Center, plaintiff processed paperwork related to his interstate compact. His paperwork was sent by Doe # 2 to defendant Joseph Williams, the superintendent of the center. Williams reviewed, signed and returned the paperwork to plaintiff. On May 1, 1992,

WESTLAW  © 2025 Thomson Reuters. No claim to original U.S. Government Works.    3

Case 3:24-cv-01358-GTS-ML    Document 13    Filed 01/07/25    Page 109 of 120

Brown v. Peters, Not Reported in F.Supp. (1997)

upon his release from the center, plaintiff traveled to South Carolina. Three days later, he entered a South Carolina parole office and promptly was arrested because of the eighty-six days of confinement that he owed the state. Plaintiff's paperwork was given to defendant John McMahan, a parole officer. Plaintiff claims that McMahan never returned this paperwork to him. On May 20, 1992, the state of South Carolina revoked plaintiff's parole and plaintiff was returned to prison to serve the eighty-six days that he owed. When he asked McMahan what would happen to his one year of parole from New York, the officer allegedly told him that his New York parole would run concurrently with his South Carolina parole, and that when he finished his South Carolina parole, he would not owe any parole whatsoever. Plaintiff served the eighty-six days he owed and was released on July 31, 1992. Amend. Compl. at ¶¶ 8–10.

In February, 1993, plaintiff was arrested on robbery charges in South Carolina. The charges ultimately were dropped, but he apparently encountered some difficulties regarding this arrest as a result of a parole hold that New York state had placed upon him. Bishop's office told him that it had nothing to do with his parole hold and that any problem that he had was between him and the state of New York. He talked to authorities in Albany, New York regarding the parole hold, but was not successful in his efforts to have the hold removed. On September 30, 1993, after had been extradited to New York as a fugitive from justice, plaintiff was given a preliminary hearing at Riker's Island, New York. The hearing officer found no probable cause that plaintiff had violated any condition of parole. He was released. Amend. Compl. at ¶¶ 11–14; Exs. C–J.

**\*5** Plaintiff claims that he would not have suffered hardships if his interstate compact had been handled correctly. He alleges that defendant Deborah Stewart failed to follow up and see whether plaintiff had arrived in South Carolina. If she had, he argues, she would have discovered that he had been arrested upon his arrival. He alleges that defendant Francis Herman, a parole officer at the Interstate Bureau failed to do his job by not investigating plaintiff's violation reports. Amend. Compl. at ¶¶ 15–17; Exs. F–I.

Plaintiff asserts that the foregoing amounts violations of his Eighth and Fourteenth Amendment rights, wherefore he both compensatory and declaratory relief.

## DISCUSSION

A. Motion to Dismiss by Williams and Peters.

Williams and Peters have filed a motion to dismiss plaintiff's complaint pursuant to FED.R.CIV.P. 12(b)(6) on the grounds that it fails to state a claim upon which relief may be granted. In a Rule 12(b)(6) motion, all factual allegations in the complaint must be taken and construed in plaintiff's favor. *See LaBounty v. Adler,* 933 F.2d 121, 122 (2d Cir.1991) (citing *Ortiz v. Cornette,* 867 F.2d 146, 149 (1989)). The Court's role is not to assess whether plaintiffs have raised questions of fact or demonstrated an entitlement to a judgment as a matter of law, as in a motion made pursuant to FED.R.CIV.P. 56 for summary judgment, but rather to determine whether plaintiff's complaint sufficiently alleges all of the necessary legal elements to state a claim under the law. *See Christopher v. Laidlaw Transit, Inc.* 899 F.Supp. 1224, 1226 (S.D.N.Y.1995), (citing *Ricciuti v. New York City Transit Authority,* 941 F.2d 119, 124 (2d Cir.1991)). Factual allegations in brief or memoranda may not be considered. *Fonte v. Board of Managers of Continental Towers Condominium,* 848 F.2d 24, 25 (2d Cir.1988). The Court now turns to the issues presented.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). As superintendents at New York State Correctional facilities, Williams and Peter may be found personally involved in the alleged deprivation of plaintiff's constitutionally protected rights by a showing that they: (1) directly participated in the infraction; (2) knew of the infraction, but failed to remedy the wrong; (3) created or continued a policy or custom under which unconstitutional practices occurred; or (4) were grossly negligent in managing subordinates who caused unlawful conditions or events. *Id.,* (quoting *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)). Supervisory liability also may be imposed against Williams or Peters with a showing of gross negligence or deliberate indifference to plaintiff's constitutional rights. *Id.* Absent some personal involvement by Williams or Peters in the allegedly constitutionally infirm conduct of their subordinates, neither can be held liable under § 1983. *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

**\*6** Plaintiff has not provided any evidence linking either Williams or Peters to his alleged constitutional deprivations. All that plaintiff has alleged is that Williams and Peters, as superintendents, have reviewed and signed paperwork

Case 3:24-cv-01358-GTS-ML    Document 13    Filed 01/07/25    Page 110 of 120

Brown v. Peters, Not Reported in F.Supp. (1997)

relating to plaintiff's compact. Though it has long been held that *pro se* complaints are held to "less stringent standards than formal pleadings drafted by lawyers" for the purpose of a motion to dismiss under Rule 12(b)(6), *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 595–96, 30 L.Ed.2d 652 (1972), plaintiff has not explained how the ministerial conduct of these two defendants was violative of the Constitution. Their motion to dismiss should be granted.

B. Motion for Summary Judgment or to Dismiss by Bishop, Magee, Barton and McMahan.

Bishop, Magee, Barton and McMahan have filed a motion for summary judgment, or in the alternative a motion to dismiss. The Court will treat their motion as a motion to dismiss. "[C]omplaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning." *Barr v. Adams,* 810 F.2d 358, 363 (2d Cir.1987). Plaintiff has not alleged specifically how the conduct of these four defendants infringed upon his constitutional rights. In his amended complaint, he contends that defendants violated the Constitution by "continuously breaching [[[their] duty" to him. This language underscores the defect with the complaint: if it alleges anything at all, it alleges that defendants were negligent in handling plaintiff's interstate compact and parole. To state a cognizable § 1983 claim, the prisoner must allege actions or omissions sufficient to demonstrate deliberate indifference; mere negligence will not suffice. *Hayes v. New York City Dept. of Corrections,* 84 F.3d 614, 620 (2d Cir.1996); *Morales v. New York State Dep't of Corrections,* 842 F.2d 27, 30 (2d Cir.1988) (section 1983 does not encompass a cause of action sounding in negligence).

The Court finds that the claims against Bishop, Magee, Barton and McMahan should be dismissed.

C. Motion to Dismiss by Herman, Stewart and Stanford.

Plaintiff's claim against Stewart is that she failed to follow up and see whether plaintiff had arrived in South Carolina. Herman, he likewise asserts, failed to do his job because he did not investigate plaintiff's violation reports. Plaintiff has not alleged how these actions run afoul of the Constitution; and again, these claims seem to be grounded in negligence, which is not actionable under § 1983. *Hayes,* 84 F.3d at 620.

Plaintiff's claim against Stanford must fail because his complaint literally fails to state a claim against that

defendant. Aside from naming Stanford as a defendant, and alleging that he was the appointed Senior Parole Officer at plaintiff's September 30, 1993 revocation hearing at Riker's Island, plaintiff does not detail how Stanford violated his constitutional rights. Absent some personal involvement by Stanford in the allegedly constitutionally infirm conduct of his subordinates, he cannot be held liable under § 1983. *Gill,* 824 F.2d at 196.

**\*7** Accordingly, the Court finds that Stanford, Stewart and Herman's motion to dismiss should be granted.

D. Plaintiff's "John Doe" Claims.

In so far as neither John Doe # 1 nor John Doe # 2 have been identified and served in this matter, the Court does not have jurisdiction over these parties and does not reach the merits of plaintiff's claims against them.

E. Discovery Motions.

Defendants Bishop, Magee and McMahan have filed a motion to stay discovery until the Court has made a ruling on their motion to dismiss. Plaintiff has filed a motion to extend the time in which he may file opposition to defendants' motion. Plaintiff, however, has filed his opposing response (dkt.47), therefore his instant discovery motion is denied as moot. In that the Court recommends granting defendants' motion to dismiss, discovery in this matter would be fruitless. Accordingly, defendants' motion for a stay of discovery pending the resolution of their motion to dismiss is granted.

**CONCLUSION**

WHEREFORE, based upon the foregoing analysis, it is hereby

ORDERED, that plaintiff's motion to extend the time to file an opposing reply (dkt.44) is denied as moot; and it is further

ORDERED, that defendants Bishop, Magee and McMahan's motion to stay discovery until their motion to dismiss is decided (dkt.41) is granted; and it is further

RECOMMENDED, that defendants Peters and Williams' motion to dismiss (dkt.13) be granted; and it is further

Brown v. Peters, Not Reported in F.Supp. (1997)

Case 3:24-cv-01358-GTS-ML    Document 13    Filed 01/07/25    Page 111 of 120

RECOMMENDED, that defendants Bishop, Magee, Barton and McMahan's motion to dismiss (dkt.20) be granted; and it is further

RECOMMENDED, that defendants Herman, Stewart and Stanford's motion to dismiss (dkt.34) be granted.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.* Roldan v. Racette, 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); FED.R.CIV.P. 6(a), 6(e) and 72.

**All Citations**

Not Reported in F.Supp., 1997 WL 599355

---

## Footnotes

1    I note, however, that the report-recommendation would survive even *de novo* review.

---

Case 3:24-cv-01358-GTS-ML    Document 13    Filed 01/07/25    Page 112 of 120

Pourzancvakil v. Humphry, Not Reported in F.Supp. (1995)

1995 WL 316935
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Mina POURZANDVAKIL, Plaintiff,

v.

Hubert HUMPHRY, Judisicial Systeam of The State of
Minnesota and Olmested County Court Systeam, and
State of Minnesota, Saint Peter State Hospital, Doctor
Gammel Stephelton, et el Erickson, North West Bank
and Trust, Olmested County Social Service, J.C. Penny
Insurnce, Metmore Finicial, Traveler Insurnce, Comecial
Union Insurnce, Hirman Insurnce, Amrican State
Insurnce, Farmers Insurnce, C. O Brown Insurnce, Msi
Insurnce, Steven Youngquist, Kent Chirstain, Micheal
Benson, United Airline, Kowate Airline, Fordmotor
Cridite, First Bank Rochester, George Restwich,
British Airways, Western Union, Prudenial Insurnce,
T.C.F. Bank, Judge Sandy Kieth, Judge Niergari,
Olmestead County Judgering, Judge Mores, Judge
Jacobson, Judge Challien, Judge Collin, Judge Thomase,
Judge Buttler, Judge Morke, Judge Moweer, Sera
Clayton, Susan Mudhaul, Ray Schmite, Defendants. [1]

Civ. A. No. 94-CV-1594.
|
May 23, 1995.

## Attorneys and Law Firms

Hubert H. Humphrey, III, Atty. Gen. of the State of Minn.,
St. Paul, MN, Jerome L. Getz, Asst. Atty. Gen., of counsel,
for Hubert H. Humphry, III, Judicial System of the State
of Minnesota, St. Peter Regional Treatment Center, Gerald
Gammell, MD, William Erickson, MD, Thomas Stapleton,
MD, the Honorable James L. Mork, Chief Judge Anne
Simonett, Judge Jack Davies, Judge Roger Klaphke, Judge
Dennis Challeen, and Judge Lawrence Collins.

Condon & Forsyth, P.C., New York City, Stephen J. Fearon,
Michael J. Holland, of counsel, for British Airways, P.L.C.
and Kuwait Airways Corp.

Dunlap & Seeger, P.C., Rochester, MN, Gregory J. Griffiths,
of counsel, for Olmsted County, Raymond Schmitz, Susan
Mundahl, Norwest Bank Minnesota, N.A. (the Northwest
Bank & Trust), C.O. Brown Agency, Inc.

Arthur, Chapman, McDonough, Kettering & Smetak, P.A.,
Minneapolis, MN, Eugene C. Shermoen, Jr., of counsel, for
J.C. Penney Ins. Co. and Metropolitan Ins. Co.

Shapiro & Kreisman, Rochester, NY, John A. DiCaro, of
counsel, for Metmor Financial, Inc.

Costello, Cooney & Fearon, Syracuse, Paul G. Ferrara, Robert
J. Smith, of counsel, for Travelers Ins. Companies; Hirman
Ins.; Commercial Union Ins. Companies.

Smith, Sovik, Kendrick & Sugnet, P.C., Syracuse, Thomas
N. Kaufmann, of counsel, for American States Ins. Co. and
Prudential Ins. Co.

Steven C. Youngquist, Rochester, MN, pro se.

Thomas J. Maroney, U. S. Atty., Syracuse, NY, William F.
Larkin, Asst. U. S. Atty., of counsel, for Michael Benson,
Postmaster N. D. of New York.

George F. Restovich & Associates, Rochester, MN, George F.
Restovich, of counsel, for George F. Restovich.

Conboy, McKay, Bachman & Kendall, L.L.P, Watertown, NY,
George K. Myrus, of counsel, for Western Union.

Richard Maki, Rochester, MN, pro se.

## MEMORANDUM-DECISION AND ORDER

POOLER, District Judge.

### INTRODUCTION

**\*1** In the four and one-half months since she filed this
action, plaintiff Mina Pourzandvakil has filed three amended
complaints and ten motions. She also has sought and received
entry of default against ten defendants, none of whom she
properly served. She twice has sought and been denied
temporary restraining orders. She has included in her action
defendants with no apparent connection to this forum, that
were vindicated in actions she brought in other forums.

In response, several individual defendants and groups of
defendants have filed a total of twelve motions, some seeking
vacation of the defaults entered against them, some seeking
dismissal and others seeking both. We grant defendants'
motions insofar as they seek vacation of the clerk's entries of
default and dismissal of the complaint. We vacate *sua sponte*

Case 3:24-cv-01358-GTS-ML    Document 13    Filed 01/07/25    Page 113 of 120

Pourzancvakil v. Humphry, Not Reported in F.Supp. (1995)

the entries of default against the non-moving defendants. Finally, we dismiss the complaint in its entirety against all defendants.


BACKGROUND

Pourzandvakil commenced this action by filing a complaint in the Office of the Clerk on December 9, 1994 (Docket No. 1). The complaint named as defendants the Attorney General of the State of Minnesota, the State of Minnesota and Olmsted County, Minnesota judicial systems, various Minnesota judges and prosecutors, St. Peter State Hospital in Minnesota and various doctors who worked at St. Peter's. Without specifying the time or defendant involved, the complaint accused the defendants of kidnapping Pourzandvakil and her daughter, torturing Pourzandvakil in the Mayo Clinic since April 1985, and causing Pourzandvakil and her daughter to suffer physically, financially and emotionally. Pourzandvakil twice requested that we issue a temporary restraining order. We denied both requests. *See* Order entered December 14, 1994 (Docket No. 4) and Memorandum-Decision and Order entered December 22, 1994 (Docket No. 6).

On December 27, 1994, Pourzandvakil filed an amended complaint (the "first amended complaint") (Docket No. 7) that appears to differ from the original complaint by adding British Airways as a defendant without making any allegations against British Airways. The first amended complaint also differs by requesting additional damages for prior cases and adding descriptions of several previous cases. Annexed to the first amended complaint is another document labeled amended complaint (the "annexed amended complaint") (Docket No. 7) whose factual allegations differ substantially from both the original complaint and the first amended complaint. The annexed amended complaint also adds British Airways as a party but specifies only that Pourzandvakil has travelled on that airline and that British Airways, along with other airlines on which Pourzandvakil has travelled, is aware of all the crimes committed against her.

Pourzandvakil filed yet another amended complaint on January 13, 1995 (the "second amended complaint") (Docket No. 11). The second amended complaint adds as defendants several banks, other financial institutions, insurance companies, insurance agents or brokers, attorneys and airlines as well as the Postmaster of Olmsted County and Western Union. The allegations against these defendants defy

easy summarization and will be addressed only insofar as they are relevant to the various motions.

**\*2** The Clerk of the Court has entered default against the following defendants: J.C. Penny Insurnce (*sic*)[2] ("J.C. Penney"), British Airways, Kowate (*sic*) Airline ("Kuwait"), MSi Insurnce (*sic*) ("MSI"), Judge Mork, Steven Youngquist ("Youngquist"), Prudncial Insurnce (*sic*) ("Prudential"), Ford Motor Credit ("Ford"), First Bank Rochester, and TCF Bank ("TCF"). Based on the submissions Pourzandvakil made in support of her requests for entry of default, it appears that she served these defendants by certified mail.

The court has received answers from the following defendants: Hubert H. Humphrey III, St. Peter Regional Treatment Center, and Drs. Gerald H. Gammell, William D. Erickson, and Thomas R. Stapleton (joint answer filed January 9, 1995); Olmsted County, Ray Schmitz ("Schmitz"), Susan Mundahl ("Mundahl"), C.O. Brown Agency, Inc. ("C.O. Brown") (answer to amended complaint filed January 23, 1995); George Restovich ("Restovich") (answer to complaint or amended complaint filed January 30, 1995); Norwest Corporation ("Norwest") (answer to amended complaint filed January 31, 1995, amended answer of Norwest Bank Minnesota, N.A. to amended complaint filed February 13, 1995); Travelers Insurance Company ("Travelers") (answer filed February 1, 1995); Michael Benson ("Benson") (answer filed February 6, 1995); Hirman Insurance ("Hirman") (answer filed February 6, 1995); Richard Maki ("Maki") (answer to complaint or amended complaint filed February 17, 1995); Western Union (answer filed February 21, 1995); Steven C. Youngquist ("Youngquist") (answer to complaint or amended complaint filed February 23, 1995); Kuwait (answer filed March 6, 1995); J.C. Penney (answer filed March 22, 1995); Susan E. Cooper[3] (answer to amended complaint filed March 24, 1995); and Chief Judge Anne Simonett, Judge Jack Davies, Judge Roger Klaphke, Judge Dennis Challeen and Judge Lawrence Collins (joint answer filed April 3, 1995).

The court has also received a total of ten motions from Pourzandvakil since February 27, 1995. She moved for a default judgment against defendants J.C. Penney, First Bank Rochester, Prudential, Ford, MSI, British Airways, and TCF. She moved for immediate trial and "venue in a different place" against several defendants and also requested action according to law and criminal charges. Finally, she made motions opposing defendants' motions.

The court also has received a total of thirteen motions [4] from defendants. Several of the defendants moved for dismissal either under Rule 56 or Rule 12 of the Federal Rules of Civil Procedure. For instance, Commercial Union Insurance Companies ("Commercial") moved for dismissal of Pourzandvakil's complaint pursuant to Fed. R. Civ. P. 12(b) or, in the alternative, for a more definite statement. Commercial argued that Pourzandvakil's complaint against it is barred by *res judicata* and collateral estoppel and that this court does not have subject matter jurisdiction over the complaints against Commercial. American States Insurance Company ("ASI") moved for dismissal based on plaintiff's failure to state a claim upon which relief can be granted. ASI further moved for an order enjoining Pourzandvakil from further litigation against it. Maki moved for summary judgment based on lack of personal jurisdiction, improper venue, plaintiff's failure to state a claim upon which relief can be granted, and lack of subject matter jurisdiction. Hubert H. Humphrey, III, the Judicial System of the State of Minnesota, Judge James L. Mork, St. Peter Regional Treatment Center and Drs. Gammell, Erickson and Stapleton (collectively, the "state defendants") moved for summary judgment alleging lack of personal jurisdiction, improper venue, plaintiff's failure to state a claim on which relief can be granted, lack of subject matter jurisdiction, sovereign immunity, and, on behalf of Judge Mork and the judicial system, absolute judicial immunity. The state defendants also requested costs and attorney's fees. Travelers moved for summary judgment based on *res judicata* and/or collateral estoppel, frivolity, lack of subject matter jurisdiction, and improper venue. Travelers sought a transfer of venue to Minnesota in the alternative. Hirman moved for summary judgment based on frivolity, lack of subject matter jurisdiction, and improper venue. Hirman also sought transfer of venue in the alternative. Olmsted County, Schmitz, Mundahl, C.O. Brown and Norwest sought dismissal based on lack of personal jurisdiction, improper venue, and plaintiff's failure to state a claim upon which relief can be granted. With respect to Schmitz and Mundahl, defendants sought dismissal based on absolute prosecutorial immunity, and with respect to C.O. Brown, defendants sought dismissal on *res judicata* grounds. Metmor Financial, Inc. ("Metmor") sought dismissal based on lack of personal jurisdiction, lack of subject matter jurisdiction, improper venue, and plaintiff's failure to state a claim upon which relief can be granted. Finally, Restovich moved for dismissal based on lack of personal jurisdiction. [5]

**\*3** Four defendants, British Airways, Kuwait, Prudential, and Youngquist, sought vacatur of the defaults entered against

them. Prudential coupled its request with a request for an order enjoining plaintiff from filing or intervening in any litigation against it. Youngquist also requested dismissal of the complaint based on lack of personal jurisdiction and lack of subject matter jurisdiction.

## ANALYSIS

The Defaults

We vacate the defaults entered in this matter because plaintiff improperly served defendants. Each application for entry of default shows service by certified mail, which is not permitted by relevant federal, New York or Minnesota rules. Under the Federal Rules of Civil Procedure, service on an individual may be made by (1) delivery to the named defendant; or (2) delivery to a person of suitable age and discretion at the defendant's dwelling house or usual place of abode; or (3) delivery to an agent authorized by law or by the defendant to receive service of process. Fed. R. Civ. P. 4(e)(2). Service on an individual also can be accomplished through a method authorized by the state in which the district court sits or in which the individual is located. Fed. R. Civ. P. 4(e)(1). Service on a corporation may be accomplished in a judicial district of the United States (1) pursuant to a method authorized by the law of the state in which the court sits or in which the corporation is located; or (2) by delivering a copy of the summons and complaint to an officer, managing or general agent, or to any other agent authorized by statute to receive service and, if the statute so requires, by also mailing a copy to the defendant. Fed. R. Civ. P. 4(h)(1) and 4(e)(1). Neither New York nor Minnesota law authorizes personal service on an individual or corporation by certified mail. *See* N.Y. Civ. Prac. L. & R. §§ 308, 311 (McKinney Supp. 1995); N.Y. Bus. Corp. Law § 306 (McKinney Supp. 1995); Minn. Stat. § 543.08 (1995); Minn. R. 4.03 (1995). Finally, service on states, municipal corporations or other governmental organizations subject to suit can be effected by (1) delivering a copy of the summons and complaint to the state's chief executive officer; or (2) pursuant to the law of the state in which the defendant is located. Fed. R. Civ. P. 4(j)(2). Minnesota law does not authorize service on a governmental entity by certified mail. *See* Minn. R. 4.03(d) and (e) (1995).

We therefore grant the motions by British Airways, Prudential, Kuwait, and Youngquist to vacate the defaults entered against them based both on the defective service and also on the meritorious defenses discussed below. We vacate *sua sponte* the entries of default against MSI, Ford, First Bank

Case 3:24-cv-01358-GTS-ML    Document 13    Filed 01/07/25    Page 115 of 120

Pourzancvakil v. Humphry, Not Reported in F.Supp. (1995)

Rochester and TCF, all of whom were served improperly and preserved the service issue by raising it or declining to waive it. Concomitantly, we deny Pourzandvakil's motion for a default judgment against J.C. Penney, First Bank Rochester, Prudential, Ford, MSI, British Airways and TCF. We vacate *sua sponte* the entry of default against J. C. Penney, which preserved the issue of service in its answer. By moving to dismiss or for summary judgment without raising the issue of service, Judge Mork may have waived the service issue. However Judge Mork objected to personal jurisdiction as inconsistent with due process and otherwise presented meritorious defenses. We therefore treat his motion for summary judgment as including a motion to vacate the entry of default and accordingly grant it.

II. The Jurisdictional Arguments

**\*4** In addition to raising various other grounds for dismissal, such as plaintiff's failure to state a claim on which relief can be granted and *res judicata,* most of the moving defendants urge (1) that this court lacks jurisdiction over either their persons or the subject matter of the controversy or (2) that this action is improperly venued. As we must, we examine jurisdiction and venue first.

A. Personal Jurisdiction

Maki, the state defendants, Olmsted County, Schmitz, Mundahl, C.O. Brown, Norwest, Metmor, Restovich and Youngquist each allege that this court cannot exercise personal jurisdiction over them consistent with due process constraints. In support of their motions, these defendants present affidavits showing that they have had no significant contacts with the state of New York relevant to this lawsuit and that their contacts with Pourzandvakil all occurred in Minnesota. Nothing in plaintiff's voluminous submissions links any of these defendants with New York. Plaintiff's extraterritorial service of process can be effective only under any of the following circumstances: (1) if defendants could be subjected to the jurisdiction of a court of general jurisdiction in New York State; (2) if the defendant is subject to federal interpleader jurisdiction; (3) if the defendant is joined pursuant to Rule 14 or Rule 19 of the Federal Rules of Civil Procedure and is served within a judicial district of the United States and not more than 100 miles from the place from which the summons issues; (4) if a federal statute provides for long-arm jurisdiction; or (5) if plaintiff's claims arise under federal law and the defendants could not be subject to jurisdiction in the courts of general jurisdiction in any state of the United States. Fed. R. Civ. P. 4(k). Defendants

are not subject to federal interpleader jurisdiction and they were not joined pursuant to Rule 14 or Rule 19. In addition, no federal long-arm statute is argued as a basis for jurisdiction, and the moving defendants all would be subject to jurisdiction in Minnesota. Therefore, we must look to New York's long-arm statute to determine whether plaintiff's extraterritorial service of process could be effective under the one ground remaining pursuant to Rule 4(k). *See* N.Y. Civ. Prac. L. & R. § 302 (McKinney Supp. 1995). This rule provides that in order to obtain jurisdiction over a non-domiciliary, the plaintiff must show both certain minimal contacts between the defendant and the state (such as transacting any business in the state) and that the harm plaintiff suffered springs from the act or presence constituting the requisite contact. *Id.* §302(a). The moving defendants have demonstrated that plaintiff does not claim harm stemming from acts or contacts within the purview of Section 302(a). Therefore, we grant these defendants' motions to dismiss the complaint for lack of personal jurisdiction.

B. Subject Matter Jurisdiction

Pourzandvakil's complaint does not contain the jurisdictional allegations required by Fed. R. Civ. P. 8(a)(1). Several defendants move for dismissal based either on this pleading defect or on an affirmative claim that no subject matter jurisdiction exists. Commercial, Travelers and Hirman (collectively, the "moving insurance companies") moved for dismissal because plaintiff has not pled the complete diversity of citizenship required for subject matter jurisdiction. The state defendants, relying on *District of Columbia Court of Appeals v. Feldman,* argue that we lack subject matter jurisdiction over any issue that was determined in a state court proceeding to which plaintiff was a party. *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 482 (1983). These issues include plaintiff's hospitalization at St. Peter Regional Treatment Center. Finally, Metmor also moved for dismissal based on lack of subject matter jurisdiction because plaintiff has failed to plead a jurisdictional basis.

**\*5** The moving insurance companies note correctly that insofar as the claims against them can be deciphered, plaintiff states that Traveler's and Commercial did not pay for damages to Pourzandvakil's property, harassed her and cancelled her policy. Pourzandvakil does not mention Hirman in her complaint, but Hirman's attorney states that Pourzandvakil informed him in a telephone conversation that her complaint against Hirman stemmed from actions it took as an agent of

Case 3:24-cv-01358-GTS-ML    Document 13    Filed 01/07/25    Page 116 of 120

Pourzancvakil v. Humphry, Not Reported in F.Supp. (1995)

Travelers in denying Pourzandvakil's 1985 property damage claim.

The moving insurance companies argue that this court has no jurisdiction over the state insurance law claims absent complete diversity of citizenship between plaintiff and the defendants. 28 U.S.C. § 1332. They point out that plaintiff lists a Syracuse, New York address for herself and that Kuwait's address as listed in the complaint is also in New York. Therefore, they argue, there is no complete diversity and this court lacks subject matter jurisdiction absent a basis for pendent jurisdiction under 28 U.S.C. § 1367(a). Section 1367(a) requires a relationship between the state and federal claims so that "they form part of the same case or controversy." *Id.* Because plaintiff's claims of denial of insurance coverage bear no apparent relationship to her other claims of rape, torture, harassment and kidnapping, we do not believe that an adequate basis for supplemental jurisdiction exists. *Id.* Plaintiff's complaint therefore shows no basis for subject matter jurisdiction against the moving insurance companies, and we dismiss as against them. [6]

We also agree with the state defendants that state court decisions may render certain of plaintiff's claims against them unreviewable either because of *res judicata* or lack of subject matter jurisdiction. However, because plaintiff's claims are so generally stated and so lacking in specifics, we are unable to discern at this juncture what parts of her complaint would be outside the jurisdiction of the court. In any case, we already have determined that the state defendants are clearly entitled to dismissal on personal jurisdiction grounds. As for Metmor, we believe that plaintiff may be attempting to state a civil rights claim by alleging a conspiracy to murder in connection with a judge although she fails to articulate an actionable claim. We note that we already have determined, in any case, that Metmor is entitled to dismissal on personal jurisdiction grounds.

### C. Venue

Metmor, Travelers, Maki, Hirman, Norwest, Olmsted County, C.O. Brown, Schmitz and Mundahl also allege that Pourzandvakil's action is not properly venued in this court. Although these defendants are entitled to dismissal on independent grounds, improper venue also would support dismissal as to these defendants. The general venue statute provides that a diversity action, except as otherwise provided by law, may be brought only in

(1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which the defendants are subject to personal jurisdiction at the time the action is commenced, if there is no district in which the action may otherwise be brought.

**\*6** 28 U.S.C. § 1391(a). Section 1391(b) provides that federal question actions, except as otherwise provided by law, may be brought only in

(1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought.

*Id.* § 1391(b). The majority of the defendants in this action are residents of Minnesota and all of the events of which Pourzandvakil complains occurred in Minnesota. No defendant resides in the Northern District of New York, and none of the conduct plaintiff complains of occurred in this district. Therefore, venue in the Northern District of New York is clearly improper. Where venue is laid in the wrong district, the court "shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." *Id.* § 1406(a). Because, as we will explain below, Pourzandvakil's complaint not only fails to state a claim upon which relief can be granted but is also frivolous, we do not deem it to be in the interest of justice to transfer this case to another district. The purpose of the court's

Case 3:24-cv-01358-GTS-ML    Document 13    Filed 01/07/25    Page 117 of 120

Pourzancvakil v. Humphry, Not Reported in F.Supp. (1995)

discretionary authority to transfer rather than dismiss in cases of improperly laid venue is "to eliminate impediments to the timely disposition of cases and controversies on their merits." *Minnette v. Time Warner,* 997 F.2d 1023, 1027 (2d Cir. 1993) (holding that it was an improper exercise of discretion to dismiss rather than transfer when the statute of limitations on a timely filed complaint ran between filing and dismissal). In this case, as discussed below, a review of the complaint and the plaintiff's submissions on these motions indicates that her claims are frivolous. We therefore dismiss as to the moving defendants both on venue grounds and on the other grounds already identified as applicable. We note also that plaintiff has made claims similar to those in this action against many of the same defendants in the United States District Court for the District of Minnesota. *Pourzandvakil v. Price,* Civ. No. 4-93-207 (D.Minn. 1993). This action was dismissed by Order to Show Cause entered April 12, 1993.

III. Failure to State a Claim on Which Relief Can be Granted and Frivolity

Defendants ASI, Travelers, Hirman, Norwest, C.O. Brown, Olmsted County, Schmitz, Mundahl, Prudential, Metmor, and Youngquist as well as the state defendants have attacked the sufficiency of plaintiff's complaint. Travelers and Hirman urge that the complaint is frivolous while the remaining defendants argue only that the complaint fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). [7] We already have dismissed against all the moving parties except ASI on jurisdictional grounds and therefore have the power to address the Rule 12(b)(6) issue only on ASI's motion. *See Bell v. Hood,* 327 U.S. 678, 682-83 (1946) (subject matter jurisdiction); *Arrowsmith v. United Press Int'l,* 320 F.2d 219, 221 (2d Cir. 1963) (personal jurisdiction). We grant ASI's motion and note in passing that were we empowered to reach the merits regarding the remaining moving defendants, we also would dismiss the complaint against them for failure to state a claim upon which relief can be granted. We also dismiss *sua sponte* as frivolous the complaint against all defendants who have not been granted dismissal previously on jurisdictional grounds.

**\*7** Pourzandvakil has not specified a statutory or constitutional basis for her claims against ASI or any of the other defendants. She alleges that certain of the insurance company defendants denied her claims for damages without alleging that the denial was in any respect wrongful. She also alleges in general terms that the defendants harassed, tortured, kidnapped and raped her and perhaps were involved

in a murder plot but does not supply (1) the dates on which these actions occurred, except to say that they began in 1984 and 1985; (2) the names of the specific defendants involved in any particular conduct; or (3) a description of any particular conduct constituting the harassment, torture or kidnapping. She suggests without further detail that ASI was involved in a plot to murder her by placing her in the Mayo Clinic. Although plaintiff does not allege specific constitutional provisions or statutes that defendants have violated, we assume -- largely because many of the defendants involved are state officials or state employees and she appears to complain of certain aspects of various trials -- that she wishes to complain of violations of her civil rights. Complaints that rely on civil rights statutes are insufficient unless "they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning." *Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir. 1987). A *pro se* plaintiff's complaint must be construed liberally and should be dismissed only "if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Estelle v. Gamble,* 429 U.S. 97, 106 (1976) (quotation omitted). Pourzandvakil has not satisfied even this minimal test; her complaint and submissions on this motion demonstrate that she cannot prove any set of facts in support of her claim which would entitle her to relief. Her complaint consists of a "litany of general conclusions" rather than "specific allegations of fact". *Barr,* 810 F. 2d at 363.

Ordinarily we would allow plaintiff an opportunity to replead to state specific allegations against ASI, but three factors militate against this course of action. First, our December 22, 1994, Memorandum - Decision and Order denying plaintiff's request for a temporary restraining order indicated that she had not shown a likelihood of success on the merits of her claim because she had not pled any specific actionable facts. Despite the fact that plaintiff since has filed three amended complaints, she still fails to set forth specific actionable conduct. Second, the defendants' motions themselves have alerted plaintiff to the need to show specific actionable facts, and yet her voluminous submissions in opposition to the motions contain no specific actionable facts. Finally, plaintiff has asserted similar allegations against many of the same defendants sued in this action -- although not ASI -- as well as others in several different jurisdictions. *See Pourzandvakil v. Blackman,* [8] Civ. No. 94-C944 (D.D.C. 1994), *Pourzandvakil v. Doty* (E.D.N.Y. 1993), *Pourzandvakil v. Price,* Civ. No. 7 (D.Minn. 1993). Where the results are known to us these actions resulted in dismissals for failure to state a claim upon

which relief can be granted. *Pourzandvakil v. Price,* Civ. No. 4-93-207, Order to Show Cause entered April 12, 1993; *Pourzandvakil v. Blackman,* Civ. No. 94-C-94, Order entered April 28, 1994, *aff'd* Civ. No. 94-5139 (D.C. Cir. 1994) (per curiam). In the Minnesota case, dismissal took place after the district court offered plaintiff an opportunity to amend her pleading and plaintiff still was not able to offer specifics. [9] Even *pro se* complaints must show "some minimum level of factual support for their claims." *Pourzandvakil v. Blackman,* Civ. No. 94-C-94, (quoting *White v. White,* 886 F. 2d 721, 724 (4th Cir. 1989)). We therefore dismiss plaintiff's complaint against ASI for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6).

**\*8** We note that in *Pourzandvakil v. Blackman,* Judge John H. Pratt dismissed plaintiff's *in forma pauperis* complaint *sua sponte* under 28 U.S.C. §1915(d), holding both that it failed to state a claim on which relief can be granted and that it was frivolous. We consider here whether we have the authority to dismiss *sua sponte* plaintiff's complaint, which was not filed *in forma pauperis,* as frivolous as against all non-moving defendants. The Supreme Court explicitly has acknowledged a district court's power under Section 1915(d) to dismiss as frivolous a complaint which "lacks an arguable basis either in law or in fact." *Neitzke v. Williams,* 490 U.S. 319, 325 (1989). The Supreme Court explicitly declined to rule, however, on whether a district court has the authority to dismiss *sua sponte* frivolous complaints filed by non-indigent plaintiffs. *Id.* at 329 n.8. The law in this circuit is that a district court may *sua sponte* dismiss a frivolous complaint even if the plaintiff has paid the filing fee. *See Tyler v. Carter,* 151 F.R.D. 537, 540 (S.D.N.Y. 1993), *aff'd* 41 F.3d 1500 (2d Cir. 1994); *cf. Pillay v. I.N.S.,* 45 F.3d 14, 17 (2d Cir. 1995) (*per curiam*) (dismissing *sua sponte* appeal for which appellant had paid normal filing fee). We believe that *sua sponte* dismissal is appropriate and necessary here because (1) plaintiff's claims lack an arguable basis in law and fact; (2) plaintiff has repeatedly attempted to replead her claims without being able to articulate actionable conduct; (3) some of plaintiff's claims have been tested in other courts and found to be without merit; and (4) the issue of frivolity has been presented by at least some of the moving defendants.

We therefore dismiss with prejudice plaintiff's complaint as frivolous as to all defendants -- regardless of whether they have moved for dismissal -- that have not been granted dismissal on jurisdictional grounds. We direct the clerk to return plaintiff's filing fee to her. *Tyler,* 151 F.R.D. at 540.

### IV. Requests for Sanctions, Costs, Attorney's Fees and Injunction Against Filing Further Actions

Because plaintiff is *pro se* and appears to have a belief in the legitimacy of her complaint, we do not believe that the purpose of Rule 11 would be served by awarding sanctions. *See Carlin v. Gold Hawk Joint Venture,* 778 F. Supp. 686, 694-695 (S.D.N.Y. 1991). Moreover, her litigiousness has not yet reached the point at which courts in this circuit have justified injunctive relief. *See id.* at 694 (and collected cases). We therefore deny the requests of ASI and Prudential for injunctive relief. Our refusal to grant sanctions and injunctive relief, however, is conditioned on this dismissal putting an end to plaintiff's attempts to sue these defendants on these claims in this forum. Any further attempts by plaintiff to revive these claims will result in our revisiting the issue of sanctions. *Id.* at 695.

### CONCLUSION

**\*9** All defaults entered by the clerk are vacated. Plaintiff's complaint is dismissed in its entirety against all moving and non-moving defendants. The dismissal of the complaint against Maki, the state defendants, Olmsted County, Schmitz, Mundahl, C.O. Brown, Norwest, Metmor, Restovich, Youngquist, Commercial, Travelers and Hirman is without prejudice as it is premised on this court's lack of power either over the person of the defendant or the subject matter of the controversy. *See Voisin's Oyster House, Inc. v. Guidry,* 799 F.2d 183, 188-9 (5th Cir. 1986) (dismissal for lack of subject matter jurisdiction is not a dismissal on the merits); *John Birch Soc'y. v. National Broadcasting Co.,* 377 F.2d 194, 199 n.3 (2d Cir. 1967) (dismissal for lack of subject matter jurisdiction implies no view of merits); *Orange Theatre Corp. v. Rayherstz Amusement Corp.,* 139 F.2d 871, 875 (3d Cir.) *cert. denied,* 322 U.S. 740(1944) (dismissal for lack of personal jurisdiction is not a dismissal on the merits). The dismissals against the remaining defendants are with prejudice. All requests for sanctions and attorney's fees are denied. The requests of defendants ASI and Prudential for an injunction with respect to future litigation is denied. However, plaintiff is cautioned that any litigation in this forum attempting to revive the claims addressed herein may subject her to sanctions. Plaintiff's motions are denied as moot.

IT IS SO ORDERED.

Case 3:24-cv-01358-GTS-ML Document 13 Filed 01/07/25 Page 119 of 120

Pourzancvakil v. Humphry, Not Reported in F.Supp. (1995)

**All Citations**

Not Reported in F.Supp., 1995 WL 316935

---

### Footnotes

1 Names in the caption are spelled to reflect plaintiff's complaint.

2 Plaintiff's spelling is idiosyncratic, and we preserve the spelling in its original form only where absolutely necessary for accuracy of the record. Otherwise we substitute the word we believe plaintiff intended for the word she actually wrote, e.g., "tortured" for "tureared."

3 Susan E. Cooper is not named as a defendant in the original complaint or any amended complaint filed with this court. From correspondence with Cooper's attorney, it appears that plaintiff sent Cooper a copy of a different version of the complaint. Because the original of this version was not filed with the court, no action against Cooper is pending in this court.

4 The court has also received three additional motions returnable May 22, 1995. The first -- from Judges Davies, Klaphake, Challeen, Collins and Chief Judge Simonett requests summary judgment dismissing the complaint based on lack of personal jurisdiction. The second by Western Union also requests summary judgment based, *inter alia,* on plaintiff's failure to state a claim on which relief can be granted. The third, by British Airways, also requests dismissal based, *inter alia,* on plaintiff's failure to state a claim on which relief can be granted. All three motions are mooted by this memorandum-decision and order which dismisses the complaint in its entirety against non-moving defendants for failure to state a claim on which relief can be granted.

5 The court also received an affidavit and memorandum of law in support of summary judgment from J.C. Penney. However, the documents were not accompanied by a notice of motion.

6 We ordinarily would offer plaintiff an opportunity to amend her complaint because her submissions and Kuwait's answer indicate two bases on which plaintiff might be able to argue diversity of citizenship. First, although plaintiff lists her address in Syracuse, New York, she also has indicated on the civil cover sheet that she is an Iranian Citizen and we are not aware of her residence status. As a permanent resident, she would be deemed a citizen of the state in which she resides. 28 U.S.C. § 1332(a). However, if she lacks permanent resident status, her citizenship would be considered diverse from that of all the defendants. *Id.* § 1332(a)(2). Second, Kuwait has submitted an answer in which it claims to be a foreign state within the meaning of 28 U.S.C. § 1603. If Kuwait is correct, plaintiff may have an independent basis for jurisdiction over Kuwait. *See* 28 U.S.C. § 1330. If Pourzandvakil could show subject matter jurisdiction over Kuwait without resort to diversity of citizenship, then Kuwait's residence in New York may not be relevant to the issue of whether this court has diversity jurisdiction under Section 1332. *Cf. Hiram Walker & Sons, Inc. v. Kirk Line,* 877 F.2d 1508, 1511-1512 (11th Cir. 1989), *cert. denied,* 115 S.Ct. 1362 (1995) (holding that the joinder of a non-diverse defendant sued under federal question jurisdiction did not destroy diversity as to the remaining defendant). Here, however, plaintiff's complaint is subject to so many other meritorious defenses -- including complete failure to state a cause of action -- that an amendment would be an exercise in futility. Additionally, plaintiff has not requested permission to amend, proffered an amended pleading, or indeed even supplied an affidavit stating her residency status or alleging a basis of jurisdiction over her claims against Kuwait other than diversity under 28 U.S.C. § 1332.

---

**Pourzancvakil v. Humphry, Not Reported in F.Supp. (1995)**

7    J.C. Penney also submits an affidavit requesting dismissal on this basis and others, but has not filed or served a notice of motion.

8    Former Supreme Court Justice Harry A. Blackmun.

9    We note also that plaintiff has not requested leave to amend in this action.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

---